IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*Electronically Filed*

| | |
|---|---|
| DANIELLA BLAINE, Adminstratrix of the estate of KENNETH H. CROSS, II, Deceased | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 3:13-cv-427-S |
| CORIZON, INC., ET AL. | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIMS**

**I.     INTRODUCTION**

This case arises from the medical care and treatment that Kenneth Cross received while incarcerated at the Louisville Metro Department of Corrections ("LMDC") on August 25, 2012. In sum, Mr. Cross died of acute intoxication several hours after intake.

Mr. Cross's sister, Daniella Blaine, brought this lawsuit on behalf of Mr. Cross's Estate against several defendants, including Louisville Metro Government and three of its officers as well as Corizon, Inc., the private contractor providing medical services at LMDC at the time of Mr. Cross's death, and three of its employees (collectively referred to as "the Corizon Defendants"). Plaintiff Blaine claims that the Corizon

Defendants committed medical malpractice and were intentionally unresponsive to Mr. Cross's medical needs.

In addition to negligence under Kentucky common law, Count I of Plaintiff's Complaint alleges that the Corizon Defendants' conduct was indicative of "deliberate ... indifference to Mr. Cross's life as well as his rights and the risk of harm to him occasioned by such conduct" in violation of the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983 claim"). See DN 01 Complaint, par. 18-20. This motion seeks partial summary judgment as to Plaintiff's § 1983 claim with respect to the Corizon Defendants.

This Court should grant summary judgment as to Plaintiff's § 1983 claim because no evidence establishes that any Corizon defendant violated Mr. Cross's constitutional right to prison medical care by acting with deliberate indifference to a serious medical need during his incarceration.

## II.  STATEMENT OF FACTS

Defendant Louisville Metro Police Department (LMPD) Office Chad Tinnell pulled over Harold Lemon's car on the afternoon of August 25, 2012. (Tinnell depo., pgs. 11-12). Mr. Cross was a passenger in Mr. Lemon's car. *Id*. In the course of the traffic stop, Officer Tinnell discovered that Mr. Cross was the subject of an outstanding warrant, and he arrested Mr. Cross at 4:00 p.m. (Tinnell depo., pg. 12; Cross LMPD Citation (attached as Exhibit 1)). During the traffic stop and subsequent arrest, Officer Tinnell did not recall Mr. Cross acting unusually or unremarkably. (Tinnell depo., pg. 13). Furthermore, Mr.

Lemon, a friend of Mr. Cross's, had never known Mr. Cross to do illegal drugs or take medication other than seizure medication. (Lemon depo., pgs. 36-37). Mr. Lemon never called the jail to report that Mr. Cross was acting unusual or had taken any drugs that day. *Id*. at 26. Another LMPD officer, Officer Lauder, transported Mr. Cross to LMCD. (Tinnell depo., pg. 13-14).

Once at LMCD and following booking, Mr. Cross was delivered to Defendant LPN Stephanie Kohl, a Corizon, Inc. employee, for medical assessment at approximately 5:00 p.m. (Kohl depo., pg. 24). During Nurse Kohl's medical assessment, Mr. Cross stated that he had drank beer that day and that he regularly takes Xanax for anxiety, Lortab for pain management, and Lisinopril for high blood pressure. (Cross Corizon Intervention/Progress Notes from 8/25/12 at 5:18 p.m. (attached as Exhibit 2); Kohl depo., pg. 33). Additionally, Mr. Cross stated that he had suffered a head injury in a motor vehicle accident several years before and that he was being treated for bipolar disorder, anxiety, and depression. (Exhibit 2). Nurse Kohl also noted that Mr. Cross's speech was slurred and rambling; that he appeared to have trouble staying awake during the assessment; and that he had a strong odor of alcohol. *Id*. Finally, at 5:07 p.m., Nurse Kohl took Mr. Cross's vital signs, which were normal. (Cross Substance Abuse Withdrawal Flowsheet (attached as Exhibit 3); Kohl depo., pgs. 83-84).

Nurse Kohl could not precisely identify when she began her assessment of Mr. Cross or how long it lasted, but she recalled spending more time than normal on his assessment because of his extensive medical history and her desire to gather all important

information for his chart. (Kohl depo., pgs. 41-42). Nurse Kohl completed her assessment at 5:18 p.m. *Id*. at 24.

