UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

[Filed Electronically]

| | |
|---|---|
| DANIELLA BLAINE, Administratrix of the Estate of KENNETH H. CROSS, II, Deceased, )<br>)<br>)<br>)<br>PLAINTIFF )<br>)<br>v. )<br>)<br>CORIZON, INC, et al., )<br>)<br>DEFENDANTS. ) | Case 3:13-cv-00427-DJH-DW |

**PLAINTIFF'S RESPONSE
TO DEFENDANT BOLTON'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Daniella Blaine, Administratrix of the Estate of Kenneth H. Cross, II, deceased, for her response in opposition to Defendant Mark Bolton's motion for summary judgment, would respectfully show as follows:

**Facts**

**I.   Introduction.**

After illness and suicide, drug/alcohol intoxication is the leading cause of death in American jails.[1] All the way back in 2004, the Sixth Circuit recognized that "more should be done in order … to ensure that individuals who show symptoms of a drug overdose while in custody obtain the medical care that they so urgently need …." *Graham ex rel. Estate v. County of Washtenaw*, 358 F.3d 377, 386 n. 6 (6th Cir. 2004). There is no question that Defendant Mark Bolton, who has been the director of the Louisville Metro Jail ("the Jail") since 2008, knew his

---

[1] See http://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf.

guards needed to be trained on the signs and symptoms of drug overdose, and at least the common sense means to prevent drug overdose deaths. But as set forth below, in August 2012, eight years after the Sixth Circuit's opinion in *Graham*, and four years after Bolton took the reins at the Jail, his guards still hadn't received the training they needed to prevent the tragedy that occurred in this case.

## II.     Bolton's Responsibilities.

Defendant Mark Bolton has been the Director of the Louisville Metro Jail since 2008. Bolton 6.[2] In the affidavit submitted in support of his motion for summary judgment, he specifically admits that he has a duty to establish *and implement* the Jail's policies and procedures. DN 101-2, Affidavit of Mark E. Bolton, ¶2.

## III.    Mr. Cross Was Exhibiting the Signs and Symptoms of a Drug Overdose When He Entered the Jail.

Bolton concedes for purposes of his motion that by the time Plaintiff's brother and decedent Kenneth Cross arrived at the Jail on August 25, 2012, the "obvious signs of [his] drug overdose" at the time of his arrest "had only increased." DN 101-1, Memorandum in Support of Motion for Summary Judgment, p. 1. Indeed, when Mr. Cross arrived at the Jail around 5 pm that day, his "gait didn't appear steady," he smelled strongly of alcohol, and his speech was slurred. Kohl 24, 26, 28. He also was having a hard time staying awake, even though it was still daytime. While he was being assessed by a nurse during the booking process, he was "nodding off" – he would close his eyes, and his head would bob downward or back. Kohl 29-30. Not only was Mr. Cross nodding off while being questioned by the booking nurse, he was nodding off while he was *eating*. Kohl 100-01. Given Mr. Cross' condition, the booking nurse flagged him for detoxification and assigned him a bottom bunk in an observation cell to minimize his

---

[2] Deposition testimony in this case is referenced by the name of the deponent, followed by the number of the page on which the testimony appears.

injuries in the event he fell out of bed. Kohl 34, 48, 51-54.

Little more than three hours later, Mr. Cross was dead from an overdose of drugs he'd taken prior to his admission to the Jail. DN 101-1, Memorandum in Support of Motion for Summary Judgment, p. 1. The condition of a person who has taken a potentially-fatal overdose of drugs gets progressively worse over time and reaches a point where their heart is still beating and they are still breathing, but they cannot be aroused. Kohl 114. Indeed, "[t]he typical progression of a drug overdose death is normalcy, lethargy, sleep, *unconsciousness*, and then death." DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶D (emphasis added). Therefore, Mr. Cross only became more intoxicated as the night wore on, and if he fell asleep, he needed to be awakened periodically to make sure he had not lapsed into unconsciousness. That was just plain common sense.

