UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**[Filed Electronically]**

| | | |
|---|---|---|
| DANIELLA BLAINE, Administratrix | ) | |
| of the Estate of KENNETH H. CROSS, II, | ) | |
| Deceased, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | Case 3:13-cv-00427-DJH-DW |
| v. | ) | |
| | ) | |
| CORIZON, INC., et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

PLAINTIFF'S RESPONSE
TO THE CORIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Daniella Blaine, Administratrix of the Estate of Kenneth H. Cross, II, deceased, for her response in opposition to the motion for summary judgment of Defendants Corizon, Inc. and its nurses, Stephanie Kohl and Thelma Sloan (hereafter collectively "the Corizon Defendants"),[1] would respectfully show as follows:

**Facts**

I.     **Introduction.**

After illness and suicide, drug/alcohol intoxication is the leading cause of death in American jails.[2] All the way back in 2004, the Sixth Circuit recognized that "more should be done in order … to ensure that individuals who show symptoms of a drug overdose while in custody obtain the medical care that they so urgently need …." *Graham ex rel. Estate v. County of Washtenaw*, 358 F.3d 377, 386 n. 6 (6th Cir. 2004). The judges of the Sixth Circuit may have

---

[1] Although the Corizon Defendants include Ada Daugherty in the ambit of their motion, Plaintiff's claims against Ms. Daugherty were previously dismissed by agreement of the parties.  DN 69.
[2] See http://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf.

1

appreciated the urgent need in 2004; but in 2012, a correctional medical provider like Defendant Corizon? Not so much.

Alicia Pennington, Corizon's designee to testify on its policies, procedures and training, admitted that drug overdoses in jails are a sufficiently recurring event that nurses have to be aware of and look for the potential for and the signs and symptoms of it. Pennington 8, 57-58.[3] Therefore, Corizon's nurses, like Defendants Kohl and Sloan, who assessed and were responsible for the medical care of intoxicated inmates like Plaintiff's decedent, Kenneth Cross, should have been thoroughly trained on the signs and symptoms of drug overdose, and at least the common sense means to prevent drug overdose deaths. But they weren't.

## II.   Mr. Cross Was Exhibiting the Signs and Symptoms of a Drug Overdose When He Entered the Jail.

It is undisputed that at all times during the events made the subject of Plaintiff's Complaint, Corizon was the contracted medical provider at the Louisville Metro Jail ("the Jail"), and that Kohl and Sloan were its employees.

When Mr. Cross arrived at the Jail around 5 pm on Saturday, August 25, 2012, he was obviously intoxicated. As part of the process by which he was admitted to the Jail, Mr. Cross was "assessed" by Defendant Stephanie Kohl, who was a licensed practical nurse ("LPN"). Kohl said that Mr. Cross' "gait didn't appear steady" as he approached her desk in the Jail's first floor booking area, and that he smelled strongly of alcohol and his speech was slurred. Kohl 20, 24, 26, 28, 45. She also said that Mr. Cross "would get easily distracted in the conversation. I would have to redirect him back to the topic that I would want him to be addressing." Kohl 31. Kohl had to ask Mr. Cross questions "multiple times." Kohl 40.

---

[3] Deposition testimony is referenced by the name of the deponent, followed by the number of the page of the deposition on which the testimony appears.

In addition, Mr. Cross was having a hard time staying awake, even though it was still daytime. While he was being assessed by Kohl, he kept "nodding off" – he would close his eyes, and his head would bob downward or back.  Kohl 29-30. Not only was Mr. Cross nodding off while being questioned by Kohl, he was nodding off while he was *eating*.  Kohl 100-01.  Mr. Cross also appeared to fall asleep entirely several times during his assessment.  Kohl 29; Exhibit 1 (5:18 pm SOAP note).  Someone "nodding off" or exhibiting confusion could be a sign of a drug overdose.  Bolton 9; DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶B.

Mr. Cross told Kohl he'd drunk half a beer that day, and that he took Xanax and Lortab for pain.  Kohl 27. And given Mr. Cross' obvious intoxication, Kohl suspected that he'd not only drunk more than half a beer, but may also have taken some drugs.  Kohl 28-29, 86-87. In the end, she indicated in her assessment that Mr. Cross appeared to be under the influence of *unknown* substances, and that Mr. Cross' "last opiate use" and the amount was similarly "unknown."  Kohl 85, 98.

