1           UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF KENTUCKY

3             LOUISVILLE DIVISION

4              NO. 3:13-CV-427

5

6   DANIELLA BLAINE, ADMINISTRATRIX OF THE ESTATE OF KENNETH

7           H. CROSS, II, DECEASED,

8                 PLAINTIFF

9

10                  V.

11

12           CORIZON, INC., ET AL.,

13              DEFENDANTS

14

15

16

17

18

19

20

21

22

23   DEPONENT:  MARK E. BOLTON

24   DATE:      SEPTEMBER 20, 2016

25   REPORTER:  CRYSTAL HAVENS

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                       APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, DANIELLA BLAINE:

4    GREGORY A. BELZLEY

5    BELZLEYBATHURST ATTORNEYS

6    3604 CONSTANTINE DRIVE

7    PROSPECT, KENTUCKY 40059

8    TELEPHONE NO.: (502) 292-2452

9    E-MAIL:GBELZLEY@AOL.COM

10

11   ON BEHALF OF THE DEFENDANTS, KEVIN LAMKIN AND MARK E.

12   BOLTON:

13   J. DENIS OGBURN

14   JEFFERSON COUNTY ATTORNEY

15   FISCAL COURT BUILDING

16   531 COURT PLACE

17   SUITE 900

18   LOUISVILLE, KENTUCKY 40202

19   TELEPHONE NO.: (502) 574-6312

20   FACSIMILE NO.: (502) 574-4215

21   E-MAIL: DENIS.OGBURN@LOUISVILLEKY.GOV

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1

2                    APPEARANCES (CONTINUED)

3

4  ON BEHALF OF THE DEFENDANTS, CORIZON, STEPHANIE KOHL,

5  AND THELMA SLOAN:

6  MATT PIEKARSKI

7  PHILLIPS PARKER ORBERSON & ARNETT, PLC

8  716 WEST MAIN STREET

9  SUITE 300

10 LOUISVILLE, KENTUCKY 40202

11 TELEPHONE NO.: (502) 583-9900

12 FACSIMILE NO.: (502) 587-1927

13 E-MAIL: MPIEKARSKI@PPOALAW.COM

14

15 ALSO PRESENT:  KRISTINA CALHOUN, TRAINEE

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-1   Filed 11/14/17   Page 4 of 44 PageID #: 699
The Deposition of MARK E. BOLTON, taken on September 20, 2016

4

INDEX

                                          Page

DIRECT EXAMINATION BY MR. BELZLEY        6

CROSS EXAMINATION BY MR. PIEKARSKI      34

EXAMINATION BY MR. OGBURN            36

REDIRECT EXAMINATION BY MR. BELZLEY    36


EXHIBITS

                                          Page

2     COURSE LIST FOR OFFICERS IN 2012    7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                    STIPULATION

2

3  The deposition of MARK E. BOLTON taken at FISCAL COURT

4  BUILDING, 531 COURT PLACE, SUITE 900, LOUISVILLE,

5  KENTUCKY 40202 on TUESDAY, the 20TH day of SEPTEMBER,

6  2016 at approximately 1:54 p.m.; said deposition was

7  taken pursuant to the FEDERAL Rules of Civil Procedure.

