1            UNITED STATES DISTRUCT COURT

2            WESTERN DISTRICT OF KENTUCKY

3               LOUISVILLE DIVISION

4           CASE NO. 3:13-CV-427-CRS

5

6     DANIELLA BLAINE, ADMINISTRATRIX OF THE ESTATE OF

7          KENNETH H. CROSS, II, DECEASED

8                  PLAINTIFF

9                    VS.

10            CORIZON, INC., ET AL.

11              DEFENDANTS

12

13

14

15

16

17

18

19

20

21

22

23  DEPONENT:   STEPHANIE KOHL

24  DATE:      DECEMBER 18, 2014

25  REPORTER:   AMANDA BECERRA

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                          APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, DANIELLA BLAINE,

4    ADMINISTRATRIX OF THE ESTATE OF KENNETH H.

5    CROSS, II, DECEASED:

6    GREGORY A. BELZLEY

7    BELZLEY BATHURST, ATTORNEYS

8    3604 CONSTANTINE DRIVE

9    P.O. BOX 278

10   PROSPECT, KY 40059

11   TELEPHONE NO.: (502) 292-2452

12   EMAIL: GBELZLEY@AOL.COM

13

14

15   ON BEHALF OF THE DEFENDANT, CORIZON, INC.:

16   MATTHEW A. PIEKARSKI

17   PHILLIPS PARKER ORBERSON & ARNETT, PLLC

18   716 WEST MAIN STREET

19   LOUISVILLE, KY 40202

20   EMAIL: MPIEKARSKI@PPOALAW.COM

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 3 of 149 PageID #: 769
The Deposition of STEPHANIE KOHL, taken on December 18, 2014

3

1   ON BEHALF OF THE DEFENDANTS, OFFICER CHAD TINNELL

2   AND OFFICER DANIEL McNAMARA:

3   ELLEN M. HOUSTON

4   DRESSMAN BENZINGER LAVELLE, PSC

5   THOMAS MORE PARK

6   207 THOMAS MORE PARKWAY

7   CRESTVIEW HILLS, KY 41017

8   TELEPHONE NO.: (859) 426-2179

9   FACSIMILE NO.: (859) 341-1469

10  EMAIL: EHOUSTON@DBLLAW.COM

11  (VIA TELEPHONE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

4

```
 1                            INDEX

 2                                               Page

 3    DIRECT EXAMINATION BY MR. BELZLEY             6

 4    CROSS-EXAMINATION BY MS. HOUSTON            124

 5    CROSS-EXAMINATION BY MR. PIEKARSKI          130

 6    REDIRECT EXAMINATION BY MR. BELZLEY         131

 7

 8                          EXHIBITS

 9                                               Page

10       1    NURSES NOTE                          22

11       2    SUBSTANCE ABUSE

12            WITHDRAW FLOW SHEET                  54

13       3    RECORDS                             65

14       4    LAUREL COUNTY POLICY

15            AND PROCEDURES                      123

16       5    CUSTODY & CARE

17            RESPONSE MATRIX                     123

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                        STIPULATION

2

3    The deposition of STEPHANIE KOHL was taken at Phillips

4    Parker Orberson & Arnett, PLLC, 716 West Main Street,

5    Suite 300, Louisville, Kentucky on Thursday the 18th

6    day of December, 2014 at approximately 12:00 P.M.  Said

7    deposition was taken pursuant to the Federal Rules of

8    Civil Procedure. It is agreed that Amanda Becerra,

9    being a Notary Public and Court Reporter for the State

10   of Kentucky, may swear the witness.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                      PROCEEDINGS

 2

 3             COURT REPORTER:  Ma'am, will you please raise

 4   your right hand.  Do you solemnly swear or affirm that

 5   the testimony you are about to give will be truth, the

 6   whole truth and nothing but the truth?

 7             THE WITNESS:  Yes.

 8             COURT REPORTER:  Thank you.

 9                  DIRECT EXAMINATION

10             BY MR. BELZLEY:

11        Q    Would you state your name for the record

12   please?

13        A    Stephanie Ann Kohl.

14        Q    And how old are you?

15        A    I am 34.

16        Q    And what do you do for a living?

17        A    I'm a nurse.

18        Q    And what kind of a nurse are you?

19        A    I'm a licensed practical nurse.

20        Q    And who do you work for or with?

21        A    I work for CCS.

22        Q    And is that an acronym for a company?

23        A    Correct Care Solutions.

24        Q    When did you begin work for Correct Care

25   Solutions?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

7

1        A     December 1st of last year.

2        Q     Of 2013?

3        A     Yes.

4        Q     And prior to working for Correct Care

5   Solutions who did you work for?

6        A     Corizon Health Care.

7        Q     Now where is it that you work for Correct

8   Care Solutions?

9        A     400 South Sixth Street, Fourth Street, 400

10  South -- I'm not sure of the exact address.

11       Q     Is that the Louisville Metro Jail?

12       A     Yes, it is.

13       Q     And prior to working for Correct Care

14  Solutions at the Louisville Metro Jail, did you work

15  for Corizon Health Care at the Louisville Metro Jail?

16       A     Yes, I did.

17       Q     How long did you work for Corizon Health Care

18  at the Louisville Metro Jail?

19       A     Five years.

20       Q     At the time of the incident we're going to be

21  discussing today, which took place on August 25, 2012,

22  I take it you were, at that time, working at the

23  Louisville Metro Jail under the employment of Corizon

24  Health Care?

25       A     Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And were you, at that time, an LPN?

2    A    Yes.

3    Q    Where did you go to high school?

4    A    Jefferson County.

5    Q    Are you a life-long Louisville resident?

6    A    Yes, I am.

7    Q    And after graduating from Jefferson High

8    School, did you go to college?

9    A    Yes, I did.

10   Q    Where did you go?

11   A    I went to LCC, Lexington Community College.

12   Q    Did you graduate from Lexington Community

13   College?

14   A    Nope.

15   Q    When was it that you attended Lexington

16   Community College?

17   A    Oh I don't know the definite dates, but it

18   was between 2000-2001, somewhere -- I'm not sure.

19   Q    That's okay.  After leaving Lexington

20   Community College, did you enroll in any other

21   secondary education institutions?

22   A    No.

23   Q    Where did you get your nursing degree?

24   A    Spencerian College.

25   Q    And when did you get that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          A     Maybe 2006 or 2007, I'm not sure of the date.

2          Q     Okay.  Beginning with the date on which you

3    obtained your licensed practical nurse certification,

4    can you tell me about your employment history?

5          A     I worked for Harborside of Louisville for 120

6    hours required by the Kentucky Board of Nursing, prior

7    to sitting for boards.  Once I completed that, I went

8    to Timbrook Hospital, KMI Dupont, and I was there for

9    two years on the Residential Adolescent Treatment

10   Facility.

11         Q     The Residential and the what treatment?

12         A     The Adolescent Treatment Facility.

13         Q     When you went to work at the Louisville Metro

14   Jail was that in the employee of Corizon Health Care?

15         A     Yes.  No, it was another company before

16   Corizon bought it.

17         Q     Okay.

18         A     I believe so.

19         Q     Okay.

20         A     I could be wrong.  It was just for a year.

21         Q     Do you remember whether the name of that

22   company might have been Correctional Medical Services?

23         A     Yes.  Yes, that's who it was CMS.

24         Q     Okay.  Now you said that you had worked for

25   Corizon Health Care at the Louisville Metro Jail for

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   five years.  Do you remember how long you worked for

2   Correctional Medical Services at the Louisville Metro

3   Jail?

4        A    It must have been, I was with -- I don't know

5   when -- I don't know when CMS and Corizon merged.  It

6   was somewhere within that five -- maybe it was the

7   first year.  I'm not sure of the dates.

8        Q    Okay.  Just so I'm clear.  You've been

9   working -- your employer has been Correct Care since

10  December 1 of 2013.

11       A    Yes.

12       Q    And for the five years preceding that, you

13  were employed by either Correctional Medical Services

14  or Corizon Health Care?

15       A    Yes.

16       Q    There was a merger at some point.

17       A    Yes, there was.

18       Q    Do you remember when you began work at the

19  Louisville Metro Jail?

20       A    November 1st, 2009.

21       Q    Prior to going to work at the Louisville

22  Metro Jail in November 2009, had you ever worked in a

23  correctional environment before?

24       A    Nope.

25       Q    What attracted you to that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A     I'm sorry -- why I chose to work there?

2     Q     Yeah.  Why did you -- was there something

3 about working at the --

4     A     It was a flexible schedule.  I had a child

5 and my husband was getting his professional degree.

6     Q     Okay.  What does your husband do?

7     A     He's a nurse.

8     Q     And you have just the one child?

9     A     Just one.

10     Q     Now are you aware of a lawsuit that was filed

11 against Correctional Medical Services back in February

12 of 2009 by the estate of Solisa Stone?

13     A     No.

14     Q     Do you recall whether you had any involvement

15 in the care of Ms. Stone while she was in the

16 Louisville Metro Jail?

17     A     I don't remember.  What -- what year was it?

18     Q     This was -- she was -- Ms. Stone was there on

19 February 7, 2008.

20     A     I can't recall.

21     Q     Okay.  In the period of time you have worked

22 at the Louisville Metro Jail have you ever heard about

23 Ms. Stone's lawsuit, or the facts of her case?

24     A     I can't remember, not really.

25     Q     In the period of time that you worked at the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Louisville Metro Jail have you heard about a prior

2    lawsuit involving an individual who died of a drug

3    overdose while incarcerated at the jail?

4        A    What year was that?

5        Q    In the time that you have worked at the

6    Louisville Metro Jail, have you heard any mention made

7    of a lawsuit filed by an individual's estate who died

8    of a drug overdose while at the jail?

9        A    I don't remember.

10       Q    In the period of time that you have worked at

11   the Louisville Metro Jail, has any of your -- or have

12   any of your employers, whether that's Correctional

13   Medical Services, Corizon, or Correct Care Solutions,

14   provided you any specific training or instruction

15   concerning assessment and monitoring of persons who

16   have possibly taken an overdose of drugs?

17       A    I'm sorry.  You're going to have to rephrase

18   that.

19       Q    Okay.  At any time during the period of time

20   that you have worked at the Louisville Jail, have any

21   of your employers, whether that's Correctional Medical

22   Services, Corizon, or Correct Care, provided you any

23   specific instruction in dealing with persons who may

24   have taken an overdose of drugs?

25       A    Like in-service meetings?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Uh-huh.

2      A      Yeah.

3      Q      What do you remember about being -- what do

4  you remember being told about those types of

5  individuals and the care they required?

6      A      On a -- I'm sorry.  On a -- on a possible

7  overdose?

8      Q      Uh-huh.

9      A      Signs and symptoms to look for.

10     Q      Do you remember what those signs and symptoms

11 were?

12     A      I don't know if it's specifically from the

13 meeting, but also what I learned just in nursing -- in

14 school.

15     Q      Okay.

16     A      I don't know if they would run together or...

17     Q      What do you understand to be the signs and

18 symptoms of a drug overdose?

19     A      It depends on which drug.

20     Q      Okay.  Well let's say an individual comes

21 into the jail.  He appears to be impaired.  He

22 acknowledges taking drugs previously, but you're unable

23 to determine what type of drug.  What signs and

24 symptoms would you look for to determine whether he's

25 taken an overdose of drugs?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1         MR. PIEKARSKI:  Object to form.  You can

2    answer that.

3         WITNESS     I don't -- okay.

4         MR. PIEKARSKI:  If you can.

5    A    What would be the sign -- I'm sorry. Repeat

6    the --

7    **Q    Okay.**

8    A    -- I'm trying to pay attention, lots of

9    words.

10   **Q    Well before I ask you that question, is it --**

11   **have you come here after working the third shift at the**

12   **jail?**

13   A    No.

14   **Q    Okay.  Is there any reason why -- are you on**

15   **any medication, or is there any reason why we can't**

16   **rely on your responses to my questions being reliable?**

17   A    No.

18   **Q    Okay.  My question to you was: If an**

19   **individual comes into the jail and he appears impaired**

20   **or intoxicated, but he can't tell you what drugs he's**

21   **taken, what are the signs and symptoms you look for to**

22   **determine whether he has taken an overdose of drugs?**

23        MR. PIEKARSKI:  Object to form.  Go ahead and

24   answer.

25   A    Vital signs.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Anything other than vital signs?

2    A    Pupils.  Whether they can answer and speak.

3   Are they conscious?  Are they alert and oriented?

4    Q    Anything else?

5    A    Not off the top of my head.

6    Q    Now in terms of vital signs, what are you

7   looking for?

8    A    I'm looking for -- I'm looking at blood

9   pressure, pulse rate, respirations.

10   Q    And when it comes to blood pressure are you

11  looking for elevated blood pressure or low blood

12  pressure?

13   A    It depends on the drug.

14   Q    How about pulse rate?

15   A    It depends on the drug.

16   Q    How about respiration?

17   A    It depends on the drug.

18   Q    So when you say, "it depends on the drug,"

19  are you saying that depending upon the drug, their

20  blood pressure could be high or low?

21   A    If someone comes in on cocaine, their blood

22  pressure and their pulse rate would be elevated.

23   Q    Okay.

24   A    If they're on heroin, it would be decreased.

25   Q    How about pulse rate?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Same.

2      Q     And respiration?

3      A     It would be decre -- depending on the drug,

4  it would be elevated or decreased.

5      Q     How -- can you generalize as to opioids, what

6  the effect opioids would have on blood pressure, pulse

7  rate and respiration?

8      A     They would be decreased.

9      Q     Decreased.

10     A     Uh-huh.  Because I'm looking at something

11  under 140 systolic.  You're looking for something lower

12  like in the 100s, 90s.

13     Q     In terms of pulse rate what would you be

14  looking for?

15     A     Lower.  Something low 60s, 50s.

16     Q     And respiration?

17     A     Lower, less than 10.

18     Q     Now would those vital signs perhaps not

19  reflect a drug overdose depending upon when they are

20  taken in relation to the ingestion of the drug?

21     A     It's possible.

22     Q     For example, if an individual had just taken

23  the drugs, I mean literally just swallowed them before

24  you took his vital signs, you wouldn't expect to see

25  any effect on the vital signs; would you?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. PIEKARSKI:  Object to form.

2     A    It's possible.

3     Q    **And as time went on the -- you would expect**

4  **to see an impact on the vital signs, not only a change**

5  **in the vital signs, but a change becoming more**

6  **pronounced over time; would you not?**

7     A    Yes.

8     Q    **Now prior to Mr. Kenneth Cross, who we're**

9  **going to discuss today, prior to his being in the jail**

10 **in August of 2012, had you received any specific**

11 **instruction that you can recall on dealing with persons**

12 **who had taken or may have taken an overdose of drugs?**

13         MR. PIEKARSKI:  Object to the form.  You can

14 answer if you can.

15         WITNESS:  Am I supposed to answer?

16         MR. PIEKARSKI:  Yeah, you are.  I'm sorry.

17         WITNESS:  Okay.

18         MR. PIEKARSKI:  I'm confusing you.  I'm

19 sorry.

20    A    Like specific meetings, or I mean we have in-

21 services monthly where it could have been discussed.  I

22 don't have the meetings in front of me to...

23    Q    **Okay.  I guess what I'm saying is just do you**

24 **have -- as you sit here today, do you have an**

25 **independent recollection prior to Mr. Cross being in**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 18 of 149 PageID #: 784
The Deposition of STEPHANIE KOHL, taken on December 18, 2014

18

1    the jail and your dealings with him, a training class

2    you took, a seminar you attended, an in-service

3    meeting, anything of that nature that was devoted

4    specifically to dealing or managing persons who came

5    into the jail who may have taken an overdose of drugs?

6         A    Probably when we started the new detox

7    protocol, or when we started those thick packets.

8         Q    Now when did they do that?

9         A    I don't know the date.

10        Q    And do you remember which of your employers

11   started that, whether that came in under Correctional

12   Medical, or Corizon, or Correct Care?

13        A    I'm un -- I'm unaware.

14        Q    Do you remember what you heard at that time,

15   whenever that was?

16        A    No.  I mean, word for word, what happened in

17   the meeting?  No, I'm sure whenever the packet -- the

18   new packet, what's expected.

19        Q    Now am I correct that as a licensed practical

20   nurse, you cannot, by virtue of the scope of your

21   practice, diagnose or treat medical conditions on your

22   own?

23        A    No nurse can diagnose.

24        Q    Okay.

25        A    LPN or RN.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      And you cannot treat, or determine the

2   appropriate treatment for an individual; can you?

3      A      We're given orders by a physician, all nurses

4   are.

5      Q      So what you do, and what you can do, is you

6   can assess a patient, you can report that to a

7   physician, and then you can provide the treatment to

8   the patient that is directed by the physician; correct?

9      A      That is correct.

10      Q      Back on August 25, 2012, do you recall who

11   your supervisor was?

12      A      Is this the case where...

13      Q      That's Mr. Cross' case.

14      A      Yeah.

15      Q      Who was your supervisor?

16      A      T. J. Sloan.

17      Q      And I believe on that date you were working

18   the second shift; is that correct?

19      A      Yes, that is correct.

20      Q      What were the hours of that shift?

21      A      3p to 11p.

22      Q      And where were you stationed or assigned to

23   work during that shift?

24      A      The booking floor.

25      Q      Was there any other medical professional

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    working the booking floor with you when you were there?

2         A     Yes, I had a partner.

3         Q     Who was that?

4         A     I don't know.

5         Q     To your recollection, did your partner have

6    any contacts with Mr. Cross?

7         A     I couldn't even know.

8         Q     Did you consult with your partner about Mr.

9    Cross?

10        A     Uh-uh.  You worked independently, but side by

11   side.

12        Q     Okay.  So you did not consult with that other

13   individual?

14        A     No, I did not.

15        Q     Where was Ms. Sloan located?

16        A     She was in the nurse's station.

17        Q     And that's on the second floor?

18        A     Second floor.

19        Q     And the booking floor, is that the first

20   floor?

21        A     That's the first floor.

22        Q     Other than you and your partner working on

23   the booking floor, were there any other medical

24   professionals that you can recall on the booking floor?

25        A     No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

21

1    Q    Do you know who Ms. Sloan's supervisor was?

2    A    That night?

3    Q    Yeah.

4    A    Probably would have been the Director of

5  Nursing.

6    Q    Do you know who that was at the time?

7    A    I would guess it was Alicia Fox.

8    Q    Was Ms. Fox at -- now I'll tell you August

9  25, 2012, was a Saturday.  Do you know whether Ms. Fox

10  was at the jail when Mr. Cross came in?

11    A    No, she was not.

12    Q    Were there any ARNPs at the jail when Mr.

13  Cross came in?

14    A    Physically at the jail?

15    Q    Yeah.

16    A    No.

17    Q    Were there any physicians at the jail when

18  Mr. Cross came in?

19    A    No.

20    Q    Other than Ms. Sloan, were there any

21  registered nurses on duty at the jail when Mr. Cross

22  came in?

23    A    I would have to see the assignment sheet to

24  tell if there were other nurses.

25    Q    Did you contact anybody outside the jail and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   discuss with them Mr. Cross?

 2       A    No.

 3       Q    When you were assessing Mr. Cross did you

 4   contact any physicians?

 5       A    No.

 6       Q    Or ARNPs?

 7       A    (No verbal response).

 8       Q    You need to say "yes" or "no."

 9       A    Oh, no.

10       Q    When you were preparing the various

11   documents, and the flow sheets, and the treatment

12   plans, did you consult with any physicians or ARNPs

13   about those?

14       A    No, that's all done at the end of the shift.

15       Q    Did you ever discuss Mr. Cross with any

16   physician or ARNP from the time you met him until he

17   was found unresponsive in the cell?

18       A    Nope.

19       Q    When Mr. Cross came into -- well let me show

20   you what's been marked -- what I marked Exhibit 1 to

21   your deposition.

22            (EXHIBIT 1 MARKED FOR IDENTIFICATION)

23            MR. BELZLEY:  Ellie, this is the document

24   that has at the top "Corizon Intervention Progress

25   Notes."
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

23

```
 1              MR. PIEKARSKI:  It's either 2 or 3 to Sloan's
 2    deposition.
 3              MS. HOUSTON:  Okay.  Thank you.
 4              MR. BELZLEY:  Okay.
 5       Q    Let me ask you if you can identify the
 6    document I've marked Exhibit 1.
 7       A    Yeah.  I can identify it.
 8       Q    What is it?
 9       A    It's a nurse's note.
10       Q    Now looking at the first page, is there any
11    information on this first page that was put there by
12    anybody other than you?
13       A    Nope.
14       Q    Okay.  Under "Allergies," there's the acronym
15    "KNDA."  I think that's supposed to be "NKDA" and
16    stands for "no known" -- basically "no known
17    allergies."
18       A    Yes.
19       Q    Okay.  Under your progress SOAP notes, you
20    have indicated the date of August 25, 2012, and the
21    time of 5:18 p.m.  Is the time of 5:18 p.m. the time
22    that you prepared this note, or is that the period of
23    time that you first saw Mr. Cross, or is there a
24    difference?
25       A    This was done once the assessment was
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 24 of 149 PageID #: 790
The Deposition of STEPHANIE KOHL, taken on December 18, 2014

24

1   complete.  It was like my blurb of our assessment, it

2   was --

3        Q      Okay.

4        A      -- required.

5        Q      So the 5:18 p.m. was the time that was at or

6   near the time of the completion of your assessment of

7   Mr. Cross?

8        A      Yes.

9        Q      Okay.  You state "IM" and I take it that's an

10  abbreviation for "inmate;" is that right?

11       A      Yes, that is correct.

12       Q      And you state "Inmate presents at medical

13  stumbling to station."  Is that the first time you had

14  seen Mr. Cross?

15       A      No.

16       Q      What did you know about Mr. Cross, what had

17  you seen about Mr. Cross, what had you heard about him

18  before he presented at "medical stumbling to station?"

19       A      He spoke very loudly throughout the entire

20  floor.

21       Q      Okay.  You heard him coming?

22       A      Yes.

23       Q      And what was he saying?

24       A      There's a screening process.  He spoke with

25  pretrial prior to medical.  So whatever questions they

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    asked him about -- I don't know what they're -- they

2    talk about -- fines, going to see court or when he

3    might be scheduled for court.  I don't know what they

4    do, but I know that when he was three stations down we

5    could all hear him talking.

6         Q    Do you remember anything he was saying?

7         A    Just that he was very loud.

8         Q    Very loud.  Now when you say he was "very

9    loud," was he yelling -- was he -- did it strike you

10   that he was angry and yelling at somebody, or was he

11   one of these guys that just has sort of a booming voice

12   and was --

13        A    Booming voice that carries.

14             MR. PIEKARSKI:  Objection to form.

15        Q    Okay.  But --

16             MR. PIEKARSKI:  I just want it noted.

17        Q    But you don't -- you didn't know -- you heard

18   him, but you didn't really hear, or make a note of

19   anything you were hearing him say?

20        A    No.  Uh-uh.

21        Q    No?

22        A    I don't -- I know -- that's not my answer.  I

23   could -- I heard him say that he lived with his mother

24   like, because I knew he was coming down to me.

25        Q    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    So I was just kind of halfway listening to

2   what he was saying.

3      Q    Do you remember him saying anything, or

4   hearing him say anything else, before coming to where

5   you were?

6      A    He asked for a sandwich and some juice.

7      Q    Sandwich and juice?

8      A    Uh-huh.

9      Q    Anything else?

10     A    No.

11     Q    Did you hear anything he was told by anybody

12   in the jail before he got to you?

13     A    No.

14     Q    Okay.  Now you state "Inmate presents at

15   medical stumbling to station."  Now tell me -- can you

16   be more specific about that?

17     A    No.

18     Q    But it was your impression that he was

19   stumbling to where you were?

20     A    Yes.

21     Q    Did he stumble over something, trip over

22   something?

23     A    His gait didn't appear steady.

24     Q    His gait was unsteady.  Did he appear to be

25   staggering?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      Hmmmmmm, no.

2      Q      Now you say, "He states he drank half a beer

3 today only."

4      A      Uh-huh.

5      Q      "But takes xanax and lortab for pain."

6      A      Uh-huh.

7      Q      Did he tell you what condition he took the

8 xanax for?

9      A      There was some mental health history there.

10     Q      Did he tell you how often he took it?

11     A      No, he did not.

12     Q      Did you ask him?

13     A      Yes.

14     Q      But he couldn't tell you?

15     A      Uh-uh.

16     Q      No?

17            MR. PIEKARSKI:  You've got say "yes" or "no."

18     A      Oh, no.

19     Q      How about the lortab?  Did you ask him for

20 what condition he took the lortab?

21     A      Yes, I did.

22     Q      And what did he tell you?

23     A      A chronic pain management.  He was in an

24 accident, a car accident.  He was thrown from a

25 vehicle.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      And did you ask him how often he took lortab?

