1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF KENTUCKY

3              LOUISVILLE DIVISION

4           CASE NO. 3:13-CV-427

5

6  DANIELLA BLAINE, ADMINISTRATRIX OF THE ESTATE OF KENNETH

7              H. CROSS, II, DECEASED,

8                   PLAINTIFF

9

10                     V.

11

12            CORIZON, INC., ET AL.,

13                 DEFENDANTS

14

15

16

17

18

19

20

21

22

23  DEPONENT:  ALICIA PENNINGTON, RN

24  DATE:     MARCH 3, 2016

25  REPORTER:  SHELBY LODA

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-6   Filed 11/14/17   Page 2 of 80 PageID #: 1016
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

2

```
 1                            APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF, DANIELLA BLAINE,

 4    ADMINISTRATRIX OF THE ESTATE OF KENNETH H. CROSS, II,

 5    DECEASED:

 6    GREGORY A. BELZLEY

 7    BELZLEYBATHURST, ATTORNEYS

 8    P.O. BOX 278

 9    PROSPECT, KENTUCKY 40059

10    TELEPHONE NO.: (502) 292-2452

11    E-MAIL: GBELZLEY@AOL.COM

12

13    ON BEHALF OF THE DEFENDANTS, CORIZON, INC., ET AL.:

14    MATTHEW A. PIEKARSKI

15    PHILLIPS PARKER ORBERSON & ARNETT, PLLC

16    716 WEST MAIN STREET, SUITE 300

17    LOUISVILLE, KENTUCKY 40202

18    TELEPHONE NO.: (502) 560-9950

19    E-MAIL: MPIEKARSKI@PPOALAW.COM

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                              INDEX

 2                                              Page

 3   DIRECT EXAMINATION BY MR. BELZLEY              5

 4

 5                            EXHIBITS

 6                                              Page

 7     1       OBSERVED RISK & SPECIAL            37

 8                  NEEDS CHART

 9     2       CORIZON INTERVENTION/PROGRESS      52

10                  NOTES

11     3       CORIZON PROBLEM LIST               68

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW  Document 109-6  Filed 11/14/17  Page 4 of 80 PageID #: 1018
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

4

1                          STIPULATION

2

3     The deposition of ALICIA PENNINGTON, RN, was taken at

4     PHILLIPS PARKER ORBERSON & ARNETT, PLLC, 716 WEST MAIN

5     STREET, SUITE 300, LOUISVILLE, KENTUCKY 40202 on

6     THURSDAY, the 3rd day of MARCH, 2016 at approximately

7     10:16 a.m.; said deposition was taken pursuant to the

8     FEDERAL Rules of Civil Procedure. It is agreed that

9     SHELBY LODA, being a Notary Public and Court Reporter

10    for the State of Indiana, may swear the witness.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    PROCEEDINGS

 2

 3        COURT REPORTER:  Will you please raise your

 4     right hand?  Do you solemnly swear or affirm the

 5     testimony you are about to give is the truth, the

 6     whole truth, and nothing but the truth.

 7        THE WITNESS:  Yes.

 8        COURT REPORTER:  Thank you.

 9                  DIRECT EXAMINATION

10  BY MR. BELZLEY:

11     Q    Ma'am, could you state your full name for the

12  record, please.

13     A    Alicia Pennington.

14     Q    Ms. Pennington, we met just a minute ago.  I'm

15  Greg Belzley and I'm representing the plaintiff in this

16  case.  How old are you?

17     A    37.

18     Q    And just so we're on an even keel, I'm 60, so

19  What do you do for a living?

20     A    I work for Corizon.  I'm a registered nurse.

21     Q    And how long have you worked for Corizon?

22     A    Since approximately 2002.

23     Q    And what is your position with them?

24     A    Right now I'm the Senior Correctional Nurse

25  Specialist.   .
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

6

1      Q      And where do you office?

2      A      In a home office -- I have a home office in

3   Indiana.

4      Q      So do I.  I like it.  Do you like yours?

5      A      Yeah.

6      Q      Yeah.  What are your responsibilities as a

7   Senior Correctional Nurse Specialist?

8      A      I help roll out new processes.  I go to sites

9   when they are having clinical issues, help determine

10  what the issue is and then build a plan to fix it.

11     Q      Troubleshooter?

12     A      Basically.

13     Q      Now, what kind of issues generally are we

14  talking about that would merit your attention to a

15  particular facility and trying to work those out?

16     A      Oh, it could be any number -- anything to do

17  clinically, any kind of issue.

18     Q      Now, would that -- how would those types of

19  issues come to your attention?

20     A      If the site reached out to the nursing

21  services department at Corizon and said that they were

22  -- they needed some help.

23     Q      Can you give me an example of what some of

24  these issuing might be that would prompt that?

25     A      One example might be that they're having

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016
7

1  trouble getting nurse sick calls done in the timely

2  manner.

3       Q     Okay.

4       A     So, we would go is see if there was a way to

5  fix that.

6       Q     Have you ever performed an investigation of

7  that nature -- not an investigation but any

8  troubleshooting of that nature with regard to the jail

9  here in Louisville?

10      A     I did not have this role when we had the

11  Louisville jail, so, no.

12      Q     Okay.  Do you all -- does Corizon still have

13  the Louisville jail?

14      A     No, sir.

15      Q     Who has it now -- do you know?

16      A     CCS.

17      Q     CCS?  And when did that change occur?

18      A     I believe January of 2013, but I'm not a

19  hundred percent sure.

20      Q     Now, you had no direct contact with Kenneth

21  Cross?

22      A     I do not believe so.

23      Q     Okay.  Were you, back in August of 2012,

24  working at the Louisville jail?

25      A     Yes.  I was the Director of Nursing up until

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

8

1     July 9th of 2012.

2           Q     Okay.

3           A     And then I was promoted to Regional Clinical

4     Services Manager, which Louisville would still have been

5     my jail, and I'm not positive that we had hired a new

6     DON at that time so I still would have been affiliated

7     with it somehow.

8           Q     Okay.  So you were Director of Nursing at the

9     Louisville jail until July of 2012?

10          A     Yes.

11          Q     Okay.  Until, up until the month this incident

12    actually happened, which was in August of 2012; is that

13    correct?

14          A     I was the Director of Nursing until July.

15          Q     Okay.  Now, we have asked -- you're appearing

16    here today pursuant to a request that we made to talk to

17    somebody who can explain to us or describe to us

18    policies, procedures, training and so on.  So that's

19    probably the primary emphasis of my questions for you

20    today.  But let me just ask you some background

21    questions: Where did grow up?

22          A     Clarksville, Indiana.

23          Q     And where did you get your nursing degree?

24          A     I got my RN at Galen.

25          Q     And when did you get that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

9

1     A    2010.

2     Q    Before that you were an LPN?

3     A    Yes.

4     Q    Where did you get your LPN?

5     A    Spencerian, and I got that in 2001.

6     Q    And it looks like pretty much all of your

7 nursing career you've worked with Corizon?

8     A    Most of it.

9     Q    What accounts for your interest in working

10 with correctional health care?

11    A    I just like it.

12    Q    What do you like about it?

13    A    It's just different every day.  I just -- I

14 like it.  I didn't want to work in a nursing home.

15    Q    Yeah.

16    A    I like it.

17    Q    In between the time you got your LPN and the

18 time you went to work for Corizon, did you work for

19 anyone else in that interim period?

20    A    Yes.

21    Q    Who'd you work for?

22    A    I worked at Audubon.

23    Q    And what did you do there?

24    A    I was a nurse on the med surg unit.

25    Q    And how long were you there?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

10

1      A      Approximately a year.

2      Q      And was it after working at Audubon that you

3  went to Corizon?

4      A      Correct.

5      Q      Okay.  Ever been fired from a job before?

6      A      Never.

7      Q      Have you ever been -- do you hold any licenses

8  that have ever been suspended or revoked?

9      A      No, sir.

10     Q      Have you ever been investigated for any reason

11 by the Board of Nursing?

12     A      Never.

13     Q      Now, do you hold a nursing license here in

14 Kentucky?

15     A      Yes.

16     Q      What did you do to prepare for deposition

17 today?

18     A      I spoke with Matt.

19     Q      Looked over some key documents?

20     A      Yeah.

21     Q      In the case?  Okay?

22     A      Yeah.

23     Q      Have you spoken with anyone about this case

24 other than the attorneys for Corizon?

25     A      No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

11

1    Q    All right.  Now, let me ask you: With regard

2    to this case, I had been provided with a nursing --

3    Correctional Medical Services nursing protocols, revised

4    March of 2011 and Correctional Medical Services, Inc.'s

5    health services policy procedures manual which I think

6    was reviewed 2008.  When it comes to nurses working in

7    the Louisville jail, were there any other documents

8    available to those nurses, or manuals, or booklets or

9    policy or procedures or protocols?  Are there anything

10   of that nature available to them other than these

11   nursing protocols and this policy and procedures manual?

12   A    Like, any other -- what is your question

13   again?

14   Q    Yeah.  When it comes to -- and that was a bad

15   question.  When it comes to books, binders to which

16   nurses at the jail could refer, to do their job, was

17   there anything other than this policy and procedures

18   manual and these nursing protocols?

19   A    Yes.

20   Q    What?

21   A    There could be any kind of book that is a

22   nursing document like from Mosby's, or any kind of

23   bookstore that they can always refer to.

24   Q    Okay.

25   A    Like in any nursing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Q     But aside from books about nursing, in terms

2     of documentation that was provided to them specifically

3     by their employer, to guide or assist them in their work

4     at the jail, was there anything other than this policy

5     procedures manual and these protocols?

6          A     I wouldn't think so, other than their

7     orientation binder.

8          Q     Okay.  Now, what's the orientation binder?

9          A     It's the new employee orientation binder that

10    every employee gets.

11         Q     And do they get to keep a copy of that?

12         A     Yes, sir.

13         Q     Would there be anything in the orientation

14    binder that concerns care, treatment of inmate medical

15    needs that is not included in either the policy

16    procedures manual or the nursing protocols?

17         A     No, I wouldn't think so.

18         Q     Okay.  Now, am I correct that although Corizon

19    was providing services to the Louisville -- inmates in

20    the Louisville jail back in August of 2012, at least

21    through August of 2012, they were using nursing

22    protocols and policy procedures manuals that had

23    Correctional Medical Services, Inc.'s name on them?

24         A     I would assume so.

25         Q     Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A    That's what you have.

2        Q    Now what -- now what accounts for that?  Did

3   Corizon, was Corizon a successor corporation to

4   Correctional Medical Services, or do you know

5        A    Correctional Medical Services bought Prison

6   Health Services and then we changed our name to Corizon.

7        Q    Okay, all right.  Now, I take it that given

8   that you've been produced by Corizon to testify about

9   policies, procedures, protocols, training and so on that

10  you are very familiar with both the nursing protocols

11  that were in effect in August of 2012 and the policy and

12  procedures manual?

13            MR. PIEKARSKI:  Object to the form.  Go ahead.

14       A    Yes, I was familiar with them then.

15       Q    Okay.  Had you had any personal involvement in

16  the promulgation of any of the nursing protocols?

17       A    In the what?

18       Q    In the promulgation, in writing up any of

19  these --

20       A    No, I did not write any of those.

21       Q    Had you had any personal involvement in

22  writing up any of what's contained in the policy

23  procedures manual?

24       A    Yes.

25       Q    Okay.  Do you recall what it was that you --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    what policies that you were involved with?

2        A    Not specifically, no.

3        Q    All right.  Do you recall specific to the

4    issues that we're going to be discussing here today,

5    whether you had any involvement in policies concerning

6    drug withdrawal or overdose?

7        A    No.

8        Q    Or alcohol withdrawal?

9        A    I would not have written the Corizon policies.

10       Q    Okay.

11       Q    Or unconsciousness?

12       A    No.

13       Q    Okay.  Let's start -- well, before we do that.

14            How do these two documents, the policy

15    procedures manual and the nursing protocols: how do they

16    relate to one another?

17       A    They really don't.

18       Q    Do they -- does one supplement the other? Does

19    -- is one more detailed than the other?  Does the policy

20    procedures manual tell you to do certain things and the

21    nursing protocols explain to you how to do them? Is

