<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>

File Name:  19a0192n.06

Case No. 18-5224

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DANIELLA BLAINE, | ) | |
| | ) | |
| Plaintiff – Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| LOUISVILLE METROPOLITAN | ) | KENTUCKY |
| GOVERNMENT, et al., | ) | |
| | ) | |
| Defendants – Appellees. | ) | |

**BEFORE:  CLAY, McKEAGUE, and BUSH, Circuit Judges.**

**JOHN K. BUSH, Circuit Judge.**  On August 25, 2012, David Cross died of a drug overdose while in custody at a Louisville Metro Department of Corrections ("LMDC") facility. As administratrix of Cross's estate, appellant Daniella Blaine alleges that the death resulted from negligence and deliberate indifference of appellees Corizon, Inc., LMDC's contracted medical provider ("Corizon"); Corizon employee and licensed practical nurse ("LPN") Stephanie Kohl; and Corizon employee and Registered Nurse ("RN") T.J. Sloan (Appellees are referred to collectively as the "Corizon Defendants").  Blaine asserts a claim under 42 U.S.C. § 1983, based on alleged violations of the Eighth Amendment, incorporated against the states pursuant to the Fourteenth Amendment, as well as state law claims of negligence, gross negligence, and wrongful death.

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

The record demonstrates that, at the most, Kohl failed to recognize that Cross had overdosed and Sloan failed to conduct her own investigation. It is tragic that Cross died under these circumstances. However, under our circuit's established case law, misdiagnosis or negligence does not amount to deliberate indifference to serious medical needs, which is required to establish an Eighth Amendment violation. Accordingly, we **AFFIRM** the district court's decision granting summary judgment for the Corizon Defendants on the federal claims and dismissing the state law claims without prejudice.

## I. BACKGROUND

During the afternoon of August 25, 2012, Louisville Metro Police Department Officer Chad Tinnell stopped a vehicle for failing to use a turn signal. A passenger in the vehicle, David Cross, had an outstanding warrant for his arrest. At 4:00 PM, Officer Tinnell took Cross into custody. During the arrest and later, while transporting Cross to the LMDC jail, Officer Tinnell did not notice any signs that Cross was heavily intoxicated or under the influence of other substances.

Upon his arrival at the jail, Cross underwent a medical assessment by LPN Kohl. Kohl filled out several medical records. The relevant ones are recited, in detail, below as they pertain to whether Kohl was deliberately indifferent toward Cross's medical care.

A.    Kohl's 5:18 PM Note

Kohl's Note, in which she handwrote the time as 5:18 PM, stated the following:

[Cross] presents at medical stumbling to station. States he drank half a beer today only, but takes [X]an[a]x and Loritab [sic] for pain. [Cross] had slurred speech[,] strong odor o[f] [alcohol], and [Cross] appeared to fall asleep several times during his interview. [Cross] slurred words, stumbled over his sentences, would ramble. [Cross] stated he suffered from a head injury [from] a [motor vehicle accident] several years ago. [Cross] stated his highest level of education is the 7th grade. [Cross] was placed on detox, bottom bunk entered into computer, [mental health] referral complete . . . [Cross] states he takes [hypertension] medication Lisinopril

2

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

> 20 mg QD and is being treated for [b]ipolar [disorder], anxiety[,] and depression. [Due to Cross's] level of functioning, he was referred to [observation room] #2 for further observation.

5:18 PM Note, R. 98-2, Page ID # 608.  Blaine contends that Kohl assessed Cross for no more than eighteen minutes, which is the difference between the time stamp on the Note and 5:00 PM, when Cross arrived at the jail.

B.      Withdrawal Initial Screening & Treatment Plan

Kohl also filled out a Withdrawal Initial Screening & Treatment Plan.  In the first section of the form, labeled "Subjective," Kohl noted that Cross had consumed his last alcoholic drink, half a beer, three hours prior to his admission at the facility.  Withdrawal Initial Screening & Treatment Plan, R. 103-2, Page ID # 660.  She also noted that he had taken two types of opioids, Xanax and Lortab, and she marked "uk" (unknown) under "last opiate use." *Id.*  This section of the form also included a checklist in which Kohl marked "no" for both "Past History of Withdrawal" and "Present Withdrawal Complaints." *Id.*  Under "History of Psychiatric Problems," she checked "yes," and she noted that Cross had a history of bipolar disorder, depression, and anxiety. *Id.*  Under "Past Medical History," she wrote that he had "HTN [hypertension]." *Id.*

For the second section of the form, labeled "Objective," Kohl added information regarding Cross's vitals, including his temperature, pulse, and blood pressure. *Id.*  A sub-section headed "Level of Consciousness" contained a checklist with a range of "Alert & Responsive" (the highest level of consciousness) to "Non-Responsive" (no consciousness). *Id.*  Kohl checked "Alert & Responsive." *Id.*  In the "Orientation" sub-section, she marked "Person," "Place," and "Time." *Id.*  She also noted Cross's fingerstick blood sugar.