It is also noteworthy that Nurse Kohl wrote a second Progress Note regarding Mr. Cross's assessment at 9:49 p.m.--after he had been transferred to the hospital. (Cross Corizon Intervention/Progress Notes from 8/25/12 at 9:49 p.m. (attached as exhibit 4)). Nurse Kohl explained that when she heard Mr. Cross had coded and been sent to the hospital, she wanted to make sure all the information relayed to her was memorialized in his chart. (Kohl depo., pgs. 38-39). The second note is slightly longer than the first and more detailed. (Exhibit 4). Importantly, it states, "multiple times during this interview I questioned the [inmate] if he had consumed any substances where [inmate] denied on multiple occasions only drinking one beer. [Inmate] stated he was fine, he had been up all day and had not slept and wanted to lie down." (Exhibit 4).

Following her medical assessment, Nurse Kohl decided to place Mr. Cross on detox protocol in a mental health observation dorm, directly across the hall from the nurses' station and separate from general jail population.. *Id*. at 31, 64-65. By virtue of this detox protocol, Mr. Cross was to be assigned a bottom bunk–in case of seizure–and his level of consciousness would be assessed every four hours. *(Id*. at 34; Sloan depo., pg. 33). Nurse Kohl made this decision based on his admission of taking Xanax and Lortab, his past head trauma, and his treatment for mental health issues. *Id*. at 33. With her evaluation completed, Nurse Kohl telephoned her supervisor, Defendant RN Thelma Sloan, to inform her of Mr. Cross's transfer and then handed him off to LMDC Officer Lamkin for

transportation to Observation Room #2. (Lamkin depo., pg. 13; Sloan depo., pg. 56).

Defendant LPN Ada Daugherty briefly interacted with Mr. Cross when he first arrived on the mental health floor. (Daugherty depo., pg. 7). She recalled that he was a "jovial" person and "actually hit on" her as he walked past. *Id*. at 8. When she asked if he was alright, he said that he was and that he was just ready to take a nap. *Id*. Also around this time, Nurse Sloan observed Mr. Cross eating the jail's handed out meal. (Sloan depo., pg. 48).

Not long after Mr. Cross had been placed in OBS #2, several other inmates sharing the observation dorm complained to Officer Lamkin that Mr. Cross was snoring loudly. *Id.* at 13-14. Officer Lamkin opened the dorm's door to check that Mr. Cross was not in distress, and finding no overt signs of distress, he let Mr Cross continue to sleep. *Id.* at 16. RN Sloan, too, recalled hearing Mr. Cross snoring loudly that evening, but she could not recall at precisely what time. (Sloan depo., pgs. 43-440).

At 8:50 p.m., an inmate work aid told Officer Lamkin that there might be something wrong with Mr. Cross. *Id.* at 21. Officer Lampin "immediately dropped what [he] was doing and went to observation cell 2." *Id.* He found Mr. Cross still in his bed but unresponsive and with blue lips; he attempted to wake Mr. Cross but was unsuccessful; he then called for help and told medical staff on the radio to bring live-saving equipment. *Id.* at 21-22.

Nurse Daugherty was the first Corizon, Inc. medical provider to reach Mr. Cross. (Daugherty depo., pg. 10). She found Mr. Cross unresponsive on the floor, and

5

LMCD officers beginning to perform CPR on him. *Id*. She could not detect a pulse nor hear respirations, and she, too, remembered Mr. Cross's lips were blue–indicating lack of oxygen. *Id*. LPN Daugherty initiated respirations but, noticing fluid in his airway, she instructed the officers to roll Mr. Cross to clear the fluid; once clear, she resumed respirations, and the officers continued CPR. *Id*. Nurse Sloan responded immediately after Nurse Daugherty and heard that an officer had contacted EMS right away. (Sloan depo., pg. 51). Nurse Sloan also retrieved Automatic External Defibrillator (AED) pads from the medical room. *Id*. 51-52. The AED was applied to Mr. Cross, but because no irregular heart rhythm was ever detected, no shock was advised. (Daugherty depo., pg. 15-16).