**IV.  Drug Overdose and Unconsciousness Were Both Considered Medical Emergencies in the Jail.**

The dangers of drug overdose and unconsciousness were no secret in the Jail. Back in August 2012, when Mr. Cross was in the Jail, both drug overdose and unconsciousness were considered *medical emergencies*. Bolton 11; Kohl 121; Lamkin 12, 20-21; Sloan 68. In fact, the Jail's policies prohibited the admission of someone in an unconscious condition. Bolton 29, Lamkin 20. Bolton therefore obviously expected the Jail's guards to assess an arrestee who appeared to be sleeping for unconsciousness <u>*before*</u> admitting them to the Jail. However, he did not train and supervise them to assess an intoxicated inmate who appeared to be sleeping for unconsciousness *after* their admission to the Jail. This inexplicable lapse in training, supervision, and common sense at the Jail proved fatal to Mr. Cross.

3

## V.     Jail Officers Had No Training to Prevent Drug Overdose Deaths.

Because Mr. Cross had been flagged by the booking nurse for detoxification from drugs and alcohol, he was supposed to be checked every four hours by the medical staff.  Sloan 33.  In the interim, however, he was in the hands of the Jail's guards, who were supposed to check him every 20 minutes.  Bolton 15-16.  Drug overdoses in jails are a sufficiently recurring event that nurses have to be aware of and look for the potential for and the signs and symptoms of it.  Pennington 57-58.  So should the guards, particularly when they're the ones responsible for monitoring an intoxicated inmate's condition in between four-hour checks by the medical staff.

Back in 2012, *Bolton knew* that the Jail's nurses would not tell the guards when they needed to monitor an inmate for unconsciousness.  Bolton 29.  Therefore, *Bolton knew* it was up to the guards to identify the signs and symptoms that signaled an inmate that warranted monitoring for unconsciousness.  But Kevin Lamkin, the guard who was primarily responsible for Mr. Cross' care and custody, had received "little to no" training on the signs and symptoms of drug overdoses prior to Mr. Cross' admission to the Jail, and could recall none at his deposition.  Lamkin 14-15. In fact, the only medical training he had received was basic first aid and CPR.  Lamkin 18-19.

Not only were the Jail's guards in general, and Lamkin in particular, completely ignorant of the signs and symptoms of a drug overdose, they weren't even expected to take the common-sense step of periodically trying to awaken an intoxicated inmate who had gone to sleep to make sure they were *not* unconscious.

Obviously, someone who is unconscious, or nonresponsive, or cannot be aroused, can appear to be asleep.  Pennington 42.  And there's no way to tell whether an intoxicated, sleeping

4

inmate is unconscious unless you try to wake them up. Bolton 30, Kohl 96, Lamkin 18.[3] But back in August 2012, a guard like Lamkin who was checking a sleeping inmate as intoxicated as Mr. Cross, was only expected by Bolton to make sure *they were still breathing* – i.e., that their chest was still moving up and down. Bolton 17, 21, 36-37; Sloan 41-42. So long as an intoxicated, sleeping inmate's chest was still moving up and down, Bolton did not expect a guard to attempt to awaken them to make sure they had not lapsed into unconsciousness. Bolton 21, Lamkin 20.

**VI.   A Last Opportunity to Save Mr. Cross is Lost, and He Dies.**

After Mr. Cross was booked, assessed by the booking nurse, and sent up to the Jail's second floor, Lamkin put him in observation cell number 2 pursuant to the directive of the "move list." Lamkin 11. Lamkin knew that this alone meant that Mr. Cross warranted careful observation and monitoring, saying: "When they're first booked in, they're screened by medical, and he was -- I guess *medical determined that he was to be kept an eye on*, so they moved him to an observation cell 2. ...." Lamkin 11. Moreover, because Mr. Cross' condition could only have deteriorated over time, when Lamkin saw him he had to have appeared at least as intoxicated as he had at booking, if not considerably worse. DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶E.