Kohl took Mr. Cross's vital signs, which indicated only that his blood pressure was elevated.  Kohl 58.  But Kohl knew that vital signs might not signal an overdose if the drug was recently ingested.  Kohl 16-17. Whether from inexperience or inattention, Kohl went on to make several obvious errors during her assessment of Mr. Cross.  For instance, she failed to administer to Mr. Cross an assessment instrument for drug withdrawal.  Kohl 104-06.  She also failed to note her concerns about Mr. Cross' alcohol and drug consumption on a withdrawal flow sheet; she said she "must have just missed it."  Kohl 55-57.

 Kohl's task in assessing Mr. Cross was not made any easier by her employer, Corizon. Although drug overdoses in jails are a recurring event, there is nothing in Corizon's policies,

procedures or protocols that identify the signs and symptoms of a drug overdose.  Pennington 28, 57-58.  There was no instrument for Kohl to use to assess Mr. Cross for drug overdose, and nothing for Kohl to check in any of her assessment instruments that even mentioned "overdose."  Kohl 106-07, 111.

Kohl had completed her assessment of Mr. Cross by 5:18 pm.  Kohl 24.  Her entire SOAP note of her assessment reads as follows:

> IM [inmate] presents at medical stumbling to station.  States he drank half a beer today only, but takes xanex and Loritab for pain.  IM had slurred speech strong odor of ETOH, and IM appeared to fall asleep several times during his interview.  IM slurred words, stumbled over his sentences, would ramble.  IM stated he suffered from a head injury for a MVA [motor vehicle accident] several years ago.  IM stated his highest level of education is the 7th grade.  IM was placed on detox, bottom bunk entered into computer, MH referral complete, class note given to A Marvels.  IM states he takes HTN [hypertension] medication Lisinopril 20 mg QD and is being treated for Bipolar, anxiety and depression.  d/t [due to] IM level of functioning he was referred to OBS #2 for further observation.

Exhibit 1.  As will become important later, *nowhere in this note is there any indication that Mr. Cross was asked if he'd taken drugs, much less denied doing so, or that he offered any explanation for his "nodding off" beyond his obvious intoxication.*

## III.  Corizon Had a System by Which Life-and-Death Decisions Were Made By an Unsupervised and Untrained LPN.

All an LPN like Kohl can do is assess a patient, report the results to a physician or an advanced practice registered nurse ("APRN"), and then provide the treatment they direct.  Kohl 19. Only a doctor or APRN could determine what was causing Mr. Cross' signs and symptoms – Kohl could not.  Kohl 80.  Simply put, an LPN like Kohl cannot diagnose.  Pennington 31. Corizon policies required that "[i]nmates with alcohol or other drug problems [be] assessed and properly managed by a physician or where permitted by law other qualified health professionals."  Pennington 30.  Kohl knew that a doctor or APRN "always has to be notified on

any detox." Kohl 59. Kohl even expected to receive new orders from the provider after informing them of the results of her assessment of Mr. Cross. Kohl 59.

However, there was no physician or APRN at the Jail when Mr. Cross was there. Daugherty 9-10, Kohl 21, Sloan 25. Kohl could have called a physician while she was assessing Mr. Cross had she wanted to. Kohl 82-83. **But instead,** *it was Corizon's policy not to require an assessing LPN like Kohl to contact a physician or APRN about an intoxicated inmate like Mr. Cross until the end of her shift, <u>and Kohl's shift wasn't over until 11 pm that night</u>.* Kohl 22, Pennington 33-35, Sloan 83. As a consequence, no doctor or APRN ever diagnosed Mr. Cross' condition, or made a treatment decision, or even looked over Kohl's paperwork. Kohl 21-22. Mr. Cross' life, by virtue of Corizon's policy, was therefore put entirely in the hands of an LPN who was violating the legal limitations on her scope of practice by diagnosing the severity of his condition and making treatment decisions on which his life would depend for the next five (5) hours. DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶C. Kohl even checked a box indicating that she had obtained a provider's orders when she admittedly had not. Exhibit 2 (Withdrawal Initial Screening & Treatment Plan).