8  It is agreed that CRYSTAL HAVENS, being a Notary Public

9  and Court Reporter for the State of KENTUCKY, may swear

10 the witness.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

6

```
 1                    PROCEEDINGS

 2

 3           COURT REPORTER:  If you'll raise your right

 4      hand for me, please.  Do you solemnly swear or

 5      affirm that the      testimony you are about to give

 6      will be the truth, the whole truth, and nothing but

 7      the truth?

 8           THE WITNESS:  I do.

 9                    DIRECT EXAMINATION

10   BY MR. BELZLEY:

11      Q    Sir, could you state your full name for the

12   record, please?

13      A    Mark, M-A-R-K, Middle initial E, last name

14   Bolton, B-O-L-T-O-N.

15      Q    And how old are you?

16      A    I am 59.

17      Q    59.  Got you beat by two.  And what do you do

18   for a living?

19      A    I am the director of the Louisville Metro

20   Department of Corrections, which is the local jail

21   system for Jefferson County.

22      Q    How long have you been the director?

23      A    It will be eight years in November.

24      Q    So since 2000 --

25      A    And '8.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    2008.  I'm here, Director Bolton, to talk to

2  you about a fellow that was in jail back in August of

3  2012, a fellow by the name of Kenneth Cross.  Are you

4  familiar with the events involving Mr. Cross?

5    A    I'm familiar.

6    Q    Okay.  Prior to August 25th of 2012, can you

7  tell me what training the corrections officers in the

8  jail received to determine whether someone had taken an

9  overdose of drugs?

10    A    Yeah.  I think -- you know, I don't have the

11  training curriculum in front of me, but

12    Q    Let's see if I've got a -- have a referral

13  document.

14    A    But all officers go through a ten-week pre-

15  service academy.

16    Q    Okay.

17    A    And that is covered in -- pretty in-depth, as

18  part of that pre-service curriculum.  Give me just a

19  second because I know I have it in here.  I just skipped

20  over it somehow.

21         MR. BELZLEY:  Off the record.

22              (OFF THE RECORD)

23  BY MR. BELZLEY:

24    Q    Let me show you what I'm going to mark Exhibit

25  2 to your deposition.  This is --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           (EXHIBIT 2 MARKED FOR IDENTIFICATION)

2           MR. OGBURN:  Well, that's 1, isn't it?

3           MR. BELZLEY:  Well, I'm saving 1.

4           MR. OGBURN:  Okay.  Okay.  Okay.  I got you.

5           MR. BELZLEY:  We'll have them for all of them,

6      and let me hand you what I've -- Denis, let me give

7      you a copy of what I just gave the director.

8           MR. OGBURN:  Thank you.

9           MR. BELZLEY:  There you go.

10  BY MR. BELZLEY:

11      Q     Director Bolton, let me ask you with regard to

12  Exhibit 2, does this look like the list of officer

13  training courses that the jail provided its officers in

14  2012?

15      A     Correct.

16      Q     Okay.  Is there a -- in this list of courses

17  that you see, is there one that you recognize as being

18  the one in which officers received some training about

19  drug overdose?

20      A     Yeah.  That would be at the bottom of the

21  page, numbered DC-104A "Drug Awareness ID and Usage".

22  And then above that numbered DC-104 "Substance Abuse"

23  would cover that potentially.  Medical procedures might

24  be some -- and again, without looking at that exact

25  curriculum -- but medical procedures may be something

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

9

1   covered there.

2       Q    Okay.  Do you know what the signs and symptoms

3   of drug overdose are?

4       A    Yeah.

5       Q    What are they?

6       A    Well, there's -- there could be a -- a -- a

7   litany of signs and symptoms.  Everything ranging from

8   elevated blood pressure or escalated blood pressure,

9   dilation of the pupils, slurring of speech, unsteady

10  gate, uneven body motions.  Demeanor, that could be

11  lethargic, could be aggressive, depending upon the type

12  of drugs a person may have -- may have used.

13      Q    Okay.  Would what's called "nodding off" or

14  "being on the nod" be a sign or symptom of a potential

15  drug overdose?

16      A    It could be.

17      Q    Would confusion be a sign or symptom?

18      A    It could be.

19      Q    Now, do you know whether the training the

20  officers in the jail received back in 2012, whether that

21  specifically covered the signs and symptoms of a drug

22  overdose?

23      A    Without the curriculum in front of me, I

24  couldn't tell you.

25      Q    Okay.  Do you know whether the curriculum



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    involved anything other than a PowerPoint?

2        A    Yeah.  It -- and again, it may have been

3    inclusive of some subject matter expertise from a member

4    of the contract health care staff.

5        Q    Okay.

6        A    It could have been subject matter expertise of

7    a full-time substance abuse counselor that we have

8    employed at Metro Corrections.

9        Q    **Is it fair to say that, as you sit here today,**

10   **you don't know specifically what was told to your**

11   **officers about the signs and symptoms of a drug**

12   **overdose?**

13       A    That would be correct.  Yeah.

14       Q    **Back in 2012 do you know whether your officers**

15   **received any medical training beyond basic First Aid and**

16   **CPR?**

17       A    That would be the requirement.

18       Q    **Did they receive any training over and above**

19   **that other than the curriculum we've been discussing?**

20       A    I -- again, I would have to see the curriculum

21   that was presented at the time.  You know, training

22   curriculums are dynamic and they change, change upon --

23   you know, based upon a whole lot of reasons.  Based upon

24   best practices.  Based upon a revision to the statutes,

25   KARs, jail standards, ACA accreditation.  All those

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  things have the potential to -- to enhance opportunity

2  for training based upon what's new in the arena.

3       Q    Back in 2012 was drug overdose considered a

4  medical emergency in the jail?

5       A    Yes.

6       Q    And how about unconsciousness?  Was that

7  considered a medical emergency?

8       A    Yes.

9       Q    Do you know how and who identified persons

10 admitted to the jail back in 2012 as potential drug

11 overdose problems?

12      A    Yeah.  We have a -- and every jail has a

13 health screen -- screening process, and in our case that

14 health screen is performed by the contract health care

15 provider, which in 2012, I believe it was different from

16 who we have now.  I believe it was Corizon back in 2012.

17 We currently use Correct Care Solutions.

18      Q    Okay.  Back in 2012 would any of the results

19 of the evaluation of a person admitted to the jail by a

20 Corizon employees, would that be communicated to the

21 jail officers who are responsible for monitoring that

22 individual?

23      A    It could be.

24      Q    Do you know under what circumstances it could

25 be?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Well, certainly if -- you know, if there's a

2  medical emergency and the individual is in a trauma

3  situation, obviously we are going to perform medical

4  response until such time EMS may arrive on the scene,

5  and that would turned over to them in that case.

6      Q    Okay.  Let's -- you want to finish your

7  answer, or do you want water?

8      A    I want water.

9         (OFF THE RECORD)

10  BY MR. BELZLEY:

11      Q    Okay.  We were talking about when information

12  that had been acquired by the medical staff on the

13  admission of an individual to the jail could be