2      A      Uh-huh.

3      Q      And did he tell you --

4      A      Yes, sorry.

5      Q      -- did he tell you how often he took it?

6      A      I would have to look at my chart to know, or

7   the initial assessment to see what he told -- right off

8   the top of my head right here in this meeting, no.

9      Q      All right.  You said he had "slurred speech;"

10  is that correct?

11     A      Yes.

12     Q      And a strong odor of "ETOH," E-T-O-H, meaning

13  alcohol?

14     A      Yes.

15     Q      Did it smell -- given that he had told you

16  that had drank only half a beer, did his strong odor of

17  alcohol seem consistent with that?

18     A      Uh-huh.  Yeah.

19     Q      Okay.  Did you believe that he had probably

20  drunk more than the half of beer he had acknowledged

21  drinking that day?

22     A      Did I believe?

23     Q      Yeah.  Or did you suspect he had drunk more

24  than the half of beer he had acknowledged -- all

25  acknowledged drinking that day?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A       Yeah.  Yes.

2       Q       Did you ask him whether he had had anything

3  other than beer?

4       A       Yes, I did.

5       Q       What did he tell you?

6       A       I believe he said he he'd -- I would have to

7  look at the chart.  I don't know right off the top of

8  my head what stated right here.

9       Q       All right.  Now you state, "Inmate appeared

10  to fall asleep several times during his interview."

11  Can you tell me -- you said he "appeared to fall

12  asleep."  Tell me what you were observing that you've

13  described as his "appearing to fall asleep."

14      A       He would close his eyes.

15      Q       Was he sitting -- where was he sitting in

16  relation to you?

17      A       Like across the table, like you are to me.

18      Q       Did his chair have a back on it?

19      A       Yes, it did.

20      Q       Did he lean back on -- into the back of the

21  chair?

22      A       I can't recall.

23      Q       He would close his eyes?

24      A       Uh-huh.

25      Q       Would his head bob?  Either downward or back?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      Yeah.

2      Q      Do you know how many times -- well let me

3   back up.

4      A      No, I don't.

5      Q      Do you remember whether -- when his head

6   would bob, whether it would bob down on his chest or

7   bob back towards the back of the chair?

8      A      No, I don't.

9      Q      Do you know how many times he did that while

10  you were talking to him?

11     A      No, I don't.

12     Q      Would he do that while he was talking to you?

13     A      No.

14     Q      Would he do that while you were talking to

15  him?

16     A      We're writing out paperwork because I'm doing

17  paperwork as I'm assessing him.

18     Q      All right.  Were you concerned that he was

19  appearing to fall asleep several times during his

20  interview at -- you know, roughly between 5:00 and 5:30

21  p.m. on a Saturday?

22     A      No.

23     Q      Were you concerned that he was behaving that

24  way when he told you that he had only drank half a beer

25  that day?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     No.

2      Q     Did you believe -- well let me hold that. You

3   next state, "Inmate slurred words, stumbled over his

4   sentences, would ramble."  Can you give me an example

5   of what you mean when you say, "He stumbled over his

6   sentences?"

7      A     He repeated himself several times.

8      Q     Okay.

9      A     He would get -- he would talk about his

10  mother.  He would get easily distracted in the

11  conversation.  I would have to redirect him back to the

12  topic that I would want him to be addressing.

13     Q     All right.  Now you -- a couple of sentences

14  further on you state, "Inmate was placed on detox."

15     A     Yes.

16     Q     Why did -- now who placed him on detox?

17     A     I did.

18     Q     Did you talk to anybody or consult with

19  anyone before placing Mr. Cross on detox?

20     A     Not at all.

21     Q     Did you refer to any documentation before

22  placing Mr. Cross on detox?

23     A     What documentation are you referring to?

24     Q     Any protocols, any policies, procedures?

25     A     Yes.  I referred to prior policy of why I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   would place an inmate on detox.

2       Q    Okay.  When you referred to that, did you

3   actually, specifically, look at the policy or the

4   protocol before making the decision to put Mr. Cross on

5   detox?

6       A    Yes.

7       Q    Do you remember what the name of the policy,

8   the number of the policy --

9       A    Oh.

10      Q    -- the type of the policy you looked at it?

11      A    I'm sorry.  I misunderstood your question.

12      Q    That's okay.

13      A    Like a physical policy.  Did I pull a policy

14  out of a manual and look at it?  Is that what you're --

15      Q    Yeah.

16      A    No.  I did not do that.

17      Q    Okay.  Did you decide to place Mr. Cross on

18  detox based upon your knowledge of policies,

19  procedures, protocols in place at the jail at the time

20  he was there?

21      A    And based on what he told me and his

22  medication history, yes.

23      Q    Okay.  What were the -- can you tell me what

24  were the policies, procedures, or protocols you had in

25  mind that led you to put Mr. Cross on detox?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 33 of 149 PageID #: 799
The Deposition of STEPHANIE KOHL, taken on December 18, 2014

33

1    A    He had -- he told me that he had been using

2  lortab for chronic pain, so any kind of -- and xanax

3  for anxiety -- or I don't know if it was anxiety, but

4  related to mental health issues and anytime you're even

5  on those medications, both of them, you know,

6  regardless if you're taking them, especially since he

7  said that -- I don't remember when he was in a motor

8  vehicle accident in 2007 -- coming off of those and not

9  having access to those in the jail would be means to

10  place him on detox.

11    Q    Okay.  Let's say Mr. Cross came in on the

12  25th and was in the jail for a week.  Would he have

13  been able to get xanax or lortab in the jail?

14    A    No.

15    Q    No?

16    A    Nope.

17    Q    And so --

18         MR. PIEKARSKI:  Wait until he finishes his

19  question.

20         WITNESS:  Okay, sir.

21         MR. PIEKARSKI:  I know you guys are

22  connecting.  This happens in my depositions all the

23  time.