22    there some kind of whey you can explain how these two

23    documents interrelate or work together?

24       A    They're really two different things.  That's

25    policies and procedures --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-6   Filed 11/14/17   Page 15 of 80 PageID #: 1029
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

15

1        Q     Uh-huh.

2        A     -- and this is a guideline for what nurses --

3    for what nurses can do that a doctor's already approved.

4        Q     Okay.  And that's guidelines for what nurses

5    can do that's already been approved by the doctor.

6    You're talking about the nursing protocols?

7        A     Correct.

8        Q     Okay.  Let's start first with the policies and

9    procedures and I brought just my copy.  I don't know

10   whether -- I don't know why everything's --

11           MR. PIEKARSKI:  We can make any copies you

12       need.

13           MR. BELZLEY:  Yeah, I don't know why -- I just

14       have kind of general questions I think about this.

15       Q     Looking at the health services policy

16   procedure manual, can you direct me to the policies and

17   procedures that you believe address first, drug overdose

18   and withdrawal?

19       A     Can I look at it?

20       Q     Sure.  And actually, I don't want to -- I'm

21   not trying to influence you, but I've got a green tag on

22   what I think it is.

23       A     I would think it would be this one.

24       Q     Okay.  Do you know whether there is anything

25   other than that policy I've tagged?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A    No, this would be the policy.

 2        Q    Okay.  Now, let me show -- let me explain to

 3   you what we have here.  We're talking about policy J-G-

 4   06.00, and what is actually has holes in it and it's in

 5   the binder was not, in effect, until after Mr. Cross was

 6   in the jail.  This, I have here the revision that I'm

 7   told was in effect at the time Mr. Cross was in the

 8   jail, which was revised September 1, 2009.  Am I correct

 9   about that?

10        A    That looks correct, yes.

11        Q    Do you know what revision, just as you sit

12   here today, do you know what revision was made to this

13   policy in 2012, after Mr. Cross had been in the jail?

14        A    Not unless I compared the two.

15        Q    Okay.  Do you know whether Mr. Cross's death

16   had anything to do with the revision made to this

17   policy?

18        A    I do not believe so, no.

19        Q    Okay.  Take a look -- take a minute if you

20   would and compare the two policies.  I think the primary

21   change has been to number 3, but I don't want to

22   influence -- you just take a second.  Go through there

23   and you let me know when you're done.

24                   (OFF THE RECORD DISCUSSION)

25   BY MR. BELZLEY:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q      Okay?

2        A      But that the form's changed, that they got out

3    withdrawal net.  That's a nursing evaluation tool, and

4    that's when they had the SOL Program, the substance

5    abuse withdrawal program, so I don't really think that

6    number 3 is the big change.

7        Q      Okay.  Now, if you look at the 2012 version

8    and I'll look at the 2009 version because I think in the

9    respects that I'm going to discuss with you they're the

10   same?

11       A      Uh-huh.

12       Q      Under paragraph 1 of the policy, it says

13   "Inmates experiencing severe life threatening

14   intoxication or withdrawal, or status epilepticus are

15   considered for urgent transfer to a community hospital."

16   Now, is drug -- are drug withdrawal and drug overdose

17   two different things?

18       A      Withdrawal and overdose?

19       Q      Yes.

20       A      Two different things.

21       Q      And when this policy refers to life

22   threatening intoxication, is it talking there about drug

23   overdose?

24           MR. PIEKARSKI:  Object to the form.

25       Q      If you know?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

18

1      A      I'm not positive.

2      Q      Okay.  Obviously, you know, they mention

3   withdrawal.  They say life threatening intoxication or

4   withdrawal.  I was just wondering whether the life

5   threatening intoxication separated by the "or" from

6   "withdrawal" you understood that to be addressing drug

7   overdose?

8      A      I think as a nurse you would think it was any

9   type of intoxication, whether it be drugs or alcohol,

10  anything severe or life threatening.

11     Q      Okay.  Now, is there anything in this policy

12  that even mentions or addressed drug overdose?

13     A      This one?  The 2009?

14     Q      Uh-huh.

15     A      Well, not drug problems, but specifically drug

16  overdose.

17     Q      Drug overdose, yes, ma'am.  And not as

18  distinct from withdrawal also.  I'm just talking about

19  drug overdose.

20            MR. PIEKARSKI:  Can I get some clarification on

21       the question?  Are you asking if it says the word

22       "overdose" or if it encompasses --

23            MR. BELZLEY:  Either.  I mean --

24            MR. PIEKARSKI:  If it encompasses --

25     A      Well, I would think life-threatening

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   intoxication would talk about drugs, alcohol -- just any

2   intoxication of anything that could be severe or life

3   threatening.

4        Q    Okay.  An overdose -- he's had -- he's taken

5   too many drugs or he's had too much to drink?

6        A    Yes, that's how a nurse would decipher that.

7        Q    Okay.  But is the word "overdose" used in that

8   policy?

9        A    I don't see the word "overdose."

10       Q    Okay.  Other than the mention in .1 under

11  policy of life threatening intoxication, is there

12  anything in there that discussed the signs and symptoms

13  or treatment of life threatening intoxication as opposed

14  to withdrawal?

15       A    Vital signs.

16       Q    Vital signs is something that in terms of

17  treating both withdrawal and life threatening

18  intoxication, vital signs could be -- you could find

19  signs and symptoms by take the vital signs?

20       A    Correct.

21       Q    Okay.  Anything else?

22       A    You mean other than this list?

23       Q    Well, and you are looking at -- and I think

24  the lists are the same, vital sign changes, nausea,

25  vomiting or diarrhea, tremors, tremulous or agitation,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  frightening or auditory visual hallucinations, sweating,

2  seizures, confusion, past history of seizure and drug

3  abuse.  Do you consider all of those signs and symptoms

4  to be applicable both to drug overdose and drug

5  withdrawal?

6      A    I would say it's more of a case-by-case basis

7  and that it's possible that some of those could be.

8      Q    All right.  Is there anything in this policy,

9  Ms. Pennington, that makes any reference to

10  unconsciousness?  Or a period in which an individual can

11  -- is breathing but cannot be aroused or awakened?

12      A    I don't see anything that says those words.

13      Q    All right.  Are you aware of anything in this

14  policy and procedures book -- manual, that addresses

15  unconsciousness?

16      A    I don't remember offhand, but it's a pretty

17  big book and I haven't looked at it since 2012.

18      Q    Yeah, take a second and I understand that. And

19  I understand just because you're here as a policy

20  procedures person doesn't mean you have this memorized.

21  It is a big book.  Here's the issue I would like you to

22  look at and I will give you a second to look at it.  Is

23  unconsciousness addressed in this policy procedures

24  manual or is it, and/or is it identified as a medical

25  emergency?  So, take a second and we'll go off the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   record.

2                    (OFF THE RECORD)

3   BY MR. BELZLEY:

4        Q    Okay, you look ready to go.  Okay.

5   Unconsciousness.

6        A    I did not see the word "unconscious" in the

7   few that I looked through.

8        Q    Did you see anything in the policies and

9   procedures manual that discusses, that -- although it

10  didn't use the word "unconsciousness" maybe discussed

11  loss of consciousness or inability to arouse somebody?

12       A    The term we would be use would be urgent or

13  emergent --

14       Q    Okay.

15       A    -- and that's what that would mean.  If you

16  have an urgent or emergent situation.

17       Q    Okay.  As I understand your testimony, if

18  somebody appears to be asleep and you can't arouse them,

19  you can't wake them up, that would be an emergent

20  situation?

21       A    If someone is unconscious, not appears to be

22  asleep.

23       Q    Okay.  Right.  But by unconsciousness, the

24  outward manifestation of it, would be somebody's laying

25  there that had been there for a while.  They haven't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    moved for whatever reason.  Somebody goes in there and

2    tries to wake them up and you can't wake them up.  That

3    would be --

4         A    That could turn into urgent emergent, yes.

5         Q    Okay.  What are the definitions of urgent

6    emergent?

7         A    I don't know if there's set definitions.  It

8    would be like a heart attack, unable to arouse someone.

9         Q    Okay.

10        A    A seizure would be emergent or urgent.

11        Q    Is there something in the policies and

12   procedures manual or a place in the policies and

13   procedures manual that lists urgent emergent type

14   conditions?

15        A    I'm not positive.  I'm not a hundred percent

16   sure but I would not say that there is something that

17   lists what an emergent thing is for a nurse.

18        Q    Would you say that it's a matter of nursing

19   common sense?

20        A    Basically, yes.

21        Q    That if you -- if you can't wake somebody up

22   that is an urgent emergent situation?

23        A    Correct.

24        Q    Okay.  Now, you stopped being the Director of

25   Nursing at the Louisville jail in July of 2012.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

23

1          MR. PIEKARSKI:  Object to form.

2     Q     How long had you been the Director of Nursing?

3          MR. PIEKARSKI:  Same objection.  Go ahead.

4     A     Approximately four-ish, five years.

5     Q     Okay.  Do you know whether the jail's

6 policies, as opposed to the policies you're looking at

7 here or the nursing protocols, the jail's policies, do

8 you know whether those policies said that

9 unconsciousness was a medical emergency?

10    A     I do not know what the jail policy said.

11    Q     Would you regard unconsciousness to be a

12 medical emergency?

13    A     Yes.

14    Q     And would you have had that same opinion even

15 back in July of 2012?

16    A     Yes.

17    Q     And would the nurses who worked under your

18 direction and supervision have had the same opinion?

19    A     Yes.

20    Q     Is there anything in the policy and procedure

21 manual that you have before you that talks about when an

22 inmate should be monitored for slipping into an

23 unconscious state?

24    A     I don't understand your question.

25    Q     Is there anything for example, in the policy

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    and procedure manual that says if an inmate comes in

2    following a drug arrest, and appears to be intoxicated,

3    let's say highly intoxicated, that he should be

4    monitored to make sure he does not become unconscious?

5            MR. PIEKARSKI:  Object to the form.

6        A    I don't think anything would say to watch them

7    to make sure they don't become, that they don't become

8    unconscious.  That's not something that anyone expects.

9    You don't think someone's going to come in and become

10   unconscious.

11       Q    Okay.

12       A    Because they drink.

13       Q    Well, how about drugs?

14       A    You don't expect someone to become

15   unconscious.  I mean, it would -- we have a policy and

16   procedure that tells us what to do.  You would put them

17   on withdrawal checks, that type of thing, but you're not

18   specifically -- specifically looking for someone to go

19   unconscious.

20       Q    What is your understanding about how someone

21   who has taken an overdose of drugs progresses to death,

22   in terms of what phases they go through up to the point

23   that their heart actually stops beating?

24           MR. PIEKARSKI:  Object to the form.

25       A    I don't really think you can answer that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  because it's different with each person.  It's going to
2  be what drugs they took.
3      Q     Okay.
4      A     How long they took drugs.  How much they took.
5  How long ago they took.  It's just -- it's totally
6  different with each person.
7      Q     Okay.  Well, Mr. Cross here said or had a
8  history of taking Xanax and Lortab.  Now, are either of
9  those drugs opioids?
10         MR. PIEKARSKI:  Object to the form.
11     Q     Do you know?
12     A     I'm not a hundred percent positive that Lortab
13  is not.
14     Q     Okay.  How about Benzodiazepines, either Xanax
15  or Lortab?
16     A     Xanax.
17     Q     Could the effects of those drugs be
18  exacerbated if they were mixed with alcohol?
19         MR. PIEKARSKI:  Object to the form.
20     A     Again, that would be according to how much you
21  took, and how much you drank, and what your resistance
22  is to those drugs.  If you take them every day, if you
23  don't take them, it's just totally case-by-case basis.
24     Q     Right.  Are you aware that someone who has