3

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

In the third section of the form, labeled "Assessment," under "Presumed Substance Abused," Kohl assigned Cross a score of "<10 = mild" on the CIWA-Ar scale.[1]  *Id.*  Under the type of risk that an inmate's condition exhibits, the form included a checklist with a range of "Risk for Withdrawal" (the lowest risk) to "Severe Withdrawal" (the highest risk).  *Id.*  In the case of severe withdrawal, the instruction accompanying the checklist stated, "Immediate provider notification required."  *Id.*  For less severe withdrawal, other instructions were included; for example, for mild withdrawal, the instruction stated, "Notify provider within 2 hours—Monitor at least every 8 hours."  *Id.*  Kohl marked "Risk of Withdrawal," which was accompanied by the instruction to "[m]onitor at least every 8 hours."  *Id.*  The "Risk of Withdrawal" instruction did not include any directions to notify a provider.  *See id.*

In the last section, labeled "Plan," Kohl checked "Orders received from provider—Note on order sheet."  *Id.*  Within this section, Kohl checked a box indicating that Cross should be observed every eight hours for five days and continue to be reoriented.  She also marked "Bottom Bunk assignment.  Continue to monitor for falls," "Notify security to observe patient for withdrawal symptoms," "Every visit—encourage fluids.  Ask patient if he is urinating," and "Provide for comfort."  *Id.*  For Cross's mental health information, Kohl marked "Refer to MH if indicated based on Mental Health Intake Screening," and she marked this as "Non-emergent."  *Id.*  She also checked "Continue to monitor for suicide risk, depression[,] and psychiatric co-morbidities."  *Id.*  Finally, she checked "Initiate Substance Abuse Withdrawal Flowsheet."  *Id.*

The bottom of the form stated in all caps and in bold to "[n]otify physician immediately if severity score increases any time during withdrawal."  *Id.*

---

[1] The Clinical Institute Withdrawal Assessment for Alcohol ("CIWA-Ar") is a ten-item scale used in the assessment and management of alcohol withdrawal.  University of Maryland School of Medicine, CIWA-Ar, *available at* https://umem.org/files/uploads/1104212257_CIWA-Ar.pdf.

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

C.      Substance Abuse Withdrawal Flowsheet

As a part of her intake, Kohl additionally completed a Substance Abuse Withdrawal Flowsheet.  At the top of the Flowsheet, she handwrote the time as 5:06 PM.  The next part of the Flowsheet stated, "Observation for (mark all that apply)" with the options of "ETOH," "Benzodiazepine," "Opioid," and "Mixed/Unknown."  Substance Abuse Withdrawal Flowsheet, R. 98-3, Page ID # 609.  Kohl did not mark any of these options.  The next part of the Flowsheet stated, "Tool used," with the options of "CIWA-Ar," "BWS-C," "COWS," and "CIWA-Ar."  *Id.* Kohl checked the first "CIWA-Ar."  *Id.*  In the next part of the Flowsheet, Kohl documented Cross's temperature, pulse, respiration, blood pressure, and orientation, among other things. Cross's vital signs fell within the normal ranges included on the Flowsheet, and Kohl wrote "mild," selecting from the range of "severe" to "mild," for his symptoms.  *Id.*  Under "Provider Notified" and "New Orders Rec'd," Kohl marked "Y."  *Id.*  Under "Observe . . . Hours," Kohl wrote "8." *Id.*  Ultimately, Kohl assigned Cross a base severity score of "0."  *Id.*

D.      Other Intake Information

Several of Cross's other medical records, created by Kohl at the time of his intake, are specifically quoted or referred to in the deposition transcripts that the parties cite in support of their appellate briefing.  The records include:

1.      CIWA-Ar

This assessment was in the form of a scoresheet broken up into 10 different categories, each scored on a scale beginning "0," as the least severe. For instance, the first box concerned "[n]ausea and vomiting," with the following questions: "Do you feel sick to the stomach? Have you vomited?"  Kohl Dep., R. 109-3, Page ID # 823–25; 863–66 (citing LMDC Medical Record, R. 54-7, Page ID # 344).  Depending upon the answer, the box included suggested scores.  At the

5

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

bottom of the box was a line in which the assessor marked the score.  Here, Cross scored a "0." *Id.*

The next box concerned "[t]actile disturbances," with the following questions: "Have you any

itching, pins and needles sensations, burning, numbness, or do you feel bugs crawling on or under

your skin?" *Id.*  Again, Kohl scored Cross a "0."  *Id.*  Other boxes concerned "[t]remor[s],"

"[a]uditory hallucinations," "[p]aroxysmal sweats," "[v]isual disturbances," "[a]nxiety,"

"[h]eadache, fullness in head," "[a]gitation," and "[o]rientation and clouding of sensorium." *Id.*

Kohl went through each section of the assessment with its various questions and scored Cross a

zero for each section; thus, ultimately, Kohl determined that Cross's total CIWA-Ar score was

zero.  The form stated, "< 10 points = Mild/at risk (Recheck as ordered)." *Id.*  The other parts of

the form stated, "10-15 points = Moderate (Notify provider)[.]  Medication may be indicated" and

"> 15 points = Severe (Notify provider immediately)[.]  Medication may be [i]ndicated." *Id.*  Kohl

signed the form at 5:06 PM.

## 2.  Corizon Problem List

This document listed alcohol detox, detox of opiates, hypertension, bipolar disorder,

anxiety, and depression as the problems identified by Kohl during her intake.  There is also a

handwritten entry adding "2009[2] brain injury" to the problem list.  *Id.* at Page ID # 325.  Kohl

signed the form.