Nurse Daughtery and the officers continued CPR and respirations until EMS arrived. *Id*. at 10. EMS took over CPR and transferred Mr. Cross to University of Louisville Hospital. (Sloan depo., pg. 50). Unfortunately, Mr. Cross died of an overdose at 9:33 p.m. that evening. *Id*. at 50, 60.

### III.  ARGUMENT

An inmate who claims a violation of his constitutional rights based on an alleged failure of prison officials to prevent harm must show that the prison official was "deliberately indifferent" to that inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Williams v. Mehra*, 186 F.3d 685, 691-92 (6th Cir. 1999). "Deliberate indifference" in this context requires that a prison official know of and disregard a substantial risk of serious harm to inmate health. *Farmer*, 511 U.S. at 837. The deliberate indifference analysis is both objective and subjective: (1) an objective inquiry, *e.g.*, was the inmate subjected to

a substantial risk of serious harm; and (2) a subjective inquiry, *e.g.*, did the prison official actually know of and disregard the risk with a sufficiently culpable state of mind. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). A "substantial risk" is defined as an "excessive risk" which society deems "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Jarrett v. Wilson*, 162 Fed. Appx. 394, 402 (6th Cir. 2005); *Talal v. White*, 403 F.3d 423, 426 (6th Cir. 2005).

Under this two-pronged standard, it is not enough to show that there was an excessive danger of which a prison official objectively should have been aware: the official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and must actually draw the inference and then close their eyes to it. *Id.* Additionally, a prison official who actually knew of a substantial risk to inmate health or safety may not be held liable for deliberate indifference if they responded reasonably to the risk, even if the harm was not averted. *Farmer*, 511 U.S. at 844. Mere negligence is insufficient to establish a § 1983 claim; in fact, the Supreme Court has equated the standard with "criminal recklessness." *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997); *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003)(citing *Farmer*, 511 U.S. at 837).

The record in this case does not support a finding that the Corizon Defendants actually knew of a substantial risk to Mr. Cross's health and disregarded that risk with a recklessly criminal state of mind. As to the first requirement, the Corizon Defendants had no actual knowledge that Mr. Cross had somehow ingested a lethal amount of drugs. According to Officer Tinnell, Mr. Cross was not acing unusual during

the initial traffic stop. Mr. Cross's friend, Mr. Lemon, even testified that he had never known Mr. Cross to take illegal drugs or abuse prescription medication. Once in custody, Mr. Cross was thoroughly medically assessed–even taking longer than most inmates--and asked multiple times if he had ingested any substances, which he denied multiple times. Although Mr. Cross slurred his words and had trouble staying awake during the interview, this is more than explained by his admission of drinking beer and not sleeping prior to being arrested. Furthermore, Mr. Cross's documented vital signs are the most objective measure of his health, and they were normal.

Additionally, even after Mr. Cross's formal medical assessment, there were no indications of substantial risks to his health. Mr. Cross appeared jovial and even flirted with a passing nurse. Later, he ate, went to sleep, and snored loudly for a time. All the evidence, including the testimony, the medical records, and Mr. Cross's own admissions, tell the same story: no Corizon Defendant had any actual knowledge that Mr. Cross's health was at substantial risk.

As to the second prong, there is certainly no evidence that the Corizon Defendants disregarded or turned a blind-eye to any substantial risk to Mr. Cross's health. For one, he was actually medically assessed, not simply tossed in a "drunk tank." Second, his medical interview was extensive, charting was upheld, and vitals were taken. Third, Nurse Kohl made an informed medical judgment and admitted Mr. Cross for detox observation based on legitimate concerns for his medication use, past head trauma, and mental health treatment. Fourth, Mr. Cross was in fact assigned to a mental health

observation dorm, where he was assigned a bottom bunk and to be formally assessed every four hours. Fifth, Mr. Cross was informally checked on at least once when Officer Lamkin attended to his loud snoring. Sixth, when Mr. Cross was found to be unresponsive, medical staff and LMDC officers alike immediately rushed to his aid, performed reasonable treatment, and contacted EMS. To reasonably characterize all of the above as deliberate indifference is simply impossible.