The next time Lamkin saw Mr. Cross was when food trays were being distributed. But Mr. Cross was already asleep and did not awaken for dinner; moreover, his cellmates were complaining because he was snoring so loudly. Lamkin 13-15. Even the nurse at the station

---

[3] Which is therefore how the Jail identified unconscious arrestees who would not be admitted to the Jail.

outside Mr. Cross' cell remembers hearing Mr. Cross snoring because he was snoring so loudly. Sloan 53-54.[4]

Despite Mr. Cross' cellmates' complaints, and Mr. Cross' own bizarre behavior, Lamkin opened the door to the cell but did not walk inside. Lamkin 16. Lamkin did not know whether Mr. Cross was sleeping or unconscious, and he knew unconsciousness could signal a life-threatening condition. But even though he knew there was no way to tell a sleeping inmate from an unconscious one without trying to wake them up, he made no attempt to awaken Mr. Cross. Lamkin 12, 17-19. *Instead, Lamkin dutifully followed the Bolton-approved Jail practice, and because Mr. Cross was still breathing, Lamkin left him where he was, undisturbed*. Bolton 32. This was not a lapse on Lamkin's part; prior to August 25, 2012, Lamkin had never seen any of his fellow officers attempt to awaken an intoxicated inmate to determine whether they were sleeping or unconscious. Lamkin 18. Nor was this the fault of Lamkin's shift supervisor, to whom Bolton is obviously attempting to shift blame in his affidavit – Lamkin's shift supervisor would not have been expected to do anything differently by Bolton, nor would Bolton have expected Lamkin's "Training Captain" to tell him to do anything differently than he did.

In other words, Lamkin -- consistent with Jail practice that ignored not only Mr. Cross' obvious intoxication but the unconsciousness that constituted a medical emergency -- allowed Mr. Cross to "sleep it off," with fatal consequences. See DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶D ("[Mr. Cross] should not have been put in a cell and allowed to 'sleep it off.' If he went to sleep, he should have been checked frequently not just to see if he was still breathing, but to determine whether he was conscious or unconscious."); see also, e.g., Exhibit 1, 2007 Laurel County Detention Center "Don't Let Them Sleep It Off"

---

[4] Unusually loud snoring can signal respiratory distress as a consequence of sleep apnea, a seizure, or obesity. Kohl 97, Sloan 55-56.

Policy. Nowadays, Lamkin *would* be expected by Bolton to attempt to awaken an intoxicated inmate who was sleeping and snoring loudly, but not back then. Bolton 33-34. Bolton's Jail finally caught up to the times (and common sense), but too late to save Mr. Cross.

A little before 9 pm, an inmate work aid told Lamkin there was something wrong with Mr. Cross. Lamkin returned to the cell and noticed that Mr. Cross' "chest was not rising" and that his lips were blue. Lamkin 21-22. Mr. Cross could not be revived. As Bolton has conceded, Mr. Cross' death was caused by an overdose of drugs taken prior to his incarceration. DN 101-1, Memorandum in Support of Motion for Summary Judgment, p. 1.

## Argument

### I. Plaintiff's Burden on Motion for Summary Judgment.

As with all motions for summary judgment made pursuant to Fed.R.Civ.P. 56, the Court "must draw all reasonable inferences in favor of the non-moving party." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). In other words, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 150-151. So, in order to satisfy their burden on summary judgment, Defendants must disclose and effectively concede all facts and inferences supporting Plaintiff's case, and then show the Court why none raise an issue of material fact that a jury could resolve in Plaintiff's favor. *Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 990 (6th Cir. 1989).

Bolton contends that Plaintiff's state-law negligence and gross negligence claims against him should be dismissed because he was not personally involved in Mr. Cross' mistreatment, and because he is entitled to qualified official immunity. He is wrong on both counts.

7

**II.     Bolton Owed a Duty to Mr. Cross.**

The elements of negligence are duty, breach of duty, and resulting injury. *Workman v. Columbia Natural Resources,* 864 F. Supp. 638, 641 (E.D. Ky. 1994) (citing *Watters v. TSR, Inc.,* 904 F.2d 378, 380 (6th Cir. 1990)). It is beyond dispute that Bolton owed Mr. Cross a legal duty given his special relationship to him. *Fryman v. Harrison,* Ky., 896 S.W.2d 908, 910 (1995). *Apropos* to this case, a special relationship exists when "the victim [is] in state custody ... at the time in question, and the violence or other offensive conduct [is] perpetrated by the state actor." *Fryman,* 896 S.W.2d at 910 (quoting *Ashby v. Louisville,* Ky. App., 841 S.W.2d 184 (1992)). It is undisputed that Mr. Cross was in state custody at all times in issue in this case, and that Bolton was a state actor. Thus, he plainly owed Mr. Cross an affirmative legal duty.