Given Mr. Cross' condition, Kohl decided to place Mr. Cross on a detoxification protocol and assigned him a bottom bunk in an observation cell to minimize his injuries in the event he fell out of bed. Kohl 31, 34, 48, 51-54. She also directed that the medical staff "continue to reorient patient," meaning that they were to periodically remind Mr. Cross where he was and what was going on. Sloan 92. But the detoxification protocol did not require that Mr. Cross be reassessed for another eight (8) hours. Kohl 59-60. This violated not only the standard of care but common nursing sense. As Plaintiff's nursing expert explained:

> One of two things was going to happen to Mr. Cross – his condition was either going to get better or it was going to get worse. .... Given Mr. Cross' signs and

symptom on assessment by LPN Kohl, the standard of care, not to mention common nursing sense and prudence, required that he be *continuously* monitored for such time as it could be determined that his condition was improving or deteriorating. .... Vigilance, until such time as the patient is determined to be improving, not deteriorating, is essential. LPN Kohl's "prescription" that Mr. Cross not be assessed again until eight hours after she had assessed him was grossly inadequate and a prescription for disaster.

DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, pp. 5-6, ¶¶C-D (emphasis added).

## IV.    Kohl Fails to Tell Sloan What She Needs to Know, and Sloan Fails to Act On Her Own.

Kohl's supervisor was Defendant Thelma Sloan, the only registered nurse ("RN") on duty at the Jail at the time, who was working on the Jail's second floor. Kohl 19-20; Sloan 6, 22, 26. The second floor is the medical floor of the Jail; that's where the nurses' station is, "like the central hub area," and it's where inmates are placed that need ongoing attention to a medical condition. Sloan 12.

Sloan's responsibilities included making sure that patients are cared for – "it's all about the patient." Sloan 26. As the charge nurse, Sloan was specifically responsible for all the inmates in the cell in which Mr. Cross was placed. Sloan 25-26. You can actually "see straight in" observation cell 2, where Mr. Cross was housed. Sloan 27. Its entire front is glass, and you can look in on its occupants "all the time." Sloan 29. Other than a column that affords some privacy for the toilet, there is nothing in observation cell 2 to interfere with you seeing what's going on in the cell. Sloan 40.

*Because LPNs like Kohl also didn't bring up the paperwork on an inmate until the end of their shift*, Sloan had to rely on what she was told by Kohl about Mr. Cross in order to properly

care for him.  Kohl 53, Pennington 64-65, Sloan 83.[4]  Sloan's pretty sure Kohl told her she was sending Mr. Cross to the second floor because of his prior brain injury and his detox.  Sloan 56-57, 84.  Sloan also believes Kohl told her that Mr. Cross "might be under the influence of something" or was "on something."  Sloan 58, 85.  But Kohl didn't tell Sloan that Mr. Cross' speech was slurred, or that he stumbled when he walked, or was nodding off or appeared to be falling asleep while she was attempting to interview him.  Sloan 57.

"The typical progression of a drug overdose death is normalcy, lethargy, sleep, *unconsciousness*, and then death."  DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶D (emphasis added). But Corizon's designee to testify on its policies and training does not recall being trained that a person who has taken an overdose of drugs will reach a point where they cannot be aroused, even though their heart is still beating and they are still breathing.  Pennington 26.

Unconsciousness is an unqualified medical emergency.  Pennington 21-23, Sloan 68.  If a patient is "nonresponsive," Corizon's protocol directs that EMS be contacted immediately. Pennington 36. But Corizon's policies don't say, and its training does not address, how to monitor someone for unconsciousness or how to respond.  Pennington 44. In fact, there's no mention of "unconsciousness" at all in Corizon's policies.  Pennington 20-21.  Corizon's designee on its policies and training frankly admitted that its nurses "don't monitor patients for non-responsiveness."  Pennington 36.

Kohl did not recommend to Sloan that Mr. Cross' vital signs be taken, or that he be awakened, any more frequently than once every eight (8) hours as required by Corizon's policy. Kohl 84, Pennington 50. Mr. Cross wasn't even due to be *checked* by a nurse until four (4) hours

---

[4] However, once paperwork got to the second floor, Corizon had no policy that dictated how quickly it should be reviewed.  Pennington 65.  Thus, there was nothing in place to insure that even Kohl's immediate supervisor (albeit just an RN) could review her paperwork on a timely basis.

later, after 9 pm.  Sloan 33-34.  In the interim, Mr. Cross' life was in the hands of the Jail's guards, who were supposed to check him every 20 minutes.  Bolton 15-16. But Corizon's nurses knew that someone in Mr. Cross' condition would only be checked by the guards to make sure he was still breathing.  Pennington 41, Sloan 41-42. There's no way of telling whether someone who appears to be sleeping and breathing can be aroused unless you try to wake them up.  Kohl 96, 121.