14  communicated to officers responsible for monitoring.

15      A    Could be.

16      Q    Are you aware of any other situations other

17  than in emergency medical?

18      A    You know, if a person is being moved up to the

19  medical floor, for example, from intake.  You know, if

20  there's a person that is -- been identified by the

21  contract medical provider that needs to be on close

22  observation, for example.  They could make that call

23  that they need to be moved immediately.  At which time

24  the officers would conduct the movement.  So if they're

25  moving a person from the booking floor, for example, to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the medical floor, they're responsible for providing

2    that movement of that inmate.

3         Q    Okay.  We just took the deposition of Officer

4    Lamkin.

5         A    Okay.

6         Q    And he testified that he was the person that

7    actually met Mr. Cross when he came up to the second

8    floor and took him and put him in the observation cell

9    2.

10        A    Okay.

11        Q    And he said that was a process that lasted 15,

12   20 seconds.

13        A    Right.

14        Q    Wasn't all that long.  Is that what you're

15   referring to?

16        A    Yeah.

17        Q    Would you expect that an officer in Officer

18   Lamkin's position, who is taking care of that

19   responsibility, would be provided the results of the

20   assessment?

21        A    No.

22        Q    Okay.

23        A    No.

24        Q    Would that officer ever get the results of the

25   assessment?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

14

1        A      Usually not.

2        Q      And is that HIPAA-related?

3        A      It -- it could be, but certainly operationally

4   we have to work hand-in-hand with the medical provider

5   relative to security, relative to movement, relative to

6   response to exit situations, but the health care

7   provider -- the inmate health care provider is

8   responsible for the inmate medical program and providing

9   health care to the inmate population.

10       Q      Okay.  Who would communicate to the officers

11  on the second floor back in 2012 that an inmate needed

12  close observation?

13       A      Well, that would be the health care staff that

14  would make that assessment, and that health care

15  provider staff would implement that protocol.

16       Q      Okay.  Do you know back in 2012 whether

17  Corizon had some kind of a matrix or an assessment

18  process by which they identified persons who needed to

19  be under close observation?

20       A      Yeah.  There is a detox flow protocol.

21       Q      Okay.

22       A      You know, there's a specific detox flow

23  protocol that's evidence-based best practice, and

24  there's one for opiates, for example.  There's one for

25  alcohol, and there's one for benzodiazepine.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

15

1      Q      Okay.

2      A      Now, at that point back in 2012, we found that

3  there was some inconsistency relative to the application

4  of those detox flow protocols.

5      Q      Okay.  And what was that?

6      A      That -- and again, I'm thinking because we've

7  made so many adjustments since then, but I think that

8  there was some indication that those detox flow

9  protocols were not being administered consistently.

10     Q      And that was -- and the administration of the

11  detox protocols was the responsibility of the medical

12  care provider at that time?

13     A      Absolutely.

14     Q      Which would have been Corizon?

15     A      Correct.

16     Q      Do you know whether the detox protocols,

17  whether it be alcohol or opiates or benzos was applied

18  appropriately in Mr. Cross' case?

19             MR. PIRKARSKI:  Object to the form.

20     A      I don't recall.

21     Q      All right.  Okay.  Do you know back in 2012

22  whether the officers on floor 2 were ever told anything

23  other than that they needed to closely monitor a

24  particular individual?  Were they ever told why?

25     A      They -- an individual that was on a 20-minute

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  observation, which would be a requirement of the detox

2  protocol.  That is initiated by the health care

3  provider.

4      Q    Okay.

5      A    So, you know, without having that case.  And I

6  have no reviewed that case.  But without having that

7  case in front of me, I know that he was moved to the

8  second floor.  Did they initiate a detox protocol -- did

9  medical initiate a detox protocol on Mr. Cross, I don't

10 recall.

11     Q    Do you know, if they had, what the detox

12 protocol required be done to monitor Mr. Cross?

13     A    It should.

14     Q    But do you know specifically what's --

15     A    On Mr. Cross, I -- I don't recall.  We book

16 34,000 people per year come through out --

17     Q    Oh, I know.

18     A    Oh.

19     Q    I know.  Prior to Mr. Cross being in the jail

20 in August of 2012, do you know whether your officers

21 were trained to determine whether an individual who had

22 been admitted to the jail in an intoxicated state, was

23 sleeping, or unconscious?

24     A    Well, we had in 2012, specific to the Cross

25 case, I don't know the answer to that question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  Just generally speaking.

2      A    Generally speaking, an individual if they are

3 on a detox protocol, they're required to be on a 20-

4 minute observation.  And part of that 20-minute

5 observation is ensuring -- it's a welfare check.  It's

6 to determine if a person is breathing, if they're in any

7 type of distress.  That is part of the training.

8      Q    Okay.

9      A    37 years in the business, that's been part of

10 the training.

11      Q    Yeah.  But in a case where an individual --

12 let's say an individual that is admitted to the jail and

13 he is assessed as being in an intoxicated state.

14      A    Okay.

15      Q    Can't be determined whether it's alcohol or

16 drugs, might be worthy under both.  He's sent up to the

17 second floor, put in observation cell 2, lays down and

18 goes to sleep.

19      A    Right.

20      Q    At what point is a determination made, or is

21 he -- is that individual checked to see whether they are

22 sleeping, whether they can be aroused, woken up, whether

23 they are unresponsive or unconscious?

24      A    I'd have to -- I would have to answer that

25 question is:  Did the health care provider initiate that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    detox protocol?

2        Q    Okay.

3        A    And if that 20-minute observation protocol was

4    initiated then, that would be a responsibility of that

5    officer as part of that 20-minute welfare check.

6        Q    Okay.  Let me make sure I understand.  If the

7    detox protocol -- is it -- it is your understanding that

8    back in August of 2012 if the medical provider initiated

9    the detox protocol, with regard to a specific individual

10   --

11       A    Right.

12       Q    -- it would be part of the responsibility of

13   the monitoring officer during his 20-minute checks --

14       A    Correct.

15       Q    -- to make sure if the individual appear to be

16   sleeping that he -- that that individual could be

17   aroused?

18       A    Do they actually go in and check the person or

19   shake the person, you know, that is a dynamic that we

20   put more due diligence into.  Back in 2012 was that done

21   with Mr. Cross, I don't know.

22       Q    Okay.

23       A    Was a detox protocol initiated on Mr. Cross, I

24   don't recall.  But if that protocol was not initiated,

25   then formally that 20-minute observation requirement did