24         MR. BELZLEY:  Yeah.  Yeah.

25         MR. PIEKARSKI:  Yeah, I just want to remind

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

34

```
 1   you.
 2              WITNESS:  All right.
 3        Q    And so in light of your knowing that, knowing
 4   that he -- his having told you that he took medications
 5   that you knew that he would -- or could not be provided
 6   while he was in the jail, you anticipated that he was
 7   at risk for withdrawal from those medications?
 8        A    Yes.
 9        Q    And is that why you put him on detox?
10        A    Because of what he told me, yes.
11        Q    Okay.  Is there any other reason you put him
12   on detox?
13        A    No.
14        Q    Now when you said -- then you also say,
15   "Bottom bunk entered into computer."
16        A    Uh-huh.
17        Q    What does that mean?
18        A    That's the standard procedure, once
19   somebody's placed on detox, they're placed on a bottom
20   bunk in case they have a seizure.
21        Q    And you don't want them falling out of the
22   top bunk?
23        A    That's correct.
24        Q    "MH" stands for "mental health," "referral
25   complete?"
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Yes.

2      Q     And what does that mean, that the "mental

3 health referral is complete?"

4      A     That a mental health professional will see

5 him within 24 hours of his admission.

6      Q     Did you know, or have an understanding -- you

7 say "within 24 hours" -- did you have an expectation

8 that that would be a certain time in the next 24 hours,

9 and by that I mean he's coming in at 5:00, did you

10 expect that the mental health professional would be

11 seeing him at 8:00 or 9:00 the next morning, or

12 something of that nature?

13      A     They have a policy -- I don't know how

14 they're, like -- all I know, from the medical

15 standpoint, that's all we have to do is refer.  And

16 then I think they have a policy that one of their

17 mental health professionals has to see them.

18      Q     Okay.  Your expectation having completed the

19 mental health referral was that he would be seen within

20 the next 24 hours by a mental health professional; is

21 that right?

22      A     Uh-huh.

23      Q     But you didn't know specifically when in that

24 24 hour period he would be seen?

25      A     That's correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      "Class note given to A. Marvels."

2      A      Yes.

3      Q      Does that mean a classification note?

4      A      Yes.

5      Q      And the classification note was an indication

6  of where you thought this individual needed to be

7  housed?

8      A      Yes.

9      Q      And who is A. Marvels?

10     A      She is a -- I believe -- I'm trying to --

11  she's a classification intake.   That's her position.

12     Q      Okay.  If you turn to the second page, do you

13  know when Mr. Cross was found unresponsive in his cell?

14     A      After I called T. J. Sloan.

15     Q      Well do you know the time at which he was

16  found unresponsive?

17     A      No.

18     Q      I will tell you that the records reflect that

19  it was approximately 8:50 p.m.

20     A      Okay.

21     Q      Tell -- tell me why -- well first of all, did

22  you make the note that appears on the second page of

23  Exhibit 1, "At or around 9:49 p.m.?"

24     A      Yes.

25     Q      And why did you do that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A     Just -- I had spoken to T. J. and she had
 2  told me that he had been sent out under a code, so I
 3  wrote this note.
 4       Q     Okay.  And why did you write this note?
 5       A     Just because he was sent out to the hospital,
 6  I wanted to make sure that as a nurse I had everything
 7  I needed.
 8       Q     If you would -- in comparing these two notes
 9  it looks like in the first note you made at 5:18 p.m.
10  you state that Mr. Cross presents at medical stumbling
11  to station.
12       A     Uh-huh.
13       Q     Is that right?  Now you did not make any
14  mention of that in your 9:49 note; did you?
15       A     No because I had already made mention to it
16  in my 5:18 note.
17       Q     Okay.  Well you had already made mention in
18  your 5:18 note that he had slurred speech, but you
19  included that in your 9:49 note; right?
20       A     You are correct.
21       Q     You stated in your 5:18 note that he took
22  xanax and lortab for pain.  You also included that in
23  your 9:49 note; --
24       A     Uh-huh.
25       Q     -- correct?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A      Correct.

2      Q      Both notes reflect that the inmate stated --

3  well, actually, your 5:18 note states that he told you

4  he had had half a beer that day.  Your 9:49 note

5  indicates that he told you he had drunk one beer;

6  right?

7      A      That's what it says.

8      Q      Your 5:18 note indicates that he had a strong

9  odor of alcohol, but that's not indicated in your 9:49

10 note; is it?

11     A      You're asking me if I put it in my 9:49 note?

12     Q      Yeah.  No?

13     A      I didn't say anything then.  No.

14     Q      And in your 5:18 note you recorded that he

15 appeared to fall asleep several times during his

16 interview, but that doesn't appear in your 9:49 note;

17 does it?

18     A      No.

19     Q      Now one thing that appears in your 9:49 note

20 that does not appear in your 5:18 note is the statement

21 and I quote from your notes:  "Multiple times during

22 this interview I questioned the inmate if he had

23 consumed any substance where inmate denied on multiple

24 occasions only drinking one beer.  Inmate stated he was

25 fine, he had been up all day and had not slept, and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    wanted to lie down."  Now why did you not include that

2    in your 5:18 note?

3          A    Because possibly that it was a sentinel

4    event.  I mean I'm trying to look back several years

5    and the sentinel events I wanted to make sure that

6    anything that was in the note -- this was going to be

7    looked at, you know, by -- I wanted to make sure I had

8    all my information in it.

9          Q    Were you concerned you were adding

10   information concerning your 5:18 assessment of Mr.

11   Cross after he had been found unresponsive?

12         A    Oh, not at all.

13         Q    You indicate in your 9:49 note that "Inmate

14   was childlike when speaking with this nurse and was

15   easily confused;" correct?

16         A    Yeah.

17         Q    When you say he was "childlike," can you give

18   us an example of what you're talking about there?

19         A    I'm a nurse so I can't say "cognitively

20   delayed" or you know that there's "MR" -- I can't

21   diagnose.

22         Q    Right.

23         A    So when I say "childlike," his ability to

24   communicate would not be like yours and mine.

25         Q    Was he speaking like a child or --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    He talked, I think, what is -- he said that

2  he had only completed the seventh grade and he kind of

3  spoke like somebody who had only completed the seventh

4  grade.

5    Q    And you said that he was "easily confused."

6  What observations did you make that led you to that

7  conclusion?

8    A    I had to ask him questions multiple times,

9  redirect him back to the conversation.

10    Q    Did you have to do that on any occasions

11  after he appeared to fall asleep?

12    A    I don't understand.

13    Q    Did you have to re-ask questions, or redirect

14  him back to the conversation, on any occasion when he

15  appeared to fall asleep?

16    A    I'm not sure.

17    Q    Did you see Mr. Cross at any time other than

18  for the assessment that is initially reported at 5:18

19  p.m.?

20    A    No, I did not.

21    Q    How long did you spend with Mr. Cross?

22    A    I can't tell you.

23    Q    Do you have kind of an average you'll spend -

24  - 10, 15, 20 minutes with somebody?

25    A    No.   Hmmmmm 10, somebody -- well somebody

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

41

1    with no problems, none -- no medical history, no

2    anything, maybe 5 minutes.

3         Q      Okay.

4         A      Somebody who has a long extensive medical

5    history or mental health history like 10 to 15 minutes.

6         Q      Okay.

7         A      It depends on the person.

8         Q      Okay.  So is it fair to say given Mr. Cross'

9    history, you probably spent in the neighborhood of 10

10   minutes with him, give or take two or three?

11        A      No.

12               MR. PIEKARSKI:  Objection.

13        Q      What -- what --

14        A      I spent more time with Mr. Cross than I would

15   normally.

16        Q      Why was that?

17        A      Because I wanted to make sure -- I was

18   assessing him and he, you know, he had a motor vehicle

19   accident so I wanted to make sure I gathered all that

20   information to find out where that was.  He had an

21   extensive mental health history.  I was trying to

22   gather that information.  He was also, I think, had

23   cardiac issues.  I was -- he had a lot going on, so I

24   wanted to make sure I gathered all the information for

25   the chart.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q    Okay.  Did it also -- did you also end up

2    spending a longer time with him because he was -- you

3    were dealing with him appearing to fall asleep,

4    stumbling over his sentences, rambling, slurring words,

5    having to redirect him back to the conversation?

6        A    No.

7        Q    Now how would you enter -- what is the

8    mechanical means by which you enter the information

9    that appears in these SOAP notes?

10       A    Computer.

11       Q    So the form comes up on a computer screen and

12   as you type, this information goes in and you can see

13   it filling out the form?

14       A    Yes.

15       Q    Can you print that off?

16       A    Yes.

17       Q    Is there -- once you finish filling out --

18   looking at the first page, for example --

19       A    Uh-huh.

20       Q    -- and you've signed it "S. Kohl, LPN," is

21   there something you do -- do you hit the "save" button

22   to preserve this information?

23       A    This is a separate -- the nursing note is a

24   separate form, as opposed to the assessment.

25       Q    Okay.  But I guess what I'm just talking

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    about is -- I know this comes up on a form on the

2    computer screen.

3        A    Uh-huh.

4        Q    Once you enter this information, is it then

5    somehow electronically stored?

6        A    A note?

7        Q    This -- these two documents.

8        A    No -- no, they are not.

9        Q    You have to print them off in order to

10   preserve them?

11       A    Yes.

12       Q    Okay.  So, if for example, you finish the

13   5:18 note and printed it off, there would have been no

14   way to go back into the computer system and pull up

15   electronically your 5:18 note and add to it?

16       A    That's correct.

17

18       Q    You would have had to prepare a separate

19   note?

20       A    Uh-huh, yes.

21       Q    Like the one we see on the second page of

22   Exhibit 1; correct?

23       A    Yes.

24       Q    When you prepared your note at 9:49 did you

25   consult the note that you prepared at 5:18?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A     No.
 2       Q     Do you remember printing off your 5:18 note
 3  after completing it?
 4       A     Yes.
 5       Q     And after you did that, where did that go?
 6  Where did that document go?
 7       A     It went into his chart.
 8       Q     Okay.  And as a practical matter, his chart
 9  is what -- is it --
10       A     Stapled together and it's taken up for a
11  doctor to sign off on.
12       Q     Is it put in a manila folder?
13       A     No.
14       Q     Okay.  It's just --
15       A     It's stapled together like this.
16       Q     Okay.  It's just free sheets at that point?
17       A     No, it's several sheets.
18       Q     Okay.  Several sheets --
19             MR. PIEKARSKI:  Did you say "three" or
20  "free?"
21       Q     Free.
22             MR. PIEKARSKI:  Yeah.  I think she thought
23  you said "three."
24             MR. BELZLEY:  Yeah.  My -- my mistake.
25             MR. PIEKARSKI:  No, that's all right.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    It's -- they're -- it's sheets of paper,

2  however many, stapled together or clipped in some

3  fashion to keep them segregated from anything else.

4      A    And there's a system that they're filed in.

5      Q    Okay.  Now you state on the first page of

6  these notes, "Inmate presents at medical, stumbling to

7  station."  I take it from that you had a station on the

8  booking floor?

9      A    I did.

10     Q    And where was that?

11     A    Like you want me to draw a picture?

12     Q    Yeah.  That would be great if you could.

13     A    (Witness draws a picture.)  I guess when

14  they're processed they come through an area over here.

15  They're sitting.  There's a female side and a male side

16  and then you have pretrial and medical stations.  I

17  think there's a medical station here and here, and then

18  you've got pretrial and classifications right there.

19  So --

20     Q    Okay.

21     A    -- he walked to my station.

22     Q    Your medical station -- you're sitting at a -

23  - something that serves as a table and there's

24  classification on the other side of you, pretrial on

25  another side --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      They're like cubicles.

2      Q      Cubicles.  And -- okay.  But in -- whenever

3  you did the job you were doing that day, did you always

4  sit at the same cubicle?

5      A      Uh-huh.

6      Q      Did that cubicle have a number?

7      A      Yes.

8      Q      Okay.  Did they --

9      A      Probably Station 4 or 5.

10     Q      Station 4 or 5.  Do you know where you're

11  partner was sitting?

12     A      If I was at 5, she was at 4.  If I was at 4,

13  she was at 5.

14     Q      Okay.

15     A      But I believe that she was to my left that

16  night.

17     Q      So that -- so you would have been in Station

18  5?

19     A      Yes.

20     Q      Okay.  And the fact that you're in a cubicle

21  and this individual is sitting across from you,

22  basically, that that -- because you're in a cubicle you

23  can -- your focus is directed on that individual and

24  you can't see the individuals that are sitting at the

25  other cubicles?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      That's correct.

2      Q      And by that, I mean you can't see the

3    pretrial or the classification people and you can't see

4    the people they might be talking to who are sitting

5    across from you?

6      A      Yes.

7      Q      Okay.  After spending this time with Mr.

8    Cross, the description of which is entered in your

9    notes marked Exhibit 1, did you ever see him again?

10     A      Nope.

11     Q      Did you ever perform any assessment, test,

12   examination, talk to him -- anything, after this?  No?

13     A      No.

14     Q      What was the next thing you heard about Mr.

15   Cross?

16     A      I called up to ask for a break and I was told

17   that he was -- they were doing CPR on him.

18     Q      Okay.  After you had visited with Mr. Cross -

19   -

20     A      Uh-huh.

21     Q      -- and you were done with him, what happened?

22   Did somebody come and get him and take him someplace?

23     A      I passed off the classification notice to

24   Ashley Marvels, which is where he's going, which was, I

25   believe, OBS II, that he was on a lower bunk, so she

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   would know to put him in the jail system so officers

2   would know he's a bottom bunk and he's going to OBS.  I

3   call up to -- and whenever you send an inmate up to

4   mental health or medical you have to call the nurse and

5   give report.

6     **Q So you talk to Ashley Marvels about him --**

7     A Yes.  I passed off my classification note to

8   her.

9     **Q And you called the nurse upstairs?**

10    A Yes, I believe it was T. J.

11    **Q Ms. Sloan?**

12    A Yes.

13    **Q And when you say -- what was it you said you**

14  **passed off to Ashley Marvels?**

15    A The classification sheet.

16    **Q Classification sheet.  Did you, in addition,**

17  **to passing off the classification sheet to Ms. Marvels,**

18  **did you tell her anything about Mr. Cross?**

19    A That he was going to be a detox and that he

20  was going to be going to OBS because she has to locate

21  housing.

22    **Q Okay.  Do you remember telling her anything**

23  **other than that?**

24    A No, I think I -- she -- she had made a

25  comment to me, but I didn't tell her anything.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

49

1      Q      What did she comment?

2      A      I can't -- I think -- I asked him multiple

3   times, like I asked him more than once, "Just one beer"

4   this is just one time and I think that she had made a

5   comment about how much I had asked him and he kept

6   saying, "No" and she kind of giggled about it. But I

7   can't really discuss much with her because it's a

8   medical -- it's like a HIPAA violation.

9      Q      Was it your impression that she found his

10  statement that he had had no more than a beer that day

11  to be not credible?

12              MR. PIEKARSKI:  Object to the form.

13     A      That she didn't think that -- I'm sorry.

14     Q      Did -- was it your impression that Ms.

15  Marvels did not find credible, Mr. Cross' statement

16  that he had only had a beer that day?

17     A      I don't know why Ashley would have asked me

18  that.  I don't know her reasoning behind it.

19     Q      Did you find it credible?

20     A      For Ashley to ask me?

21     Q      No.  Did you find Mr. Cross' statement that

22  he had only had a beer that day, did you find that to

23  be credible --

24     A      I had to.

25     Q      -- did you believe him?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

50

1    A    It doesn't -- I have to believe what he tells

2  me.

3    **Q    Well I -- you only have what he tells you.**

4    A    Right.

5    **Q    But -- but subjectively did you believe him?**

6    A    I can't answer that.  I mean I have to go by

7  what they tell me.

8    **Q    Okay.**

9    A    Did I believe that maybe he had more than

10  half a beer?

11    **Q    Yeah.**

12    A    Oh.  Sure.

13    **Q    And that's -- that's why you kept asking him**

14  **repeatedly how much did you have, how much have you**

15  **had?  You were trying to get him -- trying to see --**

16  **elicit from him some more information that he had given**

17  **you thus far?**

18    A    Yes.

19         MR. PIEKARSKI:  Is that a question?

20    **Q    Okay.**

21         WITNESS:  I need to use the restroom too, at

22  some point.

23         MR. BELZLEY:  Take a break?  Yeah.  Hey,

24  Ellie, we're going to take a break.  Are you still

25  there, I hope?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1            MS. HOUSTON:  I am.

2            MR. BELZLEY:  Okay.  All right.  We're going

3    to take a break.

4            MS. HOUSTON:  Thank you.

5             (OFF THE RECORD)

6            MR. BELZLEY:  Back on the record.

7            BY MR. BELZLEY:

8        Q     Now as I understood your testimony, Ms. Kohl,

9    you had a concern that if Mr. Cross started to

10   experience detox he might also, as a part of that,

11   experience seizure activity.

12       A     Yes.

13       Q     And that's why he was on a bottom bunk?

14       A     Yes.

15       Q     During your -- the time you spent with Mr.

16   Cross, did you observe any behavior or any signs that

17   indicated to you that he might have been experiencing a

18   seizure while you were there looking at him and talking

19   to him?

20       A     No.

21       Q     Or that he had in the recent past?

22       A     I would have to -- if he had had a seizure in

23   the recent past?

24       Q     Uh-huh.

25       A     I would have to look to see if he even told

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    me he had a seizure disorder.

2        Q    Okay.  When you called Ms. Sloan about Mr.

3    Cross, do you remember what you told her about him?

4        A    Word for word?  No.

5        Q    Generally.

6        A    He was coming up to OBS and I explained to

7    her why he was coming up to OBS probably, that he was

8    going to be placed on the detox for lortab and xanax,

9    bottom bunk order, motor vehicle accident, that he was

10   a little delayed, that could be an issue with GPE or

11   something like that, he needed to be seen by mental

12   health.

13       Q    Did you tell Ms. Sloan that you had any

14   concerns that he may have taken an overdose of drugs?

15       A    No.

16       Q    Did you tell anybody else that?

17       A    That I thought he was going to overdose?

18       Q    No, that you had a concern that he may have

19   taken an overdose of drugs before entering the jail?

20       A    No.

21       Q    Would the first -- would your note of 5:18,

22   yeah on August 25, would that have been printed off and

23   made a part of the chart that accompanied Mr. Cross up

24   to the second floor?

25       A    The chart wouldn't have gone directly to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

53

1   second floor --

2        Q       Okay.

3        A       -- with him.

4        Q       Where would it have gone?

5        A       With me, until I called the doctor to get

6   orders and then it would have gone up to the second

7   floor shift change.

8        Q       All right.  Did you ever call the doctor for

9   orders for Mr. Cross?

10       A       No.

11       Q       So when Mr. Cross went up to the second

12  floor, he -- neither he nor the officer that took him

13  up there had that first page of Exhibit 1 with them?

14       A       No.

15       Q       And so at least that document would not have

16  been available to Ms. Sloan to look at when he got up

17  there?

18       A       No.

19       Q       Looking at what you wrote at 5:18 on that

20  note, do you recall whether there -- whether you told

21  Ms. Sloan about any of that, about your observation of

22  his condition, his stumbling, his slurred speech, his

23  nodding off, anything like that?

24       A       I could have.  I don't remember if I did.  I

25  would have probably told her that he had -- what I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   wrote in my note, that would have -- that's kind of

2   like the blurb you give to the nurse coming on or

3   that's taking over, assuming care.

4        Q    Okay.  So you told Ms. Sloan you were putting

5   him on detox, bottom bunk, going in observation --

6   anything else that you told her that you can recall?

7        A    That he had a head injury.

8        Q    Head injury.

9        A    That he takes lortab, xanax, lexapro,

10  probably medical history like if there's a -- I believe

11  there was a cardiac history there.  I would have given

12  her the rundown that would have been on the front page

13  of my assessment.

14       Q    Okay.

15       A    Yeah, that -- which is what we're initially

16  going to focus on.

17       Q    Okay.  Let's get to that in just a second.

18  Let me hand you what I've marked Exhibit 2 and can you

19  identify that for the record please?

20       A    This is a running Detox Flow Sheet.

21       Q    Okay.

22            (EXHIBIT 2 MARKED FOR IDENTIFICATION)

23            MR. BELZLEY:  Ellie, this is the document

24  that has at the top "Correctional Medical Services

25  Substance Abuse Withdrawal Flow Sheet".

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. HOUSTON:  Okay.  Let me get there, just
 2    one second.  Okay.  Got it.  Thank you.
 3              MR. BELZLEY:  Okay.
 4         Q    Now I see at the top there, "Correctional
 5    Medical Services."  It's my understanding that on
 6    August 25, 2012, it was Corizon that was actually your
 7    employer; is that correct?
 8         A    Yeah, that's correct.
 9         Q    It appears that Corizon may have just simply
10    adopted some of the forms, flow sheets, and so on, that
11    had been used previously by Correctional Medical
12    Services.  Is that your understanding as well?
13         A    Yes.
14         Q    Now this Substance Abuse Withdrawal Flow
15    Sheet indicates that the withdrawal observation start
16    date was 8/25/12, the time was 5:06 p.m., and it looks
17    as if down on the flow sheet his vitals, or the
18    information that was recorded there, was either taken
19    or recorded around 5:00 -- is that 5:09?  Or --
20         A    5:06, or 5:07, I'm -- I apologize.  Yeah,
21    5:07.
22         Q    Okay.  5:07.  So I take it that basically you
23    took this sheet out, your filling it, you wrote 8/25/12
24    for the withdrawal observation start date, you looked
25    at the time, it was 5:06.  You checked the tool used,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the baseline -- maybe the baseline severity score and

2    then when you came down and actually started taking the

3    vitals, that's when you put the 5:07 there?

4        A    I've -- the way that I did it is I probably

5    looked at the watch, or looked at the clock on the

6    computer and wrote it, I would guess.

7        Q    All right.  Now it states "Observation Four

8    (mark all that apply) - ETOH, benzodiazepine, opioid,

9    mixed unknown."  Why did you not mark one of those?

10       A    I must have just missed it.

11       Q    Okay.

12       A    It happens.

13       Q    Had you had it to do over, would you have

14   marked one of those?

15       A    I think this is the same form, whether it

16   would have been the -- the sheet's the same, so whether

17   it was marked or not, the same thing would have been

18   done.

19       Q    Yeah, well.  I -- I guess what I'm saying is

20   if we could go back to August 25, 2012, before you let

21   Mr. Cross go and you -- you noticed that nothing had

22   been marked for the "Observation Four," would you have

23   marked one of those four categories?

24       A    Yes, if we could go back.

25       Q    Yeah.  What would you have marked.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

57

1        A     Opiate, because he said he took xanax.

2        Q     **Would you have marked the "ETOH?"**

3        A     Well CIWA is basically what that is, but

4   yeah.

5        Q     **Okay.  Now when it says "Observation Four"**

6   **what does that mean?**

7        A     We're observing for all of those.  Like he's

8   going to be on a CIWA, that's going to be his score.

9   Like the CIWA, the BENZO, the COWS, that's how we score

10  it.

11       Q     **Okay.**

12       A     There's a score sheet.  Alcohol,

13  benzodiazepines -- that if you're on an opiate you're

14  going to be a COW.  If you're on alcohol, you're a

15  CIWA.  So by checking that, alcohol is already -- it's

16  just I didn't mark the box.

17       Q     **And when you talk about CIWA and COW, those**

18  **are acronyms for forms you fill out as appropriate for**

19  **a particular individual?**

20       A     Yes.

21       Q     **And CIWA for the court reporter, is C-I-W-A**

22  **and COW is just C-O-W?**

23       A     Uh-huh.

24       Q     **You, yourself, took his vital signs; correct?**

25       A     Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Looking at those vital signs do you see
2  anything there that you consider to be notable?
3    A    Yes.
4    Q    What was that?
5    A    Well he said he suffered from hypertension
6  and he took lisinopril and his blood pressure was
7  elevated.
8    Q    Okay.
9    A    Would I contact a doctor for that blood
10 pressure?  No.  But I would take note, that's why he
11 would be on lisinopril.
12   Q    Anything other than the elevated blood
13 pressure?
14   A    No.
15   Q    Looking at these headings of the columns,
16 what does "P-E-R-R-L" stand for?
17   A    Pupils Equal Reactive to Light.
18   Q    Under "SAO2" it appears you put his blood
19 pressure and not his oxygen saturation.
20   A    That would be his O2, yeah, which I -- this -
21 - probably on -- there's another form too, the front
22 page of this.
23   Q    Okay.  Under "Tool's Score" you put a "0" and
24 a "/".  That was the results of the administration of
25 the CIWA; right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yeah.  He wasn't showing any --

2    Q    You've circled "Y" for provider notified.

3    A    Uh-huh.

4    Q    How did you notify the provider?

5    A    That being the night, the provider always has

6  to be notified on any detox.

7    Q    Okay.  So is it fair to say you circulated --

8  you circled the "Y" in anticipation of notifying the

9  provider later that evening?

10   A    Yes.

11   Q    "New Orders Received" you circled a "Y," is

12 it also fair to say that that was circled in

13 anticipation of you receiving new orders from the

14 provider after he was notified?

15   A    Yes.  The provider usually does give orders

16 once notified.

17   Q    All right.  But the provider -- a provider

18 was not notified, nor were orders received from the

19 provider before Mr. Cross was found unresponsive; is

20 that correct?

21   A    Yes.

22   Q    You indicated "Observe every eight hours?"

23   A    Uh-huh.

24   Q    And that -- was that your decision?

25   A    That's a standing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

60

1      Q    That's the -- is that dictated by what's
2   called a standing order, or a protocol?

3      A    Uh-huh.

4      Q    Do you remember what standing order or
5   protocol indicated he should be observed every eight
6   hours?

7      A    Anyone who comes into the jail that's placed
8   on a detox is observed once a shift, which is every
9   eight hours.

10     Q    All right.  And those are your initials under
11  "Nurse's Initials?"

12     A    Yes.

13     Q    Did you notify, or was it your intention to
14  notify, the provider later that evening of Mr. Cross'
15  elevated blood pressure.

16     A    Yes, that would be something we would go
17  over.

18     Q    Was this the only time that you took Mr.
19  Cross' vital signs?

20     A    Yes.

21     Q    Do you know whether anybody took his vital
22  signs after this?

23     A    Whether anybody other than me?

24     Q    Yeah.

25     A    I do not know.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      On account of the right side of the sheet is

2    "5:07 p.m. on August 25" the only time that you

3    performed that assessment?

4      A      That was his initial assessment to the

5    facility, yes.

6      Q      And are you aware of whether anybody

7    subsequently performed any other assess -- any

8    subsequent assessment after you did?

9      A      No, I'm not aware if anybody did that.

10      Q      Prior to Mr. Cross coming into the jail and

11    your having direct contact with him, had anyone ever

12    told you that slurred speech was a sign or a symptom of

13    a drug overdose?

14      A      Yes.

15      Q      Had anyone told you that --

16      A      Of a drug overdose?

17      Q      Yes.

18      A      No.  Like a symptom of being under the

19    influence, yes.

20      Q      Had anyone ever told you that stumbling or an

21    uneven gait was a symptom of a drug overdose, or could

22    be a symptom of a drug overdose?

23      A      It could, but it could also be a symptom of a

24    brain injury.

25      Q      Uh-huh.  And had anybody told you that an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   individual nodding off while you were talking to them

2   or engaging with them was a sign or a symptom of a

3   possible drug overdose?

4       A    Related to this case, related to Kenneth

5   Cross?

6       Q    No, just in -- prior to your having contact

7   with Kenneth Cross, anyone ever told you that?

8       A    There could be lots of reasons why somebody

9   nodded off.  I mean he didn't sleep for, he said, quite

10  some time.  I think it had been all day he hadn't had -

11  - laid down.

12      Q    Well that's what he told you.

13      A    Yeah, that's what he told me.

14      Q    But I think my question was had anybody told

15  you that someone nodding off like he was during your

16  conversation with him, that was a sign of or a symptom

17  of a potential drug overdose?

18      A    So your question is whether I think he was

19  overdosing because he was nodding off, is that -- I'm

20  trying to understand the means of your question.

21      Q    All I'm asking is prior to your seeing Mr.

22  Cross, whether anyone had told you that that kind of

23  nodding off is a sign or a symptom of a possible drug

24  overdose?

25      A    That's -- I can't -- I can't really answer

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that question because it could go so many ways.  Is

2   that fair, can I say that?

3        Q    Uh-huh.

4        A    I mean I can't really answer you -- I mean

5   that could be a symptom of many things.  It could be

6   medication, you know, it could be anti-psychotics. It

7   could be --

8        Q    Did you --

9        A    -- lack of sleep.

10       Q    Did you rule out any possible conditions that

11  could have explained Mr. Cross' nodding off while you

12  were interviewing him?

13       A    What do you -- did I rule out that he wasn't

14  overdosing when I was interviewing him?

15       Q    Well did you -- did you rule out anything

16  that could have -- you said that his nodding off could

17  have been caused by a variety of things.  Did you rule

18  any of those out?

19       A    He told me that he hadn't slept.  I think

20  it's even in my notes somewhere, that he hadn't slept

21  all day, or it had been awhile not, I'm not -- he had

22  even mentioned that he was tired, that he had been up

23  all day.

24       Q    Well but you were under the impression he had

25  been drinking; correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    From what he had told me, that he had had a
2  beer or a half a beer, a beer or half a beer.
3    Q    And then you were also -- it was also your
4  understanding that he regularly took opiates?
5    A    That he was prescribed, yes.
6    Q    Right.  And as a consequence he was a danger
7  of withdrawing from both alcohol and opiates; correct?
8    A    It could have been a -- he was placed on
9  detox because he could have withdrawn, yes.
10    Q    Did you undertake to rule out, in any way,
11  the possibility that he may have taken an overdose of
12  drugs?
13    A    Yeah, I asked him.
14    Q    Other than that?
15    A    His vital signs.  I mean I did an assessment
16  on him.  At that time when I spoke to him, I didn't --
17  there wasn't any indicators that he was.
18    Q    When you spoke to Ms. Sloan and sent her
19  upstairs -- or when Mr. Cross went upstairs and you
20  spoke to Ms. Sloan about him, did you indicate to her
21  that he should be kept under any kind of special
22  observation?
23    A    Well he was placed in an observation dorm.
24    Q    What was your understanding of the
25  observation that he would receive while in that dorm?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

65

1    A    He's directly across from the nurse's station

2  and there was possible -- he had an extensive mental

3  health history, so I wanted him to be seen for that

4  especially.

5    **Q    Did you indicate to Ms. Sloan that Mr. Cross**

6  **should be regularly monitored or checked for the level**

7  **of his consciousness?**

8    A    I'm -- like he's going to be a detox so we'll

9  be checking on him every eight hours?  I mean I'm sure

10  I told her that.

11    **Q    Well did you indicate to her, "He's been**

12  **nodding off.  If he goes to sleep -- if he appears to**

13  **go to sleep, wake him up periodically and see if he can**

14  **be aroused?"**

15    A    No, I never told T. J. that.

16    **Q    Did you tell anybody that?**

17    A    To make sure to go in and wake him up?

18    **Q    Yeah.**

19    A    No.

20    **Q    Let me show you what I've marked Exhibit**

21  **3.**

22         MR. BELZLEY:  Ellie, this is kind of a thick

23  document with a lot of stuff in it.  I think it's

24  pretty much the chart, or whatever.

25         MS. HOUSTON:  Yeah.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BELZLEY:  Yeah.  I think the first page

2    is a document that has at the top "Corizon Problem

3    List."

4               (EXHIBIT 3 MARKED FOR IDENTIFICATION)

5     Q     Okay.  I've handed you a document marked

6    Exhibit 3.  Let's just kind of go through these and

7    discuss them.

8     A     Okay.

9     Q     Who filled out this first page of Exhibit 3?

10    A     I did.

11    Q     When did you fill this out?

12    A     After I completed his medical assessment,

13   which is the chart.

14    Q     All right.  Why was -- the first six entries

15   appeared to be typed in and the last entry concerning

16   the brain injury, why was that handwritten?

17    A     Because I forgot it when I typed it out.

18    Q     When did you add that?

19    A     When I pulled it off the printer and --

20   because when you write your problem list, this is also

21   a separate document like the nurse's note and you kind

22   of compare it to your assessment --

23    Q     Uh-huh.

24    A     -- to make sure that everything -- everything

25   that we're going to address in the jail is front and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   center.  That's the first thing the doctor sees.  So

2   when -- I guess I was going through it and I wrote it.

3        Q    Okay.  Let me back up.  When Mr. Cross came

4   and sat down across from you at your cubicle --

5        A    Uh-huh.

6        Q    -- did you know then what he had been

7   arrested for?

8        A    No.

9        Q    Is that information provided to you or

10  typically provided you to assist you in your

11  assessment?

12       A    At that time, no, I don't think so -- unless

13  it might -- sometimes we have to staple their arresting

14  --

15       Q    It's not in there.

16       A    Okay.

17       Q    It's not in there.

18       A    Then no.  It wasn't given to me then.

19       Q    So is it fair to say that at the time you

20  first encountered Mr. Cross, it was your understanding

21  of the practice of the jail that you are not provided a

22  copy of the arrest citation?

23       A    Is that the standard?  I'm -- I'm getting

24  confused.

25       Q    I mean typically, at that time, back in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

68

1  **August of 2012?**

2      A    Not always, we weren't always given -- I

3  can't recall but, no, we weren't always given the

4  citation.

5      **Q    Was there a particular instance where you**

6  **would be given it, and particular instances where you**

7  **wouldn't be given it, or was it just sort of haphazard?**

8      A    Well if you have to come out and assess an

9  inmate, you would be -- when the arresting officer's

10  out there they usually run down while they were

11  arrested.

12      **Q    But that's if you have to come out --**

13      A    Yes, if you physically have to come out of

14  the jail.

15      **Q    And that would -- what would require that?**

16      A    Like if LMPD arrests somebody and they're too

17  intoxicated to come into the jail, we have to assess

18  that prior for them entering the building.  If somebody

19  comes with a wound, we have to make sure that we can

20  take them before we send them out, or situations like

21  that.

22      **Q    Okay.**

23      A    If we can care for them.

24      **Q    Okay.  Is it fair to say your recollection is**

25  **you were not provided with Mr. Cross' arrest citation?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    I don't -- I can't -- I don't know if I was,
2  or I wasn't.  It should be in his packet if I was.
3      Q    **If you were, it would be in his packet?**
4      A    Yeah, it would be part of his chart.
5      Q    **Okay.  And I will tell you based on my review**
6  **of everything that has been produced by Corizon in this**
7  **case, it's not in there.**
8      A    Uh-huh.
9      Q    **If it's not in there, would that lead you to**
10 **believe that you were not provided that information**
11 **when you saw Mr. Cross?**
12     A    Yes, because it's kind of carried with him
13 throughout the process.
14     Q    **Okay.  And for that reason you would not have**
15 **known why he was arrested?**
16     A    Uh-uh.
17     Q    **Yes or no?**
18     A    No.
19     Q    **And you would not have known of any behaviors**
20 **that the arresting officers may have observed in the**
21 **course of his arrest and transport to the jail?**
22     A    That's correct.  Obviously, we didn't need to
23 be notified of anything because they didn't come get
24 us.
25     Q    **Okay.  So when Mr. Cross came and sat down**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  across from you, other than you having heard his loud,

2  booming voice before then, he was essentially a clean

3  slate --

4      A    Uh-huh.

5      Q    -- for you; is that right?

6      A    Yes.

7      Q    Did you, in your time with Mr. Cross or

8  anytime thereafter, try to obtain any other information

9  about him either from an independent medical provider

10 or perhaps from a prior incarceration at the jail?

11     A    I believe I faxed his -- I wanted to know

12 what medication he was taking and the doses so I did, I

13 faxed something to Rite Aid to try to obtain that

14 information.

15     Q    Other than that?

16     A    No.

17     Q    Okay.  If you'd turn to the second page of

18 Exhibit 3, this is entitled, "Corizon Multi-

19 Disciplinary Referral."  And is this the mental health

20 referral that you referred to in Exhibit 1 as having

21 completed?

22     A    That's the mental health and chronic care,

23 yes.

24     Q    You've checked on this form under "Crisis

25 Intervention," "Recent Stress," what was the "recent

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  stress" that you were referring to there?

2      A    Usually when a mental health patient is

3  admitted to the jail that has an extensive mental

4  health history, just the admission to the jail can be

5  considered "recent."

6      Q    Gotcha.  Under "Evaluation of Mental

7  Condition," you've checked "Depressed," but nothing

8  else.  Why did you check "Depressed" and nothing else?

9      A    Because I believe he told me in the

10  assessment he was treated for depression.  That would

11  be what the lexapro was for.

12      Q    Okay.

13      A    So that's what he was being treated for.

14  Previously, that -- just kind of alerts the mental

15  health professionals to look and because he wasn't

16  suicidal or homicidal he denied that, he denied hearing

17  or seeing, he didn't have any physical complaints, or

18  he wasn't hostile or withdrawn.  That would be why I

19  only checked that.

20      Q    Okay.  You checked "Evaluation for Need of

21  Psychiatric Intervention," was that -- did you check

22  that box in order to prompt his evaluation within the

23  next 24 hours?

24      A    To make sure that his medication would be

25  addressed, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.

2    A    That lets them know that he was on medication

3  prior to admission.

4    Q    The -- your having checked the "History of

5  psychotropic medication prior to intake", that

6  references the xanax?

7    A    And the lexapro.

8    Q    And the lexapro.  And you've initialed

9  completion of detox.  Why did you initial that?

10   A    Because I completed the detox process to get

11 him started.

12   Q    Okay.  Okay.  The next page is "Corizon

13 Inmate Education Record."  Now what does this indicate?

14   A    This is just stuff we go over with him on

15 screening, like coping skills.  You're going to be

16 going to a small dorm.  If you need, you know, mental

17 health, it's kind of -- just an overview giving them

18 explanations of what's about to happen.  You know,

19 "You've been placed on detox.  We're going to come

20 check you every eight hours.  You were placed on detox

21 because of this."  Hypertension, he had a history of

22 it, so we told him, you know, "You have a history of

23 hypertension, it's addressed in chronic care.  We're

24 going to be giving you these meds" and then went over

25 what medication he would possibly be getting or if not,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  and how the process of getting meds.  It's just

2  basically explaining to them what we're going to do for

3  them.

4      **Q     Now what would you explain to him about drug**

5  **abuse?**

6      A     That he would be placed on a detox.

7      **Q     Anything other than that?**

8      A     Uh-uh.

9      **Q     How about the ETOH abuse?**

10     A     Just that he would be -- you're placed on

11  detox, we're going to come check you for signs and

12  symptoms of detox.  "Some signs and symptoms you might

13  experience would be this" -- that's kind -- just a very

14  brief explanation.

15     **Q     Is there any documentation, or chart, or**

16  **whatever, that you refer to when you are giving them**

17  **these -- this education?**

18     A     No, this is it.

19     **Q     Okay.  Now at the bottom it has your**

20  **electronically entered signature --**

21     A     Uh-huh.

22     **Q     -- the date is, however -- August, 8/3/2012.**

23  **Why is that?**

24     A     That's because these forms are used again and

25  again and again, and we go in and enter our name and it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  was just not changed.

2      Q     All right.  Turn to the next page, "Medical