25  taken an overdose of drugs can appear to fall asleep,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   then progress into a period of unconsciousness where

2   they can't be aroused, they can't be awakened and then

3   that that proceeds up to the point of death?

4        MR. PIEKARSKI:  Object to the form but go

5     ahead.

6        A    Again, I would think that that would be on a

7   case-by-case basis, if that could happen.

8        Q    Have you been provided -- have you been

9   provided any training in which you have instructed --

10  you have been instructed that someone who has taken an

11  overdose of drugs, that their death could be preceded by

12  a period of unconsciousness?  In other words, they could

13  not be aroused, although they were still breathing and

14  their heart was still beating?

15       A    I can't -- I don't recall that being in a

16  training that they teach us people will become

17  unconscious.

18       Q    Okay.  Have you had any personal experience in

19  the course of your work with Corizon or CMS or whoever

20  where an individual has died of a drug overdose on your

21  watch?

22       A    Say that one more time.

23       Q    Have you ever -- have you personally

24  experienced a situation where an individual in a jail

25  where you were working died of a drug overdose?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     Have an overdose?  I can't recall.

2        Q     Okay.  Let's -- I think I'm done with that and

3   I'll get that big mound of stuff out from under you

4   there.  Let's turn now to the nursing protocols and I'm

5   going to kind of take you through the same series of

6   questions as I just did with the policy and procedure

7   manual.  I've got a cheater here.  I've marked that with

8   a green tab.  Other than what I've marked, this protocol

9   that I've marked, are you aware of any other protocol in

10  this book that addresses drug overdose or might address

11  or be relevant to drug overdose?

12       A     No, not that I -- not that I am aware of.

13       Q     Other than the one that I've marked.

14       A     I don't really think this has to do with drug

15  overdose, but --

16       Q     Well, and that was going to be my question:

17  Does --

18             MR. PIEKARSKI:  Object to the form.

19       Q     Does that -- what I've marked there, and let

20  me just borrow this for a second.  This is a protocol

21  concerning altered mental status, urgent emergent

22  protocol.  When it comes to drug withdrawal or drug

23  overdose issues and the signs and symptoms of those

24  types of conditions, is there any protocol in this book

25  that you believe is more closely applicable to handling

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-6   Filed 11/14/17   Page 28 of 80 PageID #: 1042
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

28

1    that type of situation than the one I've marked here?

2        A    No, because the nursing protocol book is more

3    for stuff nurses can do without a doctor's order.

4        Q    Right.

5        A    So, no.

6        Q    Okay.  So, in terms of this book, what I've

7    marked -- this altered mental status urgent emergent

8    protocol, that is as close as we get in this book to

9    discussing issues relevant to drug withdrawal and drug

10   overdose; is that fair to say?

11       A    No, I don't think it really has anything to do

12   with drug overdose or withdrawal.  So, I would say no.

13       Q    Is there anything in this book particular or

14   that you consider to be more applicable to drug

15   withdrawal or drug overdose than this?

16       A    I don't think there's anything in this book

17   that is pertinent to drug overdose or withdrawal.

18       Q    Okay.  So, as between the two books that we've

19   been discussing, the nursing protocols and the policies

20   and procedures manual, really the only thing in those

21   two books that discusses drug withdrawal, drug overdose,

22   is the policy J-G-06 concerning substance abuse,

23   alcohol, Benzodiazepine and opioid that we were

24   discussing before?

25       A    That would be the primary policy and



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1   procedure, yes.

 2        Q    Okay.  Now you said primary.  Is there --

 3        A    Well, only what I mean by that is if someone

 4   was to happen and you had to send them out the emergency

 5   room for anyone, then there'd be a policy in the

 6   emergency room, so

 7        Q    Okay.  Now the fact that there is -- and

 8   you've described this nursing protocol book as something

 9   that provides nurses guidelines that have been approved

10   by a doctor and they can do without having to consult

11   the doctor; is that correct?

12        A    Correct.

13        Q    The fact that there is nothing in this nursing

14   protocols book that addresses drug withdrawal or drug

15   overdose, does that indicate that in those types of

16   situations there's really nothing a nurse can do without

17   consultation with a physician?

18            MR. PIEKARSKI:  Object to the form.

19        A    No, no, that's not what I'm saying.

20        Q    Okay.  But at least --

21        A    These are over the counter medications.

22        Q    Okay.

23        A    Tylenol.  Benadryl.  Creams.  Stuff like that.

24   This is just easy stuff nurses can fix that a doctor's

25   already approved.  Yes, you can give them a Tylenol.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Yes, you can give them an ibuprofen.

2          Q      Okay.

3          A      So, that's a lot different than alcohol

4      withdrawal or overdose.

5          Q      Well, in that type of situation -- I'm looking

6      here at the 2009 policy, it says under 3, "Inmates with

7      alcohol or other drug problems are assessed and proper

8      managed by a physician or where permitted by law other

9      qualified health care professionals."  Is that right?

10         A      Correct.

11         Q      And is that perhaps why there is no nursing

12     protocol that goes to withdrawal or overdose issues?

13             MR. PIEKARSKI:  Object to form.

14         Q      Because it's going to be assessed and managed

15     by a physician?

16         A      No, I can't answer that.  I can't answer why

17     there's not a drug and alcohol nursing protocol.

18         Q      Okay.  Now in 2012 this policy, J-G-06 was

19     amended to provide that "inmates with alcohol or other

20     drug problems are assessed and properly managed by a

21     physician and/or the advanced registered nurse

22     practitioner."  Do you know why the policy was changed

23     from provided that they could be assessed and managed by

24     other qualified health care professionals to specify the

25     physician and/or the advanced registered nurse



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    practitioner?

2         A    I do not know what that was changed.

3         Q    Okay.  Is it your understanding that Stephanie

4    Cole was a licensed practical nurse?

5         A    Yes.

6         Q    Back in August of 2012?

7         A    Yes.

8         Q    Had you worked with Ms. Cole?

9         A    Yes.

10        Q    Now, am I correct that licensed practical

11   nurses and registered nurses cannot diagnose or treat

12   medical conditions without consulting a physician?

13        A    Nurses --

14             MR. PIEKARSKI:  Object to form.

15        A    Nurses cannot diagnose.

16        Q    Okay.  Do you know whether Mr. Cross was ever

17   assessed when he was admitted to the jail back in August

18   of 2012?

19        A    Assessed as in his intake was completed?

20        Q    Well, let me ask this a different way: What do

21   you understand the word assessed to mean as it's used

22   paragraph 3 of policy J-G-06?

23        A    I would say that that would be done at their

24   intake.

25        Q    Okay.  And what do you understand an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    assessment, a proper assessment to involve?

2        A    An intake is a -- when this would be done,

3    when they would be put on withdrawal protocol, as a

4    basic history, which the inmate tells us what's going

5    on, if they've taken drugs.  We document all that.  Then

6    the nurse would decide from the inmate's answers if

7    they're going to be put on withdrawal protocol.  Then

8    once they're put on the withdrawal protocol, they would

9    do -- they would do their vitals, history, get a

10   baseline and they would document all that and start them

11   on withdrawal protocol.

12       Q    Now back when you were at the jail in July of

13   2012, was it your understanding that it was permitted by

14   law here in Kentucky for any other qualified health care

15   professional to assess an inmate with an alcohol or

16   other drug problem?

17       A    Yes.

18       Q    And specifically what was your understanding

19   of the law that permitted that?

20       A    Because nurses can assess.

21       Q    What is your understanding of the term "other

22   qualified health professional," as it's used in that

23   paragraph?

24       A    Nursing staff.

25       Q    And when you talk about nursing staff, you're

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    talking about LPNs and RNs?

2         A     When I talk about nursing staff, yes.

3         Q     All right.

4              MR. PIEKARSKI:  When you get to a stopping

5    point --

6              MR. BELZLEY:  Yes, why don't -- let's take a

7    break.

8              MR. PIEKARSKI:  Okay, thanks.

9                       (OFF THE RECORD)

10   BY MR. BELZLEY:

11        Q     Do you know whether the change that was made

12   in the policy J-G-06 in 2012, to provide that inmates

13   with alcohol or other drug problems would be assessed by

14   a physician or -- and/or an advanced registered nurse

15   practitioner, as opposed to just some other qualified

16   health professional, do you know whether that change was

17   occasioned by recognition that the proper assessment of

18   an inmate with an alcohol or drug problem required some

19   degree of a diagnosis?

20        A     No, I don't believe that's what that means.

21   When inmates come into the jail, it's always going to be

22   a qualified health care professional that does the

23   assessment and then calls the provider, which would be a

24   doctor or a nurse practitioner to manage their care. But

25   it would always be a qualified health care professional

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-6   Filed 11/14/17   Page 34 of 80 PageID #: 1048
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

34

1    doing the assessment.

2        Q    Do I understand your testimony to be saying

3    that if when Mr. Cross was assessed by Ms. Cole, if she

4    identified him to be someone that she believed had an

5    alcohol or other drug problem, she would have then

6    communicated with the -- a physician or an ARNP about

7    his situation?

8        A    Absolutely.

9        Q    When would she have done that?

10       A    Sometime on her shift.  It's different.  It's

11   according to how busy you are but you would -- if he was

12   started on the SOL protocol or the drug withdrawal, then

13   a physician was contacted.

14       Q    Okay.  Do you know whether a physician was

15   contacted in Mr. Cross's case, before he was started on

16   a withdrawal protocol?

17       A    If the nurse believes that they should be

18   started, then they will get that paperwork ready and

19   call the doctor and say this is -- this is what I found.

20   You know, we think we should start him on this and the

21   doctor would say we agree, and then give orders, this

22   med, this med, whatever.  Because nurses can't order

23   medication.

24       Q    Okay.

25       A    So at some point in the shift, she would have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  called the doctor if he was on a withdrawal protocol,

2  and got orders from the doctor.

3       Q      All right.  Okay.  Do you have any knowledge

4  of why this change was made in the policy from other

5  qualified health professional to advanced registered

6  nurse practitioner?

7       A      No.

8       Q      All right.  Does your understanding of altered

9  mental status include unconsciousness, an inability to

10  awaken or arouse somebody?

11       A      It's possible.

12       Q      Now, under this urgent emergent protocol for

13  altered mental status, how do you determine whether

14  altered mental status is urgent as opposed to emergent?

15       A      It would be the nurse's discretion, really.

16       Q      Okay.

17       A      From their training and background.

18       Q      Is a better way -- I've been saying

19  unconscious, can't awaken them, can't arouse them, is a

20  better way to say that "the patient is nonresponsive?"

21       A      It could be, yeah.

22       Q      Okay.  Are you aware of whether there is

23  anything in this protocol that addresses non-

24  responsiveness, other than this altered mental status

25  urgent emergent protocol?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW  Document 109-6  Filed 11/14/17  Page 36 of 80 PageID #: 1050
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

36

1      A    I would think it would be under the urgent

2  emergent, because it talks about sending them to the

3  hospital if you need to.

4      Q    Okay.  When it says here that "if patient" --

5  "if patient is nonresponsive initiate EMS immediately,"

6  and it says "see below," what your understanding about

7  EMS?  Does that mean call emergency medical services,

8  911?

9      A    You would have an officer do that, correct.

10      Q    Okay.  And it looks like on page 2 it says --

11  well, I'm sorry, it's not page 2.  Under this altered