## 3.  Louisville Metro Dept. of Corrections Psychiatric Questions

The form summarized Cross's mental history, including his recent hospitalization for

mental health reasons.  One of the questions asked, "Are you currently being treated by an

Out[p]atient Community Mental Health Center?" and next to it, there was a "Y." *Id.* at Page ID #

338.  Under the explanation, the entry stated that Cross "was not [forthcoming] with [i]nformation

---

[2] It is unclear if the record stated "2009" or "2007"

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

[and] appeared [under] the [i]nfluence." *Id.* Another question asked, "Have you recently taken or been prescribed medications for emotional problems?" and next to it, there was a "Y." *Id.* For the explanation, the form stated that Cross "appears to be under the influence of a[n] unknown substance." *Id.* Next to the question "Does subject talk or act in a strange manner?" there was a "Y." *Id.* at Page ID # 339. For the explanation, the entry stated, "slurred speech nodding off during interview." *Id.* Next to the question "Is subject apparently under the influence of alcohol or drugs?" there was a "Y" and "states he only had 1/2 beer." *Id.* Next to the question "Does subject show signs of mental illness or withdrawal?" there was a "Y." *Id.* The explanation stated "[p]ossible [h]ead [i]njury, developmentally delayed, substance use." *Id.*

   4.   Louisville Metro Dept. of Corrections Medical Detox

   This record asked several questions regarding drug use. Next to the question "Have you taken potentially dangerous levels of drugs or alcohol?" there was a "N." *Id.* at Page ID # 333. Next to "Do you drink alcohol?" there was a "Y," and the entry stated that Cross consumed one beer "today." *Id.* Next to the question "Do you use street drugs?" there was a "Y," and the entry indicated that Cross used Xanax and Lortab. *Id.* Under "How Often," the entry stated, "U[n]known appears to be under the influence" and "unknown" for the last time drugs were used. *Id.* Next to the question "Have you ever experienced . . . serious withdrawal from drugs or alcohol?" there was a "N" marked. *Id.* The form stated it was printed by Kohl.

   Kohl placed Cross "on detox" in the second floor, mental health observation section of the jail, based on her assessment, and given Cross's level of functioning, including his slurred speech, difficulty remaining awake, and need for reorientation. Kohl 5:18 PM Note, R. 98-2, Page ID #608. Kohl gave instructions that Cross be assigned to a bottom bunk and observed every eight hours. She also telephoned her supervisor, RN Sloan, who was working on the second floor, to

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

inform Sloan of Cross's transfer to that floor.  As is typically the case for all inmates at the facility, the medical intake notes did not accompany Cross's transfer.  Instead, the records were to be brought up to the second floor at the end of the LPN's shift.

After Cross arrived on the second floor, LMDC corrections officer Kevin Lamkin secured Cross in Observation Cell 2.  Soon thereafter, Sloan observed Cross talking with the other inmates, using hand gestures, and smiling.  Sloan also saw Cross eating the meal provided by the jail.  After meal time ended, Lamkin again observed Cross because several inmates complained that Cross was snoring loudly.  Lamkin opened the door to the cell and "checked in on [Cross] and he was just sleeping and snoring . . . ."  Lamkin Dep., R. 109-4, Page ID # 929.  Sloan also heard Cross snoring loudly.  Neither Sloan nor Lamkin woke up Cross.

At 8:50 PM, an inmate work aide notified Lamkin that there was something wrong with Cross.  Lamkin went to Cross's cell and noticed first that Cross's chest was not rising.  Lamkin shook Cross, and when Cross did not wake up, Lamkin rolled Cross over, onto his back, and saw that Cross had blue lips.  Lamkin "called for help and told medical on the radio to bring all life-saving equipment."  *Id.* at Page ID # 936.  Sloan, along with another nurse, responded to the distress call and attempted to revive Cross; however, their attempts were unsuccessful, as were the efforts of the Emergency Medical Technicians who transported Cross to the hospital.  Cross died of a drug overdose at 9:33 PM.

Meanwhile, before Cross was transported to the hospital, Kohl called Sloan to ask permission to take a break.  Sloan notified Kohl that Cross was receiving CPR and asked Kohl to read her information from Cross's chart relevant to his medical history.  Kohl did so, and then began "making sure that [Cross's medical] chart was together . . . ."  Kohl Dep., R. 109-3, Page ID # 858.  At that point, Kohl prepared a separate, second note describing her assessment of Cross.

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

Kohl handwrote the time as 9:49 PM on this second note.  In her deposition, Kohl explained that it was impossible for her to edit or add to her first note (the 5:18 PM Note) because notes were printed immediately after they are completed and were not stored digitally.

Unlike the 5:18 PM Note, the 9:49 PM Note did not state that Cross stumbled to the medical station, had a strong odor of alcohol, or fell asleep several times during the interview.  In addition to other minor changes, the 9:49 PM Note also had an observation not included in the 5:18 PM Note: "Multiple times during this interview I questioned [Cross] if he had consumed any substance where [Cross] denied on multiple occasions only drinking one beer.  [Cross] stated he was fine, he had been up all day and had not slept and wanted to lie down."  Kohl 9:49 PM Note, R. 103-5, Page ID # 674.

According to Kohl at her deposition, she drafted the 9:49 PM Note "to make sure that as a nurse [she] had everything [she] needed" for Cross's transfer to the hospital.  Kohl Dep., R. 109-3, Page ID # 803.  She argues on appeal that she wrote the 9:49 PM Note to be sure that all the information relayed to her was memorialized in Cross's chart.  For instance, according to other parts of Cross's medical record, Kohl asked Cross if he had "taken potentially dangerous levels of drugs or alcohol," and the response in the record stated "N," indicating that Cross answered in the negative.  LMDC Medical Record, R. 54-7, Page ID # 333.  And, at her deposition, Kohl maintained that she did not include her observations that Cross stumbled to the station, had an odor of alcohol, or feel asleep repeatedly during the intake "because [she] had already made mention to it in [her] 5:18 [PM] [N]ote."  Kohl Dep., R. 109-3, Page ID # 803.