This case is very similar to the Sixth Circuit's decision in *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001). There, police officers arrested Watkins in his home. *Id*. at 684. As they were putting him in handcuffs, they noticed foam dripping from Watkins's mouth as well as white crumbs of what they later identified as crack cocain on the floor and rear Watkins's mouth. *Id*. The officers asked Watkins if he had ingested any drugs, and he denied swallowing anything. *Id*. He explained that he had hit his mouth while being handcuffed, but declined medical treatment. *Id*. After being transported to the jail, Watkins appeared "drunk or high" and complained of an upset stomach. *Id*. The officers, again, asked if he had ingested any drugs, and he again denied swallowing anything, explaining this time that his stomach was upset from drinking alcohol and smoking marijuana. *Id*. at 684-85. The officers placed Watkins in an observation cell and informally noted his behavior about every 30 minutes. *Id*. at 685. Unfortunately, about two hours after arriving at the jail, Watkins was found unresponsive behind the cell's privacy wall, and EMS pronounced his death shortly thereafter. *Id*.

The District Court granted summary judgment to the defendant officers and

jail personnel on Watkins's Estate's claim for deliberate indifference under § 1983. *Id.* The Sixth Circuit affirmed, declining to be persuaded by plaintiff faulting the defendants for "not forcing medical treatment on Watkins in the face of his repeated denials and plausible explanations." *Id.* at 686; *see also Border v. Trumbull City Board of Commissioners*, 414 F. App'x 831, 837–38 (6th Cir. 2011) (citing numerous other cases dealing with deliberate indifference in the context of a jailhouse overdose).

    Here, the Corizon Defendants acted just as carefully, if not more so, than the *Watkins* defendants.  Unlike the *Watkins* defendants, who had several indications that Watkins had ingested drugs–evidenced by the foam in his mouth, white crumbs, intoxicated behavior, and stomach pain–the Corizon Defendants' only possible clue that Mr. Cross had ingested drugs was his appearance of drunkenness.  That in itself is not sufficient to put the Corizon Defendants on notice of a substantial risk to Mr. Cross's health, especially in light of his plausible explanations of drinking beer and not sleeping. Additionally, the Corizon Defendants thoroughly medically assessed Mr. Cross instead of merely putting him in a cell where they could informally observe him.  Nonetheless, just as in *Watkins*, the Corizon Defendants asked Mr. Cross multiple times if he had ingested any substances, and he denied same.  As held in *Watkins*, defendants should not be found deliberately indifferent when they do not force medical treatment on an inmate in the face of repeated denials.

    This Court or a jury may address whether these Defendants were negligent with respect to Mr. Cross's medical treatment; however, that is not at issue in this motion.

For the Plaintiff to prevail on her § 1983 claim, the record must teem with a recklessly criminal disregard for a risk so grave that it violates contemporary standards of decency. Because this high standard cannot be met and the evidence does not support such finding as a matter of law under a necessary prong of a § 1983, namely that prison officials actually know of and disregard the risk with a sufficiently culpable state of mind, summary judgment is appropriate.

## IV. CONCLUSION

For the forgoing reasons, Defendants, Corizon, Inc., Nurse Kohl, Nurse Daugherty, and Nurse Sloan, respectfully request that this Court grant their motion for partial summary judgment, dismissing the claims against them for constitutional right deprivations under 42 U.S.C. § 1983.

Respectfully Submitted,

 /s/ Sean Ragland
Sean Ragland
Matthew Piekarski
PHILLIPS PARKER ORBERSON & ARNETT, PLLC
716 W. Main Street, Suite 300
Louisville, Kentucky 40202
(502) 583-9900
sragland@ppoalaw.com
mpiekarski@ppoalaw.com
*Counsel for Defendants Corizon, Inc., Stephanie Kohl, Ada Daugherty, and T.J. Sloan*

CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system on the 23rd day of January, 2017:

Gregory A. Belzley
Belzley Bathurst, Attorneys
P.O. Box 278
Prospect, Kentucky 40059

Paul Brizendine
Water Tower Square
300 Missouri Ave., Suite 200
Jeffersonville, IN 47130

Denis Ogburn
Assistant Jefferson County Attorney
531 Court Place
Suite 900 Fiscal Court Bldg.
Louisville, KY  40202

                                                     */s/ Sean Ragland*
                                                      Sean Ragland