The law also imposes a specific duty on jailers like Bolton "to exercise reasonable and ordinary care and diligence to prevent unlawful [and foreseeable] injury to a prisoner placed in his custody …." *Lamb v. Clark,* Ky., 138 S.W.2d 350, 352 (1940); *Ratliff v. Stanley,* Ky., 7 S.W.2d 230, 232 (1928). Simply, "[j]ailers and deputy jailers can be sued for their tortious acts or omissions occurring within the scope of their employment." *Commonwealth v. Harris,* Ky., 59 S.W.3d at 896, 899 (2001) (citing *Sudderth v. White,* Ky. App., 621 S.W.2d 33 (1981)).

**III.    Bolton Breached His Duty to Mr. Cross.**

It was entirely foreseeable that an inmate as intoxicated as Mr. Cross might have taken an overdose of drugs, and that reasonable, common-sense precautions were required to prevent his death.  As is clear from the facts set forth above, although the Jail understandably considered drug overdose and unconsciousness to be a medical emergency, Bolton rendered that policy a nullity by failing to train and supervise his guards to periodically awaken intoxicated, sleeping inmates to make sure they were not unconscious.

This Court's resolution of Bolton's motion is controlled by the Sixth Circuit's decision in *Hedgepath v. Pelphrey*, 520 Fed. Appx. 385 (6th Cir. 2013). That case, like this one, involved a drug overdose death in a jail that considered unconsciousness to be a medical emergency, but where the guards did not awaken sleeping, intoxicated inmates to make sure they had not lapsed into unconsciousness. The Sixth Circuit held that where, as here, a jail considered "unconsciousness" to be a medical emergency, jailers had a ministerial duty to periodically awaken intoxicated detainees to make sure they were not unconscious. *Id*. at 390. Moreover, the Court ruled, based on "well-settled" Kentucky law, that although a supervisor's decision "on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function." Id. at 391 (citing *Yanero v. Davis*, 65 S.W.3d 510, 529 (Ky. 2001)). Similarly, the Court held, "the supervision of employees is a ministerial act when it merely involved enforcing known policies." Id. (citing *Yanero*, 65 S.W.3d at 522). The court went on to affirm the denial of qualified official immunity to the supervisory jailers – including the jail's administrator who, like Bolton in this case, had no direct contact with the deceased -- on the claim that they failed to train and supervise deputy jailers to awaken intoxicated inmates to make sure they had not lapsed into the medical emergency of unconsciousness. See also *Finn v. Warren County*, 768 F.3d 441, 449-50 (6th Cir. 2014) (county jailer liable for failure to train and supervise implementation of jail policy deeming alcohol withdrawal a medical emergency, citing *Hedgepath, supra*).

**WHEREFORE**, Plaintiff respectfully requests that Bolton's motion for summary judgment be denied.

Respectfully submitted,

/s/ Gregory A. Belzley

9

>Gregory A. Belzley
>BelzleyBathurst, Attorneys
>P.O. Box 278
>Prospect, KY  40059
>(502) 292-2452
>gbelzley@aol.com
>
>Paul Brizendine
>Water Tower Square
>300 Missouri Avenue, Suite 200
>Jeffersonville, IN 47130
>(812) 941-4100
>paul@brizendinelaw.com
>
>***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2017, the foregoing was delivered via CM/ECF to:

Denis Ogburn
Assistant Jefferson County Attorney
531 Court Place, Suite 900
Fiscal Court Bldg.
Louisville, KY 40202

Sean Ragland
Matt Piekarski
Phillips Parker Orberson & Arnett, PLLC
716 West Main Street, Suite 300
Louisville, KY  40202

***Counsel for Defendants***

>/s/ Gregory A. Belzley
>***Counsel for Plaintiff***