Sloan doesn't recall anyone assessing Mr. Cross' level of consciousness before he was found unresponsive.   Sloan 46, 68. In fact, Kohl wasn't expecting Mr. Cross' level of consciousness to be checked for another eight (8) hours after she saw him, which would have been sometime after 1 am the next day.   Kohl 100. Even though the alcohol withdrawal assessment Kohl prepared for Mr. Cross required that a provider be called within two (2) hours if the patient admitted to having consumed a great deal of alcohol, or was exhibiting fine tremors, no provision was made to monitor Mr. Cross for those signs or symptoms, either.  Kohl 109-11.

But Sloan wasn't entirely dependent on what she was told by Kohl.  Because Mr. Cross' condition could only have deteriorated over time, when Sloan saw him on the second floor he had to have appeared at least as intoxicated as he had to Kohl, if not considerably worse.  DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶E.  As Plaintiff's nursing expert went on to explain:

> Because Mr. Cross' condition could not have been any better when he arrived on the second floor of the Jail, and was in all likelihood at least somewhat worse, ... RN Sloan violated the applicable standard of care by not asking LPN Kohl for additional information concerning her assessment of Mr. Cross or requesting the documentation of such assessment, by not initiating continuous monitoring of Mr. Cross, and/or by not initiating contact with a doctor or APRN qualified to diagnose Mr. Cross and prescribe appropriate treatment.

DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶H.

The Jail guard responsible for Mr. Cross knew that his cell assignment meant that the medical staff on the second floor needed to keep "a sharp eye on" him.  Lamkin 11-12.  The fact that Kohl directed that Mr. Cross be put on observation cell 2 indicated she believed he warranted a higher level of medical care than was required by his detox.  Pennington 54.

But there's no evidence that Mr. Cross received any special attention from Sloan, even when he fell asleep around dinnertime and started snoring so loudly that he could be heard at the nurses' station outside the cell.  Lamkin 13-15, Sloan 53-54. Loud snoring can signal respiratory distress as a consequence of sleep apnea, a seizure, or obesity.  Kohl 97, Sloan 55-56. But no one attempted to awaken Mr. Cross or assess his responsiveness.  Lamkin 16-17, Sloan 74.  Sloan herself was clueless:

> Q  I'm talking about people that come to a jail, like Mr. Cross. After being arrested for drugs, drug offense. He's intoxicated. Ms. Kohl believed he was under the influence of drugs. She says, "He stumbles when he walks to the station. His speech is slurred." He's nodding off while she's trying to talk to him. He's confused. Has anybody ever told you, if you can recall, that under those circumstances, you ought to be watching that person to make sure they don't succumb to an overdose of drugs?
> MR. PIEKARSKI: Object to form. You can answer.
> A No.
>
> *     *     *
>
> Q Has anybody ever said if you've got an individual with those signs and symptoms, and they appear to go to sleep and start snoring really loudly, they may be at risk of an overdose of drugs?
> A No.
> Q Or that you need to assess their level of consciousness?
> A No.

Sloan 67-68.

Sloan simply allowed Mr. Cross to "sleep it off," with fatal consequences.  See DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶D ("[Mr. Cross] should not have been put in a cell and allowed to 'sleep it off.'  If he went to sleep, he should have been checked frequently not just to see if he was still breathing, but to determine whether he was

conscious or unconscious."); see also, e.g., Exhibit 3 (2007 Laurel County Detention Center "Don't Let Them Sleep It Off" Policy).  Corizon's designee to testify on its policies and training frankly admitted that if an inmate had been assessed by a nurse and deemed to be "stable," they could go upstairs and "sleep it off."  Pennington 49.

## VI.    Mr. Cross Dies.

Mr. Cross' cellmates summoned help when he "stopped snoring."  Daugherty 17. When Sloan got to his cell, Mr. Cross was "bluish, zero respirations, zero pulse."  Sloan 50. Mr. Cross could not be revived. His death was caused by an overdose of drugs taken prior to his incarceration. Exhibit 4 (Autopsy).