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   not apply unless it was initiated by the contract health

2   care provider.

3        Q    Okay.  Let me make sure I understand.

4   Regardless of whether the detox protocol was initiated

5   or not --

6        A    Uh-huh.

7        Q    -- just by virtue of the fact that Mr. Cross

8   was in observation cell 2 --

9        A    Correct.

10       Q    -- he would be observed on a 20-minute basis

11  without that protocol being implemented?

12       A    The answer to that would be "no."

13       Q    Oh, okay.  Okay.  So if a detox protocol were

14  initiated, he would be observed every 20 minutes?

15       A    Correct.  Checked on.  Correct.

16       Q    But do you know whether at back in 2012 as

17  part of that 20-minute monitoring process your officers

18  would go in and make sure that an individual who

19  appeared to be sleeping but who was admitted to the jail

20  in an intoxicated state had not become unconscious or

21  unresponsive?

22       A    If they're on a protocol, or --

23       Q    Yeah.

24       A    -- are you talking specifically to Mr. Cross?

25       Q    If that was protocol.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     A     If they are on the protocol, they're required

2  to make a 20-minute staggered observation.  Now, do they

3  actually go and check the person -- they are supposed to

4  look for movement.  They're supposed to look for

5  movement of the chest.  You know, they can go in and

6  awaken the person, but part of that requirement on that

7  20-minute protocol is to ensure that they're not in

8  distress or suffering in any traumatic event.

9     Q     Let's say an individual is admitted to the

10 jail back in August of 2012.  The individual is assessed

11 by the medical provider.  They believe he's at risk for

12 detox.  He's sent up to the second floor, put in

13 observation cell 2.

14     A     Okay.

15     Q     This individual goes to sleep.  Inmates

16 complain that he's snoring loudly.

17     A     Okay.

18     Q     Should the officer that responds to those

19 complaints do anything other than look at the individual

20 and make sure his chest is still rising --

21     A     Right.

22     Q     -- indicating he's breathing?  Make sure

23 there's no sign of blood or anything?  Is that all

24 they're supposed to do?

25     A     Well, again, if the individual was put on a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  20-minute observation protocol, the answer to that would

2  be yes.  If they haven't been put on that protocol, then

3  the answer to that would be probably not.

4      Q    Okay.  Got you.  Under what circumstances in

5  that scenario I just described --

6      A    Uh-huh.

7      Q    -- back in August of 2012, were the officers

8  at the jail instructed to go a step farther and actually

9  try and wake that individual up?

10      A    Are they on the detox protocol?

11      Q    Let's say they're on the detox protocol.

12      A    Are they on the 20-minute protocol?

13      Q    Yeah.

14      A    If they are breathing, they see signs of

15  movement, the answer to that would be not required, or

16  at least that wasn't the protocol then.

17      Q    Okay.  All right.  Is it the protocol now?

18      A    The protocol now is we have totally revamped

19  how our detox protocol is done.  Number 1, ensuring that

20  the detox flow is part of the medical screening at the

21  front end.  We now utilize a detox dorm on the medical

22  floor that is both a quasi medical model as well as a

23  peer-detox model.  Essentially what we did is we worked

24  with the Healing Place to develop a peer detox model in

25  the jail.  So -- and that's not a requirement, it was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   engaging in a best practice.

2        Q     Yeah.

3        A     And that's paid pretty significant.

4        Q     And how does that -- how does the process

5   that's in place today different from the process that

6   was in place back in 2012?

7        A     Specifically, that detox flow chart as part of

8   that medical assessment is done on the front end.  If a

9   person is requiring detox, they are immediately moved to

10  a detox monitor, which could be -- in most occasions

11  unless we're just jam packed like we have been here

12  lately.  A person will go into that detox dorm.

13       Q     Okay.

14       A     That 20-minute observation protocol is started

15  immediately.

16       Q     Okay.

17       A     And that's triggered by the health care staff

18  along with that detox flow.

19       Q     Okay.

20       A     But we've added another layer to it with the

21  peer-detox model, the Healing Place model that we're

22  operating in the jail.  We have combined our detox

23  protocols without treatment inmates.

24       Q     Uh-huh.

25       A     So the inmates -- those inmates that are in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  treatment are also assisting us with the peer detox

2  model inside the jail, which gives us an added layer.

3  But that detox flow -- initiating that 20-minute

4  observation is done immediately from the point of

5  identification on the booking floor.

6      Q     Okay.

7      A     Does that make sense?

8      Q     Yeah.  Yeah.  Is there, in place today, a

9  **process by which an individual who's admitted to the**

10 **jail in an intoxicated state is monitored for**

11 **unconsciousness?  Monitored to make sure he is, in fact,**

12 **sleeping as opposed to he's lapsed into a non-responsive**

13 **state?**

14     A     Yeah.  We have -- we have amped up our level

15 of training on signs and symptoms.  We've ramped up our

16 accountability on the 20-minute checks.  We have ramped

17 up our front-end assessment.  Everything starts with

18 that medical screening on the front end, okay?  And that

19 detox flow protocol.

20     Q     Okay.

21     A     Whether it's the COWs (phonetic) or the CWA

22 (phonetic) or the benzodiazepine flow.  And it used to

23 be that individuals that were detoxing could have been

24 spread out all through the jail, okay?  We've

25 centralized that now on our booking floor --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Q      Uh-huh.

2          A      -- or on our medical floor, I'm sorry.

3    Identified at booking.  Using best practice screening.

4    Moved to a centralized detox setting in the treatment

5    dorm --

6          Q      Uh-huh.

7          A      -- with the 20-minute observation sheet, okay?

8          Q      Okay.

9          A      That officers have to check on a staggered

10   basis, so it's not mechanical.  It's not pencil-whipped,

11   okay?  And they actually check for those signs and

12   symptoms.  Now, that could be physically going and

13   waking people up, but it doesn't have to be.

14         Q      Okay.  I understand.  Is there a category of

15   individuals for whom that is required, the physical

16   waking up?

17         A      Yeah.  Let me take that a step further.

18         Q      Yeah.

19         A      An individual that now -- you know, in 2000

20   and -- 2012 we sent out an average of four people a

21   month EMS, okay?

22         Q      Okay.

23         A      People that were in distress, okay?  Most of

24   our individuals that are in distress, they are either

25   overdosing or they're potentially detoxing.  We now send

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-1   Filed 11/14/17   Page 25 of 44 PageID #: 720
The Deposition of MARK E. BOLTON, taken on September 20, 2016

25

1   out an average of 63 people per month EMS, okay?  So we

2   are -- I think we have -- we have amped up our level of

3   monitoring and supervision.  And if there's any

4   indication of potential medical emergency or over

5   intoxication or detox-related medical emergencies, we

6   don't hesitate to send a person out EMS.

7        Q    Okay.