3  History and Screening Signature Form."  And Mr. Cross

4  has a signature at the bottom.  Was it your impression

5  -- first of all, who put the "X" there?

6      A     I did, so they know where to sign.

7      Q     You did.  Was it your impression he was

8  having a little bit of trouble coordinating his

9  movements to sign within the box?

10     A     I mean you could ask me the same question

11 with my signature.  I mean my signature is pretty all

12 over the place, too.

13     Q     Well it looks like he kind of started his

14 first name and didn't finish it.

15     A     Can you -- I mean you can't even read my name

16 though.

17     Q     I know, but, you know, it looks -- there's a

18 start, a finish, and you've got "LPN" after it.  I mean

19 -- oh well.  Let's go to the next page, "Classification

20 Notice."  Now is this what you handed Ms. Marvels?

21     A     Yes, this would be what you hand to Ms.

22 Marvels.

23     Q     Now you've checked -- and is this your

24 handwriting on this?

25     A     This is my handwriting, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And you've checked the box or the line for

2    "Psych," P-S-Y-C-H.  Why did you check that?

3        A    Because he was going to an observation cell,

4    which is located on the psychiatric unit.

5        Q    Okay.  Other than this Classification Notice,

6    did you hand Ms. Marvels anything else?

7        A    I actually hand her two of these because one

8    goes to an officer.

9        Q    Okay.  Other than handing her two of these,

10   did you hand her anything else?

11       A    I don't believe there -- no, there

12   wouldn't...

13       Q    All right.  Next page, "Louisville Metro

14   Department of Corrections Initial Medical."  Now when

15   did you fill this out?

16       A    When this -- this begins your assessment.

17   This is done before anything else is done.

18       Q    When -- okay.  This "Initial Medical" is done

19   before anything else is done and that includes the SOAP

20   notes that you, that are in Exhibit 1; correct?

21       A    Yeah.

22       Q    All right.  You've recorded his vital signs

23   here, so I take it that in addition to recording them

24   in the flow sheet, you recorded them in this document?

25       A    This is his vital signs that's referred to --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   through.

2       Q    Okay.  Would you have put them -- I take it

3   from what you've already told me, you put his vital

4   signs, or entered his vital signs, into this document

5   we're looking at right now and then handwrote them into

6   the flow sheet?

7       A    Yes.

8       Q    Gotcha.  At the bottom it says, "Do you have

9   any medical problems that we should know about?

10  "Current medical CON" period and below that

11  "Intoxicated," question mark.

12      A    Uh-huh.

13      Q    Why is there no entry there?

14      A    Because at that time I hadn't really gotten

15  into the -- the detox follows, so we hadn't even really

16  gotten into that yet, so I didn't go back and change

17  it.

18      Q    Okay.

19      A    That's like the -- further into the

20  assessment.

21      Q    In hindsight, should there have been

22  something entered there?

23      A    No because it's -- it's in -- it's in here.

24      Q    It's elsewhere in here?

25      A    Yep.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  The next page is, I guess, page 2 of 3

2  of the initial medical the doctor provided.  He gave

3  you the name of Dr. Bevens?

4    A    Yes, he provided all that information.

5    Q    Okay.  And just looking down at the bottom of

6  this page, there is an indication that it was printed

7  on August 25, 2012, at 1724 military time. That would

8  have been 5:24 p.m.?

9    A    Yep.

10    Q    Okay.  So like the SOAP notes, once you

11  filled this out, you printed it off; correct?

12    A    Usually -- well, it's hard, it depends on --

13  because you have it on the computer.  This is a

14  process.  You do many things at one time, like you're

15  doing, so --

16    Q    Yeah.

17    A    This would have been the time I would have

18  hit "Print" on the computer.  It does not mean that

19  this was when the assessment was done.

20    Q    Okay.  Same question about this as I asked

21  you about the SOAP notes.  When you enter the material

22  -- enter what we're looking at here in the initial

23  medical forms, is that electronically stored anywhere

24  or do you have to --

25    A    This?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q      -- print that off?  Yeah.

2      A      This is stored forever.

3      Q      Okay.  This is stored forever.  Look at the

4   next page which is "Medical Detox."  Under the

5   question, "Do you drink alcohol?  How Often?"  "1

6   beer."  "How much today?  Last time?"  "Today."

7      A      Uh-huh.

8      Q      And that just reflects what he told you?

9      A      Uh-huh.

10     Q      Then the next question, "Do you use street

11  drugs?  What type?"  "Xanax and lortab."  Is there a

12  reason you didn't put lexapro in there?

13     A      Because you won't detox from lexapro. These

14  are -- these are scheduled narcotics that you will

15  detox from.  Lexapro is an anti-psychotic.

16     Q      Now I asked you whether he could get xanax

17  and lortab in the jail.  Can he get lexapro?

18     A      Uh-huh.

19     Q      So he can get lexapro?

20     A      If the medical -- if the -- our psychiatrist

21  approves it.

22     Q      Okay.  And you've indicated under there, "How

23  often" and you said "Unknown, appears to be under the

24  influence."  And you meant by that he appears to be

25  under the influence of some kind of drugs?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1         A     Of beer, I mean he had told me that --

2         Q     Well but this is in the section, as I see it,

3    concerning street drugs; correct?

4         A     So you're assuming that I wrote that thinking

5    that he was under those?

6         Q     I'm just trying to find out.

7         A     I -- this was a cue for me that he was going

8    to be on detox because this -- I mean even though it's

9    a "street drug," these two drugs are prescribed.

10        Q     Was it your impression that he was under the

11   influence of some drugs in addition to the beer?

12        A     No.

13        Q     But you didn't know what he was under the

14   influence of; is that fair to say?

15        A     From what he had told me, nothing.  I mean

16   that he had drank.

17        Q     Other than -- you didn't know what he was

18   under the influence of, but he told you it was, that he

19   had a beer that day.  Is that fair to say?  Yes?

20        A     That -- what he had told me, yes.

21        Q     Okay.  And was it your impression that the

22   one beer that he had had that day accounted for the

23   level of intoxication or under the influence that you

24   observed?

25              MR. PIEKARSKI:  Object to the form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      It could have also been associated -- a lot

2    of the symptoms that you keep referring to could also

3    be associated with a head injury.

4      Q      Okay.  Well let me ask you this.  Who made

5    that determination?

6      A      That would be a doctor.  I write it all down.

7    I wrote it down to be evaluated.

8      Q      Obviously as an LPN you can't make that

9    determination; can you?

10     A      No, I can't.

11     Q      And there was no doctor at the Louisville

12   Metro Department of Corrections at the time you were

13   dealing with Mr. Cross to make that determination?

14     A      No.

15     Q      You're smiling.  Why?

16     A      Can I not smile?

17     Q      Well I find it odd since we're talking about

18   a man that died here.

19     A      Well then you're assuming my feelings and you

20   shouldn't do that.

21     Q      Okay.  Next page is "Current Medical."  It

22   says, "Do you use tobacco products?  Explain:  PPD." Is

23   that pack per day?

24     A      Yes.

25     Q      Next page "Current Medical," "Hypertension,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW  Document 109-3  Filed 11/14/17  Page 81 of 149 PageID #: 847
The Deposition of STEPHANIE KOHL, taken on December 18, 2014

81

1    treated with lisinopril."  Page 3 of 4 of "Current

2    Medical" at the bottom it has "Disposition:  Emergency

3    Room, Pre-booking Injury." What does that refer to?

4        A    That's are we sending them to the emergency

5    room, have they been recently to the emergency room.

6    This is what we're going to do, like if we were going

7    to send them out to the emergency room, they have an

8    acute condition where they might, you know.

9        Q    Okay.

10       A    We're going to call the physician

11   immediately, sick call no, I'm putting him on mental

12   health and that he understands that he may request the

13   help.

14       Q    So the letter "N" next to "Emergency Room,

15   Pre-booking Injury" indicates that that didn't happen;

16   right?

17       A    That did not happen.

18       Q    And the letter "N" next to "Emergency Room,

19   Acute Condition" indicates that that didn't happen;

20   right?

21       A    Right.

22       Q    And what does the letter "N" next to

23   "Physician" mean?

24       A    Was the physician notified upon him arriving?

25   No.  Was he placed on a physician's sick call?  No.  He

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   was referred to mental health and that he understood

2   the health care provider -- that he could assess the

3   health care provider while he was here.

4       Q    Did you ever consult with a physician while

5   conducting an assessment like the one you did with Mr.

6   Cross?

7       A    Did I consult for -- did I consult a

8   physician prior to Mr. Cross?

9       Q    No, no, no, no, no.  At anytime when you were

10  working in booking and your responsibility was to meet

11  these people coming into the jail and performing the

12  type of assessment we've been discussing here --

13      A    Have I ever had to call a physician from the

14  booking floor?  Yes, I have.

15      Q    Okay.  Was a physician available to you to

16  call while you were interviewing Mr. Cross?

17      A    Yes, he was.

18      Q    Was there any reason why you couldn't contact

19  that physician?

20      A    No, there was no reason.

21      Q    Do you know who the physician was that was

22  available for you to call?

23      A    I don't.  We've -- we've had lots of doctors.

24  I don't know if it was Cod or Smith, I'm not -- I can't

25  tell you.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q    Do you know where he would have been had he

2    called you?  Would he have been in his office, his home

3    --

4       A    His personal cell phone, we have access to

5    him 24 hours a day.

6       Q    But you could have called him had you wanted

7    to?

8           MR. PIEKARSKI:  Wait for him to finish.

9           WITNESS:  Oh, sorry.

10          MR. PIEKARSKI:  That's all right.

11          MR. BELZLEY:  I'm sorry?

12          MR. PIEKARSKI:  I just told her -- reminded

13    her to wait to you finish asking the question.

14          MR. BELZLEY:  Oh, okay.

15       Q    You could have called him had you wanted to?

16       A    Yes.

17       Q    And you chose not to do so?

18       A    There wasn't a need for me to.

19       Q    Well was there a need -- did you not perceive

20    any need to call the physician to get his advice or to

21    consult with him, or her, about distinguishing among

22    what various causes could account for Mr. Cross'

23    behavior that you were observing?

24          MR. PIEKARSKI:  Object to the form.

25       A    He wasn't in any acute distress.  His vital

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  signs were all within normal limits.  He was alert and

2  oriented.  He was speaking.  I mean because he had a

3  beer, I wouldn't have called the doctor.  We get many -

4  - many people come through the jail who are intoxicated

5  when they are arrested.

6      Q    When you spoke to Ms. Sloan, when Mr. Cross

7  was going up to the second floor, did you recommend to

8  her that she check Mr. Cross' vital signs with -- on an

9  hourly basis or every couple of hours?

10     A    No.  That he would be placed on detox and he

11 would be checked every eight per policy.

12     Q    Yeah.  Turn to page 1 of 4 of the psychiatric

13 questions.  On the middle of the page, the letter "Y,"

14 next to "Are you currently being treated by an

15 outpatient community mental health center?"  And that

16 indicates -- that letter "Y" indicates that he is?

17     A    Page 4 of 4?

18     Q    1 of 4, 1 of 4 of psychiatric questions. In

19 the middle of the page, there's a "Y" next to --

20     A    Yes.

21     Q    -- "Are you currently being treated?"

22     A    "Are you currently being treated?"  Yes.

23     Q    Okay.  His explanation he takes is xanax and

24 lexapro.

25     A    Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Under "Doctor/Agency," you entered "Inmate
2    was not forthcoming with information, appeared under
3    the influence;" correct?
4    A    Yes.
5    Q    Under the -- in the next section you've
6    entered the letter "Y" next to "Have you recently taken
7    or been prescribed medications for emotional problems?"
8    Do you see that?
9    A    Yes.
10   Q    And you had put under there, "Explain,"
11   "Inmate appears to be under the influence of an unknown
12   substance."
13   A    Uh-huh.
14   Q    Do you see that there?
15   A    I do see that.
16   Q    So I take it, at this point, does this
17   reflect -- refresh your recollection that at the time
18   you were dealing with Mr. Cross, you believed him under
19   the influence of some substance and you didn't know
20   what?
21   A    I believed that he did take prescribed
22   medication for emotional problems, that would explain
23   the lexapro and the xanax for anxiety, depression, any
24   kind of mental health.  I was making a note that he did
25   appear under -- he did appear like he had had a beer or

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  some beers.  He smelled of alcohol.

2      Q    Well you didn't say that.  You put, "Inmate

3  appears to be under the influence of an unknown

4  substance;" didn't you?

5      A    Yes.

6      Q    Okay.  You could have put, "Inmate appears to

7  be under the influence of one beer."

8      A    Okay.

9      Q    Right?

10     A    I could have put that, yes.

11     Q    This is now the third time in these documents

12 you've indicated that he appeared to be under the

13 influence, and in none of those instances did you

14 indicate that you believed he was under the influence

15 of one beer; did you?

16     A    I -- I think I did in my note.

17     Q    Okay.  You're talking about Exhibit 1?

18     A    Yeah.

19     Q    You're indicating in Exhibit 1 that he told

20 you that he had had a beer.

21     A    That he had had a beer, he smelled of alcohol

22 --

23     Q    Uh-huh.

24     A    -- so I believed what he had told me.

25     Q    Well you're --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1        A     Is it possible that he drank more than one

 2   beer?  Yeah, it's possible.

 3        Q     **It's also possible he had taken some drugs?**

 4        A     It's possible.

 5        Q     **Did you consider that?**

 6        A     Uh-huh.

 7        Q     **You did?**

 8        A     Yeah.  He had prescribed medication, xanax

 9   and lexapro.

10        Q     **Did you make an attempt to determine how much**

11   **he had taken and when?**

12        A     Oh yes.  I asked him multiple times.

13        Q     **And he did not tell you?**

14        A     He denied -- he denied it.

15        Q     **And you asked him those questions because you**

16   **were concerned about how much medication he had taken**

17   **and when; correct?**

18        A     Yeah.  I believe one of the very first

19   questions in the assessment is "Do you have any

20   immediate medical attention?"  For the detox it says,

21   "Did you take any dangerous levels of drugs or

22   alcohol?"  We asked him those questions.

23        Q     **Because that was a concern of yours?**

24        A     Well because it's also a part of our

25   assessment, yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  But in particular, when an inmate is -

2  - appears to be under the influence of an unknown

3  substance, that's a particular concern of yours; is it

4  not?

5    A    Uh-huh.

6    Q    You need to say, "yes" or "no."

7    A    Yes.

8    Q    On page 2 of 4 of the psychiatric questions,

9  near the bottom, you've entered the letter "Y" for yes

10  next to the subject "Talked or Act in a Strange

11  Manner."  And you've put "Explain," "Slurred speech,

12  nodding off during interview;" --

13    A    Uh-huh.

14    Q    correct?  Are you aware of whether the use of

15  the term "nodding off" has any particular significance

16  in the field of toxicology?

17    A    I don't have a degree in toxicology and I'm

18  not sure there was a word "nodding," like falling

19  asleep.

20    Q    Okay.  In the next section, you've entered a

21  "Y" for yes, next to "Is subject apparently under the

22  influence of alcohol or drugs" and you put next to

23  "Explain," "States he only had a one-half beer" --

24    A    Uh-huh.

25    Q    -- and that's what he told you?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          A     Uh-huh.  Yes, yes.  Sorry.

2          Q     That's okay.  In the next section it says,

3     "Does subject show signs of mental illness or

4     withdrawal," you've entered a "Y" for yes and you've

5     put next to "Explain," "Possible head injury,

6     developmentally delayed, substance use."  Did the --

7     when you put "substance use" there, what type of

8     substance were you referring to?

9          A     What he had told me that he had had that day.

10          Q     Okay.  You're referring there generally to

11     the beer and to the medications he had told you about;

12     is that right?

13          A     Uh-huh.  That is correct.

14          Q     All right.  Go to "Correctional Medical

15     Services Interdisciplinary Progress Notes," if you

16     will.  Is your handwriting anywhere on that document?

17          A     No.

18          Q     Were you involved in any efforts to revive

19     Mr. Cross?

20          A     No.

21          Q     You said that you found out that Mr. Cross

22     was getting CPR when you called upstairs to take a

23     break?

24          A     Yes.

25          Q     Am I correct that you were calling your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    supervisor, Ms. Sloan, for her permission for you to

2    take a break?

3        A    Yeah, we can't leave without permission.

4        Q    Okay.  Between the time that you -- that Mr.

5    Cross got up from the seat he was occupying directly

6    across from you in the cubicle --

7        A    Uh-huh.

8        Q    -- and the time you called Ms. Sloan to

9    request her permission to take a break, had you heard

10   anything about Mr. Cross?

11       A    No.

12       Q    Had you seen him?

13       A    I mean he had gone back to the floor before

14   they took him upstairs.

15       Q    Right, but other than that?

16       A    No.

17       Q    Do you know who it was that escorted him

18   upstairs?

19       A    I have no idea.

20       Q    Tell me, to the best of your recollection,

21   what transpired in your telephone call to Ms. Sloan

22   when you called for permission to take a break.

23       A    I said, "T. J., is it okay if I go take a

24   break?"  And she said, she told me that they were

25   performing CPR, and I asked her if she needed me to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  come upstairs to assist, and she said "no."  And then

2  she asked me for his information.

3      Q    Okay.  She told you that they were performing

4  CPR on Mr. Cross?

5      A    I -- I don't know.  I think she said "The guy

6  you brought up here, they're in there performing," I

7  think that was our conversation.

8      Q    And you asked her whether she wanted you to

9  come upstairs and help?

10     A    Yes, I asked her.

11     Q    And she said what?

12     A    She said, "I need the information out of the

13  chart."

14     Q    And did you take that up there?

15     A    No, I read it to her off the computer.

16     Q    Now what did you read to her off the

17  computer?

18     A    His problem list, what medication that he

19  said that he was prescribed, what his -- probably his

20  vital signs.  I mean I'm -- that I would -- that and

21  his medication I know, probably his vital signs upon

22  admission.  That he was alert and oriented when I saw

23  him.

24     Q    Why did she want that information?

25     A    Because she has to fill out an ER slip.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.  Now it was your understanding that --

2    that didn't surprise you that she was asking you --

3      A      Oh no.

4      Q      -- for that information?

5      A      Not at all.

6      Q      After giving her that -- do you remember

7    anything else transpiring between you and Ms. Sloan

8    during that telephone conversation?

9      A      No.

10     Q      After you provided Ms. Sloan that

11   information, after you read her the stuff off the chart

12   you described, did you take a break?

13     A      No.

14     Q      What did you do?

15     A      I know I didn't take a break.  I think my

16   super -- or I think my DON called me.

17     Q      Who was that?

18     A      Alicia Fox.

19     Q      And -- oh, DON -- Director of Nursing?

20     A      Yes.

21     Q      Do you remember when in relation to your call

22   to Ms. Sloan that Ms. Fox called you?

23     A      Probably I was sitting on the floor and I was

24   making sure that the chart was together so it was going

25   to be asked for, and I believe she called me to ask me

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    if I was okay.

2        Q    Now when you say, "you were sitting on the

3    floor," you mean you were on the booking floor?

4        A    Yes.

5        Q    Not sitting on the floor, floor.

6        A    Right.

7        Q    She called you to ask if you were okay?

8        A    Uh-huh.

9        Q    Why did she do that?

10       A    I mean whenever we have a sentinel event,

11   she's just a support system to us if there's any --

12   like, she -- "Can I do anything, are you okay, do you

13   need anything?"

14       Q    Tell me what you remember her telling you

15   during that call.

16       A    Just I vaguely remember her saying, "Are you

17   okay" and I said I hadn't had a break.  And she said,

18   "Well go smoke a cigarette."  I think that was our

19   conversation.

20       Q    Other than you telling her that you hadn't

21   had a break, do you remember what you told her --

22   anything else you told her?

23       A    No.

24       Q    Were you called by anybody else about Mr.

25   Cross or that situation that night?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     Uh-uh.

2        Q     No?  Got to say "yes" or "no."

3        A     Oh, no.

4        Q     After Mr. Cross went up to the second floor

5   and was put in observation, do you know who it was that

6   looked in on him or how often?

7        A     I have no idea.

8        Q     Do you know what it -- do you have any

9   knowledge of what happened to him once he got up on the

10  second floor, other than he was found unresponsive --

11       A     Do I know what would have happened when they

12  brought him to the floor?

13       Q     What's your understanding of what would have

14  happened to him?

15       A     He would have probably been dressed out, so

16  he would have been put into blue, a blue jumpsuit, and

17  then they would have gotten him a bunk and everything

18  and made sure that he that.  And I think officers, like

19  there's a -- there in an OBS cell there's like sheets

20  that officers have to hit.  So I mean that's -- they

21  put him in the cell and...

22       Q     Do you -- do you have a sense of how many

23  times the officer checked Mr. Cross before he was found

24  unresponsive or on what schedule?

25       A     I don't know what the officers' policy is on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   -- when they have to perform checks, I don't know.

2        Q    Or what they look for, or how they note it?

3        A    I know they have to physically view

4   everybody.

5        Q    Is there anybody -- was there anybody up

6   there on the medical floor that, or any situations in

7   which inmates were checked for their level of

8   consciousness, like at the time Mr. Cross was there?

9        A    Like when you say "level of consciousness,"

10  like someone would be walking in, speaking to him,

11  taking vital signs -- I'm not aware if anything was

12  done that night.

13       Q    Or if they appeared to be sleeping, just

14  waking them up and making sure they could be aroused.

15       A    Do officers go and wake inmates up?  Yeah, I

16  don't think --

17       Q    Do you know --

18       A    -- no, I've never seen an officer go in a

19  cell and wake an inmate up.  I mean...

20       Q    If you're standing outside of a cell, and I

21  understand that this observation cell that Mr. Cross

22  was in had big windows that you could look in --

23       A    I suppose.

24       Q    If you're standing outside of that cell and

25  looking in and there's an individual that appears to be

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   sleeping, and you can see his breathing -- that he's

2   breathing, his chest going up and down or some kind of

3   movement --

4       A    Right.

5       Q    -- how do you tell whether that inmate is

6   conscious or not, or can be aroused, or awakened?

7       A    They're laying there and they're breathing?

8       Q    Uh-huh.

9       A    How do we know if we can wake them up?

10      Q    Uh-huh.

11      A    I guess we would -- if we would need them, I

12  guess we would open up the door and say their name. I

13  don't -- I don't understand your question.

14      Q    No, as -- there's no way of telling whether

15  somebody laying there who appears to be asleep and is

16  breathing is sleeping and can be aroused, or whether

17  they are unconscious and cannot be aroused; is that

18  fair to say?

19      A    Right.

20          MR. PIEKARSKI:  Object to form.

21      Q    Unless you walk in there and try to wake them

22  up?

23      A    Yeah.  That's the only way you're going to

24  find out.

25      Q    Had you heard anything -- did you hear

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  anything about Mr. Cross snoring?

2      A    No.

3      Q    Or have you heard, prior to Mr. Cross coming

4  into the jail, had you heard that loud snoring is a

5  sign or symptom of drug overdose?

6      A    Have I ever heard that?

7      Q    Yup.

8      A    I've heard it's a symptom of sleep apnea or

9  being overweight or being obese, but as of like a drug

10 overdose snoring -- no, I've never heard that before.

11     Q    Okay.  I'm -- in this stack of documents

12 that's Exhibit 3, I'm looking at, about halfway

13 through, a "Withdrawal Initial Screening and Treatment

14 Plan."

15     A    Okay.  Yeah, that's the initial, that's the

16 very first page of the detox.

17     Q    Okay.  Now who filled this out?

18     A    I did.

19     Q    Is there anybody's marks on this document

20 other than your own?

21     A    On this page, it appears to be all mine.

22     Q    Okay.  You indicated that you subjective,

23 that -- well under "Subjective" you indicate "Last ETOH

24 alcohol drink three hours ago."

25     A    Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    What did you base that on?

2    A    Possibly what he told me if -- what he -- I

3  guess what he would have told me.

4    Q    Okay.

5    A    I don't --

6    Q    And the amount was one-half beer.

7    A    Uh-huh.

8    Q    Correct?   Below that you indicate, "Last

9  Opiate Use, UK;" does that stand for "unknown?"

10    A    Unknown.

11    Q    And the amount you put a check on that line,

12  does that indicate also "unknown?"

13    A    It's unknown.

14    Q    And you suspected that if it had -- if he'd

15  ingested some opiates at some point it was either xanax

16  or lortab?

17    A    Well those were his prescribed meds.

18    Q    Okay.

19    A    That would be what I'm going to detox him

20  from.  So even though the -- I didn't know how long ago

21  he had had them or the amount, he did tell me

22  previously that he takes those daily.

23    Q    Okay.  Under "Objective" we've got sort of a

24  vital signs and your entries corresponding with your

25  assessment that also appear in the initial medical and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  in the flow sheet; right?

2      A    Yes.

3      Q    Under "Level of Consciousness" you put "Alert

4  and responsive."

5      A    Yes.

6      Q    How does "alert and responsive" differ from

7  lethargic, but responds.

8      A    Alert and responsive, he could tell me --

9  when assessing a patient, if they're alert and

10  responsive, they can tell me their name, where they're

11  at, time -- you know, are they walking?  Also you're

12  going to look for are they walking, are they caring for

13  themselves?  Lethargic could be like over in a corner.

14  I might have to do a sternum rub, but they respond.

15  Like I can't -- I would have to introduce some type of

16  pain to get a stimulus, or I would have to shake them

17  hard, or...

18      Q    Okay.  So there is an entry on this page for

19  you to indicate the results of your assessment of a

20  level of consciousness; correct?

21      A    Right.

22      Q    And you've entered "Alert and responsive."

23  Now is there -- are you aware of any plan or any

24  protocol, or any policy, that accompanied Mr. Cross or

25  applied to Mr. Cross that required somebody to check,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 100 of 149 PageID #: 866
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
100

1    to look at this line that says "Level of consciousness"

2    and assess his level of consciousness subsequent to

3    your seeing him?

4         A    This is my initial assessment.

5         Q    I know.

6         A    And it's done every time he's seen, every

7    eight hours, every shift.

8         Q    Okay.  But your understanding is the next

9    time his level of consciousness was going to be

10   assessed was going to be eight hours after you saw him?

11        A    For detox?  Yes.

12        Q    And, in fact, that's what you essentially

13   assigned; correct?  You assigned him detox, withdrawal

14   protocol, which meant that he would be -- his level of

15   consciousness would be assessed every eight hours; is

16   that right?

17        A    I may have to look and -- it's been so long

18   since I've seen these forms.  Yeah.  Yes.

19        Q    The entry, or the box provided for

20   "Lethargic, but responds" that would not apply to

21   someone like Mr. Cross who was nodding off while you

22   were talking to him and had to be redirected back to

23   the conversation and awakened to respond to questions?

24        A    No.  Uh-uh.  That's why I checked "Alert and

25   Responsive" because he was able to -- I believe he was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 101 of 149 PageID #:
867
The Deposition of STEPHANIE KOHLER, Taken on December 18, 2014
101

1   eating in front of me as well when we were speaking.

2        Q    Do you remember what he was eating?

3        A    I think -- I know he'd opened up his juice.

4   He was -- he got a zabo and a juice before he came over

5   to my table, or to my --

6        Q    He got a what juice?

7        A    He got a zabo -- it's a sandwich that they

8   get when they get arrested.

9        Q    Oh.  So he was -- he was asking for the sand

10  -- a sandwich and the juice and he got it before he got

11  to you?

12       A    Uh-huh.

13       Q    And brought that with him when he was

14  visiting with you?

15       A    Yeah, uh-huh.

16       Q    So despite the fact that you are asking him

17  questions, and engaging with him, and he's got juice

18  and a sandwich, he's nonetheless nodding off. Is that

19  correct?

20       A    I don't know how you want --

21       Q    I'm just asking you for your -- that was your

22  observation; was it not?

23       A    My observation was that he was alert and

24  responsive.

25       Q    Yeah --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    That he was alert to person, place and time,

2  that he was able to speak to me.

3      Q    That's what you checked.  What you wrote in

4  Exhibit 1 was that "Inmate appeared to fall asleep

5  several times during his interview;" correct?

6      A    Uh-huh.

7      Q    Right?

8      A    Maybe I should have wrote out to the side,

9  "Inmate stated that he hadn't slept all day," too.  I

10  mean, so...

11      Q    Well I think that's what you put in the note

12  you prepared after he was found unresponsive.

13      A    So maybe I should have wrote it, right --

14  right there.  I need to go to the restroom again.

15           MR. BELZLEY:  Sure.  Let's take a break.

16            (OFF THE RECORD)

17           MR. BELZLEY:  Back on the record.

18           BY MR. BELZLEY:

19      Q    We're still on the Withdrawal and Initial

20  Screening and Treatment Plan.  Now under "Assessment"

21  you used the CIWA-AR scale; is that correct?

22      A    That is correct.

23      Q    And that's an assessment instrument that you

24  give the patient; correct?

25      A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:13-cv-00427-DJH-DW  Document 109-3  Filed 11/14/17  Page 103 of 149 PageID #: 869
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
103

1      Q      And we actually have that on the page

2  following the Withdrawal Initial Screening and

3  Treatment Plan; do we not?

4      A      Yes.

5      Q      Now the full name of this assessment

6  instrument is Clinical Institute Withdrawal Assessment

7  of Alcohol Scale-Revised.  And it appears to indicate

8  that based on the items for inquiry, Mr. Cross scored a

9  zero, which basically meant normal.

10      A      Yes.

11      Q      Is that fair to say?

12      A      Uh-huh.

13      Q      And as a consequence, his total CIWA score

14  was a zero.

15      A      Yes.

16      Q      And this assessment instrument indicates that

17  that meant that he was "Mild/At risk of withdrawal,

18  recheck as ordered;" correct?

19      A      Yes.

20      Q      And did that also mean that he needed to be

21  monitored only every eight hours, according to your

22  understanding of the protocols in place at the time he

23  was there?

24      A      Yes.

25      Q      Now this withdrawal assessment of alcohol,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 104 of 149 PageID #: 870
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
104

1   are you aware of a comparable assessment that was

2   available to you at this time that addressed withdrawal

3   from drugs?

4         A    Do we have another -- like a -- like a COW?

5   Like this is a CIWA, there's also a COW.

6         Q    Okay.  What you're referring to as the COW,

7   the C-O-W, that was an assessment instrument for

8   withdrawal of drugs?

9         A    Uh-huh.

10        Q    Yes?  You need to say "yes" or "no."

11        A    Yes, sorry.

12             MR. PIEKARSKI:  That's all right.

13             WITNESS:  I keep doing that.

14        Q    Why did you not prepare a COW for Mr. -- or

15   perform a COW on Mr. Cross?

16        A    The paperwork must have been done because --

17   hmmmmph, I guess when they would have gone it wasn't --

18   it wasn't on here.  It's not in here.  The COW wouldn't

19   -- started -- it would have been started the next

20   assessment.  It's kind of like rechecking.

21        Q    Was it your expectation that a COW assessment

22   would be made at Mr. Cross' next assessment,

23   approximately eight hours after you saw him?

24        A    Usually -- well yes.

25        Q    Did you communicate that to Ms. Sloan, that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 105 of 149 PageID #: 871
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
105

1   she should prepare a COW assessment when he was next

2   assessed?

3        A    No, I didn't.

4        Q    What was the basis for your understanding

5   that a COW assessment would be done when he was next

6   assessed?

7        A    Because it says it, "Alcohol and Opiate" for

8   subjective, that would -- a COW would have had to have

9   been started.  That would have been -- had his symptoms

10  progressed into withdrawal.

11       Q    Okay.  I'm just trying to understand.  Are

12  you saying that a COW assessment would not have been

13  made unless he began to go into withdrawal?

14       A    No, a COW assessment was not part of this.

15       Q    Okay.

16       A    So when -- the way it would work is this

17  would have gone up, a nurse would have -- they go

18  through and they check the packets, a COW would have

19  been added to this.  So at his next assessment a COW

20  would have been done --

21       Q    Should you have -- I'm sorry.

22       A    -- for withdrawal.  Had I had it -- I don't

23  know what's on the COW anymore, but I would have

24  assessed it.  Would he -- do I -- sorry.

25       Q    Well, should you have --in looking over this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 106 of 149 PageID #: 872
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
106

1    --

2         A    Yes.  There should have been a COW with this,

3    yes.

4         Q    Okay.

5         A    There was not a COW with it.

6         Q    Do you remember performing a COW that's not

7    included in here?

8         A    No.  Because it's not in here.

9         Q    Was it -- the fact that a COW should have

10   been prepared, was it a mistake not to do so?

11             MR. PIEKARSKI:  Object to the form.

12        A    It would have been caught.

13        Q    But is it fair to say that, under your

14   understanding of the protocols, policies, and processes

15   in place at the time you were dealing with Mr. Cross, a

16   COW should have been performed but it doesn't appear

17   that one was?

18             MR. PIEKARSKI:  Object to the form.

19        A    It's the same -- it's the same thing.

20        Q    The COW is the same thing as the CIWA?

21        A    Now they don't even do COWs, but yes.

22        Q    Okay.  Was there some kind of an assessment

23   instrument when Mr. Cross came into the jail, something

24   like the CIWA or the COW to assess him for risk of drug

25   overdose?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A      Like a form like this?

2       Q      **Yes.**

3       A      No.

4       Q      **Now I'm looking at these checkmarks for**

5    **"Withdrawal."  The results of his CIWA assessment**

6    **indicate that he is at mild risk of withdrawal.**

7       A      Uh-huh.

8       Q      **What's the difference between a mild**

9    **withdrawal where a provider is notified within two**

10   **hours and he's monitored at least every eight hours,**

11   **and risk for withdrawal where he's monitored at least**

12   **every eight hours?**

13      A      Okay.  Well "mild withdrawal" means that they

14   have to score under a ten, and if you look at this on

15   the COWs there's certain numbers that will add up.  For

16   instance, had a -- had Mr. Cross come in and said that

17   he's been having nausea and dry heaves, he would have

18   gotten a four.  If he couldn't tell me who he was or

19   where he was under orientation or tell me the date, he

20   could have gotten a three.  And those scores determine

21   where they fall.

22      Q      **Uh-huh.**

23      A      He didn't even score.  So he wasn't even

24   physically withdrawing from anything.

25      Q      **Uh-huh.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 108 of 149 PageID #: 874
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
108

1      A    If he had a beer, like he said, it would take

2    time before he would even begin to see symptoms. So he

3    got a zero.  Now say someone comes in and they're

4    sweating and they got tremors and shakes, they're

5    already in withdrawal.  So I'm going to call a doctor

6    and get him started on whatever the protocol was -- and

7    I don't remember if it was Librium or -- you know, then

8    we would address the symptoms immediately -- the

9    tremors, he'd be more at risk for a seizure.  That's

10   how we assess the severity of it. So for this

11   assessment, he wasn't showing any symptoms of

12   withdrawal.

13      **Q    Okay.  And I understand that.  The form seems**

14   **to indicate that from zero to nine, a score of zero to**

15   **nine, the person is considered to be mild withdrawal.**

16      A    Right.

17           MR. PIEKARSKI:  Object to form.

18      **Q    I guess what I'm asking you about the**

19   **Withdrawal Initial Screening and Treatment Plan is what**

20   **type of mild withdrawal is it that requires that the**

21   **provider be notified within two hours?  What is it that**

22   **triggers that?  Do you see that -- what I'm talking**

23   **about there?  You've checked the box for "Risk for**

24   **Withdrawal, monitor at least every eight hours."**

25      A    Oh, okay.  I see what you're saying.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW  Document 109-3  Filed 11/14/17  Page 109 of 149 PageID #:
875
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
109

1      Q    Yeah.  What is it that triggers, that would

2  make somebody to check the box above that that says

3  "Mild Withdrawal, notify provider within two hours?"

4      A    If you would start to see fine tremors, you

5  could feel the tremors in the fingertips or you feel

6  like a real bad alcoholic, frequent flyers that come

7  in, they're going to start withdrawing a lot faster.

8  People who drink -- like somebody'd come in and sit

9  down and say that they drink a gallon of alcohol by

10 noon and it's noon and they've only had a fifth, I'm

11 going to be concerned.

12     Q    Okay.  You said there that if you start to

13 see that, that sort of thing --

14     A    Right.

15     Q    -- what provision was made for Mr. Cross for

16 someone to see whether something like that was

17 starting?

18     A    This.  He scored a zero.  He didn't -- he

19 scored -- he wasn't nauseous, he wasn't vomiting, he

20 didn't have tremors, he wasn't sweating, he didn't have

21 any anxiety, he wasn't agitated, he wasn't having

22 visual disturbances, or auditory or hallucinal or

23 tactile hallucinations, he didn't complain of a

24 headache.

25          MR. PIEKARSKI:  Listen to the question.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 110 of 149 PageID #: 876
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
110

1           WITNESS:  I'm --

2           MR. PIEKARSKI:  Yeah.  I think you're not

3    understanding it, that's okay.  Greg is asking a good

4    question.  Why don't you try it -- I mean, did she

5    answer your question, or do you want to try it again?

6           MR. BELZLEY:  Well you -- as I understand,

7    you said that, as I understood your answers, I thought

8    I understood you to say, that somebody might qualify to

9    have the box checked that says "Mild Withdrawal, notify

10   provider within two hours" if they started exhibiting

11   tremors or things of that nature, and I guess -- and

12   what I asked you was, what provision was made for

13   someone to check Mr. Cross to see if he started

14   exhibiting some of those signs or symptoms?

15        A    That was the risk for withdrawal, which was

16   the box that I checked, that he would be monitored

17   every eight hours because he was at mild, he was at

18   risk.

19        Q    Okay.  So I guess --

20        A    He wasn't even in withdrawal at that point.

21        Q    Okay.  So I guess the answer to my question

22   is no provision was made --

23           MR. PIEKARSKI:  Objection.

24        Q    -- other than that, to check him at eight

25   hours after you saw him --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 111 of 149 PageID #: 874
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
111

1          MR. PIEKARSKI:  Object to the form.

2     A    Per the detox protocol, yes.

3     Q    -- to see whether he was starting to exhibit

4  some of the signs that might require that a provider be

5  notified within two hours.  Is that fair to say?

6          MR. PIEKARSKI:  Object to the form.

7     A    No, it's -- I don't even know what your

8  question is.  I'm saying that I checked risk for

9  withdrawal because he -- he was a potential risk to

10 withdraw.  He was not in mild withdrawal, so there was

11 no reason for me to notify a physician because he

12 wasn't in withdrawal.

13    Q    Okay.  Is there anything on this Withdrawal

14 Initial Screening and Treatment Plan that you can check

15 that uses the word or mentions "overdose?"

16    A    No.

17    Q    Is it your understanding that a drug overdose

18 is something completely different from drug withdrawal?

19    A    Yes.  They are two different things.

20    Q    Where in any of the documents that we've

21 looked at thus far, is this entirely different thing --

22 drug overdose, addressed at all?  If you know?

23    A    Yes.  On page 1 of 1 of the Medical Detox

24 where it says "Have you taken potentially dangerous

25 levels of drugs or alcohol?  No."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 112 of 149 PageID #: 878
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014

112