12  mental status urgent emergent protocol on the second

13  page it says, "Emergency -- if patient is nonresponsive

14  call 911 immediately."  Is that correct?

15      A    Yes, you would have someone call 911.

16      Q    Okay.  So basically that statement right there

17  indicates if a patient is nonresponsive, number one,

18  it's an emergency and number two, you've got to call 911

19  immediately?

20      A    If they're nonresponsive, yes.

21      Q    Okay.  What is there, if you know, in the

22  policy or procedures manual or these protocols, that

23  addresses monitoring a patient for non-responsiveness?

24      A    I don't know that you -- you don't monitor

25  patients for non-responsiveness.  I don't understand

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  what you're asking, I guess.

2      Q    Well, let me show you and I'll go ahead and

3  mark as Exhibit 1.  Have you -- let me show you what's

4  marked Exhibit 1.  Have you ever seen that chart before?

5          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

6      A    Not that I can remember.

7      Q    Are you aware of any medical conditions that

8  would require you to monitor someone for non-

9  responsiveness?

10     A    I mean, there's a lot of medical conditions,

11  so, yeah.

12     Q    Well, okay.  Tell me, would drug overdose be

13  one of them?

14     A    If anyone comes in on drugs or a potential for

15  drug withdrawal, you're going to monitor them at least

16  -- well the officer is if they're under observation, but

17  you're going to monitor them daily, three times a day. I

18  mean, you're not just specifically looking for

19  non- responsiveness.  You're checking to see they're

20  going into withdrawal or I mean a multitude of things.

21     Q    But again, withdrawal is different from

22  overdose?

23     A    Correct.

24     Q    If unconsciousness or non-responsiveness is a

25  medical emergency, is a condition itself that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

38

1   constitutes a medical emergency, don't patients need to

2   be monitor for non-responsiveness?

3        A    Ask it one more time?

4        Q    Sure.  If non-responsiveness is considered an

5   emergency that then requires that 911 be called

6   immediately --

7        A    Uh-huh.

8        Q    -- don't inmate patients need to be monitored

9   for non-responsiveness?

10       A    Are you talking all inmate patients?

11       Q    Let's start there.

12       A    Well, non-responsiveness doesn't just happen.

13  I mean, there'd have to be reasons for them to be

14  monitored for non-responsiveness.

15       Q    Right.  And what would be the reasons that

16  would trigger monitoring for non-responsiveness?

17       A    Again, I don't think you're monitoring

18  patients just for non-responsiveness.  There's a million

19  different things you would monitor patients for and

20  there's a million different reasons you would monitor

21  them for all of those.  So, I mean, there's just -- I

22  mean it's a multitude of things you would monitor

23  patients for.

24       Q    Okay.  Let's try and narrow this down.  It's

25  safe to say that if somebody comes in and they have a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    medical condition like a bad back, that's not

2    necessarily a medical condition that would raise cause

3    for concern that it might result in non-responsiveness?

4        A    Correct.

5        Q    If somebody comes in and they have a broken

6    arm and it's -- they've received treatment for it and

7    it's in a sling, that -- their arm needs to be monitored

8    but that's not necessarily a condition that's going to

9    raise some concern that it might make someone

10   nonresponsive, correct?

11       A    Correct.

12       Q    What are conditions that you believe would

13   raise concern for creating non-responsiveness?

14           MR. PIEKARSKI:  Object to the form.

15       A    Again, I just don't think that we monitor --

16   we set out to monitor people for non-responsiveness.

17   There's so many things that would happen before patients

18   become nonresponsive.  Like, not being able to answer

19   questions.

20       Q    Well they --

21       A    Like saying they just took three bottles of

22   pills.  Like, you just don't set out to monitor people

23   for non-responsiveness.

24       Q    Well, and why would you not do that in the

25   case of somebody who admitted to you that they, you



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-6   Filed 11/14/17   Page 40 of 80 PageID #: 1054
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

40

1    know, I just -- I just took three bottles of pills.

2        A    It would go along with a lot of other things.

3    What their vitals, how -- did they take three bottles of

4    pills?  Did they -- is that the norm for them?  There's

5    just so many different scenarios --

6        Q    Sure.

7        A    -- that could go with that.

8        Q    But let's take somebody like an inmate who

9    comes in.  He's being -- let's just take a hypothetical?

10       A    Okay.

11       Q    He comes in to the Louisville jail.  He's been

12   arrested on a controlled substances charge and he tells

13   the nurse, I got to tell you.  I may have done something

14   stupid, but I had a bottle of Xanax and I chugged it

15   before I got here.  The officer didn't know I had it.  I

16   didn't want to get caught.  I chugged it.  Would there

17   be any precautions put in place for that individual to

18   determine whether or not or to make sure he didn't

19   become nonresponsive?

20       A    Hypothetically, yes.  The nurse would do his

21   vital signs.  Again, ask questions.  How often do you

22   take Xanax?  Do you take Xanax?  Is that more than you

23   usually take in a day?  She would also confer with the

24   doctor hypothetically, and more than likely, he would be

25   put on some kind of observation where his vitals were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

41

1    checked at the minimum every eight hours.

2        Q    Okay.  But other than checking his vitals --

3    let's say this individual comes in at 10:00 at night.

4    He's assessed.  He's put in an observation cell of some

5    kind but everybody expecting that's he's going to go to

6    sleep because it's 10:00 he's going to go to sleep at

7    some point.  Is there anything that's red-flagged about

8    this individual to make sure or to alert people.  Hey,

9    make sure that he's -- don't mistake his sleeping for

10   non-responsiveness.  Make sure that he's -- if he's

11   sleeping that he can still be aroused and that he hasn't

12   progressed into a nonresponsive state given what he's

13   told us about chugging the pills?  Is that ever done?

14          MR. PIEKARSKI:  Object to the form.  We're

15      still on the guy who chugged the pills?

16   A    Okay --

17          MR. BELZLEY:  Yeah.

18   A    So, still the hypothetical?

19   Q    Yeah.

20   A    Hypothetically, if he's in an observation

21   cell, an officer would check on him every fifteen

22   minutes to make sure that he's still alive and breathing

23   and they would document if she was sleeping, eating,

24   drinking, chatting.  And then a nurse would be across

25   the hall from them and would check their vitals at the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   minimum every eight hours.

2        Q    Okay.  And what is your understanding of what

3   the guards would be doing to monitor them for sleeping

4   versus non-responsiveness?

5        A    I really can't answer for a guard what they

6   would do.

7        Q    Okay.

8        A    But they have a form they fill out that says

9   sleeping, talking, eating.

10       Q    And that raises another issue.  Obviously, if

11  somebody awake and moving around, not much monitoring

12  for non-responsiveness necessary, correct?

13       A    Correct.

14       Q    Monitoring somebody for non-responsiveness

15  becomes important when that individual appears to be

16  asleep?

17            MR. PIEKARSKI:  Object to form.

18       Q    Is that fair to say?

19       A    It would have to do with a lot -- all the

20  other factors involved.

21       Q    Okay.  But non-responsiveness is condition

22  that can appear to be somebody being asleep?

23            MR. PIEKARSKI:  Object to the form.

24       Q    Would you agree with that?

25       A    They can appear to be asleep.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

43

1    Q    You're not -- if you're awake, if your eyes

2  are open, even if you're laying down, chances are you

3  are not non-responsive?

4    A    More than likely.

5    Q    But, if you are laying down, you're sleeping

6  and snoring, you may just be sleeping or you might well

7  be non-responsive; fair to say?

8    A    I really can't answer that.  I wouldn't know

9  the difference in snoring and being non-responsive at

10 the same time.

11   Q    Okay.  Have you ever been trained about the

12 difference?

13   A    No.

14   Q    Are you aware of any policies, procedures or

15 protocols of Corizon or CMS that have ever spoken to the

16 difference or instructed you as to the difference?

17   A    No, sir.

18   Q    Or have you ever had anyone tell you that loud

19 snoring is oftentimes a -- can be a symptom of

20 respiratory distress in a drug overdose type situation?

21   A    No.

22   Q    Have you -- has anyone ever told you or are

23 you aware of anything that's written in the policies,

24 the procedures or the protocols that indicates that

25 someone who is progressing to a drug overdose death,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that their death might be preceded by a significant

2    period of time in which they are nonresponsive?

3        A    Say that one more time.

4        Q    Yeah.  Has anyone ever told you or have you

5    ever read in either the policies, the procedures or the

6    protocols, that prior to a drug overdose death, someone

7    might well be simply nonresponsive for a lengthy period

8    of time?

9        A    That's not in our policy or procedure --

10       Q    Okay, is it --

11       A    -- that wording.  I guess I'm never heard it,

12   but it's not in our policy and procedures.

13       Q    Okay.

14       A    Or training.

15       Q    All right.  And you've never heard that?

16       A    I'm not positive that I've never heard it but

17   it's definite not in our training.

18       Q    Okay.  What is your -- do you have an

19   understanding of whether the drug naloxone can, in most

20   cases, prevent a drug overdose death if it is

21   administered prior to the individual's heart stopping?

22       A    Are you talking about the drug Narcan?

23       Q    Narcan, yeah.  Narcan, naloxone, Narcan. Fine.

24       A    I'm not really familiar with Narcan, to be

25   honest.  We -- I don't -- I've never administered it, so

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    I can't say when it should be administered or if it has

2    to be administered before the heart stops.  I'm not

3    sure.

4        Q    Back when you were at the Louisville jail up

5    until July of 2012, do you know whether they had Narcan

6    or naloxone on -- available and on site for

7    administration to inmates?

8            MR. PIEKARSKI:  Object to the form.  The only

9        thing I want to clarify, you were still at the jail

10       after July of 2012?

11           THE WITNESS:  Yeah, I was still there just I'm

12       not sure when the DON position actually stopped.

13           MR. PIEKARSKI:  I think that -- yeah.

14           MR. BELZLEY:  Oh, okay.

15           MR. PIEKARSKI:  We're all just a little

16       confused about that.  I think she was still there.

17           THE WITNESS:  Yeah, it was still my site.  I

18       just --

19           MR. BELZLEY:  Oh, okay.

20           THE WITNESS:  I'm not sure when the DON role

21       stopped.

22           MR. PIEKARSKI:  And that's the only part of

23       your question I object to, sorry.

24       Q    Well, thank you because I can make it more --

25           MR. PIEKARSKI:  Yeah.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     -- more specific.  Back in August of 2012, do

2   you know whether the jail had available on site, Narcan

3   or naloxone?

4      A     I do not believe we did, no.

5      Q     Okay.  When inmates came into the Louisville

6   jail -- well, not inmates but arrestees came into the

7   Louisville jail and were assessed on admission, were

8   folks like Stephanie Cole provided information or did

9   they have accessible to them information as to what the

10  charges were against those individuals?

11     A     Sometimes we did.  Not always.  Not a hundred

12  percent.

13     Q     And when would you have access?  When would

14  you not?

15     A     The officers were supposed to give us a sheet

16  that showed their charges, but that didn't always

17  happen.  So it's like sometimes we did and sometimes we

18  didn't.

19     Q     Do you know whether Ms. Cole in Mr. Cross's

20  instance, was provided a sheet indicating what his

21  charges were?

22     A     I do not.

23     Q     Are those charges or can those charges be

24  relevant in properly assessing an individual that's

25  being admitted to the jail?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     Sometimes, yes.

2        Q     For example, would it be relevant in a case in

3    which an individual during his assessment appears to be

4    intoxicated and the charges against him reflect drug

5    charges as opposed to alcohol charges?

6        A     I don't know if that would be such a big red

7    flag.

8        Q     Well, it would indicate, would it not that the

9    intoxication that you're observing is most likely

10   attributable to drugs as opposed to alcohol?