Blaine argues that Kohl's 9:49 PM Note "can be interpreted as a fabricated justification for not doing more" to assess Cross because the 9:49 PM Note offered an explanation about why Cross was nodding off and mentioned that he denied taking drugs.  Appellant's Br. 19.  The district court

9

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

took a more benign view, holding that the 9:49 PM Note appeared to be "a rather clumsy, transparent, manufactured attempt at 'CYA.'"  Summ. J. Mem., R. 112, Page ID # 1272 (quoting Pl.'s Br., R. 103, Page ID # 648).  Regardless, the district court concluded that the 9:49 PM Note was not relevant to the deliberate-indifference analysis because the relevant inquiry was whether the Corizon Defendants were deliberately indifferent ***before*** Cross died, which occurred before the 9:49 PM Note.

## II.  PROCEDURAL POSTURE

Blaine filed this action against Kohl, Sloan, Corizon, and other defendants, alleging claims under § 1983, as well as state law causes of action for negligence, gross negligence, and wrongful death.  At the time of the relevant summary judgment proceedings before the district court, the only remaining claims were those under § 1983 and state law against the Corizon Defendants, and the state law claims against LMDC Director Mark Bolton.  The Corizon Defendants sought partial summary judgment as to the § 1983 claims, and Bolton moved for summary judgment on the state law claims.  The district court granted the Corizon Defendants' motion, declined to exercise supplemental jurisdiction over the state law claims, dismissed the state law claims without prejudice, and denied Bolton's summary judgment motion as moot.  Blaine timely appealed to this court.  At issue before us is the district court's decision granting the Corizon Defendants' motion for summary judgment.

## III.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment, *Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016), construing the evidence in the light most favorable to the nonmovant. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).  Summary

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## IV.  ANALYSIS

"Section 1983 provides a federal cause of action against government officials who, while acting under color of state law, 'deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States.'"  *Rhinehart v. Scutt*, 894 F.3d 721, 735 (6th Cir. 2018) (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).  "The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983."  *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018).

Blaine maintains that Cross's death was the result of cruel and unusual punishment by Corizon, Kohl, and Sloan.  The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments" against those convicted of crimes.  U.S. Const. amend. VIII.  In *Robinson v. California*, 370 U.S. 660, 667 (1962), the Supreme Court held that the Eighth Amendment prohibition against cruel and unusual punishments applies to the states through the Fourteenth Amendment.  Consequently, prisoners may sue state prison authorities for Eighth Amendment violations.  Cross, "as a pretrial detainee, is 'analogously protected under the Due Process Clause of the Fourteenth Amendment.'"  *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)).

This prohibition against the infliction of cruel and unusual punishment applies in today's prison context and in particular, to the medical needs of an inmate.  In *Rhinehart*, we stated:

> In *Estelle* [*v. Gamble*, 429 U.S. 97, 102 (1976)], the Supreme Court "first acknowledged that" the Eighth Amendment "could be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment."  But because "only the unnecessary *and wanton* infliction of pain

11

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

> implicates the Eighth Amendment," "a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs." "It is *only* such indifference that can violate the Eighth Amendment." Thus, "allegations of 'inadvertent failure to provide adequate medical care,'" "or of a 'negligent ... diagnos[is],'" "simply fail to establish the requisite culpable state of mind."

> Why is a "requisite culpable state of mind" necessary to establish in an Eighth Amendment medical-needs case? It all goes back to the text of the Eighth Amendment. Because the provision of medical care for a prisoner is not explicitly part of the sentence imposed, that care's inadequacy constitutes a "cruel and unusual punishment[ ]" only if the government actor, at a minimum, knew the care provided or withheld presented a serious risk to the inmate and consciously disregarded that risk. As a result, "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." Instead, the government actor must act with "deliberate indifference to serious medical needs of prisoners," in order for the alleged inadequacy of care to be considered "cruel and unusual punishment[ ]."

894 F.3d at 736–37 (alterations in original) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) and *Estelle*, 429 U.S. at 105).

Thus, though the government has an obligation to provide medical care for those in its prison facilities, *Estelle*, 429 U.S. at 103, "because the Eighth Amendment prohibits cruel or unusual *punishment*, an official must have actually perceived a significant risk to an inmate's health to have violated his constitutional right." *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (emphasis in original). "[A] constitutional violation arises only when the [official] exhibits '*deliberate indifference* to a prisoner's serious illness or injury' that can be characterized as 'obduracy and wantonness' rather than 'inadvertence or error in good faith.'" *Rhinehart*, 894 F.3d at 737 (emphasis in original) (quoting *Estelle*, 429 U.S. at 105 and *Wilson*, 501 U.S. at 299). Consequently, "mere failure to provide adequate medical care to a prisoner will not violate the Eighth Amendment." *Id.* "'An official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

condemned as the infliction of punishment.'" *Rouster*, 749 F.3d at 446. (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). A showing of infliction of cruel and unusual punishment "requires proof that the inmate had a sufficiently serious medical need and that a municipal actor knew of and disregarded an excessive risk to the inmate's health or safety." *North v. Cuyahoga Cty.*, No. 17-3964, 2018 WL 5794472, at *2 (6th Cir. Nov. 5, 2018) (citing *Winkler*, 893 F.3d at 890–91).