## VII.   Kohl's 9:49 pm Note.

When Kohl called Sloan to ask permission to take a break, Sloan informed her that the staff at that time was performing CPR on Mr. Cross.   Kohl 91. Corizon's Director of Nursing Alicia Fox called Kohl soon thereafter to ask if Kohl was okay.  Kohl 92-93.  Kohl testified, "I vaguely remember her saying, 'Are you okay' *and I said I hadn't had a break*. And she said, 'Well go smoke a cigarette.' I think that was our conversation."  Kohl 93 (emphasis added).

Kohl took her break, smoked her cigarette, and then returned to her desk to "dress up" the notes of her assessment of Mr. Cross.  She prepared an entirely separate note, this one timed at 9:49 pm, about an hour after Mr. Cross had become unresponsive.  Exhibit 5 (9:49 pm SOAP note).  Kohl admitted that she prepared the new note "[j]ust because [Mr. Cross] was sent out to the hospital, [and] I wanted to make sure that as a nurse I had everything I needed." Kohl 37.  Or at least something that was not as damning as the note she'd prepared contemporaneous with her assessment of Mr. Cross almost five (5) hours earlier.  Among other things:

• Kohl omitted from her 9:49 note that Mr. Cross had stumbled to her station.  Kohl 37.

- Kohl omitted from her 9:49 note any mention of Mr. Cross having a strong odor of alcohol.  Kohl 38.

- Kohl omitted from her 9:49 note any mention of Mr. Cross falling asleep several times during his interview.  Kohl 38.

- Kohl added to her 9:49 note: "Multiple times during this interview I questioned the inmate if he had consumed any substance where inmate denied on multiple occasions only drinking one beer. Inmate stated he was fine, he had been up all day and had not slept, and wanted to lie down." Kohl 38-39.

There's no legitimate explanation for Kohl's preparation of two notes.  Pennington 53, Sloan 109-10.  To be blunt, it was a rather clumsy, transparent, manufactured attempt at "CYA."  As Plaintiff's nursing expert put it:

> LPN Kohl's preparation of two separate progress notes concerning her assessment of Mr. Cross is inconsistent with the standard of practice.  First, it is unlikely that LPN Kohl's recollection of her assessment of Mr. Cross was any better at 9:49 pm, when she made her second progress note, that it was at 5:18 pm, when she made her first progress note ....  Second, the fact that LPN Kohl made her second progress note after she'd been made aware that Mr. Cross had been found unresponsive raises questions about its reliability.  Third, the differences between the two notes raise additional questions. ....  At a minimum, it raises the question of whether she is "doctoring" the record to make it appear that she tried to get Mr. Cross to tell her what he had taken, that Mr. Cross offered an innocent (i.e., non-drug related) explanation for his "nodding off," and that it was his fault for refusing to admit to having taken an overdose of drugs.  Instead, it indicates that LPN Kohl doubted Mr. Cross' word, and at least questioned whether he was being an honest or accurate historian.  This made the involvement of a doctor or an APRN, who was qualified to read between the lines and make a differential diagnosis taking into account the risk of drug overdose, all the more critical.

DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶E.

**VIII.   Corizon Conducted No Investigation, and Nothing Changed.**

There was no investigation by Corizon into what happened to Mr. Cross.  Pennington 52.

However, its designee to testify on its policies and training reviewed the incident involving Mr. Cross, and concluded that Corizon's nurses "did everything according to policy and procedure." Pennington 65.  That was precisely the problem.  As Plaintiff's nursing expert explained:

> Because Corizon, Inc., which employed LPN Kohl and RN Sloan, obviously authorized, approved, or knowingly acquiesced in customs and practices by which LPN Kohl diagnosed and prescribed treatment for Mr. Cross in violation of her permissible scope of practice, and by which medical personnel responsible for monitoring a patient were not provided his chart until then end of the assessing nurse's shift (too late to do Mr. Cross any good), it too violated the standard of care in connection with Mr. Cross.

DN 66-4, Opinion of Cindy H. Kovacs-Whaley, MSN, APRN, BC, FNP, p. 6, ¶I.

The Jail subsequently terminated its contract with Corizon, at least in part because of problems arising out of inconsistencies in Corizon's implementation of its detox protocol. Bolton 28.