8        A    And that has really been somewhat driven by

9   the onset of the opiate challenge and some of the drug

10  challenges that we're seeing in this community.  We're

11  seeing -- I mean, this is a changing dynamic in the jail

12  business.

13       Q    Yeah.

14       A    This whole issue of opioids and detox and

15  detox monitoring and medical emergencies.  When a person

16  is arrested in the community, you know, by a person

17  wearing a blue uniform and a gold badge and they're

18  brought into jail and they're handed off to a person

19  wearing a blue uniform and a gold badge, a lot of times

20  they're not talking.  So an individual may not be

21  forthright even during a medical screening if they had

22  been using an illegal drug or not.  They may not tell

23  us.  It's our ability to assess a person medically.  I

24  mean, that's why we have an $8 million health care

25  contract.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q       Sure.

2       A       You know, having a qualified health care

3   provider to provider that screening, and then ensuring

4   if the best course of action relative to a potential

5   detox or overdose situation is to get them to the

6   hospital.  Well, that's what we're doing.  And I think

7   we're doing that in a much more formalized best practice

8   protocol than we were doing back in 2012.  And that's

9   been out of necessity.  This business has getting --

10  gotten hammered by this addiction issue in our

11  community.  Not just in Louisville, but everywhere.

12      **Q       Yeah.  Let me ask you a question about that.**

13  **There's a lot of folks out there who would say, "Why**

14  **would -- why should we care if a guy comes into the jail**

15  **and either intentionally or because he's too whipped out**

16  **doesn't tell the staff that he's a potential overdose or**

17  **that he's taken pills and all that?"  I'm not asking --**

18  **my question isn't why should they care?  My question is**

19  **why do you care?**

20      A       Because the -- the foundation for what we do

21  is care, custody, and control.  And our tenants are to

22  treat people the way that I would want a family member

23  treated in a like situation.  You know, prisoners,

24  inmates are the only group of people that have a

25  constitutional right to health care.  A constitutional

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    right.  We have to provide it.  And you can strip away

2    all that, but at the end of the day, it's the right

3    thing to do and our responsibility, whether it's -- you

4    know, and that's why correctional health care is --

5    that's why we have it.  You know, I'm not a health care

6    expert.  I'm a jail expert, prison expert, not a health

7    care expert.  And so we've rely upon experts in the

8    business, and we pay for it, and we contract for it, and

9    we monitor for it.  And we are NCCHC certified, which is

10   the gold standard.

11        Q    Yeah.

12        A    And that's the National Commission on

13   Correctional Health Care.  To ensure that we're

14   deploying best practices relative to care, custody, and

15   control.  And, you know, and I'll say this, in 2016 we

16   have not had one in custody death.  Not one heart attack

17   that's resolved in a death.  Not one stroke that's

18   resolved in a death.  Not cancer that's resolved in a

19   death.  Not one suicide that's resolved in a death.  Not

20   one overdose or not one detox.  Now, we've gotten -- and

21   it could happen while I'm sitting here, we're in the

22   risk business.  But we require, I think -- and that's

23   why -- certification, whether it's -- because we're ACA

24   accredited as well, operationally.  And that's why we

25   took that on because we want to make sure that we are

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

28

1  using the gold standards relative to how we operate our

2  business.  And part of our health care contract is that

3  our health care contractor achieve NCCHC accreditation.

4      Q      Was Corizon required to have NCCHC

5  accreditation?

6      A      They were.

7      Q      Did they achieve it?

8      A      They did.

9      Q      Okay.  Was -- now, obviously, there was a

10  change made.  Corizon -- the contract with Corizon was

11  terminated.  There's a new contract with --

12      A      Correct.

13      Q      -- Correct Care Solutions?

14      A      Correct Care Solutions.

15      Q      Was part of the reason for that change the

16  inconsistencies in the application of the detox

17  protocol?

18      A      Absolutely.

19      Q      And the problems that that had caused?

20      A      Absolutely.

21      Q      Back in 2012 did the jail admit people who

22  were brought to the jail in an unconscious condition?

23      A      No.

24      Q      And why not?

25      A      If a person was unconscious  --and that was --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that's always the call of the health care provider, but

2   we would not allow the booking.  And so the arresting

3   agency would have to clear the individual at U of L ER

4   before we would even admit them to initiate that booking

5   process.

6       Q    All right.  Back in August of 2012 did the

7   medical staff -- did Corizon medical staff ever instruct

8   your officers, to your knowledge, to monitor an inmate

9   for unconsciousness?

10      A    Not that I recall.

11      Q    Given that unconsciousness was considered a

12   medical emergency in the jail back then as it is now --

13      A    Right.

14      Q    -- who was it that had the responsibility for

15   identifying an individual who needed to be monitored for

16   unconsciousness?  Would that be the health -- the

17   medical staff?

18      A    The health care provider.  Correct.

19      Q    Do you know when or how Corizon would make a

20   decision that an individual needed to -- whether or not

21   an individual needed to be monitored for potential

22   unconsciousness?

23      A    No.  That's in the health care expertise

24   arena.

25      Q    Or how they would communicate that to the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    officers in the jail?

2         A    I'm not sure if I understand your question.

3         Q    Do you know how they -- regardless of how they

4    made that judgment, do you know how the medical staff

5    would communicate that to the monitoring officers, other

6    than initiating the detox protocol.

7         A    Well, certainly initiating the detox protocol.

8    And if during that 20-minute staggered observation

9    period a person was found to be in distress, certainly

10   making the proper notification to medical that that

11   person was in distress.

12        Q    Now, would unconsciousness be considered

13   distress?

14        A    If a person knew that a person was

15   unconscious, yes.

16        Q    Are you aware of any way to tell or to

17   distinguish an inmate who is sleeping from an inmate who

18   is unconscious other than seeing if you can wake them

19   up?

20        A    No.

21        Q    Back in October -- back in August of 2012

22   would your officers attempt to wake up an individual who

23   appeared to be sleeping if they were not instructed by

24   the medical staff to do so?

25        A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

31

1    Q    Are you aware of whether loud snoring is a
2    symptom of a drug overdose?

3    A    As a medical issue?

4    Q    Just somebody that comes in --

5    A    My wife says that I snore.

6    Q    Well, I do, too.  She snores, too.  But do you
7    know whether a person is admitted to the jail who
8    appears to be in an intoxicated state, they go to sleep,
9    start snoring loudly.  Do you know whether that sets off
10   anybody's radar?

11   A    No.