```
 1        Q      Anywhere else?

 2        A      I thought it was on -- no, uh-uh.  No.

 3        Q      Okay.  Are you aware that people who succumb

 4   to an overdose of drugs in correctional settings

 5   routinely deny having taken potentially dangerous

 6   levels of drugs?

 7              MR. PIEKARSKI:  Object to the form.

 8        Q      Are you aware of that?

 9        A      No.

10        Q      Has anybody told you that that is -- that

11   somebody who comes into the jail in the condition that

12   you've described Mr. Cross being in, that you couldn't

13   necessarily take his word for whether he had taken a

14   potentially dangerous level of drugs?

15              MR. PIEKARSKI:  Object to form.  I'm not sure

16   I understand the question.

17              MR. BELZLEY:  Well.

18              MR. PIEKARSKI:  I just didn't understand it

19   -- I --

20              MR. BELZLEY:  Yeah.  I guess what I'm saying

21   -- you got a guy that's come in, he's under the

22   influence of something, he's nodding off during his

23   interview, he's stumbling, he's rambling, he's got

24   slurred speech, he's confused, he's childlike -- has

25   anybody ever told you that you might question the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  reliability of the representation of somebody like

2  that, that they had not taken a potentially dangerous

3  level of drugs?

4     A    He was in no acute distress.  He wasn't

5  sleeping through the entire interview because I was

6  able to get through it and I believe there's multiple

7  questions on here that he was able to answer.  He was

8  even eating.  So I don't -- I'm trying to understand

9  like was he in acute distress?  No, because he didn't

10  exhibit any of the symptoms.  His vital signs were

11  within normal limits, he was alert and oriented and

12  knew his name, speaking to me -- I'm trying to figure

13  out where you're going.

14     **Q    Is it your understanding that somebody who**

15  **has ingested a dangerous level of drugs can, after**

16  **doing so, appear to be in no acute distress, but that**

17  **their condition deteriorates over time?**

18     A    Can somebody -- if you were to take a bunch

19  of medicine right now, would you be acting like you are

20  right now?  Yes.

21     **Q    And over time I would begin to exhibit the**

22  **signs and symptoms associated with taking that amount**

23  **of that drug?**

24          MR. PIEKARSKI:  Object to the form.

25     A    Say -- I'm sorry.  Say this --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Yeah.  You just said if I just took a bunch
 2   of drugs now having just washed them down with water or
 3   the coffee, or the coke, or whatever, I would
 4   essentially be acting the same way I am now?
 5        A     Yeah.
 6        Q     But two hours from now, my condition may well
 7   have deteriorated?
 8        A     Yeah.
 9        Q     What is your understanding of how someone who
10   has taken a drug overdose progresses to a drug overdose
11   death?
12        A     You just explained it.  They get
13   progressively worse and...
14        Q     Is it your understanding that the moment of
15   death, i.e. the heart stopping, is preceded by a period
16   of unconsciousness?
17        A     Like unable to arouse unconsciousness?
18        Q     Uh-huh.
19        A     It's possible.
20        Q     Do you know?
21        MR. PIEKARSKI:  She just answered it.
22        MR. BELZLEY:  No, I mean you said "It's
23   possible."  I mean, do you know?
24        A     Yeah.  I mean that you can't arouse them.
25   Yes, they can...
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 115 of 149 PageID #: 881
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
115

1      Q     Do you know for how long a period of time

2  they might be in a state of unconsciousness where their

3  heart is beating, but they cannot be aroused?

4      A     The amount of time?

5      Q     Yeah.

6      A     No.

7      Q     If you would look, going through this stack

8  again, we're getting near the bottom, at the Emergency

9  Department Transfer?

10     A     Uh-huh.

11     Q     This appears to have been written by -- this

12  is Correctional Medical Services, Inc., Emergency

13  Department Transfer, it's way down.  I think it's six

14  pages from the end.  Keep going.  I think it may be the

15  next page after that.  Right after that, what you've

16  got there.

17     A     This?

18     Q     Okay.  It's the preceding page.  There we go.

19  That's it.  Is this your handwriting on this document?

20     A     No.

21     Q     Okay.  Do you know whose handwriting it is?

22     A     It's signed, "T. Sloan", so it's probably T.

23  J.'s.

24     Q     Can you read any of the stuff on here?

25     A     I see hypertension, I can't make out what the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 116 of 149 PageID #: 882
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
116

1   words say.

2       Q    Yeah.

3       A    "History of brain injury."  I see "motor

4   vehicle accident," "history" and "bipolar,"

5   "hypertension."

6       Q    Okay.

7       A    I -- I can't make out any of the stuff up

8   here.

9       Q    Turn to the next page, which is a Medical

10  Claim Form.  Do you know who filled that out?

11      A    No, I don't know who filled that out.  I

12  would think it would be the shift supervisor.

13      Q    Okay.  And under that is another copy of that

14  medical claim form.  If you would keep turning the page

15  until you get to the "Nursing MH Assessment," got it

16  there?

17      A    Okay.

18      Q    Who filled this out?

19      A    I did.

20      Q    And you filled this out at -- it appears to

21  indicate 5:25 p.m.?

22      A    Uh-huh.

23      Q    Under the "Objective Assessment" under

24  "Affect" --

25      A    Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    -- you've checked the box for "Other." What

2    does that mean?

3         A    He was cooperative, so he was giving me a lot

4    of in -- he was -- when I would ask him -- how do I

5    explain this?  Tearful, angry.  He wasn't any -- he

6    wasn't constricted, he wasn't tearful, he wasn't angry,

7    he wasn't very blunt.  He didn't show any of those

8    symptoms for his affect.

9         Q    Okay.  But it was something other than

10   appropriate obviously?

11        A    Uh-huh.

12        Q    Is that correct?

13        A    Uh-huh.  Because I didn't check it.

14        Q    What does "T/P" stand for?

15        A    Thought process.

16        Q    What's the difference between clear and

17   loose?

18        A    Clear thought process would -- his -- it's

19   hard to explain.  The reason I check "altered thought

20   process" is because he was -- he had an education of

21   the seventh grade, he was very focused on his mother,

22   he was very hard to -- it was hard for him to put -- I

23   know I'm not explaining this well.  He couldn't -- I

24   don't think that he would be able to protect himself in

25   GP.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  Now you're referring to the box for

2   "altered" or "ALT T/P" under "Assessment?"

3      A    Yeah.

4      Q    I guess what I was talking about was under

5   "Objective," the "T/P" you've checked "clear" and

6   there's a box for "loose."  What's the difference

7   between those two?

8      A    Loose would be a little delusional, it

9   doesn't add up, it's a mental health.  He wasn't like -

10  - hmmmm.  He was able to still communicate, like I --

11  you know, he wasn't talking about, you know, big bird

12  or just crazy, off the wall -- I mean, it was, his --

13  it was still clear.

14     Q    Under "Speech" you've checked "Slowed,

15  rambling, slurred."  You did not check "loud."  Was he

16  not loud when he was speaking with you?

17     A    I didn't check loud.  I should have.  Yes, he

18  was very loud.  Well actually he wasn't very loud with

19  me, he was very loud with pretrial, or -- yeah.

20     Q    Now under "Activity," he did not make eye

21  contact.  Is that why you've checked that box?

22     A    He was slow to hold eye contact.  You know,

23  he was kind of looking at what was going on in the next

24  station and looking at his food.

25     Q    Okay.  You've checked "Fidget," that he was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    fidgety and twitching.

2        A    Uh-huh.

3        Q    Did you make any determination of what was

4    causing him to be fidgety and twitching?

5        A    He was just very, you know, playing -- like

6    wouldn't -- he was just playing with his juice and kept

7    running his fingers through his hair, and rubbing his

8    arms, and he was just -- couldn't really, he didn't sit

9    still that great.

10       Q    But this was activity that you observed at

11    the same and during the same interview in which he was

12    appeared to be falling asleep at times?

13       A    At times.  When -- let's talk about "at

14    times."  Like how about when the paperwork -- I'm doing

15    the paperwork and I'm not physically having the

16    conversation like we are right now --

17       Q    Yeah.

18       A    It wasn't the whole interview that he was

19    asleep, you know, he had to speak to me through -- I

20    mean we got through the entire interview so he -- he

21    was awake.

22       Q    Okay.  But at times he appeared to fall

23    asleep during his interview, at other times he appeared

24    to be fidgety and twitching?

25       A    Uh-huh.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 120 of 149 PageID #: 886
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
120