11            MR. PIEKARSKI:  Object to the form.

12       Q     Would you agree with that?

13       A     I would agree that we ask them, if they -- if

14   they take drugs and alcohol.

15       Q     Okay.

16       A     I mean, just because they were arrested with

17   drugs on them, more than like -- I mean, it doesn't mean

18   that they took them.  They could have, but we still ask

19   a series of questions to they can tell us what truth

20   about what they've taken or what they drank.

21       Q     Okay.  The fact that somebody maybe was --

22   that someone was arrested on a drug charge, would you

23   agree with me that that would at least alert the person

24   who is assessing this individual that there may be drug

25   involvement?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. PIEKARSKI:  Object to form.

2     A     Possibly.

3     Q     Okay.  Have you ever been told or trained or

4  have you ever read in the protocols or the policies and

5  procedures and if an intoxicated inmate is admitted to

6  the jail, they must be assessed every 30 or 60 minutes?

7     A     No.

8     Q     Or checked every 30 or 60 minutes.

9     A     If they come in the jail and they're

10 intoxicated?

11    Q     Yes.

12    A     No.

13    Q     Have you ever heard that an intoxicated inmate

14 who is admitted to the jail should not be permitted to

15 sleep it off?  That they ought to be periodically

16 awakened to make sure that they have not drifted into or

17 reached a nonresponsive state?

18         MR. PIEKARSKI:  Object to the form.  What time

19     are we referring?

20         MR. BELZLEY:  In August.

21         MR. PIEKARSKI:  No, no.  As in what time during

22     their --

23         MR. BELZLEY:  Just generally.  I mean --

24         MR. PIEKARSKI:  At any time?

25         MR. BELZLEY:  Yeah.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. PIEKARSKI:  Not sleep it off?
 2              MR. BELZLEY:  Yeah.
 3    BY MR. BELZLEY:
 4         Q    After their admission?
 5         A    I would say we wouldn't allow them to sleep it
 6    off before they are assessed by a nurse.  If they come
 7    up to see us and they're drunk, we wouldn't say, oh go
 8    let them sleep it off and we'll talk to them after
 9    they've slept it off.
10         Q    Okay.
11         A    That wouldn't happen.  We would have to assess
12    them then.  Get their vitals.  You know, take an Accu-
13    Chek, stuff like that to make they're stable to proceed.
14         Q    Okay.  So, is it fair to say that if somebody
15    comes in or back in August of 2012, if somebody came
16    into the jail and appeared to be intoxicated, they could
17    be as long as they were first assessed by someone like
18    Ms. Cole, and she believed they were stable, they could
19    be allowed to go upstairs and sleep it off?
20         A    Yes, once they've been assessed by the nurse,
21    if they are stable, they will go to whatever housing the
22    nurse deem -- the nurse deemed appropriate.
23         Q    Okay.  Were -- when you were at the jail were
24    you aware of any policy, procedure or protocol that
25    required inmates who had been admitted to the jail in an
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   intoxicated state, to be awakened periodically?

2       A    They would be awakened when they got their --

3   their checks by the nurse.

4       Q    And that could be once every shift?  Once

5   every eight hours?  Once every four hours?

6       A    The minimum, every eight hours.

7       Q    Okay.  Have you seen anything in the records

8   of this case that you've looked at to indicate that Mr.

9   Cross was to be monitored for anything other than the

10  symptoms of drug or alcohol withdrawal?

11          MR. PIEKARSKI:  Object to form.  She didn't

12      review the chart to prepare that.  That wasn't in

13      the scope, but you can answer, his question

14      specifically, if you can.

15      A    That's what -- I haven't looked at anything

16  since --

17          MR. PIEKARSKI:  Okay.

18      A    -- chart wise, since that incident.

19      Q    Who -- do you know who it is at Corizon that

20  keeps the company and its nurses and its employees up-

21  to-date on changes in the law, or developments in the

22  law?

23      A    I would assume it would be someone on the

24  legal team.

25      Q    Okay, but you don't know of anyone

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   specifically?

2        A    No, sir.

3        Q    Is it your understanding that Corizon has an

4   in-house legal staff?

5        A    Yes.

6        Q    Do you know anybody on that legal staff?

7        A    Yes, I know some of the lawyers' names.

8        Q    Yeah, give me some of those.

9        A    Mia Patel, Katie West.  That's all I can think

10  of offhand.

11       Q    And where are they located, do you know?

12       A    I believe Mia's in Saint Louis and I believe

13  Katie West is in Brentwood, Tennessee but I'm not a

14  hundred percent positive on that, either.

15       Q    Have you ever heard anything about a Sixth

16  Circuit, a decision of the Sixth Circuit Court that

17  might impact the duty of medical staff or jail security

18  staff to monitor individuals for non-responsiveness?

19            MR. PIEKARSKI:  Particularly those who have

20       been admitted in an intoxicated state.

21       A    No.

22            MR. BELZLEY:  I'm just getting stuff out of the

23       way here as I'm going through.

24            MR. PIEKARSKI:  Are you done with Exhibit 1.

25            MR. BELZLEY:  Well, but that's a new one.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. PIEKARSKI:  Right.

2          MR. BELZLEY:  Can you put number 2 on there?

3          (EXHIBIT 2 MARKED FOR IDENTIFICATION)

4   BY MR. BELZLEY:

5      Q    **Let me show you what's been marked Exhibit 2**

6   **to your deposition. Have you seen these two documents**

7   **before, and I apologize because one's got a note on it?**

8      A    I may have at the time.  I don't remember

9   specifically.

10     Q    **To your knowledge, were you involved in any**

11  **investigation of this incident involving Mr. Cross?**

12     A    Not that I recall.  I remember looking it over

13  at the time.

14     Q    **Why did you do that?**

15     A    Because I was the Regional Director of Nursing

16  and that would be something that I would look at to see

17  if I felt like anything was -- could be changed.

18     Q    **Okay.  Other than your possibly doing that,**

19  **are you aware of any investigation of what happened to**

20  **Mr. Cross?**

21         MR. PIEKARSKI:  Object to form.

22     Q    **By Corizon?**

23     A    Not that I can -- not that I remember, no.

24     Q    **Do you know why we have in this case two soap**

25  **notes, one prepared at 5:18 p.m. on August 25 and one**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   prepared at 9:49 p.m. on August 25?

2       A    No.

3       Q    Is that unusual in your experience?

4           MR. PIEKARSKI:  Object to the form.  I think

5       we're wandering awfully close to outside the scope

6       of this deposition, but I will allow her to answer.

7       A    I can't answer why she did that.

8       Q    Did you, after this happened with Mr. Cross,

9   did you ask her why she did this?

10      A    I don't honestly don't remember much about the

11  specifics like that.  I just remember looking at the

12  overall care that was provided.

13      Q    Okay.  When you conduct a review like that,

14  where you are looking at the overall care provided, are

15  there any specific written policies, procedures,

16  processes that guide your work in that regard?

17          MR. PIEKARSKI:  Object to the form.  Outside

18      the scope.  Go ahead.

19      A    Yeah, I would look at our policies and

20  procedures and that's what I looked at when I looked at

21  this.

22      Q    Okay.  Would that be in the big black book

23  we've been talking about?

24      A    Yes.

25      Q    Can you point me to that policy or those

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   policies and procedures?

2        MR. PIEKARSKI:  Object to the form.  You can

3     answer.

4     A    Well, just from looking at this, I would say

5   she would have followed the substance abuse withdrawal,

6   which would be this.

7     Q    Okay.  And I'm sorry.  Perhaps my question was

8   unclear.  If there anything specifically in the policy

9   and procedures manual that says to someone like you at

10  that point who was in charge, the Regional Nursing

11  Director, as to what you would look at, what you would

12  look for, and what you would do if you found certain

13  things?

14       MR. PIEKARSKI:  Object to the form.  Go ahead.

15    A    From looking at this note, I would have made

16  sure that she put him on a detox monitor, which she did.

17  She actually put him in the OBS 2, which even a higher

18  level of medical care that was required.  I don't

19  remember a whole lot about looking at this back then in

20  2012, but I do remember looking at it thinking that

21  everything was followed.

22    Q    Yeah, and again, I think --

23       MR. PIEKARSKI:  Listen to his question.  You

24     guys are not communicating.

25       MR. PIEKARSKI:  I'm not --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MR. PIEKARSKI:  She's asking a fine question.

 2     You guys are just not on the same page.

 3     Q    I'm confusing you with my question.  I'm not

 4   asking whether that particular document complies with

 5   the policies and procedures.  What I'm trying to get at

 6   is whether there is a policy and procedure in this book

 7   that says, okay, this incident has occurred.  Ms.

 8   Pennington, you have this position.  You need to conduct

 9   this investigation and here's what you need to look at.

10     A    Oh, no.  That would not be in this book.

11     Q    That's all I'm getting at.

12     A    Sorry.  Yeah, I was way off.

13     Q    Is that anywhere?

14     A    No.  I would just -- I just know what I need

15   to do to review it.

16     Q    Okay.

17     A    To review to make sure the nurses did their

18   job.

19     Q    Have you ever read in the policies and

20   procedures manual or the protocols or been told that

21   what Ms. Cole describes as "nodding off," Mr. Cross

22   "nodding off," is a or can be a sign or symptom of a

23   drug overdose?

24     A    I think it can be a sign and symptom of many

25   different things, not sleeping.  It could -- there could

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    be a bunch of different things and that's why as a nurse

2    you would rely heavily on your assessment and their

3    vital signs and what the patient tells you.

4        **Q    Is -- would you agree with me that drug**

5    **withdrawal is a recurring event that nurses --**

6    **correctional nurses have to deal with?**

7        A    Yes, I would say they see it quite often.

8        **Q    Would you say that drug overdose is a**

9    **recurrent event that they have to deal with?**

10        MR. PIEKARSKI:  Object to the form.

11        A    I would say they see it.

12       **Q    Okay.**

13        A    I couldn't say it was as often as withdrawal.

14       **Q    Sure.  I understand that.  Thank goodness.**

15        MR. PIEKARSKI:  Let's make sure we know what

16    we're talking when we say overdose.

17        MR. BELZLEY:  Yeah.

18        MR. PIEKARSKI:  You know, are you talking about

19    death from an overdose or are we talking about just

20    you know, I took three Advil instead of two?

21        MR. BELZLEY:  Well, I'm talking about

22    potentially life threatening drug overdose.

23        MR. PIEKARSKI:  Okay.

24    BY MR. BELZLEY:

25       **Q    Is that a sufficiently recurring event that**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Corizon nurses are trained how to deal with it?

2        A    Yes, they are trained how to deal with it.

3        Q    Okay.  How are they trained to deal with it?

4   Where is it in the policies, the procedures, the

5   protocols, or the training?

6        A    In the new orientation guide there's the

7   substance abuse withdrawal program that teaches them

8   about drugs and alcohol.

9        Q    Okay, now that's a new orientation guide and

10  it teaches them about drugs and alcohol withdrawal?

11       A    Correct.

12       Q    Okay.  How about overdose?

13       A    They all kind of go hand-in-hand.

14       Q    But I thought they were withdrawal and

15  overdose --

16       A    They are two different things --

17       Q    -- two different things?

18       A    -- but they go hand-in-hand.

19       A    How so?

20       A    Well, if you take too much of either one of

21  those, you can overdose.  Again, it's always a case-by-

22  case basis but you know to look for that as a nurse in

23  the environment that we work in.

24       Q    Okay.  It's sufficiently recurring that nurses

25  have to be aware of and look for the potential for and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the signs and symptoms of a drug overdose as well as

2    drug withdrawal?

3        A    Correct.

4        Q    Are you aware of anything in the policy and

5    procedures manual or the protocols that speak directly

6    to the signs and symptoms of a drug overdose?

7        A    Not specifically.

8        Q    Or the monitoring of someone to make sure that

9    they don't become nonresponsive as a consequence of a

10   drug overdose?

11       A    I would say that the monitoring that we

12   provide would -- that's what you would -- one of the

13   signs, things you would look for.

14       Q    Okay.  And that is the -- where somebody who

15   is put on a withdrawal protocol, is checked at least

16   every eight hours and perhaps as often as every four