In accordance with the Supreme Court's holdings, an inmate must show two components, one objective and the other subjective. *Farmer*, 511 U.S. at 834. An inmate satisfies the objective component by alleging that he had a medical need that was "sufficiently serious." *Rouster*, 749 F.3d at 446 (quoting *Farmer*, 511 U.S. at 834). An inmate satisfies the subjective component by showing that prison officials acted with a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834, "equivalent to criminal recklessness" so that "a jury could conclude that each defendant so recklessly ignored the risk that [s]he was deliberately indifferent to it," *Rhinehart*, 849 F.3d at 738 (citation and internal quotation marks omitted); *see also North*, 2018 WL 5794472, at *3 ("Acting . . . with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." (citation and internal quotation marks omitted)). This showing requires the inmate to allege facts which, if true, would show that the official being sued (1) subjectively perceived facts from which to infer substantial risk to the prisoner, (2) did in fact draw the inference, and (3) then disregarded that risk. *Rouster*, 749 F.3d at 446; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.").

The district court began its analysis with the subjective component and held that that Blaine could not meet this component. The court did not then turn to an analysis of the objective

13

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

component, as it was unnecessary: an inmate alleging cruel and unusual punishment must demonstrate both components to prevail.  On appeal, the parties again focus on the subjective component of the test.  We also begin by analyzing whether Blaine has provided sufficient evidence to demonstrate the subjective component of the deliberate-indifference inquiry.  Because we hold that, for both Kohl and Sloan, Blaine cannot meet the subjective component, we decline to analyze the objective component as it is moot.[3]

A.      Deliberate Indifference Against Kohl

It may be that "there was a danger of which [Kohl] should objectively have been aware," and there arguably may have been "facts from which the inference could be drawn that a substantial risk of serious harm [to Cross] exist[ed]."  *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001).  But there is insufficient evidence from which a reasonable jury could find that Kohl in fact did "also draw the inference" that serious harm to Cross existed.  *Id.*  Because there is a lack of proof that Kohl drew the requisite inference, she could not have disregarded the substantial risk of harm to Cross.  Accordingly, Kohl was entitled to summary judgment that she did not act with deliberate indifference when assessing Cross.  Our holding in this regard is based on several factors.

First, Blaine lacks enough evidence to demonstrate that Kohl even "subjectively perceived facts from which to infer substantial risk to" Cross.  *Rouster*, 749 F.3d at 446.  Kohl determined

---

[3] We note that on appeal, neither party has briefed the objective component.  While it may appear at first glance that this should be determinative of the outcome, as Blaine has not alleged one of the two necessary components to demonstrate cruel and unusual punishment upon appeal, our court has previously held that medical conditions resulting in death are sufficiently serious.  *See, e.g.*, *Winkler*, 893 F.3d at 890–91 ("There is no question that [the inmate's] perforated duodenal ulcer, which ultimately caused his death, met this objective component.") (citation omitted); *Rouster*, 749 F.3d at 446 (holding that "it is clear" the inmate suffered from a serious medical condition because the inmate died as a result of the medical condition).  We need not determine at this juncture whether death resulting from a medical condition automatically meets the objective component, as Blaine cannot meet the subjective component.

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

that the facts available to her regarding Cross's symptoms—the smell of alcohol on his person, his slurred speech, his admission that he drank that day, and his otherwise normal vital signs—indicated that he was under the influence of alcohol, not that he was under the influence of drugs and at a risk of drug overdose. Kohl thus took steps to admit Cross to the jail based upon the non-severe alcohol intoxication condition she believed Cross had. Kohl "provided medication to address the condition that [Kohl] believed [Cross] was suffering from." *Winkler*, 893 F.3d at 893.

Though Blaine argues that a physician or other qualifying healthcare professional should have been called, Kohl's assessment revealed that Cross's condition did not appear sufficiently severe to warrant immediately calling a physician and administering treatment. For instance, his vital signs were normal and his score on the CIWA-Ar was below 10. These unrebutted facts show that Kohl did not subjectively perceive facts from which to infer a risk of drug overdose. "It is not enough that there was a danger of which an offic[ial] should objectively have been aware. 'The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Watkins*, 273 F.3d at 686 (quoting *Farmer*, 511 U.S. at 837)).

Second, even if Kohl suspected that there was a risk of drug *use* (as Blaine argues Kohl did, based on to Kohl's notes indicating that Cross may have been under the influence of an unknown substance and Kohl's deposition testimony stating that when she assessed Cross, she suspected he may have been under the influence of drugs), Blaine has not shown that Kohl inferred (or even suspected) that Cross had *overdosed* on drugs. In other words, there is no evidence that Kohl inferred that Cross's suspected drug *use* created a substantial risk of drug *overdose*. *See Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003) ("Plaintiff's contention that the [o]fficers 'believed' or 'should have known' that Weaver had swallowed drugs does not give rise to a

15

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

deliberate indifference claim."). Certainly, Kohl identified some risk of harm because she assigned Cross to an observation cell and sought certain monitoring conditions. However, her 5:18 PM Note and the assessments she administered demonstrate that the risk of harm Kohl identified—alcohol intoxication (and perhaps potential drug *use*)—was not substantial or otherwise determinative of drug overdose.