### Argument

### I.    Plaintiff's Burden on Motion for Summary Judgment.

As with all motions for summary judgment made pursuant to Fed.R.Civ.P. 56, the Court "must draw all reasonable inferences in favor of the non-moving party." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). In other words, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 150-151. So, in order to satisfy their burden on summary judgment, the Corizon Defendants must disclose and effectively concede all facts and inferences supporting Plaintiff's case, and then show the Court why none raise an issue of material fact that a jury could resolve in Plaintiff's favor. *Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 990 (6th Cir. 1989).

The Corizon Defendants seek summary judgment *only* on Plaintiff's federal claim that they were deliberately indifferent to Mr. Cross' obviously serious medical needs in violation of his Eighth and Fourteenth Amendment rights and 42 U.S.C. §1983.  They have therefore implicitly conceded that there exist at least genuine issues of material fact as to Plaintiff's claims

of negligence and gross negligence, as well as causation, that would make a summary determination on those issues inappropriate.  But there are two immediate problems with the Corizon Defendants' approach.

First, an act of gross negligence subsumes one of deliberate indifference.  In *City of Middlesboro v. Brown*, 63 S.W.3d 179 (Ky. 2001), Kentucky's Supreme Court said:

> [G]ross negligence is "something more than the failure to exercise slight care. We have stated that *there must be an element either of malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed the act was malicious or willful.*" [*Cooper v. Barth,* Ky., 464 S.W.2d 233, 234 (1971).] *Horton v. Union Light, Heat and Power Co.*[, Ky., 690 S.W.2d 382 (1985)] also illuminates the gross negligence definition and sets the standard that should be applied. "In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'" [*Id.* at 389-90.].

(Citations and emphasis added). By contrast, proof that a defendant acted for the very purpose of causing harm or with knowledge that harm will result is not required to prove deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  A finding of gross negligence automatically permits a jury to consider an award of punitive damages.  But proof of deliberate indifference does not warrant a punitive damage instruction; instead, the plaintiff must also prove that the defendants exhibited a reckless or callous disregard for his rights.  *Smith v. Wade*, 461 U.S. 30, 51 (1983).  As a consequence, because Plaintiff's claim of gross negligence goes unchallenged, her claim of deliberate indifference should survive as well.

Second, when the issue is deliberate indifference, the question on summary judgment is whether the defendants "*could* have perceived a substantial risk of serious harm to [the plaintiff]. Whether *in fact* they perceived, inferred or disregarded that risk *is an issue for trial*." *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006) (emphasis added). The Court must be particularly cautious in granting a motion for summary judgment on deliberate indifference

13

because resolution of the dispositive issue requires a determination of the Corizon Defendants' *state of mind*. Much depends on the credibility of the witnesses testifying as to their own states of mind in this case, and in such circumstances, the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the individual Defendants whose states of mind are at issue. *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir. 1970).

These two factors alone are more than enough to warrant denial of the Corizon Defendants' motion for summary judgment.

## II.      The Issue of Deliberate Indifference.

The Eighth Amendment (which is applied to a pretrial detainee like Mr. Cross by the Fourteenth Amendment[5]) embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency …." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The Eighth Amendment's prohibition of "cruel and unusual punishment" bars prison officials' "deliberate indifference to the serious medical needs of prisoners" because such acts or omissions amount to an "unnecessary and wanton infliction of pain." *Id*. at 104. The rationale behind this principle is obvious:  "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, *medical care*, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment . . . ." *DeShaney v. Winnebago County Dept. of Social Services.*, 489 U.S. 189, 200 (1989)(emphasis supplied).

Deliberate indifference exists when the defendants are aware of facts from which it can be inferred that a substantial risk of serious harm exists, and the defendants draw the inference. *Terrance v. Northville Regional Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)(citing

---

[5] *Watkins v. City of Battle Creek,* 273 F.3d 682, 685-86 (6th Cir. 2001).

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Proof that a defendant acted for the very purpose of causing harm or with knowledge that harm will result is not required. *Farmer*, 511 U.S. at 842. More importantly in the context of this case, "[w]hether a prison official had the requisite knowledge of a substantial risk *is a question of fact* subject to demonstration in the usual ways, *including inference from circumstantial evidence* . . . ." *Id*. (emphasis supplied).