12   Q    Do you know whether a death by drug overdose
13   is preceded by a period of unconsciousness?

14   A    I don't know that.

15   Q    Let me take a look at what I've got here.
16   Back in August of 2012 would the officers up on the
17   second floor be informed of what an individual had been
18   arrest for?

19   A    Likely not.

20   Q    And why is that?

21   A    I mean, it's not to say that they wouldn't,
22   but is it the requirement that they would?  No.  Now,
23   we do utilize an objective classification system.  And
24   where is a person is housed is somewhat predicated upon
25   their arresting offense and many other dynamics.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q      Uh-huh.

2        A      But most officers aren't aware of what a

3   person had been arrested for unless they go onto the

4   jail management system.  Now, if a person is in a

5   maximum security environment or administrative seg, then

6   there would be much more reasoning to know what a person

7   was arrested for.

8        Q      All right.  Let me see that.  Let me show you

9   what was marked Exhibit 1 to Mr. Lamkin's deposition.

10  It's a page out of his statement in which he testifies

11  or states that he -- and this is consistent with his

12  deposition testimony, that some time during -- some time

13  after Mr. Cross was put in observation cell 2, the

14  inmates complained that he was snoring loudly.

15       A      Right.

16       Q      "Mr. Lamkin opened the cell door, observed

17  him, did not see any signs of distress.  Saw that -- as

18  he said here he was just sleeping."

19       A      Correct.

20       Q      "And snored really loud."  Back in August 2012

21  should Officer Lamkin have attempted to wake Mr. Cross

22  up under these circumstances?

23       A      No.

24       Q      In the jail nowadays with the changes that

25  have been made, would Mr. Cross be awakened under these

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    circumstances now?

2         A    Possibly.

3         Q    Okay.  Under what circumstances would he be

4    awakened today?  Under what circumstances would he be

5    allowed to continue to sleep or snore?

6         A    If he was -- if the detox protocol was started

7    and that 20-minute observation protocol was started and

8    the communication between the medical staff and the

9    officer initiated that detox protocol and the 20-minute

10   observation, it's now centralized in the jail.  It's all

11   on one floor mostly self-contained.

12        Q    Uh-huh.

13        A    And so more training on signs and symptoms.

14   More accountability relative to the 20-minute

15   observation -- staggered 20-minute observation. And I

16   think just the amp up of the challenges associated with

17   detox and addiction and treatment.  We've gotten so much

18   better at it.

19        Q    Uh-huh.  Is it fair to say that because of all

20   the things you just mentioned.  Nowadays, if an officer

21   was confronted with a situation like Officer Lamkin had

22   on August 25, 2012, the officer might decide to wake the

23   individual up by the mere fact that that individual is

24   on a detox protocol and by the mere fact that that has

25   initiated that 20-minute observation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

34

1      A    Yes.

2      Q    Okay.  But that was not the case back in

3  August of 2012?

4      A    I don't recall if this individual -- Inmate

5  Cross was put on a detox protocol or not.

6      Q    Okay.  But even if he was on a detox protocol,

7  under the circumstances Officer Lamkin described here in

8  his statement, you wouldn't have expected him to wake

9  Mr. -- or attempt to wake Mr. Cross up?

10     A    Now?

11     Q    No.  Back then.

12     A    Back then.  No.

13     Q    Okay.  Now would you?

14     A    Yes.

15          MR. BELZLEY:  Okay.  All right.  No further

16     questions.

17                    CROSS EXAMINATION

18  BY MR. PIEKARSKI:

19     Q    Detox protocol in 2012 included a flow sheet?

20     A    Correct.

21     Q    Blue wristband?

22     A    2012.  Probably not.  Might have.

23     Q    Might have.  Okay.  And there would be a

24  classification sheet, correct?

25     A    There would be a classification --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Yeah.

2      A      -- process.

3      Q      Yeah.  Okay.  And that would delineate the 20-

4  minute check?

5      A      It is the -- it is the health care provider --

6      Q      Sure.

7      A      -- and the detox flow protocol --

8      Q      Right.

9      A      -- and the -- it is the responsibility of the

10  health care provider to initiate that.

11     Q      Right.  Right.  Right.  And if it's initiated

12  then the 20-minute checks go in place?

13     A      Correct.

14     Q      Okay.  Now, I understand.

15     A      Correct.

16     Q      And the detox folks would go to the second

17  floor?

18     A      For the most part.

19     Q      Yeah.  And that's still the case?

20     A      That's the case now.

21     Q      Sure.  Sure.  Sure.  And the second floor is

22  where the medical staff --

23     A      Correct.

24     Q      -- have their officers?

25     A      Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     Q     So when the officers generally know because

2     it's the medical floor that there are people with

3     medical conditions, right?

4          A     Correct.

5               MR. PIEKARSKI:   Okay.   That's all I was

6     confused about.   Thank you very much for your time.

7               THE WITNESS:   Thank you.

8               MR. OGBURN:   I just have one clarification.

9                         EXAMINATION

10    BY MR. OGBURN:

11         Q     If Officer Lamkin observed that the individual

12    wasn't in any type of distress back in 2012, he wouldn't

13    be required to wake him?

14         A     Correct.

15              MR. OGBURN:   Those are all the questions I

16        have.

17                    REDIRECT EXAMINATION

18    BY MR. BELZLEY:

19         Q     And basically, if the individual is -- appears

20    to be asleep and his chest is rising up and down

21    indicating he's breathing.

22         A     Right.

23         Q     Back in August 2012 that would be all that

24    Officer Lamkin needed to see --

25         A     Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

37

1    Q      -- to conclude there was no distress?

2    A      Correct.

3         MR. BELZLEY:  All right.  No further questions.

4          (DEPOSITOIN CONCLUDED AT 2:41 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MARK E. BOLTON, taken on September 20, 2016

38

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the witness in the foregoing
transcript was taken on the date, and at the time and
place set out on the Title page here of by me after
first being duly sworn to testify the truth, the whole
truth, and nothing but the truth; and that the said
matter was recorded stenographically and mechanically by
me and then reduced to typwritten form under my
direction, and constitutes a true record of the
transcript as taken, all to the best of my skill and
ability.  I certify that I am not a relative or employee
of either counsel, and that I am in no way interested
financially, directly or indirectly, in this action.



CRYSTAL HAVENS,

COURT REPORTER/NOTARY

COMMISSION EXPIRES:  01/19/2020

SUBMITTED ON:  09/30/2016

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**$**

**$8** 25:24

**-**

**--and** 28:25

**1**

**1** 8:2,3 21:19
32:9
**15** 13:11

**2**

**2** 7:25 8:1,12
13:9 15:22
17:17 19:8
20:13 32:13
**20** 13:12 19:14
**20-** 17:3 35:3
**20-minute**
15:25 17:4
18:3,5,13,25
19:10,17 20:2,7
21:1,12 22:14
23:3,16 24:7
30:8 33:7,9,14,
15,25 35:12
**2000** 6:24
24:19
**2008** 7:1
**2012** 7:3,6 8:14
9:20 10:14
11:3,10,15,16,
18 14:11,16
15:2,21 16:20,