1    Q    Okay.  And the last box where you've checked
2 "Appropriate," is the I-D-E-A-T, does that stand for --
3    A    Ideation.
4    Q    Ideation.  Okay.
5    A    He wasn't, he denied having any suicidal or
6 homicidal thoughts.
7    Q    Follow-up, the referral completed to mental
8 health professionals and we've talked about that.
9    A    Uh-huh.
10   Q    The box you checked for "Referral Made" to --
11 made to "medical sick call," does that -- is that
12 associated with your expectation that he would be
13 assessed in eight hours?
14   A    No, that would be the chronic care because he
15 had hypertension and he was on lisinopril.
16   Q    I understand.  Okay.  And the next page it
17 looks like it's just the authorization for release of
18 protective health information you sent to the pharmacy.
19   A    Yeah.  He kind of signed his name the same
20 way he did on the --
21   Q    Yeah.
22   A    -- maybe it's how he writes his name.
23   Q    Okay.  That takes care of that.  Is
24 unconsciousness a medical emergency?
25   A    It depends.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, Taken on December 18, 2014

```
 1        Q     I'm sorry?
 2        A     I mean unconsciousness, like I can't arouse
 3   you or you're asleep?
 4        Q     Yeah.  Unconsciousness, you can't arouse me.
 5        A     I can't wake you up.  Yes, that would be a
 6   medical emergency.  I couldn't -- if you wouldn't wake
 7   up if I rubbed your sternum, I...
 8        Q     Do you know whether anybody made an attempt
 9   to arouse Mr. Cross after he appeared to fall asleep up
10   on the second floor?
11        A     I have no idea.  I wasn't there.
12        Q     Are you familiar with the Nursing Protocols
13   2011 of Correctional Medical Services that I've been
14   provided?
15        A     Uh--
16        Q     Is that a "yes?"
17        A     Can I recite them verbatim?
18        Q     That's not what I'm asking.  Are you --
19        A     Yes.  We -- yes.
20        Q     Have you reviewed these?
21        A     They -- yes, it's part of our orientation.
22        Q     Were these the nursing protocols in place and
23   that governed your work and your behavior when Mr.
24   Cross came into the jail?
25        A     Yes, I believe so.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 122 of 149 PageID #: 888
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
122

1    Q    Are you aware of whether there is anything in

2  these nursing protocols that makes any mention of drug

3  overdose?

4    A    I would have to go through and see them.

5    Q    Okay.  As you sit here today, you don't know?

6    A    I mean it's been several years.  I can't

7  recall.

8    Q    Okay.  I've also been provided a copy of

9  Correctional Medical Services, Inc., Health Services

10 Policy Procedures Manual.  Was this what was in place

11 when Mr. Cross was there?

12   A    Was that CMS or Corizon?

13   Q    It is -- well --

14   A    If it's CMS.

15   Q    -- good question.  I've got a -- I've been

16 provided an index that says "Correctional Medical

17 Services" and on the first page it says "Corizon." Do

18 you -- this looks like it's Corizon's Health Services

19 Policy Procedure Manual -- do you know whether this

20 makes any reference to overdose?

21   A    I would have to look at it.

22   Q    Are you familiar with the NCCHC standards?

23   A    That's the standards of the Correctional -- I

24 don't know the full abbreviation, but that's who

25 accredits us.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Do you know whether the NCCHC standards make

2  any reference to overdose?

3      A     I'd have to look.

4      Q     Let me show you what I've marked Exhibit 4 to

5  your deposition and I've previously given you a copy of

6  this.

7             (EXHIBIT 4 MARKED FOR IDENTIFICATION)

8             MR. BELZLEY:  Matt, I'm sorry, I don't have a

9  spare.

10            MR. PIEKARSKI:  That's fine.  I know what

11  you're talking about.  Ellie, this is Exhibit 4 to T.

12  J. Sloan's deposition, I believe -- the Laurel County

13  Detention Center Toxification Form.

14            MS. HOUSTON:  Okay.  Yeah, I have it.  Thank

15  you.

16            MR. PIEKARSKI:  Am I right on the number?

17            MS. HOUSTON:  No, I think it's 3.  You were

18  close.

19      Q     Have you ever seen a policy or a document

20  that is similar or comparable to what I've marked

21  Exhibit 4?

22      A     This is from Laurel County.  No.

23      Q     Okay.

24      A     I've never worked for them.

25      Q     Let me show you what I've marked Exhibit 5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of STEPHANIE KOHL, taken on December 18, 2014

124

1 and ask you the same question. Have you ever -- take a
2 second to look at that, I don't want to jump ahead of
3 you.
4          (EXHIBIT 5 MARKED FOR IDENTIFICATION)
5     Q    Have you ever seen in the course of your work
6 at the Louisville Jail for Corizon Correctional Medical
7 or Correct Care a chart of this type for rapid
8 reference in the event any of these identified
9 behaviors are observed?
10    A    Uh-uh.  I mean I'm --
11    Q    No?
12    A    No.
13         MR. BELZLEY:  No further questions.
14         MR. PIEKARSKI:  Ellie?
15         MS. HOUSTON:  Yeah, I actually do have a
16 couple.
17                CROSS-EXAMINATION
18         BY MS. HOUSTON:
19    Q    Ms. Kohl, my name is Ellie Houston and I
20 represent Officers Tinnell and McNamara.  And I just
21 have a few follow-up questions for you.  Are you able
22 to continue or do you need a break?
23    A    No, I can continue.
24    Q    Okay.  Great.  I don't think I'm going to be
25 very long.  Did Mr. Cross communicate to you anything

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 125 of 149 PageID #: 891
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
125

1  about his arrest?

2      A     No.

3      Q     Okay.  Did he communicate to you any

4  conversation that he had with the arresting officers?

5      A     No.

6      Q     Okay.  You were asked several questions about

7  your notation that Mr. Cross was alert and oriented at

8  the time you were assessing him?

9      A     Yes.

10     Q     Would you agree he was alert and oriented

11  enough to give you a significant medical history that

12  included he knew was his pharmacy was at Rite Aid;

13  correct?

14     A     Yes.

15     Q     He could tell you who his primary care

16  physician was; correct?

17     A     Yes.

18     Q     He told you a lot of information about his

19  medical history, including that he had had a previous

20  motor vehicle accident where he sustained a head

21  injury; correct?

22     A     Yes.

23     Q     And that he had had previous mental health

24  treatment?

25     A     Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 126 of 149 PageID #: 892
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
126

1      Q      He could tell you about the medications he

2    was on; correct?

3      A      Yes.

4      Q      And he knew why he was taking them?

5      A      Yes.

6      Q      And he told you information about his

7    education level?

8      A      Yes.

9      Q      Okay.  At any time during your assessment of

10   him did he tell you that he had just suffered a

11   seizure?

12     A      No.

13     Q      Did he tell you that he had ever suffered a

14   seizure in the past?

15            WITNESS:  Can I look at the chart?

16            MR. PIEKARSKI:  If you need to, yeah.

17     A      There's a question on page 2 of 4 under

18   "Current Medical" where we ask him if they have a

19   seizure disorder, and he said "no."

20     Q      Okay.  So he denied having a seizure

21   disorder?

22     A      Yes.

23     Q      At any time during your assessment did he

24   ever tell you that arresting police officers denied him

25   medical treatment?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 127 of 149 PageID #: 893
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
127

 1          A     No.

 2          Q     Did he ever tell you that he asked for

 3    medical treatment and they just laughed at him and

 4    said, "We're not going to give it to you?"

 5          A     No.

 6          Q     During -- at any time during your assessment,

 7    did he ask you for medical treatment of any kind?

 8          A     No.

 9          Q     Did he ask to see a physician?

10          A     No.

11          Q     Did he ask to go to a hospital because he had

12    just undergone a seizure?

13          A     No.

14          Q     Actually, Ms. Kohl, if you could look at the

15    -- and I don't recall which exhibit this is, but the

16    initial medical assessment, page 1 of 3.  If you look

17    at the top there, that question says, "Do you have a

18    serious medical condition that may require attention

19    while you are here?"  Is that -- are you there?

20          A     Yeah, I'm here.

21          Q     Okay.  And you marked, "Yes;" is that

22    correct?

23          A     Yes, I did.

24          Q     And under "Explain" it says "Anxiety,

25    hypertension and bipolar."  Is that something he told

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 128 of 149 PageID #: 894
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
128

1    you?

2         A    Yes.

3         Q    Okay.  And those are the only things that he

4    told you that may require medical attention while he

5    was at the jail; correct?

6         A    That is correct.

7         Q    And I do have just one question of

8    clarification.  If you look at the medical detox, page

9    1 of 1, and if you go down to the bottom there and it

10   says, "Have you ever experienced DTs or other serious

11   withdrawal from drugs or alcohol?"  And you wrote,

12   "No;" is that correct?

13        A    Hold on, let me get there.

14        Q    Yes, sure.

15        A    Yeah, that's where we ask them if they ever

16   go through withdrawals, has he ever experienced any and

17   he said "no."

18        Q    Okay.  Including "Have you ever experienced a

19   seizure associated with withdrawal;" correct?

20        A    Yes.

21        Q    And he said, "no?"

22        A    That is correct.

23        Q    And, again, I think this is what you were

24   referring to before.  If you go to the page that says

25   "Current Medical," page 2 of 4.  That indicates there,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    does it not, that you specifically asked him if he had

2    a seizure disorder and he said no?

3          A    That is correct.

4                WITNESS:  She's not waiting for me to answer?

5                MR. PIEKARSKI:  No, I think she's thinking.

6    You're not waiting on her to answer, are you Ellie?

7                MS. HOUSTON:  No, I just want to confirm.  I

8    just want to clarify that under "Current Medical," page

9    2 of 4, where it says "Seizure Disorder" questionmark,

10   you indicated "no," meaning -- means you asked him if

11   he had a seizure disorder and he said "no;" correct?

12         A    I asked him if he had any of these disorders

13   and he said no, except to hypertension.

14         Q    Okay.  Thank you.  And then if you kind of,

15   Ms. Kohl, if you page through that to "Current

16   Medical," page 4 of 4 --

17         A    Uh-huh.

18         Q    -- that documentation there at the end where

19   it says, "Do you understand that you may request a

20   healthcare provider at any time while you are here?"

21   You asked him that question; correct?

22         A    Yeah.  That he knows how to get contact if he

23   needs to contact a provider, yes.

24         Q    Okay.  And then if you look to the section

25   called "Psychiatric Questions," page 3 of 4.  And kind

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 130 of 149 PageID #: 896
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
130

1   of go down to the middle of the page.

2       A    Okay.

3       Q    And it -- okay.  It indicates, or it states,

4   "Have you understood all the questions that I have

5   asked you," that means you asked Mr. Cross if he

6   understood your questions; correct?

7       A    Yes.

8       Q    Okay and he said that he did; correct?

9       A    Yes.

10      Q    And then right under that it says "Does the

11  screener feel that the arrestee is capable of

12  understanding all questions asked" and you indicated

13  "yes?"

14      A    Yes.

15           MS. HOUSTON:  Thank you.  I don't have any

16  further questions.

17           WITNESS:  Thank you.

18           MR. PIEKARSKI:  I do.  I've got three.

19           WITNESS:  Okay.

20                CROSS-EXAMINATION

21           BY MR. PIEKARSKI:

22      Q    Ms. Kohl, do you believe that Mr. Cross had

23  taken an overdose of drugs when you treated him?

24      A    No.

25      Q    Do you believe that when you assessed Mr.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 131 of 149 PageID #:
897
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
131

1    Cross that he was at a risk of immediate harm due to

2    intoxication?

3         A    No.

4         Q    Do you believe that Mr. Cross had any medical

5    condition that warranted immediate medical attention

6    when you saw him?

7         A    No.

8              MR. PIEKARSKI:  Okay.  That's all the

9    questions I have.

10                   REDIRECT EXAMINATION

11             BY MR. BELZLEY:

12        Q    Well your understanding concerning Mr. Cross'

13   course in the jail wasn't that he had an immediate

14   problem, isn't it?  He wasn't found unresponsive until

15   almost 9:00 that night.

16        A    That's what the paperwork -- I'm...

17        Q    Okay.

18             MR. PIEKARSKI:  What's the question?

19        Q    And as we discussed, was it your impression

20   that Mr. Cross' condition had deteriorated after you

21   saw him?

22        A    Did I say that it had deteriorated?

23        Q    No, I didn't say that -- I asked if you said

24   it -- I asked if it was your impression when you found

25   out that he was getting CPR upstairs, was it your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 132 of 149 PageID #: 898
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
132

1   impression that his condition must have deteriorated

2   after you saw him?

3        A    Yeah.

4        Q    I was produced in this litigation something

5   entitled a "Withdrawal Initial Screening and Treatment

6   Plan," Form Number 7711 from Ms. Sloan.

7        A    Uh-huh.

8        Q    This appears to be a test she was

9   administered.  I didn't see one in your file.  Do you

10   remember taking a test of that type?

11        A    I mean, we all have to take these every year.

12        Q    I'm just asking -- and I'm --

13        A    I've taken -- I've been with this company for

14   six years, so I've taken many of these.  I don't know

15   if I've taken this specific test.

16        Q    Okay.  I gotcha.  No further questions. Thank

17   you, ma'am.

18              (DEPOSITION CONCLUDED AT 3:15 P.M.)

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 133 of 149 PageID #: 899
The Deposition of STEPHANIE KOHLER, taken on December 18, 2014
133

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE


I do hereby certify that the witness in the
foregoing transcript was taken on the date, and at the
time and place set out on the Title page here of by me
after first being duly sworn to testify the truth, the
whole truth, and nothing but the truth; and that the
said matter was recorded stenographically and
mechanically by me and then reduced to type written
form under my direction, and constitutes a true record
of the transcript as taken, all to the best of my skill
and ability. I certify that I am not a relative or
employee of either counsel, and that I am in no way
interested financially, directly or indirectly, in this
action.



AMANDA BECERRA, COURT REPORTER/ NOTARY

MY COMMISSION EXPIRES ON: 12/03/2016

SUBMITTED ON: 1/2/2015

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 134 of 149 PageID #:
9002
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
134

---

**-**

**--in** 105:25

---

**0**

**0** 58:23

---

**1**

**1** 10:10 22:20,
22 23:6 36:23
43:22 47:9
53:13 70:20
75:20 78:5
84:12,18 86:17,
19 102:4
111:23 127:16
128:9

**10** 16:17 40:24,
25 41:5,9

**100s** 16:12

**11p** 19:21

**120** 9:5

**140** 16:11

**15** 40:24 41:5

**1724** 77:7

**1st** 7:1 10:20

---

**2**

**2** 23:1 54:18,22
77:1 88:8
126:17 128:25
129:9

**20** 40:24

**2000-2001**
8:18

**2006** 9:1

**2007** 9:1 33:8

**2008** 11:19

**2009** 10:20,22
11:12

**2011** 121:13

**2012** 7:21
17:10 19:10
21:9 23:20 55:6
56:20 68:1 77:7

**2013** 7:2 10:10

**24** 35:5,7,8,20,
24 71:23 83:5

**25** 7:21 19:10
21:9 23:20
52:22 55:6
56:20 61:2 77:7

**25th** 33:12

---

**3**

**3** 23:1 65:21
66:4,6,9 70:18
77:1 81:1 97:12
123:17 127:16
129:25

**34** 6:15

**3:15** 132:18

**3p** 19:21

---

**4**

**4** 46:9,10,12
81:1 84:12,17,
18 88:8 123:4,
7,11,21 126:17
128:25 129:9,
16,25

**400** 7:9

---

**5**

**5** 41:2 46:9,10,
12,13,18
123:25 124:4

**50s** 16:15

**5:00** 30:20 35:9
55:19

**5:06** 55:16,20,
25

**5:07** 55:20,21,
22 56:3 61:2

**5:09** 55:19

**5:18** 23:21 24:5
37:9,16,18,21
38:3,8,14,20
39:2,10 40:18
43:13,15,25
44:2 52:21
53:19

**5:24** 77:8

**5:25** 116:21

**5:30** 30:20

---

**6**

**60s** 16:15

---

**7**

**7** 11:19

**7711** 132:6

---

**8**

**8/25/12** 55:16,
23

**8/3/2012** 73:22

**8:00** 35:11

**8:50** 36:19

---

**9**

**90s** 16:12

**9:00** 35:11
131:15

**9:49** 36:23
37:14,19,23
38:4,9,11,16,19
39:13 43:24

---

**A**

**abbreviation**
24:10 122:24

**ability** 39:23

**abuse** 54:25
55:14 73:5,9

**access** 33:9
83:4

**accident** 27:24
33:8 41:19 52:9
116:4 125:20

**accompanied**
52:23 99:24

**account** 61:1
83:22

**accounted**
79:22

**accredits**
122:25

**acknowledged**
28:20,24,25

**acknowledges**
13:22

**acronym** 6:22
23:14

**acronyms**
57:18

**Act** 88:10

**acting** 113:19
114:4

**activity** 51:11
118:20 119:10

**acute** 81:8,19
83:25 113:4,9,
16

**add** 43:15
66:18 107:15
118:9

**added** 105:19

**adding** 39:9

**addition** 48:16
75:23 79:11

**address** 7:10
66:25 108:8

**addressed**
71:25 72:23
104:2 111:22

**addressing**
31:12

**administered**
132:9

**administration**
58:24

**admission**
35:5 71:4 72:3
91:22

**admitted** 71:3

**Adolescent**
9:9,12

**adopted** 55:10

**advice** 83:20

**affect** 116:24
117:8

**affirm** 6:4

**agitated**
109:21

**agree** 125:10

**ahead** 14:23
124:2

**Aid** 70:13
125:12

**alcohol** 28:13,
17 38:9 57:12,
14,15 64:7 78:5
86:1,21 87:22
88:22 97:24
103:7,25 105:7
109:9 111:25
128:11

**alcoholic**
109:6

**alert** 15:3 84:1
91:22 99:3,6,8,
9,22 100:24
101:23 102:1
113:11 125:7,
10

**alerts** 71:14

**Alicia** 21:7
92:18

**allergies**
23:14,17

**ALT** 118:2

**altered** 117:19
118:2

**amount** 98:6,

---



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11,21 113:22
115:4

**angry** 25:10
117:5,6

**Ann** 6:13

**answers** 110:7

**anti-psychotic**
78:15

**anti-psychotics**
63:6

**anticipated**
34:6

**anticipation**
59:8,13

**anxiety** 33:3
85:23 109:21
127:24

**anybody's**
97:19

**anymore**
105:23

**anytime** 33:4
70:8 82:9

**apnea** 97:8

**apologize**
55:20

**apparently**
88:21

**appeared**
29:9,11 38:15
40:11,15 66:15
85:2 86:12
95:13 102:4
119:12,22,23
121:9

**appearing**
29:13 30:19
42:3

**appears** 13:21
14:19 36:22
38:19 42:9 55:9
58:18 65:12
78:23,24 85:11
86:3,6 88:2
95:25 96:15
97:21 103:7

115:11 116:20
132:8

**applied** 99:25

**apply** 56:8
100:20

**approves**
78:21

**approximately**
36:19 104:23

**area** 45:14

**arms** 119:8

**ARNP** 22:16

**ARNPS** 21:12
22:6,12

**arouse** 114:17,
24 121:2,4,9

**aroused** 65:14
95:14 96:6,16,
17 115:3

**arrest** 67:22
68:25 69:21
125:1

**arrested** 67:7
68:11 69:15
84:5 101:8

**arrestee**
130:11

**arresting**
67:13 68:9
69:20 125:4
126:24

**arrests** 68:16

**arriving** 81:24

**Ashley** 47:24
48:6,14 49:17,
20

**asleep** 29:10,
12,13 30:19
38:15 40:11,15
42:3 88:19
96:15 102:4
119:12,19,23
121:3,9

**assess** 19:6
61:7 68:8,17
82:2 100:2

106:24 108:10

**assessed**
100:10,15
105:2,6,24
120:13 130:25

**assessing**
22:3 30:17
41:18 99:9
125:8

**assessment**
12:15 23:25
24:1,6 28:7
39:10 40:18
42:24 47:11
54:13 61:3,4,8
64:15 66:12,22
67:11 71:10
75:16 76:20
77:19 82:5,12
87:19,25 98:25
99:19 100:4
102:20,23
103:5,6,16,25
104:1,7,20,21,
22 105:1,5,12,
14,19 106:22
107:5 108:11
116:15,23
118:2 126:9,23
127:6,16

**assigned**
19:22 100:13

**assignment**
21:23

**assist** 67:10
91:1

**assuming** 54:3
79:4 80:19

**attempt** 87:10
121:8

**attended** 8:15
18:2

**attention** 14:8
87:20 127:18
128:4 131:5

**attracted**
10:25

**auditory**
109:22

**August** 7:21
17:10 19:10
21:8 23:20
52:22 55:6
56:20 61:2 68:1
73:22 77:7

**authorization**
120:17

**average** 40:23

**awake** 119:21

**awakened**
96:6 100:23

**aware** 11:10
61:6,9 88:14
95:11 99:23
104:1 112:3,8
122:1