17   hours by the nursing staff?

18       A    Minimum eight hours, yes.

19       Q    Okay.

20           MR. BELZLEY:  Tell you what: let's take a short

21       break.

22           MR. PIEKARSKI:  Sure.  Do you want to order

23       some lunch?

24           MR. BELZLEY:  Well, let's take a break and let

25       me see --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

59

1          MR. PIEKARSKI:  Okay.

2          MR. BELZLEY:  -- where I'm at because I may

3      have exhausted this.

4          MR. PIEKARSKI:  Okay.

5          MR. BELZLEY:  And if I can spend another 15 or

6      20 minutes with --

7          MR. PIEKARSKI:  We can take you to lunch and

8      decompress instead of nervously eating your lunch,

9      correct?

10         MR. BELZLEY:  Yeah, let me just do some

11     thinking here.

12         MR. PIEKARSKI:  Sure.

13         MR. BELZLEY:  Think over a couple of things.

14         MR. PIEKARSKI:  Let's stretch our legs.

15         MR. BELZLEY:  I may be done.

16                   (OFF THE RECORD)

17 BY MR. BELZLEY:

18     Q    Back on the record.  Ms. Pennington, before we

19 break we were talking about how recurrent a situation it

20 is for someone to come in and be at risk of drug

21 withdrawal or overdose.  Is it also a recurrent

22 situation that correctional nurses have to deal with on

23 a regular basis that someone comes into the jail and is

24 unable for one reason or another to provide you with a

25 detailed, reliable medical history?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    I would say that we ask the questions and we

2   don't ever know if they are being honest with us or not.

3       Q    Yeah.

4       A    Does that answer your question?

5       Q    Well, I know in terms of their honesty, but

6   aside from someone's intent to lie about their history,

7   some people are better medical historians than others.

8   Is that something that you all have to deal with on a

9   regular basis?

10          MR. PIEKARSKI:  Object to the form.

11      A    I don't know if I could say how often we deal

12  with it but yes, it comes up.

13      Q    And how do you deal with that?

14      A    We can try to get records from their doctor or

15  contact the pharmacy that they provide to get medical or

16  you know, medication history.  Even if we have to

17  contact a family member, there's different ways that we

18  can deal with that if they're unable to tell us.

19      Q    Would you agree with me that jail versus need

20  to be trained on the signs and symptoms of a drug

21  overdose and how do deal with that?

22          MR. PIEKARSKI:  Object to the form.  She's not

23      an expert.  She's here to answer your questions

24      about policies and procedures.

25      Q    I would say that jail nurses are trained on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

61

1   detox, withdrawal symptoms and how to deal with those

2   and if anything would go out of that, such as you've

3   mentioned, overdose, drug overdose, even though it's not

4   specifically laid out in the policy, there's always the

5   urgent emergent policy that would supersede for anyone,

6   if they become unconscious or nonresponsive.

7        Q    Okay.

8        A    No matter what the reason, we would deal with

9   it.  Whether it be send them to the ER, contact 911,

10  contact their provider.

11       Q    Were you on duty when Mr. Cross -- were you at

12  the jail when Mr. Cross was there?

13       A    I believe it was second shift and I would not

14  have been there, no.

15       Q    It was second shift.  Okay.  What shift were

16  you working at that time?

17       A    First.

18       Q    That's the 7:00 to 3:30 shift?

19       A    Yeah.

20       Q    Okay.

21       Q    What is your understanding of what the --

22            Corizon's policies and procedures and

23  protocols require that someone like Ms. Cole communicate

24  to Ms. Sloan about someone like Mr. Cross, and a little

25  bit of explanation:  It's my understanding in this case,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Ms. Cole assessed Mr. Cross at intake but Ms. Sloan was

2    on the medical floor and was in charge of the medical

3    floor up there?

4           MR. PIEKARSKI:  Object to the form of the whole

5        question.  Go ahead.

6        A    If I understand your question correctly, I'm

7    not sure it would be in a policy to say who would call

8    who but as any nurse working anywhere, you would give

9    report to the nurse that you're sending a patient to. So

10   if Stephanie was at the booking floor, which she was,

11   and was transferring a patient to Nurse Sloan, she would

12   at least call and give her a heads up.  Hey, this guy's

13   coming and this is what's going on and I'll send his

14   paperwork up.

15       Q    And would that include, given your

16   understanding of the Corizon policies and procedures and

17   protocols, would that include Ms. Cole's observation

18   that he had stumbled when he walked?

19          MR. PIEKARSKI:  Object to the form.

20       A    I'm not -- I don't know if it would be that

21   detailed.  It would be the reason she was sending him to

22   the floor.

23       Q    Or would it include the fact that she believed

24   him to be confused at times?

25          MR. PIEKARSKI:  Object to the form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     It could or could not.

2        Q     Or that he appeared to be nodding off at times

3   during her assessment?

4             MR. PIEKARSKI:  Object to the form.  You can

5        answer.

6        A     It would be what she thought was important to

7   tell that nurse, the reason he was going to the floor.

8        Q     Is there anything in the policies and the

9   procedures and the protocols that explains details or

10  provides direction as to what's important to be passed

11  on to the next nurse?

12       A     I can't think of anything specifically that

13  would tell what you would need to tell, but as a nurse,

14  you would know the important things to tell another

15  nurse.

16       Q     And am I correct that knowing the important

17  things to tell a nurse to whom a patient is being

18  transfers presupposes that the nurse that is

19  communicating that informing knows the significance of

20  what she's observing or the results of her assessment?

21            MR. PIEKARSKI:  Object to the form.  Go ahead.

22       A     Yes, things like this is what you would learn

23  in nursing school.  Like your basics, nursing basics of

24  what you observe and who you would relay to the ongoing

25  or the nurse that you're passing on a patient to.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    All right.  When you were at the jail,

2    typically, what documents were transferred up to the

3    medical floor from the assessing nurse downstairs?

4    A    All of them.

5    Q    With the -- okay.  And would those documents

6    come up with the person who's just been admitted?

7    A    No, they would not come up with the patient

8    immediately because an officer would be transporting

9    those and they would not transport those documents.

10    Q    In your experience, how soon would those

11    documents come up after the admission of the inmate?

12    A    You really couldn't put a time on that.

13    Q    Did they typically come up at the end of the

14    shift?

15    A    They could or they could come up, if the nurse

16    came up, that's why the phone call is made so that the

17    nurse can relay the important information then until the

18    paperwork makes it up so that that receiving nurse can

19    go ahead and start the observation forms and get those

20    hung up for the inmate that's going in observation.

21    Q    Okay.  Is it fair to say that until those

22    documents come up, the nurse like Ms. Sloan on the

23    medical floor, is dependent upon what -- is dependent

24    upon the information she's communicated by the nurse who

25    has performed the assessment?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1         MR. PIEKARSKI:  Object to the form.

2    A    Yes, that's how she would get her information.

3    Q    Okay.  Once those documents get up to the

4 medical floor, is there a policy or procedure that

5 defines or specifies how quickly or how soon those

6 documents should be reviewed by somebody?

7    A    No, not -- not timely, no.  I mean not --

8 there's nothing that states in a time period, how --

9 when they should be reviewed.  But that nurse that's

10 receiving those would have to chart and those -- on that

11 paperwork so they would review the notes.

12   Q    Okay.  I take it that if you did -- well, you

13 recall having reviewed this situation at some point?

14   A    Uh-huh.

15   Q    As your capacity as an employee of Corizon at

16 the jail?

17   A    Correct.

18   Q    Am I correct that you did not believe there --

19 that there was any indication of any violation of

20 Corizon policy or procedure or protocol?

21   A    That is correct.  I believe the nurses did

22 everything according to policy and procedure.

23   Q    When you were working at the jail, did you

24 ever have an opportunity to review the jail's policies

25 and procedures?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    I can't recall ever reviewing the jail -- all

2   of the jail's policies and procedures.

3      Q    Is there anything in Corizon policies,

4   procedures or protocols that were in effect at that time

5   that indicate whose policies take precedence in the

6   event of a conflict?  For example, Corizon's policy say

7   in this situation you do A but the jail policy say in

8   that same situation you do B.  Is there anything that

9   says how that conflict is resolved or whose policy takes

10   precedence?

11          MR. PIEKARSKI:  Object to the form as to the

12      scope.  Go ahead.

13      A    I can't recall anything of that nature.

14      Q    Do you know, as you sit here today, do you

15   know what the jail's policies identify to be or identify

16   as medical emergencies?

17          MR. PIEKARSKI:  Object to the form as to scope.

18      Go ahead.

19      A    Not -- I don't know what they would consider a

20   medical emergency.  I would assume that they'd be close

21   to ours since we provide the medical care.

22      Q    What is your understanding of what Corizon's

23   policies and procedures and protocols require you to

24   communicate to the guards about an inmate or about

25   monitoring an inmate?  Is there anything in there that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you know about?

2         A    Other than adhering to the HIPPA standards,

3    there's not much that you can tell an officer.  Now when

4    you do hang up those observation sheets, the officers

5    would know whether it was just vague medical detox,

6    suicide, mental health, and then like I said, they would

7    have their form that they fill out every -- with

8    staggered 15 minute checks where they're monitoring what

9    that patient is doing.  Then there would also be an

10   inmate 1-on-1 watcher outside of that observation cell

11   that also monitors and would just alert -- which they

12   don't know anything but they would alert medical or

13   officers if anything doesn't look right.  And they

14   receive training also.

15        Q    Okay.  Do you know whether there was an inmate

16   1-on-1 monitor outside the cell where Mr. Cross was?

17        A    I know anyone that's in an observation cell on

18   OBS would have a 1-on-1 watcher, so I don't know why

19   there would not be.  So I would have to say yes, there

20   was.

21        Q    Are you aware of any documentation that would

22   identify who that watcher was for Mr. Cross?

23        A    No.

24        Q    Is a drug overdose more life threatening or

25   has the potential to be more life threatening than drug

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  withdrawal?

2         MR. PIEKARSKI:  Object to the form.

3      Q    Do you know?

4      A    I would not be able to answer that.  I would

5  say they're both serious.  They could be, but I wouldn't

6  say one's more than the other.  Another case-by-case

7  basis.

8      Q    Okay.  Does Corizon have an assessment

9  instrument for drug overdose like it does for drug

10  withdrawal?

11     A    I don't know of a tool that measures drug

12  overdose.  I do know one for withdrawal, which would be

13  the CIWA, the Benzo or the COW.

14     Q    Yeah, the --

15     A    Or BCSW or the COW.

16     Q    Yeah, CIWA is just CIWA and the COW is just

17  COW.  They're acronyms for forms.  All right.

18         MR. BELZLEY:  Let me -- can you stick a number

19     3 on there for me?  Thank you.  Let me just show

20     what I've marked as Exhibit 3, which are generally

21     the records concerning Mr. Cross that have been

22     provided to me in this case.  The first document is

23     entitled at the top "Problem List."  And the first

24     two problems identified are detox etoh and the next

25     one is detox opiates.  As I understand that, that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

69

1    means there was a concern that Mr. Cross might

2    withdraw from alcohol and drug dependence?

3    (EXHIBIT 3 MARKED FOR IDENTIFICATION).

4        A    Correct.

5        Q    **Would that indicate that Ms. Cole believed he**

6    **at least might have a drug and alcohol problem?**

7            MR. PIEKARSKI:  Object to the form.

8        A    I think that that would indicate that he had

9    told Ms. Cole that he either took opiates routinely or

10   that day or alcohol routinely or that day.

11       Q    **Okay.  If you would turn to the third page**

12   **which is entitled "Inmate Education Report," what does**

13   **this form indicate?**