Kohl's situation was similar to that in *Rouster*, where we held that a nurse was not deliberately indifferent when she suspected an inmate was suffering from alcohol withdrawal, administered a CIWA-Ar, and began to treat the inmate accordingly, even though the inmate was suffering from another medical condition. 749 F.3d at 451. Similarly, in *Winkler*, we found that a nurse was not deliberately indifferent when she suspected an inmate was suffering from opiate withdrawal and ordered treatment when in fact, the inmate suffered from a perforated duodenal ulcer. *Winkler*, 893 F.3d at 891. In both *Winkler* and *Rouster*, as here, there was insufficient evidence that the medical professional subjectively perceived and drew the inference of substantial risk.

Why is it necessary that a medical professional subjectively perceive facts from which to infer a substantial risk of harm, and then also draw that inference? Because a medical professional who assesses a patient's condition and takes steps to provide medical care, based upon the condition the professional has perceived, is not acting with indifference. Even if the professional's assessment is ultimately incorrect, the professional acted to provide medical care.[4] A patient alleging deliberate indifference must show more than negligence or gross negligence, or the

---

[4] To the extent that Blaine argues that Kohl was improperly trained to detect an overdose, Blaine has failed to present evidence regarding Kohl's training, or alleged lack thereof. Thus, we have no basis upon which to review whether Kohl's training resulted in an improper assessment. We discuss this point in detail later, in regard to Blaine's claim against Corizon for its allegedly improper policies and practices.

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

misdiagnosis of an ailment.  *See Rouster*, 749 F.3d at 446–47 (finding no deliberate indifference where jail nursing staff interpreted inmate's stomach cramps, diarrhea, and bizarre behavior as alcohol withdrawal when inmate's symptoms were actually caused by sepsis from a perforated duodenal ulcer); *see also Jones*, 625 F.3d at 947 (explaining that deliberate indifference "is a very high standard of culpability, exceeding gross negligence.").

Thus, even if Kohl acted with negligence or gross negligence, Kohl cannot be found to have acted with deliberate indifference: Kohl assessed Cross's condition—as evidenced from the medical record detailing Cross's vitals, Cross's mental health history, and the results of the CIWA-Ar, among other intake records—and took steps to admit Cross to detox observation based upon the condition she believed Cross had.

Third, Kohl's assessment, while perhaps negligent or grossly negligent, is not transformed into "deliberate indifference" by the fact that Kohl falsely wrote on the Withdrawal Initial Screening and Treatment Plan that a provider had been notified and orders from the provider had been received when in fact, Kohl had not notified a provider.  Kohl contends that she made the annotation concerning provider notification in anticipation of notifying the provider later in the evening because, though "the provider always has to be notified on any detox," depending on the circumstances, Kohl could have contacted a physician or advanced practice registered nurse any time during her shift.  Kohl Dep., R. 109-3, Page ID # 825, 788.  Because Kohl determined, though an assessment, that Cross was not suffering from a condition of such severity as to require immediate provider notification, but rather should be placed in observation, Kohl did not act with deliberate indifference.

Blaine argues that in order to prevail on a claim of § 1983 liability, she does not necessarily have to show that Cross's signs and symptoms obviously demonstrated a substantial risk of harm.

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

Blaine is correct. Medical providers may "not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Farmer,* 511 U.S. at 843 n.8. As we held in *Rouster,* "if [Cross's] symptoms had been clearly inconsistent with alcohol withdrawal, [Kohl] might have been deliberately indifferent by failing to confirm that his symptoms were not indicative of a different and more serious condition." 749 F.3d at 451. "However, the majority of [Cross's] symptoms were entirely consistent with those experienced by patients suffering from alcohol withdrawal." *Id.* at 451–52. In other words, "[n]one of these facts supports a conclusion that [Kohl] had reason to believe that [Cross] was suffering from anything else" other than alcohol withdrawal. *Winkler,* 893 F.3d at 893. Kohl "did not ignore [Cross's] distress, but rather provided medication to address the condition that [Kohl] believed [Cross] was suffering from." *Id.*

Blaine cites *Border v. Trumbull Cty. Bd. of Comm'rs*, 414 F. App'x 831, 838 (6th Cir. 2011), where we reversed the district court's determination of no deliberate indifference. Blaine argues that the factual similarities of *Border* to the case at hand similarly necessitates reversal in the instant case. In *Border,* the booking officer failed to assess Border's obvious intoxication, and Border succumbed to drug overdose while in jail. *Id.* at 833. Blaine points out that, like Cross, Border nodded off in his cell and was breathing heavily while sleeping in the cell. *Id.* at 832–33. However, several additional facts were present in *Border* to demonstrate that the defendants were deliberately indifferent to Border's medical needs. Border exited his vehicle with a pill bottle in his hand and showed signs of intoxication at the scene of his arrest; Border's eyes were "red/glazed;" he lost control of his bladder while in his cell; an officer responded to these symptoms by saying "f— him;" and an officer deliberately altered several of Border's health

18

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

records four months after his death. *Id.* at 831–35. In contrast, here, neither Kohl nor Sloan saw Cross with any pills, drugs, or other substances, or received information from the police that Cross was in possession of these substances when he was arrested. Instead, Kohl was made aware only that Cross took psychiatric drugs and that he drank alcohol that day. Moreover, the only change in Cross's condition in his cell before he was found unresponsive was that he was snoring. There is no indication that Kohl or Sloan deliberately decided not to take part in, or to ignore, Cross's medical care. The booking official in *Border* was not a medical professional conducting a health assessment; here, Kohl conducted the initial intake and assessed Cross, and Sloan observed him. Though Kohl created a second Note, she did not destroy or replace the 5:18 PM Note, and in fact, she timestamped the second Note.