There is no question that Mr. Cross was exhibiting the signs and symptoms of a drug overdose when he was admitted to the Jail, or that the Corizon Defendants knew the potential consequences of an overdose, particularly if left unmonitored. Critically, a defendant may not avoid liability by "merely refus[ing] to verify underlying facts that he strongly suspected to be true, or declin[ing] to confirm inferences of risk that that he strongly suspected to exist . . . ." *Id*. at 843, fn. 8. Therefore, **that the Corizon Defendants "had no <u>actual</u> knowledge that Mr. Cross had somehow ingested a <u>lethal</u> amount of drugs" does not entitle them to summary judgment, and that obvious misconception of the deliberate indifference standard is fatal to their motion.** DN 98, Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment as to Plaintiff's Deliberate Indifference Claims, p. 7. Plaintiff need only show that Defendants were aware of Mr. Cross' general need for medical treatment. *Id*. at 843 (holding that defendant's knowledge of general threat to inmate safety is sufficient even though he cannot know the "specific" source of the problem).

Likewise, the Corizon Defendants cannot claim that summary judgment is warranted because Kohl made "an informed medical judgment" that turned out to be wrong. DN 98, Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment as to Plaintiff's Deliberate Indifference Claims, p. 8. No "informed judgment" was ever made in Mr. Cross' case – his diagnosis and treatment were dictated by an LPN who had no training or

qualifications to make such decisions, and who was violating the legal limitations on her scope of practice when she did so.  See, e.g., *Tillery v. Owens*, 719 F.Supp. 1256, 1308 (W.D.Pa. 1989) ("We will defer to the informed judgment of prison officials as to an appropriate form of medical treatment. But if an informed judgment has not been made, the court may find that an eighth amendment claim has been stated."), *aff'd*, 907 F.2d 418 (3rd Cir. 1990).

The Corizon Defendants' reliance upon *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001), and *Border v. Trumbull City Board of Commissioners*, 414 F. App'x 831, 837–38 (6th Cir. 2011) is misplaced.  *Watkins* involved police and jail officers, not medical professionals. There is no indication in *Watkins* that the officers violated any policies that could have saved the arrestee's life as the Corizon Defendants did in this case.  There is no evidence that Mr. Cross ever refused proffered medical treatment as did the arrestee in *Watkins*.

Finally, the only evidence that Mr. Cross ever was asked about and denied drug use, and offered a non-drug related explanation for "nodding off" during his interview, is in Kohl's manufactured, self-serving, *post facto* and completely discredited 9:49 SOAP note.  Kohl admitted that she didn't believe him, and both her notes reflect a multitude of reasons why anything Mr. Cross said could not be relied upon as a basis for any diagnosis or treatment decision, had anyone who was actually qualified to makes such decisions ever been consulted.

It is not clear why the Corizon Defendants cite *Border* – the Sixth Circuit in that case denied qualified immunity to a jail guard in a factual setting that bears some similarity to the case at bar.  In fact, in *Border*, the Court found that the arrestee's obvious intoxication and disorientation, his physical incapacity, and his suspected drug use "sufficiently establish[ed] from an objective standpoint that a serious medical need existed and, in addition, that [the

16

defendant] was aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and [he] ignored that risk."  (Internal quotations and citation omitted).

## III.   The Corizon Defendants Were Deliberately Indifferent to Mr. Cross' Obviously Serious Medical Need.

### A.   Defendant Kohl.

In *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), a prison psychologist returned an inmate on suicide watch to administrative segregation based on the inmate's own representation that he wasn't suicidal. The psychologist's interview of the inmate, according to the Sixth Circuit, lasted "less than a half hour," consisted merely of an interview of the inmate with no corresponding review of available records or consultations with other officers or medical professionals, including two other psychologists who had met with the inmate previously, and violated a number of applicable suicide prevention policies.  *Id*. at 699, 706.

The Sixth Circuit expressly considered this interview to be "cursory," "facial[ly] inadequate," and "grossly substandard." Citing *Farmer,* and with obvious reference to the psychologist's cursory examination of the inmate preceding his suicide, the Sixth Circuit said that the psychologist could not "escape a finding of his subjective knowledge of risk just because he 'declined to confirm inferences of risk … that he strongly suspected to exist." *Id.* at 704-09. Importantly, even though the Sixth Circuit in *Comstock* was "left with the impression" that the psychologist "did not act with actual malice or an intent to harm" the inmate, his failure to conduct any investigation into the inmate's circumstances, his violation of applicable policies and his failure to meet the standard of care nonetheless constituted deliberate indifference. *Id.* at 709-11. In *Finn v. Warren County, et al.*, Civil Action No. 1:10-CV-016 (W.D.Ky.), the Court denied summary judgment for a nurse who was aware of an inmate's alcohol withdrawal, but did nothing more than allow him to be placed in an isolation cell where he would be checked every

17

15-20 minutes by deputy jailers.  *07/27/12 Memorandum Opinion and Order* at 22-23.  A defendant's violation of policy is also evidence that the subjective prong of the deliberate indifference analysis has been satisfied.  *Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009).