24 18:8,20
19:16 20:10
21:7 22:6 24:20
26:8 28:21 29:6
30:21 31:16
32:20 33:22
34:3,19,22
36:12,23
**2016** 27:15

**25** 33:22
**25th** 7:6
**2:41** 37:4

**3**

**34,000** 16:16
**37** 17:9

**5**

**59** 6:16,17

**6**

**63** 25:1

**8**

**8** 6:25

**A**

**ability** 25:23
**Absolutely**
15:13 28:18,20
**abuse** 8:22
10:7
**ACA** 10:25
27:23
**academy** 7:15
**accountability**
23:16 33:14
**accreditation**
10:25 28:3,5
**accredited**
27:24
**achieve** 28:3,7
**acquired**
12:12
**action** 26:4
**added** 22:20
23:2
**addiction**

26:10 33:17
**adjustments**
15:7
**administered**
15:9
**administration**
15:10
**administrative**
32:5
**admission**
12:13
**admit** 28:21
29:4
**admitted**
11:10,19 16:22
17:12 19:19
20:9 23:9 31:7
**affirm** 6:5
**agency** 29:3
**aggressive**
9:11
**Aid** 10:15
**alcohol** 14:25
15:17 17:15
**allowed** 33:5
**amp** 33:16
**amped** 23:14
25:2
**anybody's**
31:10
**appeared**
19:19 30:23
**appears** 31:8
36:19
**application**
15:3 28:16
**applied** 15:17
**apply** 19:1
**appropriately**
15:18
**arena** 11:2
29:24
**aroused** 17:22

18:17
**arrest** 31:18
**arrested** 25:16
32:3,7
**arresting** 29:2
31:25
**arrive** 12:4
**asleep** 36:20
**assess** 25:23
**assessed**
17:13 20:10
**assessment**
13:20,25 14:14,
17 22:8 23:17
**assisting** 23:1
**attack** 27:16
**attempt** 30:22
34:9
**attempted**
32:21
**August** 7:2,6
16:20 18:8
20:10 21:7 29:6
30:21 31:16
32:20 33:22
34:3 36:23
**average** 24:20
25:1
**awaken** 20:6
**awakened**
32:25 33:4
**aware** 12:16
30:16 31:1 32:2
**Awareness**
8:21

**B**

**B-O-L-T-O-N**
6:14
**back** 7:2 9:20
10:14 11:3,10,
16,18 14:11,16
15:2,21 18:8,20
19:16 20:10

21:7 22:6 26:8
28:21 29:6,12
30:21 31:16
32:20 34:2,11,
12 36:12,23
**badge** 25:17,
19
**based** 10:23,24
11:2
**basic** 10:15
**basically**
36:19
**basis** 19:10
24:10
**beat** 6:17
**BELZLEY** 6:10
7:21,23 8:3,5,9,
10 12:10 34:15
36:18 37:3
**benzodiazepin
e** 14:25 23:22
**benzos** 15:17
**blood** 9:8
20:23
**blue** 25:17,19
34:21
**body** 9:10
**Bolton** 6:14 7:1
8:11
**book** 16:15
**booking** 12:25
23:5,25 24:3
29:2,4
**bottom** 8:20
**breathing** 17:6
20:22 21:14
36:21
**brought** 25:18
28:22
**business** 17:9
25:12 26:9
27:8,22 28:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## C

**call** 12:22 29:1

**called** 9:13

**cancer** 27:18

**care** 10:4 11:14,17 13:18 14:6,7,9,13,14 15:12 16:2 17:25 19:2 22:17 25:24 26:2,14,18,19, 21,25 27:4,5,7, 13,14 28:2,3, 13,14 29:1,18, 23 35:5,10

**case** 11:13 12:5 15:18 16:5,6,7,25 17:11 34:2 35:19,20

**category** 24:14

**caused** 28:19

**cell** 13:8 17:17 19:8 20:13 32:13,16

**centralized** 23:25 24:4 33:10

**certification** 27:23

**certified** 27:9

**challenge** 25:9

**challenges** 25:10 33:16

**change** 10:22 28:10,15

**changing** 25:11

**chart** 22:7

**check** 17:5 18:5,18 20:3 24:9,11 35:4

**checked** 17:21 19:15

**checks** 18:13 23:16 35:12

**chest** 20:5,20 36:20

**circumstances** 11:24 21:4 32:22 33:1,3,4 34:7

**clarification** 36:8

**classification** 31:23 34:24,25

**clear** 29:3

**close** 12:21 14:12,19

**closely** 15:23

**combined** 22:22

**Commission** 27:12

**communicate** 14:10 29:25 30:5

**communicated** 11:20 12:14

**communication** 33:8

**community** 25:10,16 26:11

**complain** 20:16

**complained** 32:14

**complaints** 20:19

**conclude** 37:1

**CONCLUDED** 37:4

**condition** 28:22

**conditions** 36:3

**conduct** 12:24

**confronted** 33:21

**confused** 36:6

**confusion** 9:17

**considered** 11:3,7 29:11 30:12

**consistent** 32:11

**consistently** 15:9

**constitutional** 26:25

**continue** 33:5

**contract** 10:4 11:14 12:21 19:1 25:25 27:8 28:2,10,11

**contractor** 28:3

**control** 26:21 27:15

**copy** 8:7

**Corizon** 11:16, 20 14:17 15:14 28:4,10 29:7,19

**correct** 8:15 10:13 11:17 15:15 18:14 19:9,15 28:12, 13,14 29:18 32:19 34:20,24 35:13,15,23,25 36:4,14,25 37:2

**correctional** 27:4,13

**corrections** 6:20 7:7 10:8

**counselor** 10:7

**County** 6:21

**courses** 8:13, 16

**COURT** 6:3

**cover** 8:23

**covered** 7:17 9:1,21

**COWS** 23:21

**CPR** 10:16

**Cross** 7:3,4 13:7 16:9,12, 15,19,24 18:21, 23 19:7,24 32:13,21,25 34:5,9,17

**Cross'** 15:18

**curriculum** 7:11,18 8:25 9:23,25 10:19, 20

**curriculums** 10:22

**custody** 26:21 27:14,16

**CWA** 23:21

## D

**day** 27:2

**DC-104** 8:22

**DC-104A** 8:21

**death** 27:16, 17,18,19 31:12

**decide** 33:22

**decision** 29:20

**delineate** 35:3

**Demeanor** 9:10

**Denis** 8:6

**Department** 6:20

**depending** 9:11

**deploying** 27:14

**deposition** 7:25 13:3 32:9, 12

**DEPOSITOIN** 37:4

**determination** 17:20

**determine** 7:8 16:21 17:6

**determined** 17:15

**detox** 14:20,22 15:4,8,11,16 16:1,8,9,11 17:3 18:1,7,9, 23 19:4,13 20:12 21:10,11, 19,20,21,24 22:7,9,10,12, 18,22 23:1,3,19 24:4 25:14,15 26:5 27:20 28:16 30:6,7 33:6,9,17,24 34:5,6,19 35:7, 16

**detox-related** 25:5

**detoxing** 23:23 24:25

**develop** 21:24

**dilation** 9:9

**diligence** 18:20

**DIRECT** 6:9

**director** 6:19, 22 7:1 8:7,11

**discussing** 10:19

**distinguish** 30:17

**distress** 17:7 20:8 24:23,24 30:9,11,13 32:17 36:12 37:1

**document** 7:13

**door** 32:16



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**dorm** 21:21 22:12 24:5

**driven** 25:8

**drug** 8:19,21 9:3,15,21 10:11 11:3,10 25:9,22 31:2,12

**drugs** 7:9 9:12 17:16

**due** 18:20

**dynamic** 10:22 18:19 25:11

**dynamics** 31:25

———

**E**

———

**elevated** 9:8

**emergencies** 25:5,15

**emergency** 11:4,7 12:2,17 25:4 29:12

**employed** 10:8

**employees** 11:20

**EMS** 12:4 24:21 25:1,6

**end** 21:21 22:8 23:18 27:2

**engaging** 22:1

**enhance** 11:1

**ensure** 20:7 27:13

**ensuring** 17:5 21:19 26:3

**environment** 32:5

**ER** 29:3

**escalated** 9:8

**Essentially** 21:23

**evaluation** 11:19

**event** 20:8

**events** 7:4

**evidence-based** 14:23

**exact** 8:24

**EXAMINATIO N** 6:9 34:17 36:9,17

**exhibit** 7:24 8:1,12 32:9

**exit** 14:6

**expect** 13:17

**expected** 34:8

**expert** 27:6,7

**expertise** 10:3, 6 29:23

**experts** 27:7

———

**F**

———

**fact** 19:7 23:11 33:23,24

**fair** 10:9 33:19

**familiar** 7:4,5

**family** 26:22

**farther** 21:8

**fellow** 7:2,3

**finish** 12:6

**floor** 12:19,25 13:1,8 14:11 15:22 16:8 17:17 20:12 21:22 23:5,25 24:2 31:17 33:11 35:17,21 36:2

**flow** 14:20,22 15:4,8 21:20 22:7,18 23:3, 19,22 34:19 35:7

**folks** 26:13 35:16

**form** 15:19

**formalized** 26:7

**formally** 18:25

**forthright** 25:21

**found** 15:2 30:9

**foundation** 26:20

**front** 7:11 9:23 16:7 21:21 22:8 23:18

**front-end** 23:17

**full** 6:11

**full-time** 10:7

———

**G**

———

**gate** 9:10

**gave** 8:7

**generally** 17:1, 2 36:1

**give** 6:5 7:18 8:6

**gold** 25:17,19 27:10 28:1

**group** 26:24

**guy** 26:14

———

**H**

———

**hammered** 26:10

**hand** 6:4 8:6

**hand-in-hand** 14:4

**handed** 25:18

**happen** 27:21

**Healing** 21:24 22:21

**health** 10:4

11:13,14 14:6, 7,9,13,14 16:2 17:25 19:1 22:17 25:24 26:2,25 27:4,5, 6,13 28:2,3 29:1,16,18,23 35:5,10

**heart** 27:16

**hesitate** 25:6

**HIPAA-RELATED** 14:2

**hospital** 26:6

**housed** 31:24

———

**I**

———

**ID** 8:21

**identification** 8:1 23:5

**identified** 11:9 12:20 14:18 24:3

**identifying** 29:15

**illegal** 25:22

**immediately** 12:23 22:9,15 23:4

**implement** 14:15

**implemented** 19:11

**in-depth** 7:17

**included** 34:19

**inclusive** 10:3

**inconsistencie s** 28:16

**inconsistency** 15:3

**indicating** 20:22 36:21

**indication** 15:8 25:4

**individual** 11:22 12:2,13 15:24,25 16:21 17:2,11,12,21 18:9,15,16 19:18 20:9,10, 15,19,25 21:9 23:9 24:19 25:20 29:3,15, 20,21 30:22 31:17 33:23 34:4 36:11,19

**individuals** 23:23 24:15,24

**information** 12:11

**informed** 31:17

**initial** 6:13

**initiate** 16:8,9 17:25 29:4 35:10

**initiated** 16:2 18:4,8,23,24 19:1,4,14 33:9, 25 35:11

**initiating** 23:3 30:6,7

**inmate** 13:2 14:7,8,9,11 29:8 30:17 34:4

**inmates** 20:15 22:23,25 26:24 32:14

**inside** 23:2

**instruct** 29:7

**instructed** 21:8 30:23

**intake** 12:19

**intentionally** 26:15

**intoxicated** 16:22 17:13 19:20 23:10 31:8

**intoxication** 25:5



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