**awhile** 63:21

_____

**B**

**back** 11:11
19:10 29:18,20,
25 30:3,7 31:11
39:4 40:9,14
42:5 43:14 51:6
56:20,24 67:3,
25 76:16 90:13
100:22 102:17

**bad** 109:6

**base** 98:1

**based** 32:18,21
69:5 103:8

**baseline** 56:1

**basically**
23:16 46:22
55:22 57:3 73:2
103:9

**basis** 84:9
105:4

**beating** 115:3

**beer** 27:2
28:16,20,24
29:3 30:24
38:4,5,24 49:3,
10,16,22 50:10
64:2 78:6 79:1,
11,19,22 84:3

85:25 86:7,15,
20,21 87:2
88:23 89:11
98:6 108:1

**beers** 86:1

**began** 10:18
105:13

**begin** 6:24
108:2 113:21

**Beginning** 9:2

**begins** 75:16

**behaving**
30:23

**behavior**
51:16 83:23
121:23

**behaviors**
69:19 124:9

**believed**
85:18,21 86:14,
24

**BELZLEY** 6:10
22:23 23:4
33:24 44:24
50:23 51:2,6,7
54:23 55:3
65:22 66:1
83:11,14
102:15,17,18
110:6 112:17,
20 114:22
123:8 124:13
131:11

**BENZO** 57:9

**benzodiazepin
e** 56:8

**benzodiazepin
es** 57:13

**Bevens** 77:3

**big** 95:22
118:11

**bipolar** 116:4
127:25

**bird** 118:11

**bit** 74:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 136 of 149 PageID #: 902
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
136

**blood** 15:8,10, 11,20,21 16:6 58:6,9,12,18 60:15

**blue** 94:16

**blunt** 117:7

**blurb** 24:1 54:2

**Board** 9:6

**boards** 9:7

**bob** 29:25 30:6, 7

**booking** 19:24 20:1,19,23,24 45:8 82:10,14 93:3

**booming** 25:11,13 70:2

**bottom** 34:15, 19 48:2 51:13 52:9 54:5 73:19 74:4 76:8 77:5 81:2 88:9 115:8 128:9

**bought** 9:16

**box** 57:16 71:22 74:9 75:1 100:19 108:23 109:2 110:9,16 117:1 118:1,6, 21 120:1,10

**brain** 61:24 66:16 116:3

**break** 47:16 50:23,24 51:3 89:23 90:2,9, 22,24 92:12,15 93:17,21 102:15 124:22

**breathing** 96:1,2,7,16

**brought** 91:6 94:12 101:13

**building** 68:18

**bunch** 113:18 114:1

**bunk** 34:15,20,

22 47:25 48:2 51:13 52:9 54:5 94:17

**button** 42:21

___

**C**

**C-I-W-A** 57:21

**C-O-W** 57:22 104:7

**call** 48:3,4 53:8 81:10,11,25 82:13,16,22 83:20 90:21 92:21 93:15 108:5 120:11

**called** 36:14 47:16 48:9 52:2 53:5 60:2 83:2, 6,15 84:3 89:22 90:8,22 92:16, 22,25 93:7,24 129:25

**calling** 89:25

**capable** 130:11

**car** 27:24

**cardiac** 41:23 54:11

**care** 6:23,24 7:4,6,8,13,15, 17,24 9:14,25 10:9,14 11:15 12:13,22 13:5 18:12 54:3 68:23 70:22 72:23 82:2,3 120:14,23 124:7 125:15

**caring** 99:12

**carried** 69:12

**carries** 25:13

**case** 11:23 19:12,13 34:20 62:4 69:7

**categories** 56:23

**caught** 106:12

**caused** 63:17

**causing** 119:4

**CCS** 6:21

**cell** 22:17 36:13 75:3 83:4 94:19,21 95:19, 20,21,24

**center** 67:1 84:15 123:13

**certification** 9:3

**chair** 29:18,21 30:7

**change** 17:4,5 53:7 76:16

**changed** 74:1

**chart** 28:6 29:7 41:25 44:7,8 52:23,25 65:24 66:13 69:4 73:15 91:13 92:11,24 124:7 126:15

**check** 71:8,21 72:20 73:11 75:2 84:8 98:11 99:25 105:18 109:2 110:13, 24 111:14 117:13,19 118:15,17

**checked** 55:25 65:6 70:24 71:7,19,20 72:4 74:23 75:1 84:11 94:23 95:7 100:24 102:3 108:23 110:9,16 111:8 117:1 118:5,14, 21,25 120:1,10

**checking** 57:15 65:9

**checkmarks** 107:4

**checks** 95:1

**chest** 30:6 96:2

**child** 11:4,8 39:25

**childlike** 39:14,17,23 112:24

**chose** 11:1 83:17

**chronic** 27:23 33:2 70:22 72:23 120:14

**cigarette** 93:18

**circled** 59:2,8, 11,12

**circulated** 59:7

**citation** 67:22 68:4,25

**CIWA** 57:3,8,9, 15,17,21 58:25 103:13 104:5 106:20,24 107:5

**CIWA-AR** 102:21

**claim** 116:10, 14

**clarification** 128:8

**clarify** 129:8

**class** 18:1 36:1

**classification** 36:3,5,11 45:24 47:3,23 48:7, 15,16,17 74:19 75:5

**classifications** 45:18

**clean** 70:2

**clear** 10:8 117:16,18 118:5,13

**Clinical** 103:6

**clipped** 45:2

**clock** 56:5

**close** 29:14,23 123:18

**CMS** 9:23 10:5 122:12,14

**cocaine** 15:21

**Cod** 82:24

**code** 37:2

**coffee** 114:3

**cognitively** 39:19

**coke** 114:3

**college** 8:8,11, 13,16,20,24

**columns** 58:15

**comment** 48:25 49:1,5

**communicate** 39:24 104:25 118:10 124:25 125:3

**community** 8:11,12,16,20 84:15

**company** 6:22 9:15,22 132:13

**comparable** 104:1 123:20

**compare** 66:22

**comparing** 37:8

**complain** 109:23

**complaints** 71:17

**complete** 24:1 34:25 35:3

**completed** 9:7 35:18 40:2,3 66:12 70:21 72:10 120:7

**completely** 111:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

completing 44:3

completion 24:6 72:9

computer 34:15 42:10,11 43:2,14 56:6 77:13,18 91:15, 17

CON 76:10

concern 51:9 52:18 87:23 88:3

concerned 30:18,23 39:9 87:16 109:11

concerns 52:14

CONCLUDED 132:18

conclusion 40:7

condition 27:7,20 53:22 71:7 81:8,19 112:11 113:17 114:6 127:18 131:5,20 132:1

conditions 18:21 63:10

conducting 82:5

confirm 129:7

confused 39:15 40:5 67:24 112:24

confusing 17:18

connecting 33:22

conscious 15:3 96:6

consciousness 65:7 95:8,9 99:3,20 100:1, 2,9,15

consequence 64:6 103:13

considered 71:5 108:15

consistent 28:17

constricted 117:6

consult 20:8, 12 22:12 31:18 43:25 82:4,7 83:21

consumed 38:23

contact 21:25 22:4 58:9 61:11 62:6 82:18 118:21,22 129:22,23

contacts 20:6

continue 124:22,23

conversation 31:11 40:9,14 42:5 62:16 91:7 92:8 93:19 100:23 119:16 125:4

cooperative 117:3

coordinating 74:8

coping 72:15

copy 67:22 116:13 122:8 123:5

Corizon 7:6, 15,17,23 9:14, 16,25 10:5,14 12:13,22 18:12 22:24 55:6,9 66:2 69:6 70:18 72:12 122:12, 17 124:6

Corizon's 122:18

corner 99:13

correct 6:23,24 7:4,7,13 10:9 12:13,22 18:12, 19 19:8,9,18,19 24:11 28:10 34:23 35:25 37:20,25 38:1 39:15 43:16,22 47:1 55:7,8 57:24 59:20 63:25 64:7 69:22 75:20 77:11 79:3 85:3 87:17 88:14 89:13,25 98:8 99:20 100:13 101:19 102:5, 21,22,24 103:18 117:12 124:7 125:13, 16,21 126:2 127:22 128:5,6, 12,19,22 129:3, 11,21 130:6,8

correctional 9:22 10:2,13,23 11:11 12:12,21 18:11 54:24 55:4,11 89:14 112:4 115:12 121:13 122:9, 16,23 124:6

Corrections 75:14 80:12

County 8:4 123:12,22

couple 31:13 84:9 124:16

court 6:3,8 25:2,3 57:21

COW 57:14,17, 22 104:4,5,6, 14,15,18,21 105:1,5,8,12, 14,18,19,23 106:2,5,6,9,16, 20,24

COWS 57:9 106:21 107:15

CPR 47:17 89:22 90:25 91:4 131:25

crazy 118:12

credible 49:11, 15,19,23

Crisis 70:24

Cross 17:8,25 20:6,9 21:10, 13,18,21 22:1, 3,15,19 23:23 24:7,14,16,17 31:19,22 32:4, 17,25 33:11 36:13 37:10 39:11 40:17,21 41:14 47:8,15, 18 48:18 51:9, 16 52:3,23 53:9,11 56:21 59:19 61:10 62:5,7,22 64:19 65:5 67:3,20 69:11,25 70:7 74:3 80:13 82:6,8,16 84:6 85:18 89:19,21 90:5,10 91:4 93:25 94:4,23 95:8,21 97:1,3 99:24,25 100:21 103:8 104:15 106:15, 23 107:16 109:15 110:13 112:12 121:9, 24 122:11 124:25 125:7 130:5,22 131:1, 4

Cross' 19:13 41:8 49:15,21 60:14,19 63:11 68:25 83:22 84:8 104:22 131:12,20

CROSS-EXAMINATION 124:17 130:20

cubicle 46:4,6, 20,22 67:4 90:6

cubicles 46:1, 2,25

crazy 118:12

cue 79:7

Current 76:10 80:21,25 81:1 126:18 128:25 129:8,15

_____

D

_____

daily 98:22

danger 64:6

dangerous 87:21 111:24 112:5,14 113:2, 15

date 9:1,2 18:9 19:17 23:20 55:16,24 73:22 107:19

dates 8:17 10:7

day 28:21,25 30:25 38:4,25 46:3 49:10,16, 22 62:10 63:21, 23 79:19,22 80:23 83:5 89:9 102:9

dealing 12:23 17:11 18:4 42:3 80:13 85:18 106:15

dealings 18:1

death 114:11, 15

December 7:1 10:10

decide 32:17

decision 32:4 59:24

decre 16:3

decreased 15:24 16:4,8,9

definite 8:17

degree 8:23 11:5 88:17

delayed 39:20 52:10 89:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**delusional** 118:8

**denied** 38:23 71:16 87:14 120:5 126:20, 24

**deny** 112:5

**Department** 75:14 80:12 115:9,13

**depending** 15:19 16:3,19

**depends** 13:19 15:13,15,17,18 41:7 77:12 120:25

**deposition** 22:21 23:2 123:5,12 132:18

**depositions** 33:22

**Depressed** 71:7,8

**depression** 71:10 85:23

**description** 47:8

**Detention** 123:13

**deteriorated** 114:7 131:20, 22 132:1

**deteriorates** 113:17

**determination** 80:5,9,13 119:3

**determine** 13:23,24 14:22 19:1 87:10 107:20

**detox** 18:6 31:14,16,19,22 32:1,5,18,25 33:10 34:9,12, 19 48:19 51:10 52:8 54:5,20

59:6 60:8 64:9 65:8 72:9,10, 19,20 73:6,11, 12 76:15 78:4, 13,15 79:8 84:10 87:20 97:16 98:19 100:11,13 111:2,23 128:8

**developmenta lly** 89:6

**devoted** 18:3

**diagnose** 18:21,23 39:21

**dictated** 60:1

**died** 12:2,7 80:18

**differ** 99:6

**difference** 23:24 107:8 117:16 118:6

**direct** 6:9 61:11

**directed** 19:8 46:23

**directly** 52:25 65:1 90:5

**Director** 21:4 92:19

**Disciplinary** 70:19

**discuss** 17:9 22:1,15 49:7 66:7

**discussed** 17:21 131:19

**discussing** 7:21 82:12

**disorder** 52:1 126:19,21 129:2,9,11

**disorders** 129:12

**Disposition** 81:2

**distinguishing** 83:21

**distracted** 31:10

**distress** 83:25 113:4,9,16

**disturbances** 109:22

**doctor** 44:11 53:5,8 58:9 67:1 77:2 80:6, 11 84:3 108:5

**Doctor/agency** 85:1

**doctors** 82:23

**document** 22:23 23:6 44:6 53:15 54:23 65:23 66:2,5,21 75:24 76:4 89:16 97:19 115:19 123:19

**documentatio n** 31:21,23 73:15 129:18

**documents** 22:11 43:7 86:11 97:11 111:20

**DON** 92:16,19

**door** 96:12

**dorm** 64:23,25 72:16

**doses** 70:12

**downward** 29:25

**drank** 27:2 28:16 30:24 79:16 87:1

**draw** 45:11

**draws** 45:13

**dressed** 94:15

**drink** 78:5 97:24 109:8,9

**drinking**

28:21,25 38:24 63:25

**drug** 12:2,8 13:18,19,23 15:13,15,17,18, 19 16:3,19,20 61:13,16,21,22 62:3,17,23 73:4 79:9 97:5,9 106:24 111:17, 18,22 113:23 114:10 122:2

**drugs** 12:16,24 13:22,25 14:20, 22 16:23 17:12 18:5 52:14,19 64:12 78:11,25 79:3,9,11 87:3, 21 88:22 104:3, 8 111:25 112:4, 6,14 113:3,15 114:2 128:11 130:23

**drunk** 28:20,23 38:5

**dry** 107:17

**DTS** 128:10

**due** 131:1

**Dupont** 9:8

**duty** 21:21

---

**E**

---

**E-T-O-H** 28:12

**easily** 31:10 39:15 40:5

**eating** 101:1,2 113:8

**education** 8:21 72:13 73:17 117:20 126:7

**effect** 16:6,25

**efforts** 89:18

**electronically** 43:5,15 73:20 77:23

**elevated** 15:11,22 16:4 58:7,12 60:15

**elicit** 50:16

**Ellie** 22:23 50:24 54:23 65:22 123:11 124:14,19 129:6

**emergency** 81:2,4,5,7,14, 18 115:8,12 120:24 121:6

**emotional** 85:7,22

**employed** 10:13

**employee** 9:14

**employer** 10:9 55:7

**employers** 12:12,21 18:10

**employment** 7:23 9:4

**encountered** 67:20

**end** 22:14 42:1 115:14 129:18

**engaging** 62:2 101:17

**enroll** 8:20

**enter** 42:7,8 43:4 73:25 77:21,22

**entered** 34:15 47:8 73:20 76:4,22 85:1,6 88:9,20 89:4 99:22

**entering** 52:19 68:18

**entire** 24:19 113:5 119:20

**entitled** 70:18 132:5



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 139 of 149 PageID #:
905
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
139

entries 66:14
98:24

entry 66:15
76:13 99:18
100:19

environment
10:23

Equal 58:17

ER 91:25

escorted
90:17

essentially
70:2 100:12
114:4

estate 11:12
12:7

ETOH 28:12
56:8 57:2 73:9
97:23

evaluated 80:7

evaluation
71:6,20,22

evening 59:9
60:14

event 39:4
93:10 124:8

events 39:5

exact 7:10

examination
6:9 47:12
131:10

exhibit 22:20,
22 23:6 36:23
43:22 47:9
53:13 54:18,22
65:20 66:4,6,9
70:18,20 75:20
86:17,19 97:12
102:4 111:3
113:10,21
123:4,7,11,21,
25 124:4
127:15

exhibiting
110:10,14

expect 16:24

17:3 35:10

expectation
35:7,18 104:21
120:12

expected
18:18

experience
51:10,11 73:13

experienced
128:10,16,18

experiencing
51:17

explain 73:4
80:22 85:10,22
88:11,23 89:5
117:5,19
127:24

explained 52:6
63:11 114:12

explaining
73:2 117:23

explanation
73:14 84:23

explanations
72:18

extensive
41:4,21 65:2
71:3

eye 118:20,22

eyes 29:14,23

_____

**F**

facility 9:10,12
61:5

fact 46:20
100:12 101:16
106:9

facts 11:23

fair 41:8 59:7,
12 63:2 67:19
68:24 79:14,19
96:18 103:11
106:13 111:5

fall 29:10,11,13
30:19 38:15

40:11,15 42:3
102:4 107:21
119:22 121:9

falling 34:21
88:18 119:12

familiar 121:12
122:22

fashion 45:3

faster 109:7

faxed 70:11,13

February
11:11,19

feel 109:5
130:11

feelings 80:19

female 45:15

Fidget 118:25

fidgety 119:1,
4,24

field 88:16

figure 113:12

file 132:9

filed 11:10 12:7
45:4

fill 57:18 66:11
75:15 91:25

filled 66:9
77:11 97:17
116:10,11,18,
20

filling 42:13,17
55:23

find 41:20
49:15,19,21,22
79:6 80:17
96:24

fine 38:25
109:4 123:10

fines 25:2

fingers 119:7

fingertips
109:5

finish 42:17

43:12 74:14,18
83:8,13

finishes 33:18

flexible 11:4

floor 19:24
20:1,17,18,19,
20,21,23,24
24:20 45:8
52:24 53:1,7,12
82:14 84:7
90:13 92:23
93:3,5 94:4,10,
12 95:6 121:10

flow 22:11
54:20,25 55:10,
14,17 75:24
76:6 99:1

flyers 109:6

focus 46:23
54:16

focused
117:21

folder 44:12

follow-up
120:7 124:21

food 118:24

forever 78:2,3

forgot 66:17

form 14:1,23
17:1,13 25:14
42:11,13,24
43:1 49:12
56:15 58:21
70:24 74:3
79:25 83:24
96:20 106:11,
18 107:1
108:13,17
111:1,6 112:7,
15 113:24
116:10,14
123:13 132:6

forms 55:10
57:18 73:24
77:23 100:18

forthcoming
85:2

found 22:17
36:13,16 39:11
49:9 59:19
89:21 94:10,23
102:12 131:14,
24

Fourth 7:9

Fox 21:7,8,9
92:18,22

free 44:16,20,
21

frequent 109:6

front 17:22
54:12 58:21
66:25 101:1

full 103:5
122:24

_____

**G**

gait 26:23,24
61:21

gallon 109:9

gather 41:22

gathered
41:19,24

gave 77:2

generalize
16:5

generally 52:5
89:10

giggled 49:6

give 6:5 31:4
39:17 41:10
48:5 54:2 59:15
102:24 125:11
127:4

giving 72:17,
24 73:16 92:21
117:3

good 110:3
122:15

gotcha 71:6
76:8 132:16

governed
121:23


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**GP** 117:25

**GPE** 52:10

**grade** 40:2,4 117:21

**graduate** 8:12

**graduating** 8:7

**great** 45:12 119:9 124:24

**Greg** 110:3

**guess** 17:23 21:7 42:25 45:13 56:6,19 67:2 77:1 96:11,12 98:3 104:17 108:18 110:11,19,21 112:20 118:4

**guy** 91:5 112:21

**guys** 25:11 33:21

———————

**H**

———————

**hair** 119:7

**half** 27:2 28:16, 20,24 30:24 38:4 50:10 64:2

**halfway** 26:1 97:12

**hallucinal** 109:22

**hallucinations** 109:23

**hand** 6:4 54:18 74:21 75:6,7,10

**handed** 66:5 74:20

**handing** 75:9

**handwriting** 74:24,25 89:16 115:19,21

**handwritten** 66:16

**handwrote**

76:5

**haphazard** 68:7

**happen** 72:18 81:15,17,19

**happened** 18:16 47:21 94:9,11,14

**Harborside** 9:5

**hard** 77:12 99:17 117:19, 22

**harm** 131:1

**head** 15:5 28:8 29:8,25 30:5 54:7,8 80:3 89:5 125:20

**headache** 109:24

**headings** 58:15

**health** 7:6,15, 17,24 9:14,25 10:14 27:9 33:4 34:24 35:3,4, 10,17,19,20 41:5,21 48:4 52:12 65:3 70:19,22 71:2, 4,15 72:17 81:12 82:1,2,3 84:15 85:24 118:9 120:8,18 122:9,18 125:23

**healthcare** 129:20

**hear** 25:5,18 26:11 96:25

**heard** 11:22 12:1,6 18:14 24:17,21 25:17, 23 47:14 70:1 90:9 96:25 97:3,4,6,8,10

**hearing** 25:19 26:4 71:16

**heart** 114:15 115:3

**heaves** 107:17

**heroin** 15:24

**Hey** 50:23

**high** 8:3,7 15:20

**hindsight** 76:21

**HIPAA** 49:8

**history** 9:4 27:9 32:22 41:1,5,9,21 54:10,11 65:3 71:4 72:4,21,22 74:3 116:3,4 125:11,19

**hit** 42:21 77:18 94:20

**hmmmm** 118:10

**Hmmmmm** 40:25

**Hmmmmmm** 27:1

**hmmmmph** 104:17

**hold** 31:2 118:22 128:13

**home** 83:2

**homicidal** 71:16 120:6

**hope** 50:25

**hospital** 9:8 37:5 127:11

**hostile** 71:18

**hour** 35:24

**hourly** 84:9

**hours** 9:6 19:20 35:5,7,8, 20 59:22 60:6,9 65:9 71:23 72:20 83:5 84:9 97:24 100:7,10, 15 103:21

104:23 107:10, 12 108:21,24 109:3 110:10, 17,25 111:5 114:6 120:13

**housed** 36:7

**housing** 48:21

**Houston** 23:3 51:1,4 55:1 65:25 123:14, 17 124:15,18, 19 129:7 130:15

**husband** 11:5, 6

**hypertension** 58:5 72:21,23 80:25 115:25 116:5 120:15 127:25 129:13

———————

**I**

———————

**I-D-E-A-T** 120:2

**i.e.** 114:15

**idea** 90:19 94:7 121:11

**Ideation** 120:3, 4

**IDENTIFICATI ON** 22:22 54:22 66:4 123:7 124:4

**identified** 124:8

**identify** 23:5,7 54:19

**II** 47:25

**illness** 89:3

**IM** 24:9

**immediately** 81:11 108:8

**impact** 17:4

**impaired** 13:21 14:19

**impression** 26:18 49:9,14 63:24 74:4,7 79:10,21 131:19,24 132:1

**in-** 17:20

**in-service** 12:25 18:2

**incarcerated** 12:3

**incarceration** 70:10

**incident** 7:20

**include** 39:1

**included** 37:19,22 106:7 125:12

**includes** 75:19

**including** 125:19 128:18

**independent** 17:25 70:9

**independently** 20:10

**index** 122:16

**indicating** 86:19

**indication** 36:5 77:6

**indicators** 64:17

**individual** 12:2 13:20 14:19 16:22 19:2 20:13 36:6 46:21,23 57:19 62:1 95:25

**individual's** 12:7

**individuals** 13:5 46:24

**influence** 61:19 78:24,25 79:11,14,18,23 85:3,11,19



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 141 of 149 PageID #:
902
The Deposition of STEPHANIE KOHL, Taken on December 18, 2014
141

86:3,7,13,14
88:2,22 112:22

**information**
23:11 39:8,10
41:20,22,24
42:8,12,22 43:4
50:16 55:18
67:9 69:10
70:8,14 77:4
85:2 91:2,12,24
92:4,11 120:18
125:18 126:6

**ingested** 98:15
113:15

**ingestion**
16:20

**initial** 28:7 61:4
72:9 75:14,18
77:2,22 97:13,
15 98:25 100:4
102:19 103:2
108:19 111:14
127:16 132:5

**initialed** 72:8

**initially** 40:18
54:15

**initials** 60:10,
11

**injury** 54:7,8
61:24 66:16
80:3 81:3,15
89:5 116:3
125:21

**inmate** 24:10,
12 26:14 29:9
31:3,14 32:1
38:2,22,23,24
39:13 45:6 48:3
68:9 72:13
85:1,11 86:2,6
88:1 95:19 96:5
102:4,9

**inmates** 95:7,
15

**inquiry** 103:8

**instance** 68:5
107:16

**instances** 68:6
86:13

**Institute** 103:6

**institutions**
8:21

**instruction**
12:14,23 17:11

**instrument**
102:23 103:6,
16 104:7
106:23

**intake** 36:11
72:5

**intention**
60:13

**Interdisciplina
ry** 89:15

**Intervention**
22:24 70:25
71:21

**interview**
29:10 30:20
38:16,22 88:12
102:5 112:23
113:5 119:11,
18,20,23

**interviewing**
63:12,14 82:16

**intoxicated**
14:20 68:17
76:11 84:4

**intoxication**
79:23 131:2

**introduce**
99:15

**involved** 89:18

**involvement**
11:14

**involving** 12:2

**issue** 52:10

**issues** 33:4
41:23

**items** 103:8

___

**J**

**J.'s.** 115:23

**jail** 7:11,14,15,
18,23 9:14,25
10:3,19,22
11:16,22 12:1,
3,6,8,11,20
13:21 14:12,19
17:9 18:1,5
21:10,12,14,17,
21,25 26:12
32:19 33:9,12,
13 34:6 48:1
52:19 60:7
61:10 66:25
67:21 68:14,17
69:21 70:10
71:3,4 78:17
82:11 84:4 97:4
106:23 112:11
121:24 124:6
128:5 131:13

**Jefferson** 8:4,
7

**job** 46:3

**juice** 26:6,7
101:3,4,6,10,17
119:6

**jump** 124:2

**jumpsuit** 94:16

___

**K**

**Kenneth** 17:8
62:4,7

**Kentucky** 9:6

**kind** 6:18 26:1
33:2 40:2,23
49:6 54:1 62:22
64:21 65:22
66:6,21 69:12
71:14 72:17
73:13 74:13
78:25 85:24
96:2 104:20
106:22 118:23
120:19 127:7
129:14,25

**KMI** 9:8

**KNDA** 23:15

**knew** 25:24
34:5 113:12

125:12 126:4

**knowing** 34:3

**knowledge**
32:18 94:9

**Kohl** 6:13
42:20 51:8
124:19 127:14
129:15 130:22

___

**L**

**lack** 63:9

**laid** 62:11

**laughed** 127:3

**Laurel** 123:12,
22

**lawsuit** 11:10,
23 12:2,7

**laying** 96:7,15

**LCC** 8:11

**lead** 69:9

**lean** 29:20

**learned** 13:13

**leave** 90:3

**leaving** 8:19

**led** 32:25 40:6

**left** 46:15

**lethargic** 99:7,
13 100:20

**lets** 72:2

**letter** 81:14,18,
22 84:13,16
85:6 88:9

**level** 65:6
79:23 95:7,9
99:3,20 100:1,
2,9,14 112:14
113:3,15 126:7

**levels** 87:21
111:25 112:6

**lexapro** 54:9
71:11 72:7,8
78:12,13,15,17,

19 84:24 85:23
87:9

**Lexington**
8:11,12,15,19

**Librium** 108:7

**licensed** 6:19
9:3 18:19

**lie** 39:1

**life-long** 8:5

**light** 34:3 58:17

**limits** 84:1
113:11

**lisinopril** 58:6,
11 81:1 120:15

**list** 66:3,20
91:18

**Listen** 109:25

**listening** 26:1

**literally** 16:23

**litigation** 132:4

**lived** 25:23

**living** 6:16

**LMPD** 68:16

**locate** 48:20

**located** 20:15
75:4

**long** 7:17 10:1
40:21 41:4
98:20 100:17
115:1 124:25

**longer** 42:2

**looked** 32:10
39:7 55:24 56:5
94:6 111:21

**loose** 117:17
118:6,8

**lortab** 27:5,19,
20 28:1 33:2,13
37:22 52:8 54:9
78:11,17 98:16

**lot** 41:23 65:23
80:1 109:7
117:3 125:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**lots** 14:8 62:8 82:23

**loud** 25:7,8,9 70:1 97:4 118:15,16,17, 18,19

**loudly** 24:19

**Louisville** 7:11,14,15,18, 23 8:5 9:5,13, 25 10:2,19,21 11:16,22 12:1, 6,11,20 75:13 80:11 124:6

**low** 15:11,20 16:15

**lower** 16:11,15, 17 47:25

**LPN** 8:1 18:25 42:20 74:18 80:8

---

**M**

**made** 12:6 37:9,15,17 48:24 49:4 52:23 80:4 94:18 104:22 105:13 109:15 110:12,22 120:10,11 121:8

**make** 25:18 36:22 37:6,13 39:5,7 40:6 41:17,19,24 65:17 66:24 68:19 71:24 80:8,13 87:10 109:2 115:25 116:7 118:20 119:3 123:1

**makes** 122:2, 20

**making** 32:4 85:24 92:24 95:14

**male** 45:15

**man** 80:18

**management** 27:23

**managing** 18:4

**manila** 44:12

**Manner** 88:11

**manual** 32:14 122:10,19

**mark** 56:8,9 57:16 76:11

**marked** 22:20, 22 23:6 47:9 54:18,22 56:14, 17,22,23,25 57:2 65:20 66:4,5 123:4,7, 20,25 124:4 127:21

**marks** 97:19

**Marvels** 36:1,9 47:24 48:6,14, 17 49:15 74:20, 22 75:6

**material** 77:21

**Matt** 123:8

**matter** 44:8

**Mcnamara** 124:20

**meaning** 28:12 129:10

**means** 33:9 42:8 62:20 107:13 129:10 130:5

**meant** 78:24 100:14 103:9, 17

**mechanical** 42:8

**medical** 9:22 10:2,13 11:11 12:13,21 18:12, 21 19:25 20:23 24:12,18,25 26:15 35:14

37:10 41:1,4 45:6,16,17,22 48:4 49:8 54:10,24 55:5, 11 66:12 70:9 74:2 75:14,18 76:9,10 77:2,23 78:4,20 80:21, 25 81:2 87:20 89:14 95:6 98:25 111:23 115:12 116:9, 14 120:11,24 121:6,13 122:9, 16 124:6 125:11,19 126:18,25 127:3,7,16,18 128:4,8,25 129:8,16 131:4, 5