14       A    This form indicates what the nurse educated

15   the inmate or patient on.

16           MR. BELZLEY:  Okay.  You know Ms. Pennington, I

17       don't think I have any further questions for you.

18           THE WITNESS:  Sounds good to me.

19           MR. PIEKARSKI:  No questions

20   (DEPOSITION CONCLUDED AT 12:54 P.M.)

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:13-cv-00427-DJH-DW   Document 109-6   Filed 11/14/17   Page 70 of 80 PageID #: 1084
The Deposition of ALICIA PENNINGTON, RN, taken on March 03, 2016

70

CERTIFICATE OF REPORTER

STATE OF INDIANA

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded stenographically and mechanically by me and then reduced to typwritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability.  I ceritfy that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.



SHELBY LODA,

COURT REPORTER/NOTARY

COMISSION EXPIRES:  12/10/2023

SUBMITTED ON:  03/15/2016

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**0**

**06.00** 16:4

**1**

**1** 16:8 17:12 19:10 37:3,4 51:24

**1-on-1** 67:10, 16,18

**10:00** 41:3,6

**12:54** 69:20

**15** 59:5 67:8

**2**

**2** 36:10,11 52:2, 3,5 54:17

**20** 59:6

**2001** 9:5

**2002** 5:22

**2008** 11:6

**2009** 16:8 17:8 18:13 30:6

**2010** 9:1

**2011** 11:4

**2012** 7:23 8:1, 9,12 12:20,21 13:11 16:13 17:7 20:17 22:25 23:15 30:18 31:6,18 32:13 33:12 45:5,10 46:1 49:15 54:20

**2013** 7:18

**25** 52:25 53:1

**3**

**3** 16:21 17:6 30:6 31:22 37:5 68:19,20 69:3

**30** 48:6,8

**37** 5:17

**3:30** 61:18

**5**

**5:18** 52:25

**6**

**60** 5:18 48:6,8

**7**

**7:00** 61:18

**9**

**911** 36:8,14,15, 18 38:5 61:9

**9:49** 53:1

**9th** 8:1

**A**

**Absolutely** 34:8

**abuse** 17:5 20:3 28:22 54:5 57:7

**access** 46:13

**accessible** 46:9

**accounts** 9:9 13:2

**Accu-** 49:12

**acronyms** 68:17

**address** 15:17 27:10

**addressed** 18:12 20:23

**addresses** 20:14 27:10 29:14 35:23

36:23

**addressing** 18:6

**adhering** 67:2

**administered** 44:21,25 45:1,2

**administration** 45:7

**admission** 46:7 49:4 64:11

**admitted** 31:17 39:25 46:25 48:5,14 49:25 51:20 64:6

**advanced** 30:21,25 33:14 35:5

**Advil** 56:20

**affiliated** 8:6

**affirm** 5:4

**agitation** 19:25

**agree** 34:21 42:24 47:12,13, 23 56:4 60:19

**ahead** 13:13 23:3 26:5 37:2 53:18 54:14 62:5 63:21 64:19 66:12,18

**alcohol** 14:8 18:9 19:1 25:18 28:23 30:3,7, 17,19 32:15 33:13,18 34:5 47:5,10,14 50:10 57:8,10 69:2,6,10

**alert** 41:8 47:23 67:11,12

**Alicia** 5:13

**alive** 41:22

**allowed** 49:19

**altered** 27:21 28:7 35:8,13, 14,24 36:11

**amended** 30:19

**and/or** 20:24 30:21,25 33:14

**answers** 32:6

**apologize** 52:7

**appeared** 49:16 63:2

**appearing** 8:15

**appears** 21:18, 21 24:2 42:15 47:3

**applicable** 20:4 27:25 28:14

**approved** 15:3,5 29:9,25

**approximately** 5:22 10:1 23:4

**arm** 39:6,7

**ARNP** 34:6

**arouse** 21:11, 18 22:8 35:10, 19

**aroused** 20:11 26:2,13 41:11

**arrest** 24:2

**arrested** 40:12 47:16,22

**arrestees** 46:6

**asleep** 21:18, 22 25:25 42:16, 22,25

**assess** 32:15, 20 49:11

**assessed** 30:7,14,20,23 31:17,19,21 33:13 34:3 41:4 46:7 48:6 49:6, 17,20 62:1

**assessing** 46:24 47:24 64:3

**assessment** 32:1 33:17,23 34:1 47:3 56:2 63:3,20 64:25 68:8

**assist** 12:3

**assume** 12:24 50:23 66:20

**attack** 22:8

**attention** 6:14, 19

**attorneys** 10:24

**attributable** 47:10

**auditory** 20:1

**Audubon** 9:22 10:2

**August** 7:23 8:12 12:20,21 13:11 31:6,17 46:1 48:20 49:15 52:25 53:1

**awake** 42:11 43:1

**awaken** 35:10, 19

**awakened** 20:11 26:2 48:16 50:1,2

**aware** 20:13 25:24 27:9,12 35:22 37:7 43:14,23 49:24 52:19 57:25 58:4 67:21

**B**

**back** 7:23 12:20 23:15 31:6,17 32:12 39:1 45:4 46:1 49:15 54:19 59:18

**background** 8:20 35:17



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

bad 11:14 39:1

baseline 32:10

basic 32:4

basically 6:12
22:20 36:16

basics 63:23

basis 20:6
25:23 26:7
57:22 59:23
60:9 68:7

BCSW 68:15

beating 24:23
26:14

believed 34:4
49:18 62:23
69:5

believes 34:17

Belzley 5:10,
15 15:13 16:25
18:23 21:3
33:6,10 41:17
45:14,19 48:20,
23,25 49:2,3
51:22,25 52:2,4
56:17,21,24
58:20,24 59:2,
5,10,13,15,17
68:18 69:16

Benadryl
29:23

Benzo 68:13

Benzodiazepi
ne 28:23

Benzodiazepi
nes 25:14

big 17:6 20:17,
21 27:3 47:6
53:22

binder 12:7,8,
9,14 16:5

binders 11:15

bit 61:25

black 53:22

Board 10:11

book 11:21
20:14,17,21
27:10,24 28:2,
6,8,13,16 29:8,
14 53:22 55:6,
10

booking 62:10

booklets 11:8

books 11:15
12:1 28:18,21

bookstore
11:23

borrow 27:20

bottle 40:14

bottles 39:21
40:1,3

bought 13:5

break 33:7
58:21,24 59:19

breathing
20:11 26:13
41:22

Brentwood
51:13

broken 39:5

brought 15:9

build 6:10

bunch 56:1

busy 34:11

───── C ─────

call 34:19 36:7,
14,15,18 62:7,
12 64:16

called 35:1
38:5

calls 7:1 33:23

capacity 65:15

care 9:10 12:14
30:9,24 32:14
33:22,24,25
53:12,14 54:18
66:21

career 9:7

case 5:16
10:21,23 11:2
34:15 39:25
47:2 50:8 52:24
57:22 61:25
68:22

case-by- 57:21

case-by-case
20:6 25:23 26:7
68:6

cases 44:20

caught 40:16

CCS 7:16,17

cell 41:4,21
67:10,16,17

chances 43:2

change 7:17
16:21 17:6
33:11,16 35:4

changed 13:6
17:2 30:22 31:2
52:17

charge 40:12
47:22 54:10
62:2

charges 46:10,
16,21,23 47:4,5

chart 37:4
50:12,18 65:10

chatting 41:24

cheater 27:7

check 41:21,25

checked 41:1
48:8 58:15

checking
37:19 41:2

checks 24:17
50:3 67:8

Chek 49:13

chugged
40:14,16 41:15

chugging
41:13

Circuit 51:16

CIWA 68:13,16

clarification
18:20

clarify 45:9

Clarksville
8:22

clinical 6:9 8:3

clinically 6:17

close 28:8 53:5
66:20

closely 27:25

CMS 26:19
43:15

Cole 31:4,8
34:3 46:8,19
49:18 55:21
61:23 62:1
69:5,9

Cole's 62:17

common 22:19

communicate
61:23 66:24

communicate
d 34:6 64:24

communicatin
g 54:24 63:19

community
17:15

company
50:20

compare
16:20

compared
16:14

completed
31:19

complies 55:4

concern 39:3,
9,13 69:1

concerns
12:14

CONCLUDED
69:20

condition
37:25 39:1,2,8
42:21

conditions
22:14 27:24
31:12 37:7,10
39:12

conduct 53:13
55:8

confer 40:23

conflict 66:6,9

confused
45:16 62:24

confusing
55:3

confusion
20:2

consciousnes
s 21:11

consequence
58:9

considered
17:15 38:4

constitutes
38:1

consult 29:10

consultation
29:17

consulting
31:12

contact 7:20
60:15,17 61:9,
10

contacted
34:13,15

contained
13:22

controlled
40:12

copies 15:11

copy 12:11
15:9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Corizon** 5:20, 21 6:21 7:12 9:7,18 10:3,24 12:18 13:3,6,8 14:9 26:19 43:15 50:19 51:3 52:22 57:1 62:16 65:15,20 66:3 68:8

**Corizon's** 61:22 66:6,22

**corporation** 13:3

**correct** 8:13 10:4 12:18 15:7 16:8,10 19:20 22:23 29:11,12 30:10 31:10 36:9,14 37:23 39:4,10,11 42:12,13 57:11 58:3 59:9 63:16 65:17,18,21 69:4

**correctional** 5:24 6:7 9:10 11:3,4 12:23 13:4,5 56:6 59:22

**correctly** 62:6

**counter** 29:21

**couple** 59:13

**Court** 5:3,8 51:16

**COW** 68:13,15, 16,17

**Creams** 29:23

**creating** 39:13

**Cross** 7:21 16:5,7,13 25:7 31:16 34:3 50:9 52:11,20 53:8 55:21 61:11,12, 24 62:1 67:16, 22 68:21 69:1

**Cross's** 16:15 34:15 46:19

**D**

**daily** 37:17

**day** 9:13 25:22 37:17 40:23 69:10

**deal** 56:6,9 57:1,2,3 59:22 60:8,11,13,18, 21 61:1,8

**death** 16:15 24:21 26:3,11 43:25 44:1,6,20 56:19

**decide** 32:6

**decipher** 19:6

**decision** 51:16

**decompress** 59:8

**deem** 49:22

**deemed** 49:22

**defines** 65:5

**definite** 44:17

**definitions** 22:5,7

**degree** 8:23 33:19

**department** 6:21

**dependence** 69:2

**dependent** 64:23

**deposition** 10:16 52:6 53:6 69:20

**describe** 8:17

**describes** 55:21

**detailed** 14:19 59:25 62:21

**details** 63:9

**determine** 6:9 35:13 40:18

**detox** 54:16 61:1 67:5 68:24,25

**developments** 50:21

**diagnose** 31:11,15

**diagnosis** 33:19

**diarrhea** 19:25

**died** 26:20,25

**difference** 43:9,12,16

**direct** 5:9 7:20 15:16

**direction** 23:18 63:10

**directly** 58:5

**Director** 7:25 8:8,14 22:24 23:2 52:15 54:11

**discretion** 35:15

**discuss** 17:9

**discussed** 19:12 21:10

**discusses** 21:9 28:21

**discussing** 14:4 28:9,19,24

**DISCUSSION** 16:24

**distinct** 18:18

**distress** 43:20

**doctor** 15:5 29:10,11 33:24 34:19,21 35:1,2 40:24 60:14

**doctor's** 15:3 28:3 29:24

**document**

11:22 32:5,10 41:23 55:4 68:22

**documentatio n** 12:2 67:21

**documents** 10:19 11:7 14:14,23 52:6 64:2,5,9,11,22 65:3,6

**DON** 8:6 45:12, 20

**downstairs** 64:3

**drank** 25:21 47:20

**drifted** 48:16

**drink** 19:5 24:12

**drinking** 41:24

**drug** 14:6 15:17 17:16,22 18:6,12,15,17, 19 20:2,4 24:2 26:20,25 27:10, 11,14,22 28:9, 12,14,15,17,21 29:14 30:7,17, 20 32:16 33:13, 18 34:5,12 37:12,15 43:20, 25 44:6,19,20, 22 47:4,22,24 50:10 55:23 56:4,8,22 58:1, 2,6,10 59:20 60:20 61:3 67:24,25 68:9, 11 69:2,6

**drugs** 18:9 19:1,5 24:13,21 25:2,4,9,17,22, 25 26:11 32:5 37:14 47:10,14, 17 57:8,10

**drunk** 49:7

**duty** 51:17 61:11

**E**

**easy** 29:24

**eating** 41:23 42:9 59:8

**educated** 69:14

**Education** 69:12

**effect** 13:11 16:5,7 66:4

**effects** 25:17

**emergencies** 66:16

**emergency** 20:25 23:9,12 29:4,6 36:7,13, 18 37:25 38:1,5 66:20

**emergent** 21:13,16,19 22:4,6,10,13, 17,22 27:21 28:7 35:12,14, 25 36:2,12 61:5

**emphasis** 8:19

**employee** 12:9,10 65:15

**employees** 50:20

**employer** 12:3

**EMS** 36:5,7

**encompasses** 18:22,24

**end** 64:13

**entitled** 68:23 69:12

**environment** 57:23

**epilepticus** 17:14

**ER** 61:9

**etoh** 68:24



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

evaluation
17:3

event 56:5,9,25
66:6

everything's
15:10

exacerbated
25:18

EXAMINATIO
N 5:9

exhausted
59:3

exhibit 37:3,4,
5 51:24 52:3,5
68:20 69:3

expect 24:14

expecting 41:5

expects 24:8

experience
26:18 53:3
64:10

experienced
26:24

experiencing
17:13

expert 60:23

explain 8:17
14:21,22 16:2

explains 63:9

explanation
61:25

eyes 43:1

---

**F**

---

facility 6:15

fact 29:7,13
47:21 62:23

factors 42:20

fair 28:10 42:18
43:7 49:14
64:21

fall 25:25

familiar 13:10,
14 44:24

family 60:17

felt 52:17

fifteen 41:21

fill 42:8 67:7

find 19:18

fine 44:23 55:1

fired 10:5

fix 6:10 7:5
29:24

flag 47:7

floor 62:2,3,10,
22 63:7 64:3,23
65:4

folks 46:8

form 13:13
17:24 23:1
24:5,24 25:10,
19 26:4 27:18
29:18 30:13
31:14 39:14
41:14 42:8,17,
23 45:8 47:11
48:1,18 50:11
52:21 53:4,17
54:2,14 56:10
60:10,22 62:4,
19,25 63:4,21
65:1 66:11,17
67:7 68:2 69:7,
13,14

form's 17:2

forms 64:19
68:17

found 34:19
54:12

four-ish 23:4

frightening
20:1

full 5:11

---

**G**

---

Galen 8:24

general 15:14

generally 6:13
48:23 68:20

give 5:5 6:23
20:22 29:25
30:1 34:21
46:15 51:8
62:8,12

good 69:18

goodness
56:14

green 15:21
27:8

Greg 5:15

grow 8:21

guard 42:5

guards 42:3
66:24

guess 37:1
44:11

guide 12:3
53:16 57:6,9

guideline 15:2

guidelines
15:4 29:9

guy 41:15

guy's 62:12

guys 54:24
55:2

---

**H**

---

hall 41:25

hallucinations
20:1

hand 5:4

hand-in-hand
57:13,18

handling 27:25

hang 67:4

happen 26:7
29:4 38:12
39:17 46:17

49:11

happened
8:12 52:19 53:8

heads 62:12

health 9:10
11:5 13:6 15:15
30:9,24 32:14,
22 33:16,22,25
35:5 67:6

heard 44:11,
15,16 48:13
51:15

heart 22:8
24:23 26:14
44:21 45:2

heavily 56:2

Hey 41:8 62:12

higher 54:17

highly 24:3

HIPPA 67:2

hired 8:5

historians
60:7

history 20:2
25:8 32:4,9
59:25 60:6,16

hold 10:7,13

holes 16:4

home 6:2 9:14

honest 44:25
60:2

honestly 53:10

honesty 60:5

hospital 17:15
36:3

hours 41:1
42:1 50:5,6
58:16,17,18

housing 49:21

hundred 7:19
22:15 25:12
46:11 51:14

hung 64:20

hypothetical
40:9 41:18

hypothetically
40:20,24 41:20

---

**I**

---

ibuprofen 30:1

IDENTIFICATI
ON 37:5 52:3
69:3

identified
20:24 34:4
68:24

identify 66:15
67:22

immediately
36:5,14,19 38:6
64:8

impact 51:17

important
42:15 63:6,10,
14,16 64:17

in-house 51:4

inability 21:11
35:9

Inc.'s 11:4
12:23

incident 8:11
50:18 52:11
55:7

include 35:9
62:15,17,23

included 12:15

Indiana 6:3
8:22

indicating
46:20

indication
65:19

individual
20:10 26:20,24
40:17 41:3,8
42:15 46:24
47:3,24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**individual's**
44:21

**individuals**
46:10 51:18

**influence**
15:21 16:22

**information**
46:8,9 64:17,24
65:2

**informing**
63:19

**initiate** 36:5

**inmate** 12:14
23:22 24:1
32:4,15 33:18
38:8,10 40:8
48:5,13 64:11,
20 66:24,25
67:10,15 69:12,
15

**inmate's** 32:6

**inmates** 12:19
17:13 30:6,19
33:12,21 45:7
46:5,6 49:25

**instance** 46:20

**instructed**
26:9,10 43:16

**instrument**
68:9

**intake** 31:19,24
32:2 62:1

**intent** 60:6

**interest** 9:9

**interim** 9:19

**interrelate**
14:23

**intoxicated**
24:2,3 47:4
48:5,10,13
49:16 50:1
51:20

**intoxication**
17:14,22 18:3,
5,9 19:1,2,11,
13,18 47:9

**investigated**
10:10

**investigation**
7:6,7 52:11,19
55:9

**involve** 32:1

**involved** 14:1
42:20 52:10

**involvement**
13:15,21 14:5
47:25

**involving**
52:11

**issue** 6:10,17
20:21 42:10

**issues** 6:9,13,
19 14:4 27:23
28:9 30:12

**issuing** 6:24

_____

**J**

**J-G-** 16:3

**J-G-06** 28:22
30:18 31:22
33:12

**jail** 7:8,11,13,24
8:5,9 11:7,16
12:4,20 16:6,8,
13 22:25 23:10
26:24 31:17
32:12 33:21
40:11 45:4,9
46:2,6,7,25
48:6,9,14
49:16,23,25
51:17 59:23
60:19,25 61:12
64:1 65:16,23
66:1,7

**jail's** 23:5,7
65:24 66:2,15

**January** 7:18

**job** 10:5 11:16
55:18

**July** 8:1,9,14
22:25 23:15
32:12 45:5,10

_____

**K**

**Katie** 51:9,13

**keel** 5:18

**Kenneth** 7:20

**Kentucky**
10:14 32:14

**key** 10:19

**kind** 6:13,17
11:21,22 14:22
15:14 27:5
40:25 41:5
57:13

**knowing** 63:16

**knowledge**
35:3 52:10

_____

**L**

**laid** 61:4

**law** 30:8 32:14,
19 50:21,22

**lawyers'** 51:7

**laying** 21:24
43:2,5

**learn** 63:22

**legal** 50:24
51:4,6

**legs** 59:14

**lengthy** 44:7

**level** 54:18

**license** 10:13

**licensed** 31:4,
10

**licenses** 10:7

**lie** 60:6

**life** 17:13,21
18:3,4,10 19:2,
11,13,17 56:22
67:24,25

**life-
threatening**
18:25

**list** 19:22 68:23

**Listen** 54:23

**lists** 19:24
22:13,17

**living** 5:19

**located** 51:11

**long** 5:21 9:25
23:2 25:4,5
49:17

**looked** 10:19
20:17 21:7
50:8,15 53:20

**Lortab** 25:8,12,
15

**loss** 21:11

**lot** 30:3 37:10
40:2 42:19