As the district court noted, the time of the second Note—9:49 PM—indicates the Note was written after Kohl assessed Cross and determined that his symptoms indicated alcohol consumption, assigned him to the second floor and bottom bunk, and provided instructions to observe him every eight hours. It may be that this second Note provides some indirect evidence as to whether Kohl had a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834. However, the contents of the Note ultimately do not "demonstrate that [Kohl] considered an alternative, more serious diagnosis but refused to verify that [Cross's] symptoms were consistent with such a condition," *Rouster*, 749 F.3d at 451–52, or that Kohl otherwise ignored Cross's medical condition.

Accordingly, we affirm the district court's holding that Blaine has not presented sufficient evidence to demonstrate that Kohl was deliberately indifferent in her assessment of Cross.

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

B.      Deliberate Indifference Against Sloan

Similarly, Blaine has not demonstrated that Sloan was subjectively aware of Cross's serious medical needs and was deliberately indifferent to his welfare.  From her telephone conversation with Kohl, Sloan knew that Cross was being transferred to the observation floor. Sloan observed Cross acting normally with the other inmates when he arrived at Observation Cell 2.  She also observed Cross eating, and she heard him snoring.  She was not due to check on him for another four hours, per Kohl's assessment.  From these undisputed facts, it is not apparent that Sloan even had the facts from which to draw an inference regarding Cross's serious medical condition of drug overdose.

Blaine argues that because Cross was placed in an observation cell, it was apparent that Cross required a higher level of medical care.  Thus, Blaine maintains that Sloan should have questioned Kohl further or asked to see Cross's medical records.  However, Sloan herself observed Cross, and there was no indication from Sloan's observations of Cross that he had a serious medical condition which would necessitate inquiry further than the intake assessment recommending that Cross be observed every eight hours.  *See Winkler*, 893 F.3d at 894 ("[The defendant] argues that Nurse Johnson should have gathered more information about [the inmate's] condition . . . . Although Nurse Johnson's actions might have fallen below a reasonable standard of care, she did not disregard [the inmate's] complaints." "Nothing in these facts suggests that Nurse Johnson perceived that [the inmate] was suffering from anything other than opiate withdrawal.").

Blaine also argues that Sloan should have checked on Cross when she heard him snoring because snoring is one indicator that a person is suffering from respiratory distress and/or unconsciousness, or both.  Consequently, Blaine contends that Sloan's failure to identify or investigate the actual cause of Cross's snoring demonstrates Sloan's deliberate indifference

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

towards Cross.  However, "[Cross's] weakness at that time would not necessarily have indicated a serious medical condition." *Rouster*, 749 F.3d at 450.  As Sloan explained in her deposition, snoring alone, without other noticeable symptoms, can indicate sleep apnea, and it is not otherwise indicative of respiratory distress from drug overdose.  No other indicators were present that would have led Sloan to perceive facts indicating that Cross was suffering from a drug overdose.  At the most, Blaine's argument that Sloan should have acted when she heard Cross snoring amounts to an allegation of "inadvertent failure to provide adequate medical care," which is insufficient to rise to deliberate indifference.  *Estelle*, 429 U.S. at 105.  Blaine must show "that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and that the official acted with a culpable enough state of mind, rising above gross negligence." *Rhinehart*, 894 F.3d at 737 (citing *Farmer*, 511 U.S. at 834–35).

Blaine points to two deficiencies on Sloan's part: her failures (1) to ask for the requisite medical paperwork, or otherwise question Kohl for more information than what Kohl relayed to her on the phone, and (2) to interpret Cross's snoring as a serious medical condition.  Neither of these alleged mistakes rises to the level of "obduracy and wantonness," particularly when Sloan herself saw no indications that Cross was suffering from a serious medical condition.  *Wilson*, 501 U.S. at 299.  "Because the nursing staff did not know that [Cross] suffered from a serious medical ailment, and they instead interpreted his symptoms as indicating a different condition, for which they provided appropriate treatment, they were not deliberately indifferent to his medical needs." *Rouster*, 749 F.3d at 453.  Moreover, "[n]o record evidence indicates that any member of the nursing staff ever suspected that [Cross] was suffering from a more serious condition than alcohol withdrawal." *Id.*

21

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

Accordingly, we affirm the district court's holding that Blaine has not presented sufficient evidence to demonstrate that Sloan was deliberately indifferent in her care of Cross.

C.      Deliberate Indifference Against Corizon

Blaine appears to allege that Cross suffered harm as the result of Corizon's policies or practices of (1) allowing LPNs to conduct initial assessments, (2) relying upon LPNs to determine whether to call a physician, and (3) providing medical staff with the option to wait hours before checking on impaired inmates ultimately caused harm to Cross.

Though Blaine asks us to engage in an inquiry of whether Corizon's policies or practices were a "moving force behind" Cross's death, *id.* at 453 (quotation omitted), neither Blaine nor Corizon has provided Corizon's official written polices or procedures for the record.  Instead, both parties rely upon deposition testimony from Alicia Pennington, the Senior Correctional Nurse Specialist at Corizon, in which she stated that an inmate who has been admitted to the jail in an intoxicated state is to be awakened once every eight hours.  This is in accordance with the procedure Kohl and Sloan followed for Cross, and, as discussed, neither Kohl nor Sloan violated Cross's constitutional rights in so doing.