There is no question but that there exists at least a genuine issue of material fact whether Kohl was deliberately indifferent to Mr. Cross.  Mr. Cross was obviously intoxicated, and Kohl believed he was not only drunk but possibly drugged.  But she spent barely fifteen (15) minutes asssessing him, and a lot of that time Mr. Cross was nodding off and Kohl was having to repeat her questions.  She had no training or qualifications to assess his level of intoxication, or to determine what was causing it, or to decide what to do about it.  There is a legitimate question whether she ever asked Mr. Cross if he'd taken drugs prior to his admission to the Jail and, if so, how much.  Corizon policies required that she call a provider about Mr. Cross, and she even checked a box indicating she'd done so, but she didn't.  She made no attempt to contact anyone who could diagnose Mr. Cross' condition and prescribe appropriate treatment. She failed to perform assessments that were required under the circumstances, and then failed to communicate material information to the nurse who would be responsible for Mr. Cross the rest of the evening.

Then after she found out Mr. Cross was dead, she took a break, smoked a cigarette, and returned to her desk to make an utterly inept attempt to doctor the record to make it look like she'd done more than she did.  A reasonable jury that heard these facts, and was able to watch Kohl's demeanor on the witness stand, could conclude she'd been deliberately indifferent to Mr. Cross' medical needs.

**B.      Defendant Sloan.**

Likewise, Defendant Sloan.  When Sloan first saw Mr. Cross, he was in at least as bad a condition, if not worse, as when Kohl had seen him.  But instead of making any inquiry – assessing Mr. Cross herself, questioning Kohl further, or just asking to see her paperwork -- she simply relied on what she was told by the unqualified LPN who had assessed him, and let him "sleep it off" even though he was exhibiting signs of respiratory distress before he died.

**C.      Defendant Corizon.**

An employer can be liable under 42 U.S.C. §1983 when its policies or practices cause a constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 386 (1989) (citing *Monell v. New York City Dep't of Soc. Serves.*, 436 U.S. 658 (1978)).  "[I]n light of the duties assigned to specific officers or employees, the need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton, supra* at 390 (emphasis added).

Drug overdoses were a sufficiently recurring event in jails that Corizon knew its nurses needed to be properly trained and supervised to recognize the signs and symptoms and to do what needed to be done when they saw them.  But Corizon's nurses received no training on the signs and symptoms of drug overdose, and no mention of drug overdose was made in Corizon's policies or protocols to which a nurse could refer if she had questions.

True, Corizon's *policies* required that Kohl contact a provider about Mr. Cross' detox. But that requirement was rendered a nullity by Corizon's *practice* of permitting unqualified LPNs like Kohl to make diagnostic and treatment decisions outside their scope of practice without any meaningful review until the end of their eight (8) hour shift.  The consequences of

such a practice – a drug overdose death – was entirely foreseeable, but apparently made no difference to Corizon.  The question of its deliberate indifference to Mr. Cross should go to the jury, as well.

**WHEREFORE**, Plaintiff respectfully requests that the Corizon Defendants' motion for summary judgment be denied.

Respectfully submitted,

/s/ Gregory A. Belzley
Gregory A. Belzley
BelzleyBathurst, Attorneys
P.O. Box 278
Prospect, KY  40059
(502) 292-2452
gbelzley@aol.com

Paul Brizendine
Water Tower Square
300 Missouri Avenue, Suite 200
Jeffersonville, IN 47130
(812) 941-4100
paul@brizendinelaw.com

***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2017, the foregoing was delivered via CM/ECF to:

Denis Ogburn
Assistant Jefferson County Attorney
531 Court Place, Suite 900
Fiscal Court Bldg.
Louisville, KY 40202

Sean Ragland
Matt Piekarski
Phillips Parker Orberson & Arnett, PLLC
716 West Main Street, Suite 300

20

Louisville, KY  40202

**Counsel for Defendants**

/s/ Gregory A. Belzley

**Counsel for Plaintiff**