involved 10:1

involving 7:4

issue 25:14
26:10 31:3

___

J

jail 6:20 7:2,8
8:13 9:20 10:25
11:4,10,12,19,
21 12:13 16:19,
22 17:12 19:19
20:10 21:8,25
22:22 23:2,10,
24 25:11,18
26:14 27:6
28:21,22 29:12
30:1 31:7 32:4,
24 33:10

jam 22:11

Jefferson 6:21

judgment 30:4

___

K

KARS 10:25

Kenneth 7:3

kind 14:17

knew 30:14

knowledge
29:8

___

L

Lamkin 13:4
32:16,21 33:21
34:7 36:11,24

Lamkin's
13:18 32:9

lapsed 23:12

lasted 13:11

layer 22:20
23:2

lays 17:17

lethargic 9:11

level 23:14
25:2

list 8:12,16

litany 9:7

living 6:18

local 6:20

long 6:22 13:14

lot 10:23 25:19
26:13

loud 31:1 32:20

loudly 20:16
31:9 32:14

Louisville 6:19
26:11

___

M

M-A-R-K 6:13

made 15:7
17:20 28:10
30:4 32:25

make 12:22
14:14 18:6,15
19:3,18 20:2,
20,22 23:7,11
27:25 29:19

making 30:10

management
32:4

mark 6:13 7:24

marked 8:1
32:9

matrix 14:17

matter 10:3,6

maximum 32:5

mechanical
24:10

medical 8:23,
25 10:15 11:4,7
12:2,3,12,17,
19,21 13:1
14:4,8 15:11
16:9 18:8 20:11
21:20,21,22

22:8 23:18 24:2
25:4,5,15,21
29:7,12,17
30:4,10,24 31:3
33:8 35:22
36:2,3

medically
25:23

member 10:3
26:22

mentioned
33:20

mere 33:23,24

met 13:7

Metro 6:19
10:8

Middle 6:13

million 25:24

minute 17:4
35:4

minutes 19:14

model 21:22,
23,24 22:21
23:2

monitor 15:23
16:12 22:10
27:9 29:8

monitored
23:10,11 29:15,
21

monitoring
11:21 12:14
18:13 19:17
25:3,15 30:5

month 24:21
25:1

motions 9:10

moved 12:18,
23 16:7 22:9
24:4

movement
12:24 13:2 14:5
20:4,5 21:15

moving 12:25

___

N

National 27:12

NCCHC 27:9
28:3,4

necessity 26:9

needed 14:11,
18 15:23 29:15,
20,21 36:24

nod 9:14

nodding 9:13

non-
responsive
23:12

notification
30:10

November
6:23

nowadays
32:24 33:20

Number 21:19

numbered
8:21,22

___

O

Object 15:19

objective
31:23

observation
12:22 13:8
14:12,19 16:1
17:4,5,17 18:3,
25 19:8 20:2,13
21:1 22:14 23:4
24:7 30:8 32:13
33:7,10,15,25

observed
19:10,14 32:16
36:11

occasions
22:10

October 30:21

offense 31:25

officer 8:12
13:3,17,24
18:5,13 20:18
32:21 33:9,20,
21,22 34:7
36:11,24

officers 7:7,14
8:13,18 9:20
10:11,14 11:21
12:14,24 14:10
15:22 16:20
19:17 21:7 24:9
29:8 30:1,5,22
31:16 32:2
35:24 36:1

OGBURN 8:2,
4,8 36:8,10,15

onset 25:9

opened 32:16

operate 28:1

operating
22:22

operationally
14:3 27:24

opiate 25:9

opiates 14:24
15:17

opioids 25:14

opportunity
11:1

opposed 23:12

overdose 7:9
8:19 9:3,15,22
10:12 11:3,11
26:5,16 27:20
31:2,12

overdosing
24:25

___

P

P.M. 37:4

packed 22:11

paid 22:3

part 7:18 17:4,
7,9 18:5,12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

19:17 20:6
21:20 22:7
28:2,15 35:18

**pay** 27:8

**peer** 21:24 23:1

**peer-detox**
21:23 22:21

**pencil-
whipped** 24:10

**people** 16:16
24:13,20,23
25:1 26:22,24
28:21 36:2

**perform** 12:3

**performed**
11:14

**period** 30:9
31:13

**person** 9:12
11:19 12:18,20,
25 13:6 17:6
18:18,19 20:3,6
22:9,12 25:6,
15,16,18,23
28:25 30:9,11,
14 31:7,24
32:3,4,6

**persons** 11:9
14:18

**phonetic**
23:21,22

**physical** 24:15

**physically**
24:12

**PIEKARSKI**
34:18 36:5

**pills** 26:17

**PIRKARSKI**
15:19

**place** 21:24
22:5,6,21 23:8
35:12

**point** 15:2
17:20 23:4

**population**
14:9

**position** 13:18

**Possibly** 33:2

**potential** 9:14
11:1,10 25:4
26:4,16 29:21

**potentially**
8:23 24:25

**Powerpoint**
10:1

**practice** 14:23
22:1 24:3 26:7

**practices**
10:24 27:14

**pre-** 7:14

**pre-service**
7:18

**preceded**
31:13

**predicated**
31:24

**presented**
10:21

**pressure** 9:8

**pretty** 7:17
22:3

**Prior** 7:6 16:19

**prison** 27:6

**prisoners**
26:23

**problems**
11:11 28:19

**procedures**
8:23,25

**PROCEEDING
S** 6:1

**process** 11:13
13:11 14:18
19:17 22:4,5
23:9 29:5 35:2

**program** 14:8

**proper** 30:10

**protocol**
14:15,20,23
16:2,8,9,12

17:3 18:1,3,7,9,
23,24 19:4,11,
13,22,25 20:1,7
21:1,2,10,11,
12,16,17,18,19
22:14 23:19
26:8 28:17
30:6,7 33:6,7,9,
24 34:5,6,19
35:7

**protocols**
15:4,9,11,16
22:23

**provide** 27:1

**provided** 8:13
13:19

**provider** 11:15
12:21 14:4,7,15
15:12 16:3
17:25 18:8 19:2
20:11 26:3
29:1,18 35:5,10

**providing** 13:1
14:8

**pupils** 9:9

**put** 13:8 17:17
18:20 20:12,25
21:2 32:13 34:5

_____

**Q**

_____

**qualified** 26:2

**quasi** 21:22

**question** 16:25
17:25 26:12,18
30:2

**questions**
34:16 36:15
37:3

_____

**R**

_____

**radar** 31:10

**raise** 6:3

**ramped** 23:15,
16

**ranging** 9:7

**reason** 28:15

**reasoning**
32:6

**reasons** 10:23

**recall** 15:20
16:10,15 18:24
29:10 34:4

**receive** 10:18

**received** 7:8
8:18 9:20 10:15

**recognize** 8:17

**record** 6:12
7:21,22 12:9

**REDIRECT**
36:17

**referral** 7:12

**referring** 13:15

**regard** 8:11
18:9

**relative** 14:5
15:3 26:4 27:14
28:1 33:14

**rely** 27:7

**REPORTER**
6:3

**require** 27:22

**required** 16:12
17:3 20:1 21:15
24:15 28:4
36:13

**requirement**
10:17 16:1
18:25 20:6
21:25 31:22

**requiring** 22:9

**resolved**
27:17,18,19

**responds**
20:18

**response** 12:4
14:6

**responsibility**
13:19 15:11
18:4,12 27:3

29:14 35:9

**responsible**
11:21 12:14
13:1 14:8

**results** 11:18
13:19,24

**revamped**
21:18

**reviewed** 16:6

**revision** 10:24

**rising** 20:20
36:20

**risk** 20:11
27:22

_____

**S**

_____

**saving** 8:3

**scenario** 21:5

**scene** 12:4

**screen** 11:13,
14

**screening**
11:13 21:20
23:18 24:3
25:21 26:3

**seconds** 13:12

**security** 14:5
32:5

**seg** 32:5

**self-contained**
33:11

**send** 24:25
25:6

**sense** 23:7

**service** 7:15

**sets** 31:9

**setting** 24:4

**shake** 18:19

**sheet** 24:7
34:19,24

**show** 7:24 32:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

sign 9:14,17 20:23

significant 22:3

signs 9:2,7,21 10:11 21:14 23:15 24:11 32:17 33:13

Sir 6:11

sit 10:9

sitting 27:21

situation 12:3 26:5,23 33:21

situations 12:16 14:6

skipped 7:19

sleep 17:18 20:15 31:8 33:5

sleeping 16:23 17:22 18:16 19:19 23:12 30:17,23 32:18

slurring 9:9

snore 31:5 33:5

snored 32:20

snores 31:6

snoring 20:16 31:1,9 32:14

solemnly 6:4

Solutions 11:17 28:13,14

speaking 17:1, 2

specific 14:22 16:24 18:9

specifically 9:21 10:10 16:14 19:24 22:7

speech 9:9

spread 23:24

staff 10:4 12:12 14:13,15 22:17

26:16 29:7,17 30:4,24 33:8 35:22

staggered 20:2 24:9 30:8 33:15

standard 27:10

standards 10:25 28:1

start 31:9

started 22:14 33:6,7

starts 23:17

state 6:11 16:22 17:13 19:20 23:10,13 31:8

statement 32:10 34:8

states 32:11

statutes 10:24

step 21:8 24:17

strip 27:1

stroke 27:17

subject 10:3,6

substance 8:22 10:7

suffering 20:8

suicide 27:19

supervision 25:3

supposed 20:3,4,24

swear 6:4

symptom 9:14,17 31:2

symptoms 9:2,7,21 10:11 23:15 24:12 33:13

system 6:21 31:23 32:4

**T**

taking 13:18

talk 7:1

talking 12:11 19:24 25:20

ten-week 7:14

tenants 26:21

terminated 28:11

testified 13:6

testifies 32:10

testimony 6:5 32:12

thing 27:3

things 11:1 33:20

thinking 15:6

time 10:21 12:4,23 15:12 32:12 36:6

times 25:19

today 10:9 22:5 23:8 33:4

told 10:10 15:22,24

totally 21:18

trained 16:21

training 7:7,11 8:13,18 9:19 10:15,18,21 11:2 17:7,10 23:15 33:13

trauma 12:2

traumatic 20:8

treat 26:22

treated 26:23

treatment 22:23 23:1 24:4 33:17

triggered 22:17

truth 6:6,7

turned 12:5

type 9:11 17:7 36:12

**U**

Uh-huh 19:6 21:6 22:24 24:1,6 32:1 33:12,19

unconscious 16:23 17:23 19:20 28:22,25 30:15,18

unconsciousn ess 11:6 23:11 29:9,11,16,22 30:12 31:13

understand 18:6 19:3 24:14 30:2 35:14

understanding 18:7

uneven 9:10

uniform 25:17, 19

unresponsive 17:23 19:21

unsteady 9:9

Usage 8:21

utilize 21:21 31:23

**V**

virtue 19:7

**W**

wake 21:9 30:18,22 32:21 33:22 34:8,9 36:13

waking 24:13, 16

water 12:7,8

wearing 25:17, 19

welfare 17:5 18:5

whipped 26:15

wife 31:5

woken 17:22

work 14:4

worked 21:23

worthy 17:16

wristband 34:21

**Y**

year 16:16

years 6:23 17:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com