**medication** 14:15 32:22 63:6 70:12 71:24 72:2,5,25 85:22 87:8,16 91:18,21

**medications** 33:5 34:4,7 85:7 89:11 126:1

**medicine** 113:19

**meds** 72:24 73:1 98:17

**meet** 82:10

**meeting** 13:13 18:3,17 28:8

**meetings** 12:25 17:20,22

**mental** 27:9 33:4 34:24 35:2,4,10,17, 19,20 41:5,21 48:4 52:11 65:2 70:19,22 71:2, 3,6,14 72:16 81:11 82:1 84:15 85:24 89:3 118:9 120:7 125:23

**mention** 12:6 37:14,15,17 122:2

**mentioned** 63:22

**mentions** 111:15

**merged** 10:5

**merger** 10:16

**met** 22:16

**Metro** 7:11,14, 15,18,23 9:13, 25 10:2,19,22 11:16,22 12:1, 6,11 75:13 80:12

**MH** 34:24 116:15

**middle** 84:13, 19 130:1

**mild** 107:6,8,13 108:15,20 109:3 110:9,17 111:10

**Mild/at** 103:17

**military** 77:7

**mind** 32:25

**mine** 39:24 97:21

**minutes** 40:24 41:2,5,10

**missed** 56:10

**mistake** 44:24 106:10

**misunderstood** 32:11

**mixed** 56:9

**moment** 114:14

**monitor** 108:24

**monitored** 65:6 103:21 107:10,11 110:16

**monitoring** 12:15

**monthly** 17:21

**morning** 35:11

**mother** 25:23 31:10 117:21

**motor** 33:7 41:18 52:9 116:3 125:20

**movement** 96:3

**movements** 74:9

**Multi-** 70:18

**multiple** 38:21, 23 40:8 49:2 87:12 113:6

---

**N**

**narcotics** 78:14

**nature** 18:3 35:12 110:11

**nausea** 107:17

**nauseous** 109:19

**NCCHC** 122:22 123:1

**necessarily** 112:13

**needed** 36:6 37:7 52:11 90:25 103:20

**neighborhood** 41:9

**night** 21:2 46:16 59:5 93:25 95:12 131:15

**NKDA** 23:15

**nodded** 62:9

**nodding** 53:23 62:1,15,19,23 63:11,16 65:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

88:12,15,18
100:21 101:18
112:22

**nonetheless**
101:18

**noon** 109:10

**normal** 84:1
103:9 113:11

**notable** 58:2

**notation** 125:7

**note** 23:9,22
25:18 36:1,3,5,
22 37:3,4,9,14,
16,18,19,21,23
38:3,4,8,10,11,
14,16,19,20
39:2,6,13 42:23
43:6,13,15,19,
24,25 44:2 48:7
52:21 53:20
54:1 58:10
66:21 85:24
86:16 95:2
102:11

**noted** 25:16

**notes** 22:25
23:19 37:8
38:2,21 42:9
45:6 47:9 63:20
75:20 77:10,21
89:15

**notice** 47:23
74:20 75:5

**noticed** 56:21

**notified** 59:2,6,
14,16,18 69:23
81:24 107:9
108:21 111:5

**notify** 59:4
60:13,14 109:3
110:9 111:11

**notifying** 59:8

**November**
10:20,22

**number** 32:8
46:6 123:16
132:6

**numbers**
107:15

**nurse** 6:17,18,
19 9:3 11:7
18:20,23 37:6
39:14,19 48:4,9
54:2 105:17

**nurse's** 20:16
23:9 60:11 65:1
66:21

**nurses** 19:3
21:21,24

**nursing** 8:23
9:6 13:13 21:5
42:23 92:19
116:15 121:12,
22 122:2

─────────

**O**

**O2** 58:20

**obese** 97:9

**Object** 14:1,23
17:1,13 49:12
79:25 83:24
96:20 106:11,
18 108:17
111:1,6 112:7,
15 113:24

**Objection**
25:14 41:12
110:23

**Objective**
98:23 116:23
118:5

**OBS** 47:25
48:2,20 52:6,7
94:19

**observation**
53:21 54:5
55:15,24 56:7,
22 57:5 64:22,
23,25 75:3 94:5
95:21 101:22,
23

**observations**
40:6

**observe** 51:16
59:22

**observed**
60:5,8 69:20
79:24 119:10
124:9

**observing**
29:12 57:7
83:23

**obtain** 70:8,13

**obtained** 9:3

**occasion**
40:14

**occasions**
38:24 40:10

**occupying**
90:5

**odd** 80:17

**odor** 28:12,16
38:9

**office** 83:2

**officer** 53:12
75:8 94:23
95:18

**officer's** 68:9

**officers** 48:1
69:20 94:18,20
95:15 124:20
125:4 126:24

**officers'** 94:25

**one-half** 88:23
98:6

**open** 96:12

**opened** 101:3

**opiate** 57:1,13
98:9 105:7

**opiates** 64:4,7
98:15

**opioid** 56:8

**opioids** 16:5,6

**opposed** 42:24

**order** 43:9 52:9
60:2,4 71:22

**ordered**
103:18

**orders** 19:3
53:6,9 59:11,
13,15,18

**orientation**
107:19 121:21

**oriented** 15:3
84:2 91:22
113:11 125:7,
10

**outpatient**
84:15

**overdose**
12:3,8,16,24
13:7,18,25
14:22 16:19
17:12 18:5
52:14,17,19
61:13,16,21,22
62:3,17,24
64:11 97:5,10
106:25 111:15,
17,22 112:4
114:10 122:3,
20 123:2
130:23

**overdosing**
62:19 63:14

**overview**
72:17

**overweight**
97:9

**oxygen** 58:19

─────────

**P**

**P-E-R-R-L**
58:16

**P-S-Y-C-H**
75:2

**p.m** 36:23

**p.m.** 23:21 24:5
30:21 36:19
37:9 40:19
55:16 61:2 77:8
116:21 132:18

**pack** 80:23

**packet** 18:17,
18 69:2,3

**packets** 18:7
105:18

**pages** 115:14

**pain** 27:5,23
33:2 37:22
99:16

**paper** 45:1

**paperwork**
30:16,17
104:16 119:14,
15 131:16

**part** 51:10
52:23 69:4
87:24 105:14
121:21

**partner** 20:2,5,
8,22 46:11

**passed** 47:23
48:7,14

**passing** 48:17

**past** 51:21,23
126:14

**patient** 19:6,8
71:2 99:9
102:24

**pay** 14:8

**people** 47:3,4
82:11 84:4
109:8 112:3

**perceive** 83:19

**perform** 47:11
95:1 104:15

**performed**
61:3,7 106:16

**performing**
82:11 90:25
91:3,6 106:6

**period** 11:21,
25 12:10,19
23:22 35:24
76:10 114:15
115:1

**periodically**
65:13

**permission**
90:1,3,9,22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**person** 41:7
102:1 108:15

**personal** 83:4

**persons** 12:15,
23 17:11 18:4

**pharmacy**
120:18 125:12

**phone** 83:4

**physical** 32:13
71:17

**physically**
21:14 68:13
95:3 107:24
119:15

**physician**
19:3,7,8 22:16
81:10,23,24
82:4,8,13,15,
19,21 83:20
111:11 125:16
127:9

**physician's**
81:25

**physicians**
21:17 22:4,12

**picture** 45:11,
13

**PIEKARSKI**
14:1,4,23 17:1,
13,16,18 23:1
25:14,16 27:17
33:18,21,25
41:12 44:19,22,
25 49:12 50:19
79:25 83:8,10,
12,24 96:20
104:12 106:11,
18 108:17
109:25 110:2,
23 111:1,6
112:7,15,18
113:24 114:21
123:10,16
124:14 126:16
129:5 130:18,
21 131:8,18

**place** 7:21
32:1,17,19
33:10 74:12

**placing** 31:19,
22

**plan** 97:14
99:23 102:20
103:3 108:19
111:14 132:6

**plans** 22:12

**playing** 119:5,
6

**point** 10:16
44:16 50:22
85:16 98:15
110:20

**police** 126:24

**policies** 31:24
32:18,24
106:14

**policy** 31:25
32:3,7,8,10,13
35:13,16 84:11
94:25 99:24
122:10,19
123:19

**position** 36:11

**possibility**
64:11

**possibly** 12:16
39:3 72:25 98:2

**potential** 62:17
111:9

**potentially**
111:24 112:5,
14 113:2

**PPD** 80:22

**practical** 6:19
9:3 18:19 44:8

**practice** 18:21
67:21

**Pre-booking**
81:3,15

**preceded**
114:15

**preceding**
10:12 115:18

**prepare** 43:18
104:14 105:1

**prepared**
23:22 43:24,25
102:12 106:10

**preparing**
22:10

**prescribed**
64:5 79:9 85:7,
21 87:8 91:19
98:17

**presented**
24:18

**presents**
24:12 26:14
37:10 45:6

**preserve**
42:22 43:10

**pressure** 15:9,
10,11,12,20,22
16:6 58:6,10,
13,19 60:15

**pretrial** 24:25
45:16,18,24
47:3 118:19

**pretty** 65:24
74:11

**previous**
125:19,23

**previously**
13:22 55:11
71:14 98:22
123:5

**primary**
125:15

**print** 42:15
43:9 77:18 78:1

**printed** 43:13
52:22 77:6,11

**printer** 66:19

**printing** 44:2

**prior** 7:4,13 9:6
10:21 12:1
17:8,9,25 24:25

**preceding**
31:25 61:10
62:6,21 68:18
70:10 72:3,5
82:8 97:3

**problem** 66:2,
20 91:18
131:14

**problems** 41:1
76:9 85:7,22

**procedure**
34:18 122:19

**procedures**
31:24 32:19,24
122:10

**PROCEEDING
S** 6:1

**process** 24:24
69:13 72:10
73:1 77:14
117:15,18,20

**processed**
45:14

**processes**
106:14

**produced** 69:6
132:4

**products**
80:22

**professional**
11:5 19:25
35:4,10,20

**professionals**
20:24 35:17
71:15 120:8

**progress**
22:24 23:19
89:15

**progressed**
105:10

**progresses**
114:10

**progressively**
114:13

**prompt** 71:22

**pronounced**
17:6

**protect** 117:24

**protective**
120:18

**protocol** 18:7
32:4 60:2,5
99:24 100:14
108:6 111:2

**protocols**
31:24 32:19,24
103:22 106:14
121:12,22
122:2

**provide** 19:7

**provided**
12:14,22 34:5
67:9,10,21
68:25 69:10
77:2,4 92:10
100:19 121:14
122:8,16

**provider** 59:2,
4,5,9,14,15,17,
19 60:14 70:9
82:2,3 107:9
108:21 109:3
110:10 111:4
129:20,23

**provision**
109:15 110:12,
22

**Psych** 75:2

**psychiatric**
71:21 75:4
84:12,18 88:8
129:25

**psychiatrist**
78:20

**psychotropic**
72:5

**pull** 32:13
43:14

**pulled** 66:19

**pulse** 15:9,14,
22,25 16:6,13

**Pupils** 15:2
58:17

**put** 23:11 32:4,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-3   Filed 11/14/17   Page 145 of 149 PageID #:
911
The Deposition of STEPHANIE KOHL, taken on December 18, 2014
145

25 34:9,11
38:11 44:12
48:1 56:3
58:18,23 74:5
76:2,3 78:12
85:10 86:2,6,10
88:11,22 89:5,7
94:5,16,21
98:11 99:3
102:11 117:22

**putting** 54:4
81:11

---

**Q**

**qualify** 110:8

**question**
14:10,18 32:11
33:19 50:19
62:14,18,20
63:1 74:10
76:11 77:20
78:5,10 83:13
96:13 109:25
110:4,5,21
111:8 112:16,
25 122:15
124:1 126:17
127:17 128:7
129:21 131:18

**questioned**
38:22

**questionmark**
129:9

**questions**
14:16 24:25
40:8,13 84:13,
18 87:15,19,22
88:8 100:23
101:17 113:7
124:13,21
125:6 129:25
130:4,6,12,16
131:9 132:16

**quote** 38:21

---

**R**

**raise** 6:3

**ramble** 31:4

**rambling** 42:4
112:23 118:15

**rapid** 124:7

**rate** 15:9,14,22,
25 16:7,13

**re-ask** 40:13

**Reactive** 58:17

**read** 74:15
91:15,16 92:11
115:24

**real** 109:6

**reason** 14:14,
15 34:11 69:14
78:12 82:18,20
111:11 117:19

**reasoning**
49:18

**reasons** 62:8

**recall** 11:14,20
17:11 19:10
20:24 29:22
53:20 54:6 68:3
122:7 127:15

**receive** 64:25

**received** 17:10
59:11,18

**receiving**
59:13

**recent** 51:21,
23 70:25 71:5

**recently** 81:5
85:6

**recheck**
103:18

**rechecking**
104:20

**recite** 121:17

**recollection**
17:25 20:5
68:24 85:17
90:20

**recommend**
84:7

**record** 6:11
51:5,6 54:19

72:13 102:16,
17

**recorded**
38:14 55:18,19
75:22,24

**recording**
75:23

**records** 36:18

**redirect** 31:11
40:9,13 42:5
131:10

**redirected**
100:22

**refer** 31:21
35:15 73:16
81:3

**reference**
122:20 123:2
124:8

**references**
72:6

**referral** 34:24
35:3,19 70:19,
20 120:7,10

**referred** 31:25
32:2 70:20
75:25 82:1

**referring** 31:23
71:1 80:2 89:8,
10 104:6 118:1
128:24

**reflect** 16:19
36:18 38:2
85:17

**reflects** 78:8

**refresh** 85:17

**registered**
21:21

**regularly** 64:4
65:6

**related** 33:4
62:4

**relation** 16:20
29:16 92:21

**release** 120:17

**reliability**
113:1

**reliable** 14:16

**rely** 14:16

**remember**
9:21 10:1,18
11:17,24 12:9
13:3,4,10
18:10,14 25:6
26:3 30:5 32:7
33:7 44:2 48:22
52:3 53:24 60:4
92:6,21 93:14,
16,21 101:2
106:6 108:7
132:10

**remind** 33:25

**reminded**
83:12

**Repeat** 14:5

**repeated** 31:7

**repeatedly**
50:14

**rephrase**
12:17

**report** 19:6
48:5

**reported** 40:18

**reporter** 6:3,8
57:21

**represent**
124:20

**representation**
113:1

**request** 81:12
90:9 129:19

**require** 68:15
111:4 127:18
128:4

**required** 9:6
13:5 24:4 99:25

**requires**
108:20

**resident** 8:5

**Residential**

9:9,11

**respiration**
15:16 16:2,7,16

**respirations**
15:9

**respond** 99:14
100:23

**responds** 99:7
100:20

**response** 22:7

**responses**
14:16

**responsibility**
82:10

**responsive**
99:4,6,8,10,22
100:25 101:24

**restroom**
50:21 102:14

**results** 58:24
99:19 107:5

**review** 69:5

**reviewed**
121:20

**revive** 89:18

**risk** 34:7
103:17 106:24
107:6,11 108:9,
23 110:15,18
111:8,9 131:1

**Rite** 70:13
125:12

**RN** 18:25

**room** 81:3,5,7,
14,18

**roughly** 30:20

**routinely**
112:5

**rub** 99:14

**rubbed** 121:7

**rubbing** 119:7

**rule** 63:10,13,
15,17 64:10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

run 13:16 68:10

rundown 54:12

running 54:20 119:7

**S**

sand 101:9

sandwich 26:6,7 101:7, 10,18

SAO2 58:18

sat 67:4 69:25

saturation 58:19

Saturday 21:9 30:21

save 42:21

scale 102:21

Scale-revised 103:7

schedule 11:4 94:24

scheduled 25:3 78:14

school 8:3,8 13:14

scope 18:20

score 56:1 57:8,9,12 58:23 103:13 107:14, 23 108:14

scored 103:8 109:18,19

scores 107:20

screen 42:11 43:2

screener 130:11

screening 24:24 72:15 74:3 97:13 102:20 103:2

108:19 111:14 132:5

seat 90:5

secondary 8:21

section 79:2 85:5 88:20 89:2 129:24

sees 67:1

segregated 45:3

seizure 34:20 51:11,18,22 52:1 108:9 126:11,14,19, 20 127:12 128:19 129:2,9, 11

seminar 18:2

send 48:3 68:20 81:7

sending 81:4

sense 94:22

sentences 31:4,6,13 42:4

sentinel 39:3,5 93:10

separate 42:23,24 43:18 66:21

serves 45:23

services 9:22 10:2,13 11:11 12:13,22 17:21 54:24 55:5,12 89:15 115:12 121:13 122:9, 17,18

settings 112:4

seventh 40:2,3 117:21

severity 56:1 108:10

shake 99:16

shakes 108:4

sheet 21:23 48:15,16,17 54:20,25 55:15, 17,23 57:12 61:1 75:24 76:6 99:1

sheet's 56:16

sheets 22:11 44:16,17,18 45:1 55:10 94:19

shift 14:11 19:18,20,23 22:14 53:7 60:8 100:7 116:12

show 22:19 65:20 89:3 117:7 123:4,25

showing 59:1 108:11

sick 81:11,25 120:11

side 20:10,11 45:15,24,25 61:1 102:8

sign 14:5 44:11 61:12 62:2,16, 23 74:6,9 97:5

signature 73:20 74:3,4,11

signed 42:20 115:22 120:19

significance 88:15

significant 125:11

signs 13:9,10, 17,23 14:21,25 15:1,6 16:18, 24,25 17:4,5 51:16 57:24 58:1 60:19,22 64:15 73:11,12 75:22,25 76:4 84:1,8 89:3 91:20,21 95:11 98:24 110:14 111:4 113:10, 22

similar 123:20

simply 55:9

sir 33:20

sit 17:24 46:4 109:8 119:8 122:5

sitting 9:7 29:15 45:15,22 46:11,21,24 47:4 92:23 93:2,5

situation 93:25

situations 68:20 95:6

Sixth 7:9

skills 72:15

slate 70:3

sleep 62:9 63:9 65:12,13 97:8

sleeping 95:13 96:1,16 113:5

slept 38:25 63:19,20 102:9

slip 91:25

Sloan 19:16 20:15 21:20 36:14 48:11 52:2,13 53:16, 21 54:4 64:18, 20 65:5 84:6 90:1,8,21 92:7, 10,22 104:25 115:22 132:6

Sloan's 21:1 23:1 123:12

slow 118:22

Slowed 118:14

slurred 28:9 31:3 37:18 53:22 61:12 88:11 112:24 118:15

slurring 42:4

small 72:16

smell 28:15

smelled 86:1, 21

smile 80:16

smiling 80:15

Smith 82:24

smoke 93:18

snoring 97:1,4, 10

SOAP 23:19 42:9 75:19 77:10,21

solemnly 6:4

Solisa 11:12

Solutions 6:23,25 7:5,8, 14 12:13

somebody'd 109:8

somebody's 34:19

someplace 47:22

sort 25:11 68:7 98:23 109:13

South 7:9,10

spare 123:9

speak 15:2 102:2 119:19

speaking 39:14,25 84:2 95:10 101:1 113:12 118:16

special 64:21

specific 12:14, 23 17:10,20 26:16 132:15

specifically 13:12 18:4 32:3 35:23 129:1

speech 28:9 37:18 53:22 61:12 88:11 112:24 118:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Spencerian** 8:24

**spend** 40:21, 23

**spending** 42:2 47:7

**spent** 41:9,14 51:15

**spoke** 24:19,24 40:3 64:16,18, 20 84:6

**spoken** 37:1

**stack** 97:11 115:7

**staggering** 26:25

**stand** 58:16 98:9 117:14 120:2

**standard** 34:18 67:23

**standards** 122:22,23 123:1

**standing** 59:25 60:2,4 95:20,24

**standpoint** 35:15

**stands** 23:16 34:24

**staple** 67:13

**stapled** 44:10, 15 45:2

**start** 55:15,24 74:18 109:4,7, 12

**started** 18:6,7, 11 51:9 56:2 72:11 74:13 104:19 105:9 108:6 110:10, 13

**starting** 109:17 111:3

**state** 6:11 24:9, 12 26:14 29:9

31:3,14 37:10 45:5 115:2

**stated** 29:8 37:21 38:2,24 102:9

**statement** 38:20 49:10,15, 21

**states** 27:2 38:3 56:7 88:23 130:3

**station** 20:16 24:13,18 26:15 37:11 45:7,17, 21,22 46:9,10, 17 65:1 118:24

**stationed** 19:22

**stations** 25:4 45:16

**steady** 26:23

**Stephanie** 6:13

**sternum** 99:14 121:7

**stimulus** 99:16

**Stone** 11:12, 15,18

**Stone's** 11:23

**stopping** 114:15

**stored** 43:5 77:23 78:2,3

**Strange** 88:10

**street** 7:9 78:10 79:3,9

**stress** 70:25 71:1

**strike** 25:9

**strong** 28:12, 16 38:8

**stuff** 65:23 72:14 92:11 115:24 116:7

**stumble** 26:21

**stumbled** 31:3,5

**stumbling** 24:13,18 26:15, 19 37:10 42:4 45:6 53:22 61:20 112:23

**subject** 88:10, 21 89:3

**subjective** 97:22,23 105:8

**subjectively** 50:5

**subsequent** 61:8 100:2

**subsequently** 61:7

**substance** 38:23 54:25 55:14 85:12,19 86:4 88:3 89:6, 7,8

**succumb** 112:3

**suffered** 58:5 126:10,13

**suicidal** 71:16 120:5

**super** 92:16

**supervisor** 19:11,15 21:1 90:1 116:12

**support** 93:11

**suppose** 95:23

**supposed** 17:15 23:15

**surprise** 92:2

**suspect** 28:23

**suspected** 98:14

**sustained** 125:20

**swallowed** 16:23

**swear** 6:4

**sweating** 108:4 109:20

**symptom** 61:12,18,21,22, 23 62:2,16,23 63:5 97:5,8

**symptoms** 13:9,10,18,24 14:21 73:12 80:2 105:9 108:2,8,11 110:14 113:10, 22 117:8

**system** 43:14 45:4 48:1 93:11

**systolic** 16:11

———————

**T**

**T/p** 117:14 118:2,5

**table** 29:17 45:23 101:5

**tactile** 109:23

**takes** 27:5 54:9 84:23 98:22 120:23

**taking** 13:22 33:6 54:3 56:2 70:12 95:11 113:22 126:4 132:10

**talk** 25:2 31:9, 18 47:12 48:6 57:17 119:13

**talked** 40:1 88:10 120:8

**talking** 25:5 30:10,12,14 39:18 42:25 47:4 51:18 62:1 80:17 86:17 100:22 108:22 118:4,11 123:11

**tearful** 117:5,6

**telephone** 90:21 92:8

**telling** 48:22 93:14,20 96:14

**tells** 50:1,3

**ten** 107:14

**term** 88:15

**terms** 15:6 16:13

**test** 47:11 132:8,10,15

**testimony** 6:5 51:8

**thick** 18:7 65:22

**thing** 38:19 47:14 56:17 67:1 106:19,20 109:13 111:21

**things** 63:5,17 77:14 110:11 111:19 128:3

**thinking** 79:4 129:5

**thought** 36:6 44:22 52:17 110:7 112:2 117:15,18,19

**thoughts** 120:6

**thrown** 27:24

**Timbrook** 9:8

**time** 7:20,22 8:1 11:21,25 12:5,10,19 17:3,6 18:14 21:6 22:16 23:21,23 24:5, 6,13 32:19 33:23 35:8 36:15 40:17 41:14 42:2 47:7 49:4 51:15 55:16,25 60:18 61:2 62:10 64:16 67:12,19, 25 70:7 76:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

77:7,14,17 78:6
80:12 85:17
86:11 90:4,8
95:8 99:11
100:6,9 102:1
103:22 104:2
106:15 108:2
113:17,21
115:1,4 125:8
126:9,23 127:6
129:20

**times** 29:10
30:2,9,19 31:7
38:15,21 40:8
49:3 87:12
94:23 102:5
119:12,13,14,
22,23

**Tinnell** 124:20

**tired** 63:22

**tobacco** 80:22

**today** 7:21
17:9,24 27:3
78:6 122:5

**told** 13:4 26:11
28:7,15 30:24
32:21 33:1
34:4,10 37:2
38:3,5 47:16
51:25 52:3
53:20,25 54:4,6
61:12,15,20,25
62:7,12,13,14,
22 63:19 64:1
65:10,15 71:9
72:22 76:3 78:8
79:1,15,18,20
83:12 86:19,24
88:25 89:9,11
90:24 91:3
93:21,22 98:2,3
112:10,25
125:18 126:6
127:25 128:4

**tool** 55:25

**Tool's** 58:23

**top** 15:5 22:24
28:8 29:7 34:22
54:24 55:4 66:2
127:17

**topic** 31:12

**total** 103:13

**toxicology**
88:16,17

**Toxification**
123:13

**training** 12:14
18:1

**Transfer**
115:9,13

**transpired**
90:21

**transpiring**
92:7

**transport**
69:21

**treat** 18:21
19:1

**treated** 71:10,
13 81:1 84:14,
21,22 130:23

**treatment** 9:9,
11,12 19:2,7
22:11 97:13
102:20 103:3
108:19 111:14
125:24 126:25
127:3,7 132:5

**tremors** 108:4,
9 109:4,5,20
110:11

**triggers**
108:22 109:1

**trip** 26:21

**trouble** 74:8

**truth** 6:5,6

**turn** 36:12
70:17 74:2
84:12 116:9

**turning** 116:14

**twitching**
119:1,4,24

**type** 13:23
32:10 42:12
78:11 82:12

89:7 99:15
108:20 124:7
132:10

**typed** 66:15,17

**types** 13:4

**typically**
67:10,25

———————

**U**

**Uh--** 121:15

**uh-huh** 13:1,8
16:10 26:8
27:4,6 28:2,18
29:24 34:16
35:22 37:12,24
42:19 43:3,20
46:5 47:20
51:24 57:23
59:3,23 60:3
61:25 63:3
66:23 67:5 69:8
70:4 73:21
76:12 78:7,9,18
84:25 85:13
86:23 87:6
88:5,13,24
89:1,13 90:7
93:8 96:8,10
97:25 98:7
101:12,15
102:6 103:12
104:9 107:7,22,
25 114:18
115:10 116:22,
25 117:11,13
119:2,25 120:9
129:17 132:7

**uh-uh** 20:10
25:20 27:15
69:16 73:8 94:1
100:24 112:2
124:10

**UK** 98:9

**un** 18:13

**unable** 13:22
114:17

**unaware** 18:13

**unconscious**
96:17

**unconsciousn
ess** 114:16,17
115:2 120:24
121:2,4

**undergone**
127:12

**understand**
13:17 40:12
62:20 95:21
96:13 105:11
108:13 110:6
112:16,18
113:8 120:16
129:19

**understanding**
35:6 55:5,12
64:4,24 67:20
92:1 94:13
100:8 103:22
105:4 106:14
110:3 111:17
113:14 114:9,
14 130:12
131:12

**understands**
81:12

**understood**
51:8 82:1
110:7,8 130:4,6

**undertake**
64:10

**uneven** 61:21

**unit** 75:4

**unknown** 56:9
78:23 85:11
86:3 88:2 98:9,
10,12,13

**unresponsive**
22:17 36:13,16
39:11 59:19
94:10,24
102:12 131:14

**unsteady**
26:24

**upstairs** 48:9
64:19 89:22
90:14,18 91:1,9
131:25

———————

**V**

**vaguely** 93:16

**variety** 63:17

**vehicle** 27:25
33:8 41:18 52:9
116:4 125:20

**verbal** 22:7

**verbatim**
121:17

**view** 95:3

**violation** 49:8

**virtue** 18:20

**visited** 47:18

**visiting** 101:14

**visual** 109:22

**vital** 14:25
15:1,6 16:18,
24,25 17:4,5
57:24 58:1
60:19,21 64:15
75:22,25 76:3,4
83:25 84:8
91:20,21 95:11
98:24 113:10

**vitals** 55:17
56:3

**voice** 25:11,13
70:2

**vomiting**
109:19

———————

**W**

**wait** 33:18
83:8,13

**waiting** 129:4,
6

**wake** 65:13,17
95:15,19 96:9,
21 121:5,6

**waking** 95:14

**walk** 96:21



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**walked** 45:21

**walking** 95:10
99:11,12

**wall** 118:12

**wanted** 37:6
39:1,5,7 41:17,
19,24 65:3
70:11 83:6,15
91:8

**warranted**
131:5

**washed** 114:2

**watch** 56:5

**water** 114:2

**ways** 63:1

**week** 33:12

**windows**
95:22

**withdraw**
111:10

**withdrawal**
34:7 54:25
55:14,15,24
89:4 97:13
100:13 102:19
103:2,6,17,25
104:2,8 105:10,
13,22 107:5,6,
9,11,13 108:5,
12,15,19,20,24
109:3 110:9,15,
20 111:9,10,12,
13,18 128:11,
19 132:5

**withdrawals**
128:16

**withdrawing**
64:7 107:24
109:7

**withdrawn**
64:9 71:18

**word** 18:16
52:4 88:18
111:15 112:13

**words** 14:9
31:3 42:4 116:1

**work** 6:20,21,
24 7:5,7,14,17
9:13 10:18,21
11:1 19:23
105:16 121:23
124:5

**worked** 9:5,24
10:1,22 11:21,
25 12:5,10,20
20:10 123:24

**working** 7:4,
13,22 10:9 11:3
14:11 19:17
20:1,22 82:10

**worse** 114:13

**wound** 68:19

**write** 37:4
66:20 80:6

**writes** 120:22

**writing** 30:16

**written** 115:11

**wrong** 9:20

**wrote** 37:3
53:19 54:1
55:23 56:6 67:2
79:4 80:7
102:3,8,13
128:11

---

**X**

**xanax** 27:5,8
33:2,13 37:22
52:8 54:9 57:1
72:6 78:11,16
84:23 85:23
87:8 98:15

---

**Y**

**year** 7:1 9:20
10:7 11:17 12:4
132:11

**years** 7:19 9:9
10:1,12 39:4
122:6 132:14

**yelling** 25:9,10

**Yup** 97:7

---

**Z**

**zabo** 101:4,7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com