54:19

**loud** 43:18

**Louis** 51:12

**Louisville** 7:9,
11,13,24 8:4,9
11:7 12:19,20
22:25 40:11
45:4 46:5,7

**LPN** 9:2,4,17

**LPNS** 33:1

**lunch** 58:23
59:7,8

_____

**M**

**made** 8:16
16:12,16 33:11
35:4 54:15
64:16

**make** 15:11
24:4,7 39:9
40:18 41:8,9,
10,22 45:24
48:16 49:13
55:17 56:15
58:8

**makes** 20:9
64:18

**manage** 33:24

**managed** 30:8,
14,20,23

**Manager** 8:4

**manifestation**
21:24

**manner** 7:2

**manual** 11:5,
11,18 12:5,16
13:12,23 14:15,
20 15:16 20:14,
24 21:9 22:12,
13 23:21 24:1
27:7 28:20
36:22 54:9
55:20 58:5

**manuals** 11:8
12:22

**March** 11:4

**mark** 37:3

**marked** 27:7,8,
9,13,19 28:1,7
37:4,5 52:3,5
68:20 69:3

**Matt** 10:18

**matter** 22:18
61:8

**means** 33:20
69:1

**measures**
68:11

**med** 9:24 34:22

**medical** 11:3,4
12:14,23 13:4,5
20:24 23:9,12
31:12 36:7
37:7,10,25 38:1
39:1,2 51:17
54:18 59:25
60:7,15 62:2
64:3,23 65:4
66:16,20,21
67:5,12

**medication**
34:23 60:16

**medications**
29:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

member 60:17

memorized 20:20

mental 27:21 28:7 35:9,13, 14,24 36:12 67:6

mention 18:2 19:10

mentioned 61:3

mentions 18:12

merit 6:14

met 5:14

Mia 51:9

Mia's 51:12

million 38:18, 20

minimum 41:1 42:1 50:6 58:18

minute 5:14 16:19 67:8

minutes 41:22 48:6,8 59:6

mistake 41:9

mixed 25:18

monitor 36:24 37:8,15,17 38:2,19,20,22 39:15,16,22 42:3 51:18 54:16 67:16

monitored 23:22 24:4 38:8,14 39:7 50:9

monitoring 36:23 38:16,17 42:11,14 58:8, 11 66:25 67:8

monitors 67:11

month 8:11

Mosby's 11:22

mound 27:3

moved 22:1

moving 42:11

multitude 37:20 38:22

_____

**N**

naloxone 44:19,23 45:6 46:3

names 51:7

Narcan 44:22, 23,24 45:5 46:2

narrow 38:24

nature 7:7,8 11:10 66:13

nausea 19:24

necessarily 39:2,8

needed 6:22

nervously 59:8

net 17:3

night 41:3

nodding 55:21,22 63:2

non- 35:23 37:8,19

non-responsive 43:3,7,9

non-responsiveness 36:23,25 37:24 38:2,4,9, 12,14,16,18 39:3,13,16,23 41:10 42:4,12, 14,21 51:18

nonresponsive 35:20 36:5,13, 17,20 39:10,18 40:19 41:12

44:2,7 48:17 58:9 61:6

norm 40:4

note 52:7 54:15

notes 52:25 65:11

number 6:16 16:21 17:6 36:17,18 52:2 68:18

nurse 5:20,24 6:7 7:1 9:24 18:8 19:6 22:17 29:16 30:21,25 31:4 32:6 33:14,24 34:17 35:6 40:13,20 41:24 49:6,20, 22 50:3 56:1 57:22 62:8,9,11 63:7,11,13,15, 17,18,25 64:3, 15,17,18,22,24 65:9 69:14

nurse's 35:15

nurses 11:6,8, 16 15:2,3,4 23:17 28:3 29:9,24 31:11, 13,15 32:20 34:22 50:20 55:17 56:5,6 57:1,24 59:22 60:25 65:21

nursing 6:20 7:25 8:8,14,23 9:7,14 10:11,13 11:2,3,11,18, 22,25 12:1,16, 21 13:10,16 14:15,21 15:6 17:3 22:18,25 23:2,7 27:4 28:2,19 29:8,13 30:11,17 32:24, 25 33:2 52:15 54:10 58:17 63:23

_____

**O**

object 13:13 17:24 23:1 24:5,24 25:10, 19 26:4 27:18 29:18 30:13 31:14 39:14 41:14 42:17,23 45:8,23 47:11 48:1,18 50:11 52:21 53:4,17 54:2,14 56:10 60:10,22 62:4, 19,25 63:4,21 65:1 66:11,17 68:2 69:7

objection 23:3

OBS 54:17 67:18

observation 37:16 40:25 41:4,20 62:17 64:19,20 67:4, 10,17

observe 63:24

observing 47:9 63:20

occasioned 33:17

occur 7:17

occurred 55:7

offhand 20:16 51:10

office 6:1,2

officer 36:9 37:16 40:15 41:21 64:8 67:3

officers 46:15 67:4,13

oftentimes 43:19

one's 52:7 68:6

ongoing 63:24

open 43:2

opiates 68:25 69:9

opinion 23:14, 18

opioid 28:23

opioids 25:9

opportunity 65:24

opposed 19:13 23:6 33:15 35:14 47:5,10

order 28:3 34:22 58:22

orders 34:21 35:2

orientation 12:7,8,9,13 57:6,9

outward 21:24

overdose 14:6 15:17 17:16,18, 23 18:7,12,16, 17,19,22 19:4, 7,9 20:4 24:21 25:25 26:11,20, 25 27:1,10,11, 15,23 28:10,12, 15,17,21 29:15 30:4,12 37:12, 22 43:20,25 44:6,20 55:23 56:8,16,19,22 57:12,15,21 58:1,6,10 59:21 60:21 61:3 67:24 68:9,12

_____

**P**

p.m. 52:25 53:1 69:20

paperwork 34:18 62:14 64:18 65:11

paragraph 17:12 31:22 32:23

part 45:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

passed 63:10

passing 63:25

past 20:2

Patel 51:9

patient 35:20
36:4,5,13,17,23
56:3 62:9,11
63:17,25 64:7
67:9 69:15

patients 36:25
38:1,8,10,18,
19,23 39:17

Pennington
5:13,14 20:9
55:8 59:18
69:16

people 26:16
39:16,22 41:8
60:7

percent 7:19
22:15 25:12
46:12 51:14

performed 7:6
64:25

period 9:19
20:10 26:1,12
44:2,7 65:8

periodically
48:15 50:1

permitted 30:8
32:13,19 48:14

person 20:20
25:1,6 47:23
64:6

personal
13:15,21 26:18

personally
26:23

pertinent
28:17

pharmacy
60:15

phases 24:22

phone 64:16

physician

29:17 30:8,15,
21,25 31:12
33:14 34:6,13,
14

PIEKARSKI
13:13 15:11
17:24 18:20,24
23:1,3 24:5,24
25:10,19 26:4
27:18 29:18
30:13 31:14
33:4,8 39:14
41:14 42:17,23
45:8,13,15,22,
25 47:11 48:1,
18,21,24 49:1
50:11,17 51:19,
24 52:1,21
53:4,17 54:2,
14,23,25 55:1
56:10,15,18,23
58:22 59:1,4,7,
12,14 60:10,22
62:4,19,25
63:4,21 65:1
66:11,17 68:2
69:7,19

pills 39:22
40:1,4 41:13,15

place 22:12
40:17

plaintiff 5:15

plan 6:10

point 24:22
26:3 33:5 34:25
41:7 53:25
54:10 65:13

policies 8:18
13:9 14:1,5,9,
25 15:8,16
16:20 21:8
22:11,12 23:6,
7,8 28:19
43:14,23 44:5
48:4 53:15,19
54:1 55:5,19
57:4 60:24
61:22 62:16
63:8 65:24
66:2,3,5,15,23

policy 11:5,9,
11,17 12:4,15,

22 13:11,22
14:14,19 15:15,
25 16:1,3,13,17
17:12,21 18:11
19:8,11 20:8,
14,19,23 23:10,
20,25 24:15
27:6 28:22,25
29:5 30:6,18,22
31:22 33:12
35:4 36:22
44:9,12 49:24
53:25 54:8 55:6
58:4 61:4,5
62:7 65:4,20,22
66:6,7,9

position 5:23
45:12 55:8

positive 8:5
18:1 22:15
25:12 44:16
51:14

possibly 48:2
52:18

potential 37:14
57:25 67:25

potentially
56:22

practical 31:4,
10

practitioner
30:22 31:1
33:15,24 35:6

precautions
40:17

preceded
26:11 44:1

precedence
66:5,10

prepare 10:16
50:12

prepared
52:25 53:1

presupposes
63:18

pretty 9:6
20:16

prevent 44:20

primary 8:19
16:20 28:25
29:2

prior 44:6,21

Prison 13:5

problem 32:16
33:18 34:5
68:23 69:6

problems
18:15 30:7,20
33:13 68:24

procedure
15:16 23:20
24:1,16 27:6
29:1 44:9 49:24
55:6 65:4,20,22

procedures
8:18 11:5,9,11,
17 12:5,16,22
13:9,12,23
14:15,20,25
15:9,17 20:14,
20,23 21:9
22:12,13 28:20
36:22 43:14,24
44:5,12 48:5
53:15,20 54:1,9
55:5,20 57:4
58:5 60:24
61:22 62:16
63:9 65:25
66:2,4,23

proceed 49:13

PROCEEDING
S 5:1

proceeds 26:3

processes 6:8
53:16

produced 13:8

professional
32:15,22 33:16,
22,25 35:5

professionals
30:9,24

program 17:4,
5 57:7

progress 26:1

progressed
41:12

progresses
24:21

progressing
43:25

promoted 8:3

prompt 6:24

promulgation
13:16,18

proper 30:7
32:1 33:17

properly 30:20
46:24

protocol 27:8,
9,20,22,24
28:2,8 29:8
30:12,17 32:3,
7,8,11 34:12,16
35:1,12,23,25
36:12 49:24
58:15 65:20

protocols
11:3,9,11,18
12:5,16,22
13:9,10,16
14:15,21 15:6
23:7 27:4 28:19
29:14 36:22
43:15,24 44:6
48:4 55:20 57:5
58:5 61:23
62:17 63:9
66:4,23

provide 30:19
33:12 58:12
59:24 60:15
66:21

provided 11:2
12:2 26:8,9
30:23 46:8,20
53:12,14 68:22

provider 33:23
61:10

providing
12:19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

pursuant 8:16

put 24:16 32:3, 7,8 40:17,25 41:4 52:2 54:16,17 58:15 64:12

**Q**

qualified 30:9, 24 32:14,22 33:15,22,25 35:5

question 11:12,15 18:21 23:24 27:16 45:23 50:13 54:7,23 55:1,3 60:4 62:5,6

questions 8:19,21 15:14 27:6 39:19 40:21 47:19 60:1,23 69:17, 19

quickly 65:5

**R**

raise 5:3 39:2, 9,13

raises 42:10

reached 6:20 48:17

read 44:5 48:4 55:19

ready 21:4 34:18

reason 10:10 22:1 59:24 61:8 62:21 63:7

reasons 38:13, 15,20

recall 13:25 14:3 26:15 27:1 52:12 65:13 66:1,13

receive 67:14

received 39:6

receiving 64:18 65:10

recognition 33:17

record 5:12 16:24 21:1,2 33:9 59:16,18

records 50:7 60:14 68:21

recurrent 56:9 59:19,21

recurring 56:5, 25 57:24

red 47:6

red-flagged 41:7

refer 11:16,23

reference 20:9

referring 48:19

refers 17:21

reflect 47:4

regard 7:8 11:1 23:11 53:16

Regional 8:3 52:15 54:10

registered 5:20 30:21,25 31:11 33:14 35:5

regular 59:23 60:9

relate 14:16

relay 63:24 64:17

relevant 27:11 28:9 46:24 47:2

reliable 59:25

rely 56:2

remember 20:16 37:6 52:8,12,23

53:10,11 54:19, 20

report 62:9 69:12

REPORTER 5:3,8

representing 5:15

request 8:16

require 37:8 61:23 66:23

required 33:18 49:25 54:18

requires 38:5

resistance 25:21

resolved 66:9

respects 17:9

respiratory 43:20

responsibilities 6:6

responsiveness 35:24 37:9, 19

result 39:3

results 63:20

review 50:12 53:13 55:15,17 65:11,24

reviewed 11:6 65:6,9,13

reviewing 66:1

revised 11:3 16:8

revision 16:6, 11,12,16

revoked 10:8

risk 59:20

RN 8:24

RNS 33:1

role 7:10 45:20

roll 6:8

room 29:5,6

routinely 69:9, 10

**S**

safe 38:25

Saint 51:12

scenarios 40:5

school 63:23

scope 50:13 53:5,18 66:12, 17

security 51:17

seizure 20:2 22:10

seizures 20:2

send 29:4 61:9 62:13

sending 36:2 62:9,21

Senior 5:24 6:7

sense 22:19

separated 18:5

September 16:8

series 27:5 47:19

services 6:21 8:4 11:3,4,5 12:19,23 13:4, 5,6 15:15 36:7

set 22:7 39:16, 22

severe 17:13 18:10 19:2

sheet 46:15,20

sheets 67:4

shift 34:10,25 50:4 61:13,15,

18 64:14

short 58:20

show 16:2 37:2,3 52:5 68:19

showed 46:16

sick 7:1

sign 19:24 55:22,24

significance 63:19

significant 44:1

signs 19:12,15, 16,18,19 20:3 27:23 40:21 56:3 58:1,6,13 60:20

simply 44:7

sir 7:14 10:9 12:12 43:17 51:2

sit 16:11 66:14

site 6:20 45:6, 17 46:2

sites 6:8

situation 21:16,20 22:22 26:24 28:1 30:5 34:7 43:20 59:19,22 65:13 66:7,8

situations 29:16

Sixth 51:15,16

sleep 41:6 48:15 49:1,5,8, 19

sleeping 41:9, 11,23 42:3,9 43:5,6 55:25

slept 49:9

sling 39:7

slipping 23:22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Sloan** 61:24
62:1,11 64:22

**snoring** 43:6,9,
19

**soap** 52:24

**SOL** 17:4 34:12

**solemnly** 5:4

**somebody's**
21:24

**someone's**
24:9 60:6

**Sounds** 69:18

**speak** 58:5

**Specialist**
5:25 6:7

**specific** 14:3
46:1 53:15

**specifically**
12:2 14:2 18:15
24:18 32:18
37:18 50:14
51:1 52:9 54:8
58:7 61:4 63:12

**specifics**
53:11

**specifies** 65:5

**Spencerian**
9:5

**spend** 59:5

**spoke** 10:18

**spoken** 10:23
43:15

**stable** 49:13,
18,21

**staff** 32:24,25
33:2 51:4,6,17,
18 58:17

**staggered**
67:8

**standards**
67:2

**start** 14:13
15:8 32:10
34:20 38:11

64:19

**started** 34:12,
15,18

**state** 5:11
23:23 41:12
48:17 50:1
51:20

**statement**
36:16

**states** 65:8

**status** 17:14
27:21 28:7
35:9,13,14,24
36:12

**Stephanie**
31:3 46:8 62:10

**stick** 68:18

**stopped** 22:24
45:12,21

**stopping** 33:4
44:21

**stops** 24:23
45:2

**stretch** 59:14

**stuff** 27:3 28:3
29:23,24 49:13
51:22

**stumbled**
62:18

**stupid** 40:14

**substance**
17:4 28:22 54:5
57:7

**substances**
40:12

**successor**
13:3

**sufficiently**
56:25 57:24

**suicide** 67:6

**supersede**
61:5

**supervision**
23:18

**supplement**
14:18

**supposed**
46:15

**surg** 9:24

**suspended**
10:8

**swear** 5:4

**sweating** 20:1

**symptom**
43:19 55:22,24

**symptoms**
19:12,19 20:3
27:23 50:10
58:1,6 60:20
61:1

_____

**T**

**tab** 27:8

**tag** 15:21

**tagged** 15:25

**takes** 66:9

**taking** 25:8

**talk** 8:16 19:1
32:25 33:2 49:8

**talking** 6:14
15:6 16:3 17:22
18:18 33:1
38:10 42:9
44:22 53:23
56:16,18,19,21
59:19

**talks** 23:21
36:2

**teach** 26:16

**teaches** 57:7,
10

**team** 50:24

**tells** 24:16 32:4
40:12 56:3

**Tennessee**
51:13

**term** 21:12

32:21

**terms** 12:1
19:16 24:22
28:6 60:5

**testify** 13:8

**testimony** 5:5
21:17 34:2

**there'd** 29:5
38:13

**thing** 22:17
24:17 28:20
45:9

**things** 14:20,
24 17:17,20
37:20 38:19,22
39:17 40:2
54:13 55:25
56:1 57:16,17
58:13 59:13
63:14,17,22

**thinking** 54:20
59:11

**thought** 57:14
63:6

**threatening**
17:13,22 18:3,
5,10 19:3,11,
13,17 56:22
67:24,25

**time** 8:6 9:17,
18 16:7 26:22
38:3 43:10
44:2,3,8 48:18,
21,24 52:8,13
61:16 64:12
65:8 66:4

**timely** 7:1 65:7

**times** 37:17
62:24 63:2

**to-date** 50:21

**today** 8:16,20
10:17 14:4
16:12 66:14

**told** 16:7 41:13
43:22 44:4 48:3
55:20 69:9

**tool** 17:3 68:11

**top** 68:23

**totally** 25:5,23

**trained** 43:11
48:3 57:1,2,3
60:20,25

**training** 8:18
13:9 26:9,16
35:17 44:14,17
57:5 67:14

**transfer** 17:15

**transferred**
64:2

**transferring**
62:11

**transfers**
63:18

**transport** 64:9

**transporting**
64:8

**treat** 31:11

**treating** 19:17

**treatment**
12:14 19:13
39:6

**tremors** 19:25

**tremulous**
19:25

**trigger** 38:16

**trouble** 7:1

**Troubleshoote
r** 6:11

**troubleshooti
ng** 7:8

**truth** 5:5,6
47:19

**turn** 22:4 27:4
69:11

**Tylenol** 29:23,
25

**type** 18:9 22:13
24:17 28:1 30:5
43:20

**types** 6:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

27:24 29:15

**typically** 64:2, 13

---

**U**

---

**Uh-huh** 15:1 17:11 18:14 38:7 65:14

**unable** 22:8 59:24 60:18

**unclear** 54:8

**unconscious** 21:6,21 23:23 24:4,8,10,15,19 26:17 35:19 61:6

**unconsciousn ess** 14:11 20:10,15,23 21:5,10,23 23:9,11 26:1,12 35:9 37:24

**understand** 20:18,19 21:17 23:24 31:21,25 34:2 36:25 56:14 62:6 68:25

**understanding** 24:20 31:3 32:13,18,21 35:8 36:6 42:2 44:19 51:3 61:21,25 62:16 66:22

**understood** 18:6

**unit** 9:24

**unusual** 53:3

**up-** 50:20

**upstairs** 49:19

**urgent** 17:15 21:12,16 22:4, 5,10,13,22 27:21 28:7 35:12,14,25 36:1,12 61:5

---

**V**

---

**vague** 67:5

**version** 17:7,8

**versus** 42:4 60:19

**violation** 65:19

**visual** 20:1

**vital** 19:15,16, 18,19,24 40:21 56:3

**vitals** 32:9 40:3,25 41:2,25 49:12

**vomiting** 19:25

---

**W**

---

**wake** 21:19 22:2,21

**walked** 62:18

**wandering** 53:5

**watch** 24:6 26:21

**watcher** 67:10, 18,22

**ways** 60:17

**West** 51:9,13

**whey** 14:22

**Who'd** 9:21

**wise** 50:18

**withdraw** 69:2

**withdrawal** 14:6,8 15:18 17:3,5,14,16,18 18:3,4,6,18 19:14,17 20:5 24:17 27:22 28:9,12,15,17, 21 29:14 30:4, 12 32:3,7,8,11 34:12,16 35:1 37:15,20,21

50:10 54:5 56:5,13 57:7, 10,14 58:2,15 59:21 61:1 68:1,10,12

**wondering** 18:4

**word** 18:21 19:7,9 21:6,10 31:21

**wording** 44:11

**words** 20:12 26:12

**work** 5:20 6:15 9:14,18,21 12:3 14:23 26:19 53:16 57:23

**worked** 5:21 9:7,22 23:17 31:8

**working** 7:24 9:9 10:2 11:6 26:25 61:16 62:8 65:23

**write** 13:20

**writing** 13:18, 22

**written** 14:9 43:23 53:15

---

**X**

---

**Xanax** 25:8,14, 16 40:14,22

---

**Y**

---

**year** 10:1

**years** 23:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com