Pennington's deposition testimony appears to refer to various written policies and procedures, but these documents are not before us.  Other than Pennington's deposition, there is no mention of Corizon's policies in the record.[5]  We cannot evaluate Blaine's claim based on this insufficient evidence.  *See North*, 2018 WL 5794472, at *7 ("[A] plaintiff pursuing an affirmative policy or custom claim against a municipal entity must (1) show the existence of a policy,

---

[5] It is unclear why the written policies and procedures are not in the record.  At oral argument, Plaintiff's counsel initially seemed surprised to learn that they were not in the record, before confirming in rebuttal that this was the case.  (Dec. 5, 2018, Oral Arg. 7:38-8:51; 25:03-25:48.)  It was error not to include the policies and procedures in the record, as they are central to the case.  Plaintiff's counsel should have obtained these documents during the course of discovery, or otherwise sought to compel their production. It is unfortunate that we are unable to consider a claim due to counsel's failure to submit documents.

22

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

(2) connect that policy to the municipality, and (3) demonstrate that his injury was caused by the execution of that policy." (citation omitted)).  For instance, Blaine claims that "Corizon did not require an assessing LPN like Kohl to contact a physician or ARPN about an intoxicated inmate like Cross until the end of her shift," (Appellant Br. at 13), and cites Pennington's deposition as support; however, it is unclear if this is actually Corizon's policy.  (*See* Pennington Dep., R. 109-6, Page ID # 1048–49 (stating that an LPN was able contact a physician "*sometime* on her shift.  It's different [depending on the medical severity]."  "So at some point in the shift, she would have called the doctor if he was on a withdrawal protocol . . . .") (emphasis added)).

The only evidence of a written Corizon policy available to this court is included in Cross's medical intake records.  The Withdrawal Initial Screening & Treatment Plan states that an LPN conducting the initial assessment had the ability to call a physician or qualified healthcare professional for immediate assistance if the LPN perceived that such necessity was present; for instance, it says, in all capital letters, "notify physician immediately if severity score increases any time during withdrawal," and "Severe Withdrawal – Immediate provider notification required." *See* Withdrawal Initial Screening & Treatment Plan, R. 103-2, Page ID # 660.  However, if the LPN determined that a serious risk of harm was not present, the LPN was not required to call a physician.  In other words, nothing in Corizon's policies prevented an LPN from calling a physician, and in fact, if an assessment or the intake itself yielded such severity, an LPN was required to call a physician.

Accordingly, even from the policies and protocols that are available from the record, we are unable to find evidence of a constitutional violation stemming from Kohl and Sloan's failure to call a physician or advanced practicing registered nurse.  It is true that "[a]n official's failure to follow applicable policies and protocols can be persuasive evidence of deliberate indifference in

23

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

the Eighth Amendment context," *North*, 2018 WL 5794472, at *3, though "the failure to follow internal policies, without more, [does not] constitute deliberate indifference," *Winkler*, 893 F.3d at 891. Blaine must show that Kohl and Sloan were "subjectively aware of information from which [they] could have inferred a substantial risk to [Cross's] health, and that [they] acted with reckless disregard to that risk." *Id.* at 892.

Based upon Cross's normal vital signs, the results of his assessment at the intake, and his concession that he had consumed alcohol that day, Kohl determined that Cross was suffering from alcohol intoxication and that observation and reorientation were needed, not immediate physician assistance. It is not that Kohl or Sloan determined Cross's medical condition was severe and required physician assistance, and then they both deliberately disregarded that risk, in contravention of Corizon policy. Rather, neither Kohl nor Sloan determined that Cross's medical condition was of a such severity so as to warrant immediately calling a physician. This does not constitute deliberate indifference, but rather, is a professional medical assessment in accordance with what Blaine has presented to this court as Corizon's policies and protocols.

To the extent that Blaine argues that Corizon failed to adequately train its medical staff, again, Blaine "provides no supporting evidence or explanation . . . that the training was inadequate . . . ." *Winkler*, 893 F.3d at 904. "Because [Blaine] has not . . . otherwise explained how [Corizon's] training . . . was inadequate, the record would not support a jury finding that [Corizon] exhibited deliberate indifference toward inmates at the [facility] by failing to adequately train its medical staff." *Id.* at 905 (citing *Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.")).

Case No. 18-5224, *Blaine v. Louisville Metro. Gov't*

Blaine does not "identify a specific policy that reflects deliberate indifference to [Cross's] right to adequate medical care." *Id.* Accordingly, we affirm the district court's grant of summary judgment regarding the claim of Corizon's deliberate indifference of medical care.

D.      State Law Claims Against Corizon

Finally, we affirm the district court's dismissal of the state law claims. "A federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *see also Winkler*, 893 F.3d at 885 (affirming the district court's decision to decline to exercise supplemental jurisdiction over the remaining state law claims after the district court determined that the defendants—a detention center's contracted medical provider, jail personnel, and members of the medical provider's staff—were not deliberately indifferent to the inmate's medical needs).

## V.  CONCLUSION

The facts of this case are tragic. However, in the end, the facts support a case of misdiagnosis rather than one of deliberate indifference. Thus, for the reasons stated above, we **AFFIRM** the district court's grant of